1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 38

3   ---------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,       :   Indictment
4                                              :   No. 1934N-18
              -against-                        :
5                                              :
    DUANE T. COSTA,                            :   ATT-MURD 1
6                                              :
                        Defendant.            :   Calendar Call
7   ---------------------------------------------X

8                                    October 5, 2021

9                                    262 Old Country Road
                                     Mineola, New York
10

    B E F O R E:
11
          HONORABLE PATRICIA A. HARRINGTON,
12            -   Acting Supreme Court Justice

13
    A P P E A R A N C E S:
14
              HON. JOYCE A. SMITH
15            Acting Nassau County District Attorney
              For the People
16            BY:  RYAN R. NELSON, ESQ.,
                             Assistant District Attorney
17                           of Counsel.

18            LORI GOLOMBEK, ESQ.
              Attorney for Defendant
19                114 Old Country Road - Suite
                  Mineola, New York  11501
20

21              *          *          *

22
                                     LISA H. WINKLER
23                                   Senior Court Reporter

24

25

                                                        lhw

Proceedings                          2

1              THE CLERK:  This is indictment 1934N of 2018,

2      the People versus Duane Costa.

3              Counsel, your appearance, People.

4              MR. NELSON:  For the People, Assistant

5      District Attorney Ryan Nelson.  Good afternoon, Judge.

6              THE COURT:  Good afternoon.

7              MS. GOLOMBEK:  Good afternoon, your Honor.

8      Good afternoon, everyone.  For Duane Costa, Lori

9      Golombek, 114 Old Country Road, Mineola, New York.

10             THE COURT:  Good afternoon.

11             THE CLERK:  You are Duane Costa?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Good afternoon, Mr. Costa.  Long

14     time no see, huh?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Yeah.  So you have a document in

17     front of you that is called a Waiver of a Jury Trial.

18     You know -- and I know you know this -- under the

19     Constitution of the United States, you are entitled to

20     a trial by jury.

21             THE DEFENDANT:  Yes.

22             THE COURT:  And do you wish to waive that

23     trial by jury and have a trial just with me as the

24     finder of fact?

25             THE DEFENDANT:  Yes.

Proceedings                          3

1          THE COURT:  Okay.  Very good.

2          Any questions about that?

3          THE DEFENDANT:  No.

4          MS. GOLOMBEK:  Your Honor, I just want to

5     make a record that I have advised my client that I

6     recommend that he go with a trial by jury, since there

7     would be 12 people, and all 12 people would have to

8     come to a unanimous verdict.

9          Of course, the decision is his, Judge, and I

10    have discussed that with him at the jail quite a few

11    times, Judge.  I just want the record, you know, to

12    reflect on the record that I have recommended that he

13    go with a trial by jury, just because there is 12

14    people versus one trier of fact, your Honor.

15         THE COURT:  Uh-huh.  Okay, thank you.

16         MS. GOLOMBEK:  Okay.  Thank you.  Nothing

17    personal, your Honor, as you know.

18         THE COURT:  It's not personal.

19         And you understand all that, Mr. Costa,

20    correct?

21         THE DEFENDANT:  Yes, I do.

22         THE COURT:  But today you wish to waive a

23    jury trial and go with just me as the finder of fact,

24    correct?

25         THE DEFENDANT:  Yes.

                                          lhw

Proceedings                    4

1              THE COURT:  Okay.  So can we unhook so he can

2     sign that document.

3              Mr. Costa, let me just quickly ask you, has

4     anyone made any threats or tried to force you in any

5     way to waive a trial by jury?

6              THE DEFENDANT:  No.

7              THE COURT:  Okay.

8              (Defendant and counsel conferred.)

9              THE DEFENDANT:  Your Honor -- your Honor, no

10    problem.

11             THE COURT:  I just want to explain to you,

12    Mr. Costa, with the scheduling, all right?

13             So we are going to start next Wednesday, the

14    13th, and we will work on the 13th and the 14th.  And

15    then, because there is an issue with the prosecutor and

16    then I have a vacation planned, we won't be able to

17    continue until November 15th.  So I just want you to

18    know that, that there were a couple of things that are

19    going to -- that I just couldn't accommodate you a

20    continual trial.

21             The only way I can accommodate you a

22    continual trial is if we started November 15th, so if

23    that's something you want to talk to your attorney

24    about, that's fine, you can talk to her about it.  But

25    I wanted to get started so we can see where we are

Proceedings                        5

1        going and the witnesses.  That was my thought.

2                    THE DEFENDANT:  Yes, I'm right along with

3        you.

4                    THE COURT:  Okay.  Very good.

5                    So then anything further for the record,

6        Mr. Nelson?

7                    MR. NELSON:  Yes, Judge, very briefly.

8                    People maintain their readiness for trial and

9        are ready to start October 13th.

10                   THE COURT:  Very good.

11                   Anything further for the record,

12       Ms. Golombek?

13                   MS. GOLOMBEK:  Yes, your Honor.  On the 13th,

14       Judge, we have a conference, and I have some motions in

15       limine I will be making the 13th.  I also have a

16       Sandoval hearing on the 13th as well.

17                   THE COURT:  Yes.  We will do all that.  The

18       trial will start at eleven o'clock.  We will do the

19       Sandoval and you will have your motions in limine at

20       that time, Ms. Golombek.  And I anticipate we will

21       start with testimony at 2:30 -- 2:15, 2:30 that

22       afternoon, all right?

23                   MS. GOLOMBEK:  Thank you.

24                   THE COURT:  All right.  So I will see you

25       again, Mr. Costa, on October 13th, next Wednesday.

                                                        lhw

Proceedings                    6

1          THE DEFENDANT:  All right.

2          THE COURT:  All right.  Have a good rest of

3     the day, everybody.

4          MR. NELSON:  Thank you, Judge.

5

6               *              *              *

7

8          The foregoing is hereby certified to be a true and

9     accurate transcript of the proceedings as transcribed

10     from the stenographic notes.

11

12

13

14     _____
       LISA H. WINKLER
15     Senior Court Reporter

16

17

18

19

20

21

22

23

24

25

lhw

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 38

3   ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK      : Indictment
4                                            : No. 1934N-18
            -against-                        :
5                                            :
    DUANE COSTA,                             :
6                                            :
                        Defendant.           : Trial
7   ------------------------------------------X

8                               October 13, 2021

9                               262 Old Country Road
                                Mineola, New York
10

11  B E F O R E:

12      HONORABLE PATRICIA HARRINGTON,
                Acting Supreme Court Justice
13

14  A P P E A R A N C E S:

15          HON. JOYCE SMITH
            Acting Nassau County District Attorney
            BY:  JARED ROSENBLATT, ESQ.
16               - and -
            RYAN NELSON, ESQ.
17          Assistant District Attorneys
                    For the People
18

19          LORI GOLOMBEK, ESQ.
            114 Old Country Road
20          Mineola, New York
                    For the Defendant
21

22              *           *           *

23
                            CHRISTINE FREYEISEN
24                          Senior Court Reporter

25

1          (Whereupon, proceedings, having been

2      previously conducted, were not herein transcribed for

3      purposes of this transcript.)

4          THE COURT:  All right, Mr. Rosenblatt, do

5      you want to call your first witness?

6          MR. ROSENBLATT:  Yes, the People call

7      Officer Kenneth Kraemer.

8          (Whereupon, the witness entered the

9      courtroom.)

10

11   K E N N E T H  K R A E M E R, Police Officer, called on

12   behalf of the People, having been duly sworn, took the

13   witness stand and testified as follows:

14

15          THE CLERK:  Please state your name and spell

16      your name for the record.

17          THE WITNESS:  Kenneth Kraemer.

18      K-E-N-N-E-T-H  K-R-A-E-M-E-R.

19          THE CLERK:  Please state your shield number

20      and your command.

21          THE WITNESS:  My shield is 3028 and my

22      command is the Third Precinct.

23          THE COURT:  Good afternoon, Officer.

24          Mr. Rosenblatt, you may inquire.

25          MR. ROSENBLATT:  Thank you, your Honor.

1   DIRECT EXAMINATION BY

2   MR. ROSENBLATT:

3        Q.    Good afternoon, Officer Kraemer.

4        A.    Good afternoon.

5        Q.    Tell the Court, do you work?

6        A.    Excuse me?

7        Q.    Do you work?

8        A.    I do work.

9        Q.    What type of work do you do?

10       A.    I'm a police officer.

11       Q.    For how long have you been working in law

12   enforcement?

13       A.    Coming on completing 16 years.

14       Q.    Has your entire tenure in law enforcement been

15   with the Nassau County Police Department?

16       A.    It has.

17       Q.    Where are you currently assigned?

18       A.    I'm in the Third Precinct.

19       Q.    Back in 2018, where were you assigned?

20       A.    The Bureau of Special Operations.

21       Q.    I want to talk to you a little bit about the

22   Bureau of Special Operations.

23             How long did you work there?

24       A.    A total of eight years.

25       Q.    When did you start?

1      A.    2013, I believe in October.

2      Q.    You were there until?

3      A.    July of this year.

4      Q.    What are the duties and responsibilities of

5   somebody in the Bureau of Special Operations?

6      A.    We are Nassau County's tactical team.  Any

7   hostage barricade, high risk search warrant, we're the

8   people you call for them.

9            We also help out detectives when they have

10  probable cause to make an arrest on a subject.  Most of the

11  time we're in plainclothes though and unmarked cars doing

12  basically anticrime patrol, within the whole County.

13     Q.    When you say doing anticrime, what does that

14  mean?

15     A..   Street level, guns, drugs, weapon, any other

16  weapons, just enforcement within communities.

17     Q.    Officer Kraemer, I want to talk to you now about

18  the evening of October 27th into the early morning of

19  October 28th, 2018.

20           Were you working on that day and at that time?

21     A.    I was.

22     Q.    Do you remember what your shift was that day?

23     A.    Yeah, I was working 3:30 in the afternoon until

24  1:30 in the morning.

25     Q.    Back on October 27th into October 28th of 2018,

1    where were you assigned to work by the Bureau of Special

2    Operations?

3        A.    In the Village of Hempstead.

4        Q.    In summary, what were you doing that night?

5        A.    I was basically enforcement within that area,

6    showing a presence.  There was an uptick of gang activity

7    in that area during that timeframe.

8              MS. GOLOMBEK:  I'm sorry, I didn't hear the

9        word.

10       A.    Uptick.

11             MS. GOLOMBEK:  Uptick of?

12       A.    Gang activity.

13             MS. GOLOMBEK:  Objection, your Honor.

14             THE COURT:  Overruled.

15       Q.    That evening of October 27th into the early

16   morning of October 28th, were you working alone or with a

17   partner?

18       A.    With a partner.

19       Q.    And on that particular day, were you dressed in

20   plainclothes?

21       A.    I was.

22       Q.    Who was your partner that day?

23       A.    Thomas Rilling.  R-I-L-L-I-N-G.

24       Q.    Now, on October 27th into the 28th were you and

25   Officer Rilling in one vehicle or more than one vehicle?

1     A.    One.

2     Q.    That one vehicle, was it marked or unmarked?

3     A.    Unmarked.

4     Q.    What kind of car was it?

5     A.    Chevy Tahoe.

6     Q.    Now, on October 27th and 28th, that Chevy Tahoe

7   that you and Officer Rilling were inside of, did it have

8   lights and sirens available to be used?

9     A.    Yes.

10    Q.    Tell us about that.

11    A.    If you flip the switch, the lights will go on.

12  If you flip another switch, the sirens will go on.

13    Q.    Now, I want to turn your attention to

14  October 28th at approximately 12:45 in the morning.

15        Tell the judge what happened on October 28th at

16  that time.

17    A.    We were traveling eastbound on Vancott Avenue in

18  Hempstead and there was a black Altima in front of us.

19  That Altima made a left turn onto Lafayette Avenue and it

20  didn't signal and that's going north now.

21        We also made the left onto Lafayette Avenue,

22  around the vicinity of Meriam Street.  We activated our

23  lights and then we chirped our sirens and we conducted a

24  VTL stop in the vicinity of Midwood Street and Lafayette

25  Avenue.

1          Q.   I want to back up a little bit and talk through

2     what you told the Court.

3               When you first observed the car, approximately

4     where were you in relation to it?

5          A.   Approximately three to four houses behind it,

6     traveling in the same direction.

7          Q.   At the time that you stopped or you attempted to

8     stop it, how far did it go until it stopped?

9          A.   It went a block, went from like Meriam to Midwood

10    but it's a short block.

11         Q.   When it traveled that short block, did the car

12    pull over?

13         A.   It did.

14         Q.   Now, at the time that it pulled over, were

15    your -- was your lights, your police lights active?

16         A.   Yes.

17         Q.   And you indicated you chirped it.

18              What sound does that make?

19         A.   It's like a quick on/off with the siren.

20         Q.   Letting them know you're a police vehicle?

21         A.   That there was --

22              MS. GOLOMBEK:  Objection.

23              Leading the witness.

24              Move to strike.

25              MR. ROSENBLATT:  I'll rephrase.

1     Q.    What is the purpose of the chirp?

2     A.    The purpose of the chirp, if they don't notice

3   the lights behind them, if you have a sound it let's them

4   know the police are behind them.

5     Q.    As the lights were on and you chirped it, you

6   said after a short block that car pulled over?

7     A.    It did.

8     Q.    Now, on October 28th, we're now in the early

9   morning hours of October 28th, who was driving at that

10  time?

11    A.    I was.

12    Q.    Where was Officer Rilling sitting?

13    A.    Front passenger seat.

14    Q.    As the car was pulled over, what happened?

15    A.    At that point I exited the driver's side, pulled

16  my shield out from my sweatshirt and approached the driver

17  of that Altima on foot.

18    Q.    As you got out of the car you told us you took

19  your shield out.

20          What did Officer Rilling do?

21    A.    He exited the vehicle also and approached the

22  passenger side of the same vehicle.

23    Q.    At that time, did you observe whether his shield

24  was out?

25    A.    I did.

1          Q.    Was it?

2          A.    Yes.

3          Q.    As you approached that car, did you have any idea

4     who was inside of it?

5          A.    No.

6          Q.    Meaning, at the time, did you have any prior

7     relationship with the driver or the passenger?

8          A.    No.

9          Q.    As you approached the car, tell the Court what

10    happened.

11         A.    Both windows were opened, I shined my flashlight

12    in the car and I proceeded to ask the driver for her

13    identification, her license specifically.

14              As I'm talking to her I can smell the distinct

15    odor of alcoholic beverage from within the cabin of the

16    car.

17              MS. GOLOMBEK:  Objection.

18              Compound answer.  Move to strike the last

19         part.  It doesn't answer -- it's not responsive to the

20         question, your Honor.

21              The question is what did you say, not what

22         did you smell.

23              MR. ROSENBLATT:  I'll rephrase the question.

24              THE COURT:  Your objection is sustained and

25         the second part of that answer regarding smelling

1    alcohol will be stricken.

2         Go ahead, Mr. Rosenblatt, and ask the next

3    question.

4    Q.   Tell us what happened when you approached the

5    driver's side.

6    A.   I shined my flashlight inside the vehicle.  I

7    asked the driver for her license and I could smell the odor

8    of alcoholic beverage within the cabin of the vehicle

9    emanating.

10   Q.   When you shined the light inside the vehicle,

11   what, if anything, did you observe?

12   A.   I also noticed the front passenger didn't have a

13   seatbelt on.  That's about it at that point.

14   Q.   Now, did you come to learn the name of the

15   driver?

16   A.   I did.

17   Q.   What was that person's name?

18   A.   April Grant.

19   Q.   Did you ultimately come to learn the name of the

20   front seat passenger?

21   A.   I did.

22   Q.   Who was that person?

23   A.   Duane Costa.

24   Q.   Do you see Mr. Costa in the courtroom today?

25   A.   I do.

1    Q.    Can you tell us what is he wearing, point and

2    identify something that --

3    A.    A blue suit and a red striped tie.  Red and blue.

4            THE COURT:  The record will reflect the

5    witness has identified the defendant.

6            MR. ROSENBLATT:  Thank you, your Honor.

7    Q.    As you were speaking to Ms. Grant, the driver,

8    you told us you asked for identification.

9            Did Ms. Grant provide you with that?

10   A.    She did.

11   Q.    Did she say -- withdrawn.

12           As you observed Ms. Grant's identification, could

13   you hear what the defendant was saying to Officer Rilling?

14   A.    I couldn't.

15           MS. GOLOMBEK:  Objection.

16           Assumes --

17           THE COURT:  Sustained.

18   Q.    Was the defendant talking at that time?

19   A.    Yes.

20   Q.    Could you hear him?

21   A.    Yes.

22   Q.    What did he say?

23   A.    He said I just came from a bar, I'm on my way

24   home.

25   Q.    At that time, where were you looking?

1  A.   Within the cabin of the car.

2  Q.   What did you see at that time?

3  A.   At that time I heard my partner ask for

4  identification from --

5          MS. GOLOMBEK:  Objection.

6          Not responsive.  The question is what did

7     you see.  He indicated what he heard.

8          THE COURT:  Sustained.

9  Q.   What happened at that time?

10  A.   At that time I saw the defendant go for his ID

11  and when he reached down towards his pocket I saw him

12  adjust a large bulge underneath his jacket.

13  Q.   When you observed that what happened next?

14  A.   I asked the driver to exit the vehicle and I

15  heard my partner ask the defendant to exit the vehicle.

16  Q.   Now, at that time when you did that, that is you

17  speaking to Ms. Grant and Officer Rilling speaking to the

18  defendant, what happened next?

19  A.   Ms. Grant exits the vehicle and I see the

20  defendant exit his side of the vehicle and as he's exiting

21  I also see him give my partner a shove.  My partner takes a

22  couple of steps back and I see the defendant run eastbound

23  on Midwood Street.

24  Q.   As you observed the defendant push Officer

25  Rilling, where did he go?



1    A.    Eastbound on Midwood Street and he went directly
2  for his waistband with his right hand.

3    Q.    As he did that, you indicated with your arm going
4  to his waistband, approximately how far was the defendant
5  from you at that time?

6    A.    He's across the car and a little bit forward, I
7  would say no more than twenty feet.

8    Q.    As you observed the defendant go to his
9  waistband, what happened next?

10    A.    He continues eastbound.  My partner starts
11  running eastbound after him and soon after that I hear a
12  loud metallic object hit the ground and defendant goes back
13  into his waistband again.

14    Q.    At the time that you heard the metallic item hit
15  the ground that you described how far were you from the
16  defendant, approximately?

17    A.    At that time I would say 30 to 40 feet.

18    Q.    As you observed -- what was Officer Rilling doing
19  at that time?

20    A.    He was running also eastbound on Midwood.

21    Q.    What were you doing?

22    A.    I was coming around the car and I got on the same
23  sidewalk running eastbound on Midwood also.

24    Q.    When you say you got on the sidewalk, where were
25  you going?




1      A.    After the defendant.

2      Q.    Running?

3      A.    Yes.

4            MS. GOLOMBEK:  Objection.

5            Leading the witness, your Honor.

6            THE COURT:  Yes, but I'll overrule it.

7            Technically you're right but I'll overrule

8      for now.

9      Q.    As you and Officer Rilling were chasing the

10     defendant you indicated he was going to his waistband

11     again?

12     A.    Correct.

13     Q.    Describe what you saw.

14     A.    I saw his right hand go into his waistband and

15     then it came back out with a gun in his right hand.

16     Q.    Could you see the gun?

17     A.    I did.

18     Q.    At the time that you saw the gun being removed

19     from the defendant's waistband, approximately how far were

20     you?

21     A.    The same 30, 40 feet.

22     Q.    Were you still running?

23     A.    I was.

24     Q.    And the defendant was still running?

25     A.    Yes.

1      Q.    And as the defendant was going to his waistband,
2   did he ever stop running?

3      A.    No.

4      Q.    At that time, did you stop running?

5      A.    No.

6      Q.    What happened next?

7      A.    The defendant got halfway or three-quarters of a
8   way down the block and I heard a loud bang and I saw a
9   muzzle flash.  I heard two pops go off.

10         At that point I was catching up to my partner
11   to -- actually I saw -- I was catching up on the right side
12   of him, he was on the left.  He stopped and took a stance
13   with his gun out and I ran past my partner to stay in foot
14   pursuit.

15      Q.    I want to focus in on what you told us you saw.
16         You said you saw a muzzle flash.  What is that?

17      A.    I said multiple muzzle flashes.  When a gun
18   discharges a bullet especially at nighttime you can see
19   like an explosion out the front of the weapon.  And I saw
20   multiple of them.

21      Q.    Where was that muzzle flash coming from at the
22   time that you saw it?

23      A.    From the end of the gun that he pointed back at
24   us.

25      Q.    Can you show the judge what the defendant was

People - Kraemer - People - Direct

16

1    doing when you saw the muzzle flash?

2        A.    He's running eastbound and he turns back and two

3    quick rounds and then another, came down a little bit and

4    then another round after that (indicating).

5            Three muzzle flashes while he's running down

6    Midwood Street.

7                THE COURT:  The record will reflect the

8        witness turned to his right and with his right arm

9        pointed behind him.

10       Q.    At the time that you observed the muzzle flashes

11   you described multiple times, what did you hear?

12               MS. GOLOMBEK:  Objection.

13               Leading the witness, your Honor.  Assumes

14       fact not in evidence, your Honor, as to the hearing,

15       your Honor.

16               THE COURT:  Please rephrase.

17       Q.    As you see the muzzle flash, what, if anything,

18   did you hear?

19       A.    Loud bangs.

20       Q.    Describe that to the Court.

21       A.    The explosion of a weapon going off it makes a

22   very loud sound.  Winds up later on when we recovered it,

23   it was a very large weapon that was fired.

24               MS. GOLOMBEK:  Objection as to the large

25       weapon that we recovered.  It's not responsive to the

- CDF -

1          question, your Honor.

2                    Move to strike.

3                    THE COURT:  Objection sustained.

4                    The response after very loud bang will be

5          struck.

6                    MR. ROSENBLATT:  The question is, what did

7          you hear?

8                    THE COURT:  And he talked about later on

9          when they recovered the gun, so that's not really

10         responsive to the question.

11         Q.    Can you describe the sound you heard for the

12    Court.

13         A.    It's a loud crack, like a very loud explosion

14    sound, like a big firecracker.

15         Q.    As you heard and saw what you described, what did

16    you do?

17         A.    I kept running but very soon after that, in my

18    peripheral vision I saw there was other BSO cops not

19    associated with this car stop that had an arrest on

20    Clinton.  When you're on Midwood it goes right to Clinton,

21    it's perpendicular.  They had a car stop on that northeast

22    corner over there, they had somebody under arrest out of

23    their car, I saw another BSO officer come running at me --

24                    MS. GOLOMBEK:  Objection, Judge.

25                    It's a narrative and the question is what

1    did you see, not what did you do and now you have what

2    he saw.

3              THE COURT:  I think what he did and what he

4    saw are related to each other.

5              I'm going to overrule that objection.

6    A.    Another BSO officer came at me in a fighting

7    stand with his gun out and his gun was pointed directly at

8    me, so -- should I proceed?

9    Q.    Tell the Court what happened.

10    A.    At that point I put my hands up (indicating)

11    because I'm in a black sweatshirt and plainclothes and I

12    yell blue, blue, blue, which is a code word for a police

13    interaction and so he knew that I was a police officer --

14              MS. GOLOMBEK:  Objection as to so that he

15    knew.  That's speculation.

16              THE COURT:  What speculation?  He's telling

17    you about what he did and what he saw.

18              MS. GOLOMBEK:  And the phrase so that the

19    officer knew what he was doing.  That's what I'm

20    objecting, Judge.

21              THE COURT:  Overruled.

22    A.    That's a code word we use in training to let

23    other people know we're police officers in a situation like

24    that.

25              THE COURT:  You don't know if he knew then

1    that you were a police officer, right, you just said

2    it because that's what you're supposed to do?

3              THE WITNESS:  That's a safe word, yeah.

4        Q.    At the time that you're running down the street

5    and you've indicated you put your hands and your arms up in

6    the air, who did you see?

7        A.    It was Officer Denehy.  D-E-N-E-H-Y.

8        Q.    As you observed Officer Denehy at that time, what

9    was he doing?

10       A.    Pointing his gun at me.

11       Q.    At the time that you yelled blue, as you told the

12   Court, what did Officer Denehy do at that point?

13       A.    It took me a couple of times for him -- to have

14   him take his gun off of me.  Once he did he yelled at me,

15   are you shooting and I said no, he is and then Officer

16   Denehy ran southbound on Clinton.

17       Q.    At the time that you were running after the

18   defendant and you observed Officer Denehy, how far were you

19   at the time that you eventually stopped running towards him

20   from him?

21       A.    I would say 150 feet.

22       Q.    Say again?

23       A.    150 feet.

24       Q.    From Officer Denehy?

25       A.    Right.

PO Kraemer - People - Direct

1    Q.    At the time that you yelled blue and you stopped,

2    how close were you?

3    A.    I came to a full stop right away, within a couple

4    of feet, I just froze right there and stopped.

5    Q.    At the time that you froze and you indicated

6    Officer Denehy takes his firearm off of you, where does he

7    go?

8    A.    The defendant made a right turn on Clinton to go

9    south and Officer Denehy went in that same direction.

10    Q.    So if I'm you and you're Officer Denehy, as I'm

11    running towards you, which way is the defendant going?

12    A.    South would be a right onto Clinton, off Midwood.

13    Q.    To your left, that way (indicating)?

14    A.    I'm sorry?

15    Q.    I'm you, running at Officer Denehy, and you're

16    Officer Denehy?

17    A.    Yeah.

18    Q.    As I'm running towards you, which way is he --

19    A.    Officer Denehy is on my left.

20    Q.    Where does the defendant go?

21    A.    Defendant makes a right onto Clinton.

22    Q.    The defendant runs to my right, your left?

23    A.    Right.

24            MS. GOLOMBEK:  Judge, can we --

25            MR. ROSENBLATT:  I'll use photographs,

1        Judge.

2                      THE COURT:  You can't speak at the same

3        time.

4                      MR. ROSENBLATT:  I'll use the photograph.

5                      THE COURT:  Ms. Golombek, what did you have

6        to say?

7                      MS. GOLOMBEK:  Rather than for the record

8        saying left and right, what street was turned on by

9        whom, it makes it clear for the record, it's easier to

10       cross-examine on.

11                     THE COURT:  That's fine, I agree it's easier

12       to figure out what we're talking about.

13                     MR. ROSENBLATT:  I'm going to ask the

14       witness be shown what's been premarked as Exhibits 1

15       through 4.

16                     THE COURT:  1 through 4 for identification.

17                     (Whereupon, the exhibits were handed to the

18       witness.)

19       Q.    Officer Kraemer, do you recognize what's been

20       handed to you as Exhibits 1 through 4?

21       A.    I do.

22       Q.    Let's start with Exhibit 1.  What is it?

23       A.    I see a recovered gun on the grass.  But this is

24       Midwood Street looking eastbound towards Clinton, close to

25       I would say about it starts 80 feet east of Lafayette

1   Avenue.

2       Q.    Is Exhibit 1 a fair and accurate depiction of the

3   direction that you were running on October 28th, 2018 --

4       A.    Yes.

5       Q.    -- when you were chasing the defendant?

6       A.    Yes.

7               MS. GOLOMBEK:  Objection.

8               Move to strike I see a recovered gun.

9   There's been no testimony about the gun recovered.

10              THE COURT:  But as we know this is a

11  non-jury trial and certainly this could be admitted

12  for this purpose now and if it's going to be admitted

13  for another purpose later, that's fine.

14              MS. GOLOMBEK:  Move to strike the gun

15  recovered.

16              That may not go into evidence, your Honor.

17              THE COURT:  Officer, did you say that the

18  gun was recovered?

19              THE WITNESS:  I did, ma'am.

20              THE COURT:  Strike that the gun was

21  recovered.

22              Officer, just talk about what it shows with

23  regard to direction, where you were and what you were

24  doing.

25      Q.    You said it was a photo of Midwood Street?

1    A.    Yes.

2    Q. .  If you could just continue.

3    A.    Facing eastbound towards Clinton.

4    Q.    Is that a fair and accurate depiction of the

5    route you took chasing the defendant down Midwood?

6    A.    It is.

7    Q.    What is Exhibit 2?

8    A.    That's the other end of Midwood -- I don't know

9    if it's the end but it's Midwood Street facing back

10   westbound towards where the car stop occurred.

11   Q.    Would that be a fair and accurate depiction of a

12   photograph of where Officer Denehy was looking at you?

13                  MS. GOLOMBEK:  Objection.

14                  That's not what he testified to.  He just --

15                  THE COURT:  Let him say that, Ms. Golombek.

16                  He's asked the question.  Let the witness

17        say that.

18   A.    Yes, he approached from the north side of Clinton

19   towards Midwood --

20   Q.    What is it --

21                  THE COURT:  But that doesn't show --

22                  THE WITNESS:  Where he is, no.

23                  THE COURT:  It doesn't show where he is,

24        correct?

25                  THE WITNESS:  I can't tell from that angle.

1          THE COURT:  That's the answer.

2              He can't tell, it doesn't show from that

3      angle where Officer Denehy was.

4              MR. ROSENBLATT:  I said is that a view, a

5      photo from where the view he's looking at him.  And

6      he's saying yes.

7      A.    It looks a little west on the block.  I can't

8  tell what's behind it, I can't tell how far down the block

9  we were.

10     Q.    What is --

11             THE COURT:  I'm trying to figure this all

12     out now.

13             Officer Denehy was on Clinton, correct, on

14     the corner of Clinton and Midwood?

15             THE WITNESS:  Correct.

16             THE COURT:  So is that east?  So this photo

17     is looking west, correct?

18             THE WITNESS:  Yeah, but he comes from east

19     towards west.  This picture is looking west

20     (indicating) so he could be starting over here, I just

21     can't tell how far down the block we are, but he comes

22     this way.

23     Q.    It's the other end of Midwood?

24     A.    Right.  If that's the end of Midwood that's where

25  he is, yes.

 1              THE COURT:  But that's not good enough.  If

 2      that's the end of Midwood --

 3      Q.    What is Exhibit 2 to you?

 4      A.    It's Midwood Street looking westbound towards the

 5      car stop.

 6      Q.    What is Exhibit 3?

 7      A.    Exhibit 3 is the south side of Midwood probably

 8      three-quarters of a way down the block towards Clinton and

 9      you could see the gas station in the background.

10      Q.    What is Exhibit 4?

11      A.    That is the gas station.  Once you go south off

12      of Midwood on Clinton, that is the BP gas station.

13      Q.    Are those fair and accurate depictions of the

14      scene from October 28th, 2018?

15      A.    Yes.

16      Q.    Would those photos help describe where you were

17      and the route you took on October 28th, 2018?

18      A.    Yes.

19              MR. ROSENBLATT:  I ask those items be

20          received.

21              THE COURT:  Let's show them to Ms. Golombek.

22              MS. GOLOMBEK:  May I, your Honor?

23              THE COURT:  You want to voir dire?

24              MS. GOLOMBEK:  Yes.

25              THE COURT:  All right.

1    VOIR DIRE EXAMINATION BY

2    MS. GOLOMBEK:

3         Q.    Did you take these photos?

4         A.    No.

5         Q.    Did you see who took these photos?

6         A.    While she was taking them?

7         Q.    Yes.

8         A.    No, ma'am.

9         Q.    You have no knowledge whether they were -- you

10   didn't see whether anybody took these photos on

11   October 28th, 2018, correct?

12        A.    I did not see her taking them.

13             MS. GOLOMBEK:  Objection, your Honor.

14             THE COURT:  Based on what?

15             MS. GOLOMBEK:  It may depict the location

16   but it didn't depict the way it looked on October 28th

17   at that time.

18             I have no objection if it's coming in as the

19   location facing westbound or facing eastbound but I

20   don't know that it was, in fact, taken that evening.

21             THE COURT:  That doesn't matter just as long

22   as the witness can say they fairly and accurately

23   represent the roads at that particular time.

24             MS. GOLOMBEK:  I don't know if it represents

25   on that evening.  It wasn't taken that evening, I see

1    a car, I don't know if that car was there.

2         THE COURT:  Are we talking about,

3    Mr. Rosenblatt, are we just talking about directional

4    purposes that's why those photographs are coming in?

5         MR. ROSENBLATT:  I asked him if it fairly

6    and accurately depicts the location on the early

7    morning hours of October 28th, 2018 and he said yes.

8         I believe that's the proper foundation for

9    the admissibility of these four photographs at this

10   time.

11        THE COURT:  I may have to agree with

12   Ms. Golombek then since this officer doesn't know when

13   they were taken, who knows if that car was parked in

14   that specific position.

15        MR. ROSENBLATT:  He's indicated that it

16   fairly and accurately depicts it.

17        Ms. Golombek says he didn't take a

18   photograph, that's not a foundational --

19        THE COURT:  I agree he doesn't have to take

20   the photographs.  However, if he doesn't know when

21   they were taken.

22        MR. ROSENBLATT:  It doesn't matter.  He's

23   saying they fairly and accurately depict that location

24   that day.  That's what he said.

25        MS. GOLOMBEK:  It does matter, Judge,

Case 2:25-cv-05058-DG    Document 44-11    Filed 02/09/26    Page 34 of 705 PageID #: 91

1    because if there's cars then there's possible

2    witnesses.

3            THE COURT:  Actually, they were taken that

4    day because the gun is pictured in one of the photos

5    and that was found then, that's what we're talking

6    about, so as far as fairly and accurately depicting

7    I'm going to overrule your objection and they're

8    admitted into evidence over your objection.

9            MS. GOLOMBEK:  I'm going to note my

10   exception.

11           THE COURT:  Of course.

12           MS. GOLOMBEK:  Because that might be as to

13   the photo of the gun but it's not as to the photo of

14   the gas station or the cars there.

15           THE COURT:  You have your exception,

16   Ms. Golombek.

17           MS. GOLOMBEK:  Certainly.

18           MR. ROSENBLATT:  Judge, just for the record,

19   as an offer of proof, Officer Krill will testify at

20   some point during this trial and so if your Honor

21   thinks it's insufficient at this time as an offer of

22   proof, subject to the connection later of the officer

23   who took it, it will come in later through that

24   officer as well.

25           THE COURT:  Thank you.

1          (Whereupon, People's Exhibits 1 through 4,

2      previously marked for identification, were received in

3      evidence.)

4          THE COURT OFFICER:  So marked.

5          THE COURT:  Mr. Rosenblatt, do you want

6      these pictures shown back to the witness?

7          MR. ROSENBLATT:  Your Honor, with the

8      Court's permission may those be given to the witness

9      and may I publish so everyone in the room can see the

10     photos on the TV?

11         THE COURT:  Are you going to use this

12     witness on the TV to point things out?

13         MR. ROSENBLATT:  I just want to publish the

14     exact duplicate I showed Ms. Golombek earlier on the

15     TV while he has the photos in front of him.

16         THE COURT:  Sure.

17 CONTINUED DIRECT EXAMINATION BY

18 MR. ROSENBLATT:

19     Q.   Just so the record is clear, Officer Kraemer, you

20 have in front of you those four photographs, correct?

21     A.   Yes.

22     Q.   And on screen I've published an exact duplicate

23 of Exhibit 1.  Do you see that?

24     A.   I do.

25     Q.   Is that the same item you have in front of you?

1    A.    It is.

2    Q.    Now that this item is up, can you describe to the

3    Court what you were doing going down this sidewalk on

4    October 28th?

5    A.    I was running after the defendant.

6    Q.    Is this the view that you had running after the

7    defendant that early morning hours?

8    A.    Yes.

9    Q.    Now on the screen what's in evidence as

10   Exhibit 2.

11         Do you have that in front of you?

12   A.    I do.

13   Q.    Is that the same item?

14   A.    It is.

15   Q.    Do you see on that photograph a police vehicle?

16   A.    Yes.

17   Q.    On October 28th, what was in the area -- what was

18   parked in the area of where that police vehicle was?

19   A.    The Nissan Altima.

20         MS. GOLOMBEK:  I'm sorry, I didn't hear the

21   answer.

22   A.    Altima.

23   Q.    Is that the area of where you had stopped

24   Ms. Grant and the defendant at approximately 12:45 in the

25   morning?

1        A.    Yes.  But she was a little back and catty-corner

2    on that corner.

3        Q.    When you say that, describe that on the photo.

4        A.    She was like attempted to start to make the turn

5    and I guess then didn't so she was like maybe 45 degree

6    angle with Lafayette and Midwood.

7        Q.    Using this photograph that's in evidence as

8    Exhibit 2, do you see the red light on the police vehicle?

9        A.    Yes.

10       Q.    Is that the area where she was angled?

11       A.    Yes.

12       Q.    And so looking at this photograph, Exhibit 2, the

13   left side of the sidewalk, the side where there's a one

14   (indicating), is that the area that you were running after

15   the defendant?

16       A.    It is.

17            MR. ROSENBLATT:  Indicating my finger from

18        the police car to the light post along the left side.

19            MS. GOLOMBEK:  Objection.

20            He's not the witness.

21            The witness can testify as to what the area

22        represents rather than the DA saying is that where you

23        were running from.

24            THE COURT:  Mr. Rosenblatt, the witness

25        didn't actually testify.

1    Q.    I want you to take a look at what's in evidence

2    now as Exhibit 4.

3         Do you see this photograph?

4    A.    I do.

5    Q.    Now I just want you to describe for the judge,

6    there's a green sign B and C, what street is that am I

7    indicating with my finger by that B and C sign

8    (indicating)?

9    A.    That's Midwood.

10    Q.    What street is this Nassau County Police van

11    parked on (indicating)?

12    A.    Clinton.

13    Q.    Which route -- which side of the street were you

14    running after the defendant?

15    A.    On the south side of the street.

16    Q.    Point to something on that screen that would

17    indicate the south side.

18    A.    Well, that green sign it's on the fence, if

19    that's on the fence -- along the fence line.

20    Q.    When you say along the fence, were you running

21    from the left side of the photo to the right side of the

22    photo?

23    A.    Yes.

24         MS. GOLOMBEK:  Objection.

25         Leading the witness.

1          THE COURT:  Overruled.

2     Q.   You indicated at some point you reached Clinton

3  Street?

4     A.   Yes.

5     Q.   Is this Clinton Street with the Nassau van

6  (indicating)?

7     A.   Yes.

8     Q.   The same one you described?

9     A.   Right.

10    Q.   When you reached Clinton Street, which direction

11 did you go?

12    A.   South.

13    Q.   Where is south on the photograph?

14    A.   Coming off Clinton, it's a right.  Coming towards

15 us.

16    Q.   Meaning running from the front of the van towards

17 the near side of the photo?

18    A.   Correct.

19    Q.   Is that what you mean?

20    A.   Yes.

21    Q.   Now, you told us before -- I want to go back to

22 Exhibit 1.

23         You have 1 in front of you and 1 is on the

24 screen?

25    A.   I do.

1    Q.   Now, you told us before at some point the

2    defendant began firing at you?

3    A.   Yes.

4    Q.   Where was -- where were you on this photograph at

5    the time the defendant was firing the weapon?

6    A.   I was close to or passed that telephone pole.

7    MR. ROSENBLATT:   Your Honor, I believe

8    there's only one telephone pole visible in that

9    screen.

10   THE COURT:   Yes, there's only one telephone

11   pole.

12   Q.   At the time that you were at that telephone pole,

13   where was the defendant in relation to you, using this

14   photograph?

15   A.   He was further away.

16   Q.   Meaning, looking at the photograph further away

17   from the person that took it?

18   A.   Right.

19   Q.   Using Exhibit 2, can you see where the defendant

20   was in this photograph when he fired?

21   A.   It would be left of this photo, a little bit.

22   Q.   Utilizing Exhibit 3, can you see where it was in

23   that photograph?

24   A.   Yeah, in the vicinity of the telephone pole.

25   Q.   What are we looking at on Exhibit 3?

1       A.    It's to the left side is the gas station and you

2   got a residence on the right side.

3       Q.    What street is this photo?

4       A.    Midwood Street.

5       Q.    Where is this telephone pole on Exhibit 3 in

6   relationship to Exhibit 2?

7       A.    It's to the left.

8       Q.    Meaning if Exhibit 2 continued to the left, would

9   we get to Exhibit 3?

10      A.    Yes.

11      Q.    You've indicated that Exhibit 3, does that

12  photograph fairly and accurately depict approximately the

13  location of where the defendant was when he began firing at

14  you?

15      A.    Yes.

16      Q.    Now you told us that the defendant fired, I

17  believe you said earlier, you counted three times?

18      A.    Correct.

19      Q.    Could you see where the bullets went after they

20  were fired by the defendant?

21      A.    No.

22      Q.    At the time the defendant fired the weapon, were

23  you still running?

24      A.    Yes.

25      Q.    Now, I want to talk to you about what happened

1  after you and Officer Denehy saw each other.

2         Using Exhibit 4 that's on the screen, where did

3  you run?

4      A.   I ran southbound -- I'm sorry, coming towards us.

5      Q.   Tell us what on the photograph you ran from to,

6  if that makes any sense?

7      A.   Along the fence line.  See where the green sign

8  is on Midwood along the fence line, then I made a right

9  where the fence stopped and I came towards us through that

10  parking lot of that gas station, in that alley that you see

11  there with those gas tanks, between that curb and the gas

12  tanks.  I ran in the direction towards us.

13         MR. ROSENBLATT:  Your Honor, with the

14      Court's permission if I could use my finger to

15      demonstrate?

16         THE COURT:  All right.

17      Q.   Officer Kraemer, are you indicating he ran along

18  the fence line in the middle of the photograph and then

19  made a right into the parking lot about three-quarters of

20  the way into the photograph and then ran from the area of

21  where that deli sign is to the number five (indicating)?

22      A.   Yes and continuing.

23         MS. GOLOMBEK:  Judge, why don't we have the

24      witness show where he was going rather than the DA

25      showing.

1          THE COURT:  The witness testified verbally

2      as to where he went which would correspond to what

3      Mr. Rosenblatt just pointed out on the screen but I

4      think you have a good point, Ms. Golombek, and I think

5      if you want the witness to come down and show

6      specifically on the photograph where he went and where

7      he was, that would be fine.

8          MR. ROSENBLATT:  With the Court's

9      permission.

10          THE COURT:  And in fact, I have a pointer

11      (handing).

12  A.    My initial action with Officer Denehy I proceeded

13  to run eastbound on Midwood (indicating), I got to here

14  (indicating) and I made a right turn.

15          THE COURT:  Here being the end of the fence?

16          THE WITNESS:  Yes, here is the end of the

17      fence (indicating).  There is a driveway and the gas

18      station.  I made a right turn and proceeded southbound

19      right through over here (indicating), between the gas

20      station and that curb southbound.

21          THE COURT:  Thank you.

22  Q.    While you're there, since you have the pointer,

23  show us on Exhibit 1 now with the pointer the route you

24  took when you were chasing the defendant.

25  A.    I came from -- the car stop was a little further

1     back here (indicating).  By the time I got in this area I

2     was already on the sidewalk and I ran up the right side of

3     the sidewalk and eastbound and then the whole block of

4     Midwood.  Up the whole block of Midwood.

5          Q.    When you say, up the whole block, can you show on

6     Exhibit 2?

7          A.    The car stop is here (indicating).  I came over

8     here, I came over here (indicating) and I ran, ran, ran

9     (indicating).

10         Q.    For the record, on Exhibit 2 you're indicating

11    from the top of the police vehicle to the left side of the

12    screen?

13         A.    That's Lafayette down there.

14         Q.    And using Exhibit 3.

15         A.    I'm running along the sidewalk here still,

16    there's the fence that I talked about, when it ends I made

17    the right into the BP gas station.

18         Q.    And you see the fence ending in Exhibit 4?

19         A.    Right.  Back here (indicating) and then, like I

20    said earlier, (indicating).

21         Q.    And the fence in Exhibit 4 is the same fence in

22    Exhibit 3?

23               MS. GOLOMBEK:  Objection.

24               THE COURT:  Overruled.

25         Q.    Is it?

- CDF -

1    A.    It's all connected.  I don't know if it changes

2    color, from right there to there (indicating) but it's all

3    part of that property.

4    Q.    Now, as you began the chase down Clinton Street,

5    what happened?

6    A.    I see Officer Denehy in front of me and I see the

7    defendant in front of Officer Denehy all traveling

8    southbound.

9    Q.    Now, you've indicated to the Court that on

10   Midwood you heard three shots?

11   A.    Right.

12   Q.    Did you hear any other shots that night?

13   A.    Yes.

14         When the interaction with me and Denehy was

15   ending up I heard two to three more loud bangs coming from

16   Clinton.

17   Q.    At that time that you heard the loud bangs, could

18   you see where they were coming from?

19   A.    No, I could not.

20   Q.    Would it be fair to say at that time you just

21   heard the loud bangs?

22   A.    True.

23         MS. GOLOMBEK:  Objection.

24         Leading the witness as to heard.

25         THE COURT:  Overruled.

- CDF -

1    Q.    What happened as you began running down Clinton,

2    indicating from the police vehicle in Exhibit 4 towards the

3    person who took that photo?

4    A.    I kept proceeding southbound.

5    The defendant crossed over Meriam, Officer Denehy

6    crossed over Meriam and I crossed over Meriam and I could

7    see the defendant made a right turn into an alley.

8    Q.    Now, when the defendant -- when you observed the

9    defendant running down Clinton and turning into an alley,

10   approximately how far were you?

11   A.    I was behind him a decent amount at the time, at

12   least 300 feet.

13   Q.    I didn't hear --

14   A.    At least 300 feet.

15   Q.    When you saw the defendant turn down the alley,

16   did he turn right or left from the position you were

17   looking?

18   A.    He made a right.

19   Q.    When you observed the defendant make the right

20   turn down the alley, what happened as you approached the

21   alley?

22   A.    As I got to the alley there is a chain-link fence

23   in the middle of that alley and there's no way to know

24   which way he went.  I saw him making a right but I didn't

25   know if he went to the north side or south side of that

1    chain-link fence.

2        Q.   As you're at the alley, were you alone or were
3    other members of the police department present?

4        A.   Officer Denehy he got there before I did and soon
5    thereafter I saw my partner show up in the Tahoe driving to
6    that alley.

7        Q.   Now, other than you, Officer Denehy and Officer
8    Rilling, were there any other members of the police
9    department that arrived at that alley?

10       A.   In fairly quick time, yes.  I don't know who they
11   were at that point.  There were a lot of officers in that
12   area.

13       Q.   At the time that you were at that alley, tell the
14   Court, what did you do?

15       A.   Officer Rilling came up to me, I said he went
16   down here and then we decided to clear the north side --
17   the alley splits and then there's a backyard to the north
18   side, which would be the right side of it and we decided to
19   go ahead and clear that first backyard which means go in,
20   check the corner, check hiding spots to see if the
21   defendant, for lack of a better term, hunkered down in the
22   backyard.

23            MS. GOLOMBEK:  I'm going to object to the
24       characterization "that we".  That we decided.  He's
25       testifying as to what Rilling decided.  He shouldn't

1      be able to do that, Judge.

2                  THE COURT:  Overruled.

3          Q.   You told us that you and other members of the

4      police department went into that backyard?

5          A.   Correct.

6          Q.   Tell the Court what happened as you went into the

7      yard.

8          A.   Negative results.  There was no person or

9      anything in that backyard.

10         Q.   What did you do next?

11         A.   I backed out of the backyard, I wanted to form a

12     perimeter at this point so I wanted to start coordinating

13     to get other officers set up in the area.

14         Q.   When you say, form a perimeter, at a basic level,

15     what does that mean?

16         A.   That means you get cops in a surrounding area

17     wider than where you think the defendant could have gotten

18     out of by then and slowly start your search there.

19         Q.   When you were executing that police operation,

20     that perimeter, where did you go?

21         A.   I really never got to executing it, it was talked

22     about this is what we're going to do.  Soon thereafter I

23     heard yelling, show me your hands, show me your hands, get

24     down.

25                  MS. GOLOMBEK:  Objection.

1    That's not what he did, that's what he

2    heard, your Honor.

3         THE COURT:  Overruled.

4    Q.   When you heard that, did you recognize the voice?

5    A.   I did.

6    Q.   Whose voice did you recognize?

7    A.   Officer Denehy.

8    Q.   When you heard Officer Denehy yelling those

9    commands, what did you do?

10   A.   I went north on Clinton to Meriam Street and then

11   west on Meriam Street to where I heard the sound coming

12   from.

13   Q.   Approximately how far was that?

14   A.   North on Clinton, probably 30 to 40 feet, not

15   much and then figure, the whole Meriam Street I would say

16   300 feet, 3 to 400 feet.

17   Q.   When you eventually get to Meriam Street, what

18   did you observe?

19   A.   I ran down the block and when I got to the end of

20   the block in front of 6 Meriam I saw Officer Denehy and a

21   Hempstead police officer, I think Whiting walking the

22   defendant out in handcuffs.

23   Q.   The area that we're describing, Exhibits 1

24   through 4, and Meriam Street, is that here in the County of

25   Nassau?

1    A.    It is.

2    Q.    Is that in the Village of Hempstead?

3    A.    It is.

4    Q.    As you observed the defendant being brought out

5    of Meriam, did you recognize him from earlier that day?

6    A.    I did.

7    Q.    Tell us about that.

8    A.    That was the person I saw in the front passenger

9    seat, the same person I saw shooting at me, the same person

10   I was chasing down Midwood and Clinton.

11   Q.    After the defendant was brought out of Meriam

12   Street, what was the next thing that happened?

13   A.    He was placed in a Hempstead patrol car and then

14   Officer Rilling was there with me at that point too and we

15   both went back to Midwood Street to, A, look for April

16   Grant who was part of this.  And, B, to look to see what

17   fell from the defendant while he was running.

18   Q.    Tell us what happened.

19   A.    We proceeded north on Lafayette Avenue on foot to

20   the next block over to Midwood.  When we got there --

21   before we got there we could see the Altima was gone, April

22   Grant was no longer at scene.

23        MS. GOLOMBEK:  I'm missing that.  All I

24        heard was went north on Lafayette.

25   A.    On foot and when we got there we could see April

1    Grant was gone and the black Altima was also not at scene
2    any longer.
3                We walked eastbound on Midwood and that's what we
4    saw what's depicted in the grass, a Smith & Wesson .40
5    caliber handgun.
6        Q.    I want to back up to what you said.
7              You said you went to look for April Grant?
8        A.    Yes.
9        Q.    At the time that you looked for April Grant,
10   what, if any, identification did you have of hers?
11       A.    I had her license still.
12       Q.    What, if any, identification was in the
13   possession of the police department of Mr. Costa, the
14   defendant?
15       A.    Officer Rilling had his ID, I don't know if it
16   was his license.
17       Q.    Now, when you went back to the location that you
18   described earlier, is that the vicinity of Exhibit 1?
19       A.    Yes.
20       Q.    You told us that when you went back you observed
21   an item.
22             What did you observe?
23       A.    It was a Smith & Wesson .40 caliber handgun.
24       Q.    Does the item on the right side of the grass
25   contained in Exhibit 1, does that fairly and accurately

1    reflect where you observed the gun on October 28th, 2018?

2              MS. GOLOMBEK:  Objection.

3              He never showed us the item on the grass in

4      Exhibit 1, Judge.

5              THE COURT:  I'm sorry?

6              MS. GOLOMBEK:  The witness never pointed to

7      an item on the grass as being where the gun was

8      recovered, Judge.

9              THE COURT:  That's actually not true.

10             When he initially looked at the first

11     photograph, Exhibit Number 1, he said it showed

12     eastbound on Midwood and the gun.

13             So you had objected at that point and I said

14     they were only being admitted for directional at this

15     particular point in time.

16             But he did mention the gun.

17             You can answer the question.

18     A.    Yes.

19     Q.    Where in Exhibit 1 is the gun that you described?

20     A.    If you're looking at the sidewalk, it's to the

21  right of the sidewalk, in the first section of the fence,

22  probably three-quarters of the way through that.

23     Q.    Rather than get up, can you hold up the photo you

24  have and show the Court where that item is?

25             MS. GOLOMBEK:  Judge, that's not going to be

1    satisfactory.  I don't know what he's pointing to.

2            THE COURT:  Please step down and use the

3    pointer, Officer.

4    A.    Here (indicating).

5            THE COURT:  It's the little dark object?

6            THE WITNESS:  Dark object in the grass right

7    here (indicating).

8            THE COURT:  That's the south side, correct?

9            THE WITNESS:  Correct.

10   Q.    Now Officer Kraemer, did you recover that item at

11   that time?

12   A.    I didn't touch it.

13   Q.    Ultimately did you leave it to be recovered by

14   members of the Crime Scene Unit?

15   A.    Yes.

16           MS. GOLOMBEK:  Objection.

17           Leading the witness.

18           THE COURT:  Overruled.

19   Q.    When you observed that item -- withdrawn.

20           You indicated that at the time you were chasing

21   the defendant you heard a metallic item hit the cement.

22           Is that the area that you heard that item hit the

23   cement on October 28th?

24   A.    Yes.

25   Q.    After you observed that, what you described as

1    a .40 caliber Smith & Wesson gun, what did you do?

2        A.    I actually went over my departmental radio and I

3    notified that there was a gun recovered but I also stated

4    there has to be another gun because I was shot at passed

5    this point.

6        Q.    At the time that you did that, did another member

7    of the police department come to that location to safeguard

8    that weapon?

9        A.    Yeah, Officer --

10              MS. GOLOMBEK:  Objection.

11              Leading the witness.

12              THE COURT:  Overruled.

13       A.    Officer Phaneuf.  P-H-A-N-E-U-F.  He was told to

14   stay with that weapon.

15       Q.    Where did you go next after Officer Phaneuf

16   responded?

17       A.    At that point we were trying to figure out how to

18   recover April Grant.

19       Q.    Did there come a point in time that you

20   participated in searching for the second gun, the one that

21   was fired at you?

22       A.    Yes.

23       Q.    Tell the Court about that search.

24       A.    I was approached by Detective Sergeant Vinberg

25   and he asked me the path that we went throughout this whole

1    process.

2                    MS. GOLOMBEK:  Objection.

3                    Hearsay.

4                    THE COURT:  Overruled.

5                    It's not being offered for the truth but as

6         to what this officer -- why he was doing what he was

7         doing.

8         A.    Detective Sergeant Vinberg and I we walked the

9    path of the foot pursuit.

10                   MS. GOLOMBEK:  I'm sorry, Detective?

11        A.    Detective Sergeant Vinberg.

12                   And he was able to locate a second weapon in the

13   back of 20 Meriam Street and a jacket that the defendant

14   was wearing during the car stop but not during his arrest.

15        Q.    Now, you told us that Detective Vinberg and you

16   walked that path.

17                   Did you ultimately see a jacket with him?  Did

18   you see a jacket?

19        A.    I did see the jacket.

20        Q.    Did you ultimately see the location of that other

21   gun?

22        A.    Yes.

23        Q.    Where was the jacket that you observed?

24        A.    In the back -- you're going, looking at 20 Meriam

25   it's just at the beginning of the backyard, there is an

1    alley by the side, the jacket is right next to where the

2    alley turns into the backyard.

3        Q.    Where was the second gun that you observed in

4    relation to that jacket?

5        A.    Further into the backyard.

6        Q.    That yard or another yard?

7        A.    I believe 20 Meriam.

8        Q.    I'm going to show you what has been premarked as

9    Exhibits 5 through 9 for identification purposes.

10                (Whereupon, the exhibits were handed to the

11       witness.)

12       Q.    I want to take them in turn.

13             Do you recognize what's been premarked as

14   Exhibit 5?

15       A.    I do.

16       Q.    What is it?

17       A.    That's the backyard where the second weapon was

18   recovered.

19       Q.    What's Exhibit 6?

20       A.    That is the jacket the defendant was wearing

21   during the car stop and in that same backyard.

22       Q.    What is Exhibit 7?

23       A.    Another picture of the jacket where the alley

24   turns into the backyard.

25       Q.    And what is Exhibit 8?

1    A.    8 is the second weapon that was recovered in that

2    same backyard.

3    Q.    And did you observe that jacket and that gun on

4    October 28th, 2018?

5    A.    I did.

6              MS. GOLOMBEK:  Objection.

7              Asked and answered.

8              THE COURT:  Overruled.

9    Q.    Do those photographs fairly and accurately depict

10   what you described in your observations in the early

11   morning hours of October 28th, 2018?

12   A.    Yes.

13             MR. ROSENBLATT:  I ask Exhibits 5 through 8

14        be received.

15             THE COURT:  Show them to Ms. Golombek.

16             MR. ROSENBLATT:  I'm sorry, I apologize.

17   Q.    What is 9?

18   A.    Number 9 is the Smith & Wesson on Midwood Street.

19             MS. GOLOMBEK:  On what street?

20             THE WITNESS:  Midwood.

21             MS. GOLOMBEK:  Thank you.

22   Q.    Is Exhibit 9 a closer photograph of the gun that

23   you identified in Exhibit 1?

24   A.    It is.

25   Q.    Is that a fair and accurate depiction of that

1    Smith & Wesson as you observed it on October 28th?

2         A.    It is.

3              MR. ROSENBLATT:  Your Honor, I ask

4    Exhibits 5 through 9 be received.

5              THE COURT:  Show them to Ms. Golombek.

6              (Whereupon, the exhibits were handed to

7    defense counsel.)

8              MS. GOLOMBEK:  May I have a short voir dire,

9    your Honor?

10             THE COURT:  Yes.

11   VOIR DIRE EXAMINATION BY

12   MS. GOLOMBEK:

13        Q.    Did you take these pictures?

14        A.    No, ma'am.

15        Q.    Did you see who took these pictures?

16        A.    I know who took them but I didn't see her take

17   it.

18             MS. GOLOMBEK:  I'm going to object, Judge,

19   not the proper foundation.

20             THE COURT:  Overruled.

21             People's 5 through 9 will be marked in

22   evidence.

23             (Whereupon, People's Exhibits 5 through 9,

24   previously marked for identification, were received in

25   evidence.)

1          THE COURT OFFICER:  So marked.

2    CONTINUED DIRECT EXAMINATION BY

3    MR. ROSENBLATT:

4         Q.   Detective, you indicated at some point you went

5    to look for April Grant?

6         A.   Yes.

7         Q.   Tell us about that.

8         A.   We had information she was at 209 Yale Street --

9              MS. GOLOMBEK:  I'm sorry, I'm going to ask

10        him to slow down and to talk a little louder please.

11             THE COURT:  All right.

12        A.   We had information that she resided at 209 Yale

13   Street in Hempstead.

14             MS. GOLOMBEK:  Who is we, Judge?

15        A.   Me.  I did.

16             So we sent some officers over there, Officers

17   Hurt and Wolf.  When they arrived there they did see the

18   car, the black Altima in the driveway.

19             MS. GOLOMBEK:  Objection as to what they

20        saw, he wasn't there at the time.

21        A.   They notified me.

22             THE COURT:  Sustained.

23        Q.   Did there come a point in time that you responded

24   to 209 Yale Street?

25        A.   Yes.

1      Q.    When you arrived at 209 Yale Street, what did you

2   observe?

3      A.    I spoke to a young female at the door, I think

4   she was the daughter of April Grant.

5      Q.    Without telling us what she said, what did you

6   observe in the driveway?

7      A.    I saw the same black Nissan Altima that was

8   involved in the car stop.

9      Q.    Did you observe, at that moment when you arrived,

10   April Grant?

11      A.    No.

12      Q.    Ultimately, what happened to that vehicle, the

13   Altima that you pulled over on October 28th?

14      A.    It was ultimately departmentally impounded.

15      Q.    What is that, towed?

16      A.    Towed, yes.

17      Q.    Where was the Altima towed, where was it towed

18   to?

19      A.    ESU --

20             MS. GOLOMBEK:  Objection.

21             Did he tow this?  He's testifying as to

22      what --

23             THE COURT:  Were you involved in the towing

24      aspect of this at all?

25             THE WITNESS:  No.

1              THE COURT:  Sustained.

2       Q.   Did you ultimately see that car again?

3       A.   No.

4       Q.   At the time the Nissan Altima was parked in the

5  driveway, did you look into it?

6       A.   I did.

7       Q.   What were you looking into -- what were you

8  trying to search or see?

9       A.   Any other weapons.  Anything else in regards to

10  the case.

11      Q.   At the time that you observed through the window

12  and into that Altima --

13              MS. GOLOMBEK:  Objection.

14              Leading the witness.

15              He just said he looked in, he didn't say how

16      he looked.  We now have the prosecutor testifying,

17      your Honor.

18              THE COURT:  Overruled.

19      Q.   What, if anything, did you see when you looked

20  into the car?

21      A.   There were a couple of older cellphones in the

22  center but I don't recall anything else in particular of

23  importance.

24              MR. ROSENBLATT:  I have no further questions

25      for the witness at this time, your Honor.



1          THE COURT:  All right, thank you very much.

2          Ms. Golombek, cross-examination?

3          MS. GOLOMBEK:  Yes, but first I need to take

4     a few minutes break, Judge.

5          THE COURT:  Okay.  It's five after 4:00.

6          So I was going to stop at 4:30.  Would you

7     rather have me stop now and start your cross --

8          MS. GOLOMBEK:  Yes, Judge, because I have to

9     use the facilities and by the time I come back.

10         THE COURT:  All right.  We'll break now

11    until tomorrow morning.

12         See everybody at 10:30 tomorrow.

13         Officer Kraemer, since you're now going to

14    be starting cross-examination, don't discuss your

15    testimony with anybody.

16         Have a good evening everyone.  See you

17    tomorrow.

18

19         *              *              *

20         (Whereupon the trial was adjourned to

21    Thursday, October 14th, 2021.)

22

23

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 38

3   --------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,     : Indictment
4                                            : No. 1934N-18
              -against-                      :
5                                            :
    DUANE COSTA,                             :
6                                            :
                        Defendant.           : Trial
7   --------------------------------------------X

8                              October 14, 2021

9                              262 Old Country Road
                               Mineola, New York
10

11  B E F O R E:

12      HONORABLE PATRICIA HARRINGTON,
                 Acting Supreme Court Justice
13

14  A P P E A R A N C E S:

15  (As Previously Noted)

16          *        *        *        *        *
17

18              THE CLERK:  Continued trial,

19  Indictment 1934N of 2018, the People v. Duane T.

20  Costa.

21              Counsel, your appearance please.

22              MR. ROSENBLATT:  For the People, Assistant

23  District Attorney Jared Rosenblatt.

24              Good morning, your Honor.

25              THE COURT:  Good morning.

- CDF -

1          MR. NELSON:  Assistant District Attorney

2     Ryan Nelson.

3               Good morning, Judge.

4               THE COURT:  Good morning.

5               MS. GOLOMBEK:  Good morning, your Honor.

6     Good morning, everyone.

7               For Duane Costa, Lori Golombek, 114 Old

8     Country Road, Mineola, New York.

9               THE COURT:  Good morning.

10              THE CLERK:  Sir, you are Duane Costa?

11              THE DEFENDANT:  Yes, ma'am.

12              THE COURT:  Good morning, Mr. Costa.

13              THE DEFENDANT:  Good morning.

14              THE COURT:  Is there anything that we need

15    to put on the record before we bring in the witness?

16              MR. ROSENBLATT:  Judge, I provided

17    Ms. Golombek photos that we discussed yesterday, as

18    well as additional photos that may be used later

19    today.  They were -- they're either copies of the

20    Grand Jury exhibits that were previously provided to

21    her or they're screenshots of the different videos

22    that were previously provided.

23              THE COURT:  Anything, Ms. Golombek, for the

24    record before we bring in the witness?

25              MS. GOLOMBEK:  No, Judge.

- CDF -

1               Judge, do you mind if I'm here versus over
2        there or does it matter?
3               THE COURT:  Over there is the microphone
4        which it just helps the reporter get everything.
5               If you need to be going back and forth,
6        that's fine.
7               MS. GOLOMBEK:  I'll need to be going back
8        and forth.
9               THE COURT:  Let's bring Officer Kraemer in.
10              (Whereupon, the witness entered the
11       courtroom.)
12              THE CLERK:  Officer, please be advised
13       you're still under oath.
14              Do you understand?
15              THE WITNESS:  Yes.
16              THE COURT:  Good morning, Officer Kraemer,
17       have a seat.
18              We are now going to have begin with
19       cross-examination.
20              You may inquire, Ms. Golombek.
21              MS. GOLOMBEK:  Thank you, Judge.
22   CROSS-EXAMINATION BY
23   MS. GOLOMBEK:
24       Q.    Officer Kraemer, you spoke to the Assistant
25   District Attorney Jared Rosenbloom (sic) about your

- CDF -

1    testimony, correct?

2        A.    Rosenblatt, yes.

3        Q.    You spoke to him about your testimony, correct?

4        A.    About yesterday's testimony?

5        Q.    You spoke to him about your testimony prior to

6    yesterday, correct?

7        A.    Prior to yesterday we spoke about testimony, yes.

8        Q.    He told you what to say?

9        A.    No.

10       Q.    You reviewed your hearing transcript?

11       A.    Yes.

12       Q.    And what you testified to in court is based on

13   what's in the hearing transcript, correct; yes or no?

14       A.    Yes.

15       Q.    It's not based on your independent recollection,

16   correct; yes or no?

17       A.    I'm sorry?

18       Q.    It's not based on your independent recollection,

19   correct; yes or no?

20       A.    I don't follow the question, I'm sorry, ma'am.

21       Q.    It's not based on your memory, it's based on what

22   you read in the hearing transcript, correct; yes or no?

23       A.    The transcript is based on what I said previously

24   at a hearing.

25       Q.    And your testimony yesterday is based on what's

- CDF -

1    in the hearing transcript, correct?

2        A.    Yes.

3        Q.    And you tried to say the exact same thing,

4    correct?

5        A.    No.

6        Q.    And your testimony is also based on your Grand

7    Jury minutes, correct?

8        A.    Yes.

9        Q.    And you read that a few times prior to

10   testifying, correct?

11       A.    Yes.

12       Q.    And that was so that you would say the exact same

13   thing, correct?

14       A.    No.

15       Q.    Now, on April 28th, 2018 and April 27th, 2018,

16   you were a Bureau of Special Operations officer, correct?

17       A.    April or October?

18       Q.    I'm sorry, October.

19       A.    Yes, I was in the Bureau of Special Operations.

20       Q.    In the Bureau of Special Operations you had

21   special training, correct?

22       A.    Yes.

23       Q.    And your special training included hostage

24   situations, correct?

25       A.    Yes.

- CDF -

1        Q.    And you had training in that, correct, hours and

2   hours of training, correct?

3        A.    Yes.

4        Q.    And you also had hours and hours of training,

5   special training about tactical situations, correct?

6        A.    Yes.

7        Q.    And drugs and weapons, correct?

8        A.    Yes.

9        Q.    And you weren't a patrol officer, were you, on

10   that date, October 27th, 2018?

11        A.    Bureau of Special Operations is a part of patrol,

12   yes.

13        Q.    You weren't a patrol officer, were you?

14        A.    I was.

15        Q.    On that date of October 27th into the morning of

16   October 28th, you weren't a patrol officer; isn't that

17   correct?

18        A.    No.

19        Q.    With all your special training, it was highly

20   unusual for you to stop for a traffic stop, correct?

21        A.    Incorrect.

22        Q.    That morning of October 28th, 2018, you were

23   working as BSO, correct?

24        A.    Correct.

25        Q.    And you were working in your capacity with all

- CDF -

1      your training of Bureau of Special Operations officer,

2      correct?

3          A.    Correct.

4          Q.    When you did traffic stops that's something you

5      did when you first became an officer, correct; yes or no?

6          A.    Yes.

7          Q.    On October 28th, 2018 you were already a BSO

8      officer for eight years or six years at that time?

9          A.    Six at that time.

10         Q.    You had a lot of experience to be stopping

11     somebody for just a mere traffic stop, correct?

12         A.    I don't understand the question.

13         Q.    You have a lot of experience just to be doing a

14     traffic stop; isn't that correct?

15         A.    I had experience, yes.

16         Q.    Well, you had a lot of experience and traffic

17     stops were not what you were trained for in BSO; isn't that

18     correct?

19         A.    Incorrect.

20         Q.    Now, you indicated that this black Altima on

21     October 28th, 2018 at about 12:45 a.m. failed to signal,

22     correct?

23         A.    Correct.

24         Q.    And you radioed that in, correct?

25         A.    No.

- CDF -

1          Q.    Well, if somebody commits an infraction, isn't it

2     police procedure to radio that in?

3          A.    No.

4          Q.    Didn't you want to alert other police officers

5     that there might be a problem when you saw a VTL

6     infraction?

7          A.    No.

8          Q.    Now, this VTL infraction that you're talking

9     about, this black Altima, at the time you first saw this

10    black Altima, how far was your vehicle from this black

11    Altima?

12         A.    Three to four houses.

13         Q.    Is it fair to say it's about 20 car lengths away?

14         A.    That sounds like much.

15         Q.    Excuse me?

16         A.    That sounds like much.

17         Q.    Sounds like too much?

18         A.    Yes.

19               MS. GOLOMBEK:   One moment, your Honor.

20               (Whereupon, a pause was had in the record.)

21               MS. GOLOMBEK:   I draw the Court's attention

22    to page -- withdraw that.

23         Q.    You're about halfway down the block from where

24    this black Altima is making a turn, correct?

25         A.    Which block?

- CDF -

1      Q.    When you first saw the black Altima, you're about

2  halfway down the block from where this black Altima is

3  making a turn; is that correct?

4      A.    Approximately.

5      Q.    And at this time at 12:45 a.m., it's dark out,

6  correct?

7      A.    Yes.

8      Q.    And as a matter of fact, it's the middle of the

9  night, correct?

10      A.    Yes.

11      Q.    And the reason why you went to pull this car over

12  is because you saw two black people in a black Altima in

13  the middle of the night, correct?

14              MR. ROSENBLATT:  Objection.

15              THE COURT:  Overruled.

16      A.    Incorrect.

17      Q.    And now there were other people in the area at

18  about 12:45 a.m., correct?

19      A.    Correct.

20      Q.    There were a lot of other people in the area,

21  correct?

22              MR. ROSENBLATT:  Objection.

23              As to where?

24      Q.    When you first saw the black Altima at 12:45 a.m.

25  on October 28th, 2018, there were a lot of people in the

- CDF -

1    area, correct; yes or no?

2         A.    I don't know what you mean by a lot, ma'am.

3         Q.    How many people were in the area, other than the

4    black Altima with two people in it?

5         A.    People in their houses or?

6         Q.    People in a car.

7         A.    In what car?

8         Q.    In the black Altima.

9         A.    I could not tell how many people were in the car

10   when we did the car stop.

11        Q.    Because it was too dark, correct?

12        A.    It was too dark behind them, yes.

13        Q.    It's too dark to see but you were able to see a

14   failure to signal, correct?

15        A.    Yes.

16        Q.    So it's too dark for some things but not for

17   others, correct?

18                    MR. ROSENBLATT:  Objection.

19                    THE COURT:  Sustained.

20        Q.    Now, when you observed this vehicle from about

21   four houses away, were there any vehicles in between the

22   vehicle you were driving and the black Altima?

23        A.    No.

24        Q.    Were there any people -- persons walking in the

25   street on October 28th at about 12:45 a.m. when you first

1      saw the black Altima?

2          A.    No.

3          Q.    There was no streetlight overhead of this black

4      Altima when you first saw it, correct?

5          A.    I don't recall.

6          Q.    You don't recall the streetlight being lit over

7      the black Altima, correct?

8          A.    Correct.

9          Q.    When you did this traffic stop you walked over to

10     April Grant, who was the driver of the vehicle, correct?

11         A.    Correct.

12         Q.    And your partner walked over to the other

13     passenger who you later learned his name to be Duane Costa,

14     correct?

15         A.    Correct.

16         Q.    You had your flashlight shining into the car,

17     correct?

18         A.    Correct.

19         Q.    So when you first shined the flashlight into the

20     car, you don't see any bulges on the passenger, do you; yes

21     or no?

22         A.    No.

23         Q.    And when you shined your flashlight into the car,

24     you're not suspicious at that time, correct?

25         A.    Correct.

- CDF -

1    Q.   So you shined your flashlight into the car and

2  your attention is on April Grant because you're asking her

3  for her license, correct?

4    A.   Correct.

5    Q.   And when you ask her for her license she gives

6  you the license, correct?

7    A.   Correct.

8    Q.   How long do you talk to April Grant for?

9    A.   The whole interaction is about a minute.

10    Q.   While you're having the interaction with April

11  Grant, your partner, Officer Rilling, is talking to Duane

12  Costa, the person who you later learned to be Duane Costa,

13  correct?

14    A.   Correct.

15    Q.   And his conversation is taking place while your

16  conversation is taking place, correct?

17    A.   Correct.

18    Q.   And you're not watching what he's doing, correct?

19    A.   Incorrect.

20    Q.   Well, is his hands on Duane Costa at this point?

21    A.   No.

22    Q.   So as you're talking to April Grant your

23  attention is not focused on April Grant?

24    A.   Not totally.

25    Q.   So it's half focused on April Grant?

- CDF -

1     A.    It's on the cabin of the car.

2     Q.    On the cavity of the car?

3     A.    Cabin.  The inside of the car.

4     Q.    Your flashlight is on, correct?

5     A.    It is.

6     Q.    Your flashlight is shining everywhere, correct?

7     A.    Shining inside the car, yes.

8     Q.    See anything unusual when it's shining inside the

9 car on Duane Costa?

10     A.    At what point?

11     Q.    At the time you first shine it into the car?

12     A.    No.

13     Q.    You're looking all around the car, correct?

14     A.    Correct.

15     Q.    You don't see anything sticking out of his pants,

16 do you?

17     A.    No.

18     Q.    You don't see anything sticking out of his jacket

19 at that point, do you?

20     A.    No.

21     Q.    And you have your flashlight on, correct?

22     A.    Correct.

23     Q.    And you're able to see, correct?

24     A.    Correct.

25     Q.    When April Grant gives you her license, are you

1    looking at the license?

2       A.   No.

3       Q.   You never looked at the license?

4       A.   No.

5       Q.   Well, Duane Costa is asked for his license,

6    correct?

7       A.   Yes.

8       Q.   When he's asked for his license, are you looking

9    at Duane Costa?

10      A.   Yes.

11      Q.   You're looking at him because you're out to get

12   him, correct?

13      A.   Incorrect.

14      Q.   You noticed that he's a black man in the

15   passenger seat in the middle of the night and you want to

16   pin something on him, correct?

17      A.   Incorrect.

18      Q.   So when he gives you the license, do you look at

19   his license?

20      A.   No.

21      Q.   Did Officer Rilling look at his license?

22      A.   I just want to correct you.  He didn't give me

23   his license, you stated in your last statement.

24      Q.   He gave it to Officer Rilling, correct?

25      A.   Correct.

1  Q. Are you able to see his license at that point?

2  A. No.

3  Q. And he fully complies, correct?

4  A. Correct.

5  Q. And while he's giving his license you indicate

6 that he reaches -- well, he goes to get his license.

7   Where is his license?

8  A. In his pocket.

9  Q. Which pocket?

10  A. Jeans pocket.

11  Q. Front pocket, back pocket?

12  A. I remember going to his front right pocket.

13  Q. Front right pocket?

14  A. Yes.

15  Q. He goes to his front right pocket with which

16 hand?

17  A. His right hand.

18  Q. He goes with his right hand and in his left hand

19 is his cellphone, correct?

20  A. Correct.

21  Q. He's holding onto his cellphone, correct?

22  A. Correct.

23  Q. He's going into his back pocket, correct?

24  A. Front pocket.

25  Q. Front pocket.

1          And that's when you notice his bulge, correct?

2      A.    Well, he made an adjustment to the bulge, that's

3  why I noticed it.

4      Q.    He's making an adjustment to the bulge, with his

5  third hand, is that what you're saying?

6      A.    No.

7      Q.    Well, he has one hand going into his right front

8  pocket, correct?

9      A.    Not in the pocket yet, ma'am.

10     Q.    It's in the -- it's going towards the pocket and

11 the other hand has the cellphone, correct?

12     A.    He did not go in the pocket yet before he made

13 the adjustment.

14     Q.    You're saying he made the adjustment first?

15     A.    He went towards the pocket area, made the

16 adjustment and then went into the pocket.

17     Q.    He puts his cellphone down to make the

18 adjustment?

19     A.    All with the right hand.

20     Q.    He puts his cellphone down with the right hand

21 and makes the adjustment with the same hand?

22     A.    No, ma'am.

23     Q.    He puts his cellphone down and makes the

24 adjustment with the other hand?

25     A.    No, ma'am.



1    Q.    Which hand did he have the cellphone?

2    A.    Left hand.

3    Q.    He has the cellphone in the left hand and the

4    right hand he's fixed -- before he sticks his hand in his

5    pocket he makes the adjustment; is that what you're saying?

6    A.    Yes.

7    Q.    When he makes this adjustment, is it at that time

8    you see this large bulge?

9    A.    Yes.

10    Q.    How large was this bulge?

11    A.    It was the size of what could be a gun.

12    Q.    Excuse me?

13    A.    It was the size of what could be a gun.

14    Q.    So you see something that's the size of what

15    could be a gun.

16         Don't you immediately yell to your partner, gun?

17    A.    No.

18    Q.    Don't you immediately yell to your partner, let's

19    get some help?

20    A.    No.

21    Q.    Don't you radio in that the subject may have a

22    gun?

23    A.    No.

24    Q.    Well, let me ask you, you see a large object

25    which you think may be a gun, correct?

- CDF -

1          A.    Could be.

2          Q.    And your concern is for your safety, correct?

3          A.    Yes.

4          Q.    And your safety is the most important thing to

5    you, correct?

6          A.    It's important.

7          Q.    It's important.

8                Along with the safety of your other officers,

9    correct?

10         A.    Safety of everyone.

11         Q.    Excuse me?

12         A.    The safety of everyone.

13         Q.    The safety of everyone, correct?

14         A.    Yes.

15         Q.    So you let Mr. Costa's hands remain loose, is

16   that what you're saying; yes or no?

17         A.    I did not touch his hands.

18         Q.    You didn't touch his hands, correct?

19         A.    Correct.

20         Q.    So you're saying it may be a gun and you let his

21   hands remain loose, right?

22         A.    I didn't touch his hands, correct.

23         Q.    And you don't even tell him put your hands on the

24   dashboard of the car, correct?

25         A.    I did not.

- CDF -

1    Q.    And one of the reasons you might -- you would

2    tell somebody to put their hands on the dashboard of a car

3    is so that they can't use them to do anything like grab a

4    gun, correct?

5    A.    Correct.

6    Q.    But you didn't do that here, did you; yes or no?

7    A.    Nope.

8    Q.    You let his hand remain loose and if he had a gun

9    he could have shot you at that time, correct?

10   A.    He could have -- excuse me?  His hands never

11   grabbed the gun.

12   Q.    I understand his hands never did grab the gun,

13   that is correct, thank you.

14           MR. ROSENBLATT:  Objection.

15           That's a statement, Judge.

16           THE COURT:  Yes.

17           MS. GOLOMBEK:  I'm repeating his testimony.

18           THE COURT:  That would be an incorrect

19   recitation of his testimony because we're talking

20   about a specific moment in time and so at that moment

21   in time Mr. Costa did not grab a gun.

22   Q.    Now, isn't it true that when Duane Costa was

23   asked for identification he reached into his pocket, you

24   saw him make an adjustment to his waistband at the same

25   time he pulled out his ID, correct?

- CDF -

1          A.    He reached towards his pocket, I saw the

2    adjustment and then he continued towards his pocket and got

3    his ID out.

4          Q.    You are sure about that, correct?

5          A.    That's how I remember.

6                MS. GOLOMBEK:  I'm going to call the Court's

7          attention to the Grand Jury testimony of -- to the

8          hearing testimony of Officer Kraemer.

9          Q.    You testified at a hearing, Officer Kraemer,

10   correct?

11         A.    Yes.

12         Q.    And that hearing was on November 26th, 2019

13   before the Honorable Patricia Harrington, correct?

14         A.    Yes.

15         Q.    And you were under oath at that date, correct?

16         A.    Yes.

17         Q.    Just like you're under oath today, correct?

18         A.    Correct.

19         Q.    And you were asked this question and you gave

20   this answer.  I draw the Court's attention to page 25 lines

21   17 through 25.

22                    Question:  Did you come to learn that a

23                    defendant provided Officer Rilling any

24                    identification?

25                    Answer:  I saw him hand his identification,

- CDF -

1          yes.
2          Question:  Okay.  Now I want to focus in on
3          the defendant at the time he was asked to
4          exit the vehicle.
5          What did you observe and what did you hear
6          from the defendant.
7          Ms. Golombek:  Objection.  Leading the
8          witness.
9          Court:  Overruled.
10         Answer:  Well, when he asked for
11         identification he reached into his pocket
12         and I saw him make an adjustment to his
13         waistband at the same time and he pulled out
14         the ID and he handed it to my partner.
15     Were you asked that question -- ask those
16  questions and did you give that answer?
17     A.    Yes.
18     Q.    Isn't it true that Mr. Costa went to his pocket
19  first before he did anything?
20     A.    No.  It was all one motion.  Towards the pocket,
21  adjustment, in the pocket.
22     Q.    You're sure of that?
23     A.    That's how I remember it, yes.
24     Q.    Do you recall testifying at the hearing of April
25  Grant on April 19th, 2019?

- CDF -

1      A.    Yes.

2      Q.    And on that day you were under oath, correct?

3      A.    Yes.

4      Q.    And you swore to tell the truth like you're

5   swearing today, correct?

6      A.    Yes.

7      Q.    And you were before a judge of the County Court,

8   correct?

9      A.    Yes.

10      Q.    I draw the Court's attention to the Grand Jury

11   testimony regarding April Grant.

12            MR. ROSENBLATT:  I'm sorry, Grand Jury or

13        hearing?

14            MS. GOLOMBEK:  I'm sorry, the Grand Jury.

15            I'll start over, Judge.

16            THE COURT:  All right.

17            MS. GOLOMBEK:  Withdraw that.

18      Q.    Do you recall testifying at the Grand Jury of

19   April Grant on April 19th, 2019?

20      A.    Yes.

21      Q.    And you were under oath at that date, correct?

22      A.    Correct.

23      Q.    And you swore to tell truth, correct?

24      A.    Yes.

25      Q.    Just like you swore to tell the truth today,

- CDF -

1    correct?

2        A.    Correct.

3        Q.    And were you asked this question and did you give

4    these answers.

5            MS. GOLOMBEK:  I draw the Court's attention

6        to the Grand Jury minutes of April Grant, page 39 --

7        one moment, Judge.

8            Judge, I'm going to correct my reference as

9        to what he was testifying to, my apologies.

10       Q.    You testified at the hearing of Duane Costa on

11   November 26th, 2019 before the Honorable Patricia

12   Harrington, correct?

13       A.    '19 or '18, ma'am?

14       Q.    November 26th, 2019.

15       A.    Yes.

16       Q.    That was the hearing of Duane Costa, correct?

17       A.    Yes.

18       Q.    And you were asked this question and you gave

19   this answer, draw the Court's attention to page 39 lines 20

20   through 23 --

21           MR. ROSENBLATT:  Can I have one moment to

22       pull the page?

23           THE COURT:  All right.

24           MR. ROSENBLATT:  Okay, page 39?

25           MS. GOLOMBEK:  Page 39, lines 20 through 23.

- CDF -

1    Q.   Were you asked this question and did you give

2    this answer.

3                    Question:  So when you say Mr. Costa

4                    goes towards his waistband, did you see

5                    this or did you see him go towards his

6                    pocket or towards his waistband?

7                    Answer:  Pocket first and he adjusted

8                    his waistband second.

9              Were you asked that question and did you

10        give that answer?

11        A.   Yes.

12        Q.   Is your memory better today than it was on

13   November 26th, 2019?

14                  MR. ROSENBLATT:  Objection.

15                  THE COURT:  Overruled.

16        A.   I believe the answer says he went towards the

17   pocket.  It's the same answer as today.  And then towards

18   the waistband.  I didn't say in the pocket.

19        Q.   Now, when you saw on Duane Costa what you thought

20   was this large bulge that you thought might be a gun, you

21   don't take your gun out?

22        A.   No.

23        Q.   You're going to let him possibly grab for a gun

24   if he has one and not have your gun out, is that what

25   you're saying?

1      A.   I was still observing, it was not confirmed he

2  had a gun on him.

3      Q.   You saw this large bulge, correct?

4      A.   Yes.

5      Q.   And you're suspicious, correct?

6      A.   Yes.

7      Q.   And you described the size as being like a

8  weapon, correct?

9      A.   Could be.

10      Q.   Could be but that was your testimony on direct a

11  few minutes ago, correct?

12      A.   Yes.

13      Q.   So you did absolutely nothing about it, is that

14  what you're telling us?

15              MR. ROSENBLATT:  Objection.

16              THE COURT:  Overruled.

17      A.   We continued the VTL stop, ma'am.

18      Q.   So the next thing that happens is Rilling -- so

19  you see this bulge.  You don't radio it in at that time?

20      A.   No.

21      Q.   You don't want other officers to be alerted?

22      A.   No.

23      Q.   Well, Police Officer Rilling is right next to

24  Costa, so you had an opportunity to radio it in, correct?

25      A.   Yes.

1       Q.   You had a device on you which you could have

2    radioed it in, correct?

3       A.   Yes.

4       Q.   Or you could have went back to the police vehicle

5    and called it in, correct?

6       A.   Correct.

7       Q.   So you're saying you thought it could be a gun

8    and you don't do this?

9       A.   Yes.

10      Q.   And at this time you have special training and

11   are a BSO officer for at least six years, correct?

12      A.   Yes.

13      Q.   And you're trained in the most serious of

14   situations, correct?

15      A.   Very serious situations, yes.

16      Q.   But you don't take any action when you think

17   Duane Costa may have a gun, correct?

18              MR. ROSENBLATT:  Objection.

19              THE COURT:  It's been asked and answered a

20          number of times, Ms. Golombek.

21      Q.   You indicated on direct that Officer Rilling told

22   Duane Costa to exit the vehicle, correct?

23      A.   Correct.

24      Q.   And this is after Duane Costa complies and shows

25   his ID, correct?

- CDF -

1        A.    Yes.

2        Q.    But you said you noticed he wasn't wearing a

3    seatbelt, correct?

4        A.    Correct.

5        Q.    Do you give him a ticket for not wearing a

6    seatbelt?

7        A.    I believe so.

8        Q.    So you had time to do that but you don't have

9    time to radio in to the police, is that what you're saying?

10        A.    Not at scene, later on that night, during the

11    arrest processing, ma'am.

12        Q.    So now you indicate that Officer Rilling has

13    Duane Costa exit the vehicle, correct?

14        A.    Correct.

15        Q.    Does Officer Rilling take him out of the vehicle?

16        A.    No.

17        Q.    Does Officer Rilling put his hands on Duane Costa

18    as Duane Costa is getting out of the vehicle?

19        A.    I don't know.

20        Q.    You don't know because you didn't see what was

21    going on on the other side of the car, correct?

22        A.    I could not see Officer Rilling's hands, correct.

23        Q.    And you didn't have a clear view of the vehicle,

24    correct; yes or no?

25        A.    No.  I mean, yes, I had a clear view of the

1    vehicle.

2         Q.    But you didn't have a view of whether Officer

3    Rilling had his hands on Duane Costa, correct; yes or no?

4         A.    Yes.

5         Q.    Now, you indicate you can't see what's going on

6    inside of the car when Officer Rilling may have his hands

7    on Duane Costa, correct?

8         A.    Correct.

9         Q.    But you testified there was a shove, correct?

10        A.    Correct.

11        Q.    So you're telling us you were able to see a shove

12   but you weren't able to see whether Officer Rilling had his

13   hands on Duane Costa, correct?

14        A.    Correct.

15        Q.    You're able to see some things but not others,

16   correct?

17        A.    The shove was above the height of the car.

18        Q.    How high -- how many inches of the height of the

19   car was the shove?

20        A.    Shoulder height, ma'am.

21        Q.    Now, you indicate that Duane Costa started

22   running, correct?

23        A.    Correct.

24        Q.    And when he runs he is running -- he's in front

25   of you, correct?

- CDF -

1      A.    Yes.

2      Q.    As a matter of fact, he's not only in front of

3   you, you're on one side of the car and Officer Rilling is

4   on the other side, correct?

5      A.    In the beginning, yes.

6      Q.    And in the beginning when he was running, you

7   indicate that there is an adjustment to Duane Costa's

8   waistband, correct?

9      A.    No.

10      Q.    There's no adjustment at that point?

11      A.    I saw him reach to the waistband, I didn't see an

12   adjustment, ma'am.

13      Q.    You see him reach for the waistband?

14      A.    Yes.

15      Q.    And his waistband would be at his waist, correct?

16      A.    Yes.

17      Q.    He is not reaching for the back of him, correct?

18      A.    The front waistband.

19      Q.    He's reaching -- you indicated he's reaching for

20   the front.

21          Isn't it true when he's running what you're able

22   to see is Duane Costa's back; yes or no?

23      A.    Yes.

24      Q.    And at this time that you say he reaches you're

25   not able to see the front of Duane Costa, correct; yes or

- CDF -

1    no?

2         A.    Incorrect.  I'm at an angle because I'm still in

3    the street so I could see him reaching towards the front.

4         Q.    Well, you indicate you're at an angle but Duane

5    Costa is approximately 30 feet in front of you, correct, as

6    he's running?

7         A.    Correct.

8         Q.    And it's 12:45 or maybe 12:46 at night, correct?

9         A.    Yes.

10        Q.    This whole incident with Duane Costa happened

11   very quickly, correct; yes or no?

12        A.    Yes.

13        Q.    And it happened in a matter of a few minutes,

14   correct?

15        A.    Correct.

16        Q.    Not more than five minutes, correct?

17        A.    What instance, ma'am?

18        Q.    The whole interaction, from the car stop until

19   the apprehension of Duane Costa, took approximately five,

20   six minutes, correct?

21        A.    I think it was closer to 10.

22        Q.    Most of that time was looking for the person in

23   the alleyway, correct?

24        A.    Not in the alleyway, no.

25        Q.    Was looking for the person in the yard after you

- CDF -

1  testified the person ran into the alleyway, correct; yes or

2  no?

3    A. In the area, yes, correct.

4    Q. And that was about five minutes that there was a

5  search for this person in the area of the alleyway by

6  Meriam Street, correct?

7    A. Correct.

8    Q. And from the time that you saw Duane Costa in the

9  vehicle at 12:45 until you see this reaching, this reaching

10 with the waistband, how long was that?

11   A. Sitting in the car, ma'am?

12   Q. Not sitting in the car, just reaching, how long

13 was that after the initial stop?

14   A. The initial stop is about a minute and then it's

15 right away as he starts running.

16   Q. Now, this reaching was with the left hand or the

17 right hand?

18   A. Right hand.

19   Q. You can't see what he's reaching for because he's

20 in front of you, correct; yes or no?

21   A. I can't see the object, no.

22   Q. You can't see if there is an object there at all,

23 correct; yes or no?

24   A. I did not see an object.

25   Q. You couldn't see because that was in front of

- CDF -

```
 1    you, correct?
 2         A.   Correct.
 3         Q.   And Duane Costa was in front of you, correct?
 4         A.   Correct.
 5         Q.   At least 30 feet, correct?
 6         A.   In the beginning?  He was right across the car
 7    and he gained on me --
 8         Q.   At the time you saw what you described as
 9    reaching, correct?
10         A.   Approximately twenty feet.
11         Q.   And when you see this reaching, it's in the
12    middle of the night, correct?
13         A.   Yes.
14         Q.   And your flashlight is not shining at this person
15    running, is it?
16         A.   Not that I recall.
17         Q.   And you're telling me you're able to see this
18    without your flashlight shining at 12:46 a.m.; yes or no?
19         A.   Approximate time, yes.
20         Q.   Officer Rilling didn't have his flashlight
21    shining at this time; isn't that correct; yes or no?
22         A.   I don't know.
23         Q.   So nobody's flashlight is on and this person is
24    running and you would have this Court believe that you
25    could see somebody reaching for their waistband, correct?
```

- CDF -

1      A.    Correct.

2      Q.    And you didn't see a light overhead of this

3  person running, correct?

4      A.    Correct.

5      Q.    And you didn't see the face of the person who was

6  running; isn't that correct?

7            At the time of this reaching, you don't see the

8  face of the person who's running, correct?

9      A.    Correct.

10      Q.    And this reaching that you said, was that with

11  the left hand or with the right hand?

12      A.    Same right hand.

13      Q.    So when you see this reaching, what you described

14  as this reaching, you didn't -- you then radioed it in that

15  you see somebody reaching for what might be a gun when this

16  running is happening and this reaching, correct?

17      A.    Incorrect.

18      Q.    You take your gun out, correct?

19      A.    I don't recall.

20      Q.    Well, you said somebody is reaching for their

21  waist, now your suspicions are up even more, correct?

22      A.    Yes.

23      Q.    You don't take your gun out at that point?

24      A.    I'm not sure if I had it out at that point,

25  ma'am, I was running.





- CDF -

1    Q.    You don't tell your partner gun?

2    A.    He yelled gun.  I heard him yell gun.  I soon

3    after yelled gun.

4    Q.    You continued to run?

5    A.    Yes.

6    Q.    Without your gun out?

7    A.    It could have been out.

8    Q.    You don't remember, correct?

9    A.    I truthfully don't remember.

10    Q.    So you don't remember that but you remember the

11    reaching, is that what you're telling us?

12    A.    Yes.

13    Q.    So you have a selective memory as to what you

14    remember, correct?

15              MR. ROSENBLATT:  Objection.

16              THE COURT:  Sustained.

17    Q.    You also testified that you heard a loud bang,

18    correct?

19    A.    Correct.

20    Q.    And you heard this from 30 feet away?

21    A.    Approximately.

22    Q.    Or were you 60 feet away at this time?

23    A.    I would say closer to 30.

24    Q.    When you hear this loud bang, is Officer Rilling

25    running in front of you or you were running in front of

- CDF -

1    Officer Rilling?

2         A.    The first bang are we talking about?

3         Q.    The first bang you hear.

4         A.    I'm still behind Officer Rilling at this point.

5         Q.    So he's ahead of you.

6               Is Officer Rilling's gun out?

7         A.    Yes.

8         Q.    Is Officer Rilling's gun out the whole time?

9         A.    Oh, I don't know.

10        Q.    At what point does Officer Rilling take his gun

11   out?

12        A.    When he posted up I saw him with his gun out.

13   That's the first time I saw his gun out.

14        Q.    When he's running, he runs before you run?

15        A.    I'm sorry.  The bang goes off, he posts up with

16   his gun out in a fighting stance and that's when I see his

17   gun out.

18        Q.    Well, you indicate he posts up, Officer Rilling,

19   but before that point --

20        A.    Well, I don't know.

21        Q.    You don't know if Officer Rilling had his gun

22   out?

23        A.    I do not know.

24        Q.    Isn't your attention focused on the whole area?

25        A.    No, at that point I'm running.


- CDF -

1        Q.    Well, you're looking ahead at the person who you

2    say is Duane Costa, correct?

3        A.    Yes.

4        Q.    And Officer Rilling is between you and Duane

5    Costa, correct?

6        A.    Correct.

7        Q.    But you don't know -- and Officer Rilling is in

8    front of you, correct?

9        A.    He is.

10       Q.    He's in your line of sight, correct?

11       A.    He is.

12       Q.    So you're telling us you don't know whether he

13   had a gun out at that time?

14       A.    Correct.

15       Q.    You don't know whether you saw him or the gun out

16   but you were able to see Duane Costa with a gun out, is

17   that what you're saying?

18       A.    Correct.

19       Q.    Well, this time that Duane Costa had a gun out --

20   let me ask you, at the time you see this gun, was that for

21   a second?

22       A.    It was as he was running, so, I don't know, it's

23   short.  Seconds.

24       Q.    So you're saying he took the gun out for a second

25   and you were able to see this, correct?

- CDF -

1        A.    Correct.

2        Q.    Now this is from your 30 feet away, correct?

3        A.    Yes.

4        Q.    And this is with Officer Rilling in between you

5   and him, correct?

6        A.    Yes.

7        Q.    Well, when he takes his gun out, is that when you

8   say he's running with his hand extended backwards?

9        A.    Further down the street, he extends his hand

10  backwards and that's when the loud bang goes off.

11       Q.    Let me stop you for a moment.

12             He's running, right?

13       A.    Right.

14       Q.    He's running for a while, correct?

15       A.    It's a short block.

16       Q.    And when he's running, he's running forward,

17  correct?

18       A.    Yes.

19       Q.    And as he's running forward you're saying he was

20  running and he puts his hand behind him; is that correct?

21       A.    His right hand.

22       Q.    He puts his right hand behind him?

23       A.    Right.

24       Q.    So when he puts his right hand behind him, he

25  does that all as he's running forward, correct?

- CDF -

1    A.    Correct.

2    Q.    And you say that you hear this bang as he's still

3    running, correct?

4    A.    Correct.

5    Q.    So you're telling me that you were able to see

6    him running and shoot while he's running forward, correct?

7    A.    Correct.

8    Q.    How many shots happen while he's running forward?

9    A.    At what point?

10    Q.    At the point that you say he's running.

11    A.    On Midwood Street?

12    Q.    He's running on Midwood Street, correct?

13    A.    At least three shots on Midwood Street.

14    Q.    He reaches his hand back, correct?

15    A.    Correct.

16    Q.    And he's still running forward, correct?

17    A.    Correct.

18    Q.    And that's what you could see, you could see the

19    back of him, correct?

20    A.    Correct.

21    Q.    And at that point you're saying he takes the gun

22    and shoots it, correct?

23    A.    Correct.

24    Q.    And he's still running, correct?

25    A.    Correct.

- CDF -

1    Q.    And he's not looking backwards, correct?

2    A.    Incorrect.

3    Q.    So he's looking backwards while he's running,

4    correct?

5    A.    Correct.

6    Q.    So you're saying that he's running forward but

7    looking backwards and how does this action take that he's

8    running and not looking where he's going, is that for five

9    minutes?

10    A.    Less than a second, ma'am.

11    Q.    So you were able to see for less than a second

12    somebody running with their arm backwards, is that what

13    you're saying?

14    A.    Approximately.  Might be more than a second but

15    around that timeframe, yes.

16    Q.    So you're saying for a second somebody looked

17    back as they're running forward?

18    A.    Yes.

19    Q.    Now, you indicate that you heard on Midwood

20    Street, you heard three shots, correct?

21    A.    Yes.

22    Q.    You heard two and then you heard another one,

23    correct?

24    A.    Correct.

25    Q.    So when you heard these two, are you saying Duane



- CDF -

1    Costa was running through both those two shots?

2       A.   Yes.

3       Q.   Did you see both those two shots?

4       A.   I saw the muzzle flash, yes.

5       Q.   Well, you saw the muzzle, right?

6       A.   I saw an explosion at the end of the muzzle, yes,

7    a bright flame.

8       Q.   That was from how many feet away?

9       A.   Approximately 30.

10      Q.   30 feet away with a gun out?

11      A.   The whole street I don't remember if my gun was

12   out.

13      Q.   You don't know whether your gun is out but you're

14   telling me you see a flash and didn't take your gun out?

15      A.   I'm not saying I did or didn't.  I don't know.

16      Q.   Let me get this straight.

17           You're going to run after somebody who you think

18   has a gun in their hand and you're going to be unprotected,

19   correct?

20                MR. ROSENBLATT:  Objection.

21                It's not what he's saying.  He's saying he

22        doesn't remember.

23                THE COURT:  Sustained.

24      Q.   Now, you indicate that you keep running, correct?

25      A.   To what point?



```
 1        Q.    You indicate that Duane Costa -- you hear these
 2   three bangs, correct, you hear three shots?
 3        A.    Correct.
 4        Q.    You see three muzzle flashes?
 5        A.    Yes.
 6        Q.    And all this time Officer Rilling is ahead of
 7   you, correct?
 8        A.    No.
 9        Q.    Officer Rilling is not ahead of you for all three
10   shots?
11        A.    No.
12        Q.    Well, is he ahead of you for two shots?
13        A.    Yes.
14        Q.    Well, there comes a time that Officer Rilling
15   stops, correct?
16        A.    Correct.
17        Q.    You say he posts up, correct?
18        A.    Correct.
19        Q.    You said that he stops by a telephone pole,
20   correct?
21        A.    Yes.
22        Q.    And he hides by a car, correct?
23        A.    Hides?
24        Q.    Hides.  He ducks down by a car, correct?
25        A.    I saw the telephone pole.
```

- CDF -



1    Q.    All you saw was the telephone pole?

2    A.    I saw him posted up by a telephone pole, yes.

3    Q.    You don't see with your peripheral vision that

4    you indicate that you have him ducking by a car?

5    A.    No.

6                    MR. ROSENBLATT:  Objection.

7                    THE WITNESS:  Sorry.

8                    THE COURT:  Overruled.

9    Q.    You don't see with your peripheral vision

10   everything that's going on?

11   A.    No.

12   Q.    Aren't you looking at your fellow officer?

13   A.    I saw me passing him, yes.

14   Q.    You indicate that he posted up.  Is that when you

15   passed him?

16   A.    Yes.

17   Q.    Does he shoot at that point?

18   A.    No.

19   Q.    Well, let me ask you, after you see this first

20   muzzle flash, don't you shoot with your gun?

21   A.    No.

22   Q.    Doesn't Officer Rilling shoot with his gun?

23   A.    Nope.

24   Q.    So you're going to let this person that you say

25   has let a shot out just shoot, is that what you're doing?

1    A.    I did not shoot at him.

2    Q.    Officer Rilling didn't shoot at him, correct?

3    A.    He did not.

4    Q.    And you don't call for assistance after this

5    first shot, correct?

6    A.    No, I went over the radio on Midwood Street and

7    said shots fired towards Clinton.

8    Q.    Now, you indicate that you keep -- after this

9    loud explosion that you testified to sounded like a

10   firecracker, you indicate you keep running, correct?

11   A.    Yes.

12   Q.    You don't shoot, correct?

13   A.    Correct.

14   Q.    You don't load up your ammunition and make sure

15   your gun is loaded, correct?

16   A.    No.  Correct.

17   Q.    You don't take your gun out in a ready position,

18   correct?

19   A.    I don't know if my gun was out, ma'am.

20   Q.    Excuse me?

21   A.    I don't know if my gun was out or not while I was

22   running.

23   Q.    If you were to catch him and this person had a

24   gun in his hand, you might have been shot, correct?

25   A.    Correct.

- CDF -

1      Q.    And you wouldn't have had your gun out, correct?

2      A.    I don't know.

3      Q.    And after all your years of training you're going

4    to let that happen?

5                    MR. ROSENBLATT:  Objection.

6                    THE COURT:  Sustained.

7      Q.    Now, there comes a time that you see other BSO

8    officers, correct?

9      A.    Correct.

10      Q.    And they're making a separate arrest, correct?

11      A.    Correct.

12      Q.    And as a matter of fact, one of the BSO officers,

13    Officer Denehy, comes towards you, correct?

14      A.    Correct.

15      Q.    And takes his gun out, correct?

16      A.    Correct.

17      Q.    And he raises his gun at you, correct?

18      A.    Correct.

19      Q.    And it's at this point that you lose track of the

20    person who was running with what you said was a weapon,

21    correct?

22      A.    During that interaction, yes.

23      Q.    Now, when you see Officer Denehy pointing his gun

24    he's yelling at you, "Are you shooting", correct?

25      A.    Incorrect.

- CDF -

1    Q.    You testified on direct that he was yelling "Are

2    you shooting"?

3    A.    I'm sorry, I thought you asked if I was shooting.

4    He did, he yelled at me, "Are you shooting", correct.

5    Q.    That lead you to believe he had difficulty seeing

6    what was happening, correct?

7                    MR. ROSENBLATT:  Objection.

8                    THE COURT:  Sustained.

9    Q.    You were about a 150 feet from Officer Denehy,

10   correct?

11   A.    100 to 150.

12   Q.    Now, you indicated initially when Duane Costa was

13   running you heard something drop to the ground, correct?

14   A.    Correct.

15   Q.    You didn't see anything drop to the ground,

16   correct?

17   A.    Correct.

18   Q.    And when Duane Costa was running, he was running

19   on the sidewalk, correct?

20   A.    Correct.

21   Q.    Am I correct?

22   A.    Correct.

23   Q.    He wasn't running on the grass, was he?

24   A.    No.

25   Q.    When Duane Costa first runs eastward on Midwood,

- CDF -

1    you're about 30 feet from him when you testified you heard

2    this metallic sound hit the ground, correct, possibly 40

3    feet, correct?

4         A.    From him or from the car stop where it fell?  I'm

5    sorry.

6         Q.    You're about 30 to 40 feet away from Duane Costa,

7    correct?

8         A.    Correct.

9         Q.    You didn't see what hit the ground, correct?

10        A.    Correct.

11        Q.    You didn't see exactly where this object hit the

12   ground, correct?

13        A.    Correct.

14        Q.    So you don't know whether the object hit the

15   ground at that time, you didn't know whether the object hit

16   the ground from where Duane Costa was running or from a

17   nearby area, correct?

18        A.    I'm sorry, repeat the question.

19        Q.    You didn't see an object hit the ground at that

20   point, correct?

21        A.    Correct.

22        Q.    When you heard these two bangs, these two shots

23   initially, you didn't see where any bullets went, correct?

24        A.    Correct.

25        Q.    You didn't see any bullets at this time, did you,

1    when you heard the bang?

2        A.    Correct.

3        Q.    You don't know whether there were any bullets

4    fired at that time?  You didn't know whether there were any

5    bullets fired at that time, correct, or discharged at that

6    time?

7                        THE COURT:  Which time?  When he heard the

8        bang?

9        Q.    When you heard the bang, you didn't see any

10   bullets, correct?

11       A.    I did not see a bullet, no.

12       Q.    You didn't see anything come out of the gun,

13   correct?

14       A.    I saw a muzzle flash come out of the gun.

15       Q.    You didn't see any casings fall out of the gun,

16   did you?

17       A.    No.

18       Q.    Now, at the time -- now, you indicated that you

19   saw Duane Costa being taken out of an area located around

20   Meriam Street, correct?

21       A.    Correct.

22       Q.    And it wasn't you who took Duane Costa out of the

23   area, correct?

24       A.    Correct.

25       Q.    And when you saw Duane Costa, he didn't have a

- CDF -

1    weapon on him, did he?

2        A.    He did not.

3        Q.    And as far as you know, he didn't have any

4    gunpowder residue on him, did he?

5        A.    Not that I know of.

6        Q.    He didn't have any gunpowder residue on his

7    clothing, did he?

8        A.    Not that I know of.

9        Q.    He didn't have a .40 caliber weapon on him, did

10   he?  You didn't see him with a .40 caliber weapon when he

11   was apprehended, did you?

12       A.    I did not.

13       Q.    And you didn't see him with another weapon, a

14   7.265 by 18 weapon, did you?

15               THE COURT:  He already said he didn't see

16           him with any weapon when he came out of -- after he

17           was apprehended.

18       Q.    When he came out of 20 Meriam Street or the

19   location near 20 Meriam Street, you didn't see any

20   ammunition on Duane Costa, did you?

21       A.    He wasn't taken from 20 Meriam Street, ma'am.

22       Q.    The address you saw him taken out of, was that 6

23   Meriam Street?

24       A.    It was.

25       Q.    Did you see him with any ammunition on him?

- CDF -

1    A.    I did not.

2    Q.    Now, you indicated that you walked around the

3    area where Duane Costa was recovered -- you participated in

4    a -- withdraw that.

5          You indicated that you participated in a search

6    of the second gun, correct?

7    A.    Correct.

8    Q.    When you participated in the search, is it you

9    who recovered the second gun?

10    A.    No.

11    Q.    So you didn't see where the second gun was

12    recovered, correct?

13    A.    I did after.

14    Q.    You didn't see it when it was recovered, correct?

15    A.    Soon thereafter.  Not right away.

16    Q.    You didn't see who placed the second gun in the

17    area of Meriam Street, correct?

18          MR. ROSENBLATT:  Objection to the form of

19          the question, Judge.

20          THE COURT:  I'm going to overrule it.

21          You can answer.

22    A.    I did not see that.

23    Q.    You didn't see the time that the weapon was

24    placed in that area, correct?

25    A.    Correct.

- CDF -

1    Q.    You didn't see whether that weapon was placed in

2    that area on that day, correct?

3                MR. ROSENBLATT:  Objection.

4                Asked and answered.

5                THE COURT:  Yes, it is.

6                I mean, I'll allow you to answer the

7    question, Officer.

8    A.    I did not.

9    Q.    You didn't see whether the weapon was placed in

10    that area a month before, correct?

11                THE COURT:  Sustained.

12                MS. GOLOMBEK:  One moment.

13                THE COURT:  Yes.

14                (Whereupon, a pause was had in the record.)

15    Q.    Now, there is an allegation against you on

16    June 2nd, 2006, a complaint, that you became involved in a

17    dispute with a tree company, that a complainant -- well, it

18    started as the complainant was involved in a dispute with a

19    tree company.

20                You were a Seventh Precinct officer at that time,

21    correct?

22                MR. ROSENBLATT:  Objection.

23                THE COURT:  Overruled at this point.

24    Q.    Isn't it true that there is a complaint by

25    somebody that he was falsely accused of a traffic violation

- CDF -

1    and that the officers who were there were rude,

2    disrespectful and ethically biased?

3                    MR. ROSENBLATT:  Objection.

4                    THE COURT:  Ms. Golombek, was this something

5         that was unfounded?

6                    MS. GOLOMBEK:  Judge, it was undetermined.

7                    THE COURT:  Objection is overruled.

8         Q.    And you were one of the Seventh Precinct officers

9    who were accused of that?

10        A.    I'm sorry, I remember it being a recruit in 2006

11   and the Seventh Precinct landscaping thing had nothing to

12   do with the VTL stop, so I don't know if you're mixing up

13   two things there.

14        Q.    Isn't it true that you were accused of racial and

15   ethical bias at that point?

16        A.    They accused it, yes, but it didn't happen.

17        Q.    Isn't it true on May 13th, 2009 somebody accused

18   you as being one of the officers who assaulted them while

19   you were -- while aid was being rendered to his unconscious

20   wife in the Village of Old Westbury and the person

21   indicated that he was pushed and punched by officers and

22   that he sustained bruises and contusions about his head and

23   torso?

24        A.    Accused.  Didn't happen.

25        Q.    Isn't it true that that matter was referred to

- CDF -

1    Nassau County Police Department Internal Affairs for

2    whatever administrative action, if any, would be deemed

3    appropriate?

4         A.    If that's what it says, yes.

5         Q.    Isn't it true that you were accused of

6    unprofessional conduct on April 27th, 2017, somebody

7    indicated at IAU by a letter to Nassau County District

8    Attorney's office, the District Attorney stated that his

9    client, whose name is not disclosed, was contacted by BSO

10   Police Officer Kraemer regarding a pending case and Police

11   Officer Kraemer offered to discuss her case over dinner and

12   sent NCPD intelligence bulletin about the case along with

13   your phone number?

14        A.    Yes, that was false.  She was told she would not

15   get dinner at the precinct.  She said she would not turn

16   herself in because she was hungry.

17        Q.    Isn't it true on April 28th, 2015 you were again

18   accused of unprofessional conduct when Sergeant Robert

19   Henry of the Second Squad received a phone call on

20   April 28th, 2015 at about 920 hours from someone who was an

21   attorney representing a client, he states that this client

22   was rudely --

23             MR. ROSENBLATT:  Objection.

24        Q.    Rudely awakened on the date sometime after

25   midnight and three plainclothes detectives from the Second

1   Squad were looking to interview his son and he was informed

2   his client was harassed by the detectives and that you were

3   one of the detectives who spoke to him in a threatening

4   manner and threats were made against his son?

5           MR. ROSENBLATT:  Objection.

6   A.      I never worked for the Second Squad, ma'am.

7           MS. GOLOMBEK:  I have no further questions

8       at this time.

9           THE COURT:  Thank you, Ms. Golombek.

10          Any redirect?

11          MR. ROSENBLATT:  Brief redirect, your Honor.

12  REDIRECT EXAMINATION BY

13  MR. ROSENBLATT:

14  Q.      Officer Kraemer, you were asked questions on

15  cross-examination regarding your ability to recall the

16  events of October of 2018.

17          Do you remember being asked those questions on

18  cross?

19  A.      Yes.

20  Q.      Do you have an independent recollection of what

21  happened?

22  A.      I do.

23  Q.      Prior to today, you were asked questions

24  regarding how you prepared.

25          What documents did you review?

- CDF -

1    A.   The arrest report and my prior minutes from the

2  hearings and grand juries of the defendant and April Grant.

3    Q.   You were asked questions on cross-examination

4  regarding at the time of the car stop when you saw a bulge

5  whether you used your radio to relay anything at that time?

6    A.   Yes.

7    Q.   Do you remember being asked those questions?

8    A.   Yes.

9    Q.   At the time of the car stop, tell the Court why

10 is it that you didn't pull out a radio and relay anything?

11   A.   It was only a suspicion at that point.  We've had

12 many car stops where that could be anything from a fanny

13 pack or something nonthreatening, so at that point I did

14 not have enough to call in for help.

15   Q.   You were asked questions regarding the use of

16 your weapon.

17       At any point in time on October 28th, 2018 when

18 chasing the defendant, did you ever fire your weapon?

19   A.   No.

20   Q.   Did you ever see Officer Rilling fire his weapon?

21   A.   No.

22   Q.   You were asked questions on cross-examination

23 regarding the moment Officer Denehy had his gun pointed at

24 you.

25       Do you remember being asked those questions?

1    A.    I do.

2    Q.    Can you tell the Court at that moment, what was

3  going on?

4    A.    Fear, number one.  I saw his gun pointed at me

5  and it was just a lot of confusion in the area at the time.

6  Shots were going off, I had another gun pointing at me.  A

7  lot of confusion.

8    Q.    You were asked questions regarding, on

9  cross-examination, regarding the moment that Mr. Costa was

10  running down Midwood towards Clinton with his gun pointed

11  at you.

12        Do you remember being asked those questions?

13    A.    Yes.

14    Q.    Tell the Court, at that time, in what direction

15  was the defendant's gun pointed?

16    A.    Westbound down Midwood.

17    Q.    Who was it pointed at?

18    A.    Me.

19    Q.    Where was it aimed?

20    A.    Me.

21    Q.    At the time that the gun was fired, in what

22  direction was it pointed?

23    A.    Westbound.

24    Q.    Towards who?

25    A.    Me.

- CDF -

1    Q.    Finally, Officer Kraemer, you were asked

2  questions on cross-examination regarding these allegations

3  that were made against you.

4          Were any of them -- did any of them result in any

5  sort of punishment for you?

6    A.    No.

7    Q.    Were any of them true?

8    A.    No.

9          MR. ROSENBLATT:  I have nothing further,

10  your Honor, thank you.

11          THE COURT:  Thank you.

12          Any recross, Ms. Golombek?

13          MS. GOLOMBEK:  One moment.

14          (Whereupon, a pause was had in the record.)

15          MS. GOLOMBEK:  May I, your Honor?

16          THE COURT:  Yes.

17  RECROSS-EXAMINATION BY

18  MS. GOLOMBEK:

19    Q.    You watched the video regarding 21 Midwood

20  Street, correct?

21          MR. ROSENBLATT:  Objection.

22          Outside the scope.

23          THE COURT:  Sustained.

24          Is that it, Ms. Golombek?

25          MS. GOLOMBEK:  That's it, Judge.



- CDF -

1          THE COURT:  You're excused, Officer Kraemer,

2      thank you very much.  Have a good rest of the day.

3          THE WITNESS:  Thank you.  You too.

4          (Whereupon, the witness was excused from the

5      courtroom.)

6          THE COURT:  Do you have another witness,

7      Mr. Rosenblatt?

8          MR. ROSENBLATT:  Yes, your Honor, the People

9      call Officer Tom Rilling.

10          (Whereupon, the witness entered the

11      courtroom.)

12

13  T H O M A S   R I L L I N G, Police Officer, called on

14  behalf of the People, having been duly sworn, took the

15  witness stand and testified as follows:

16

17          THE CLERK:  Please state your name and

18      spelling for the record.

19          THE WITNESS:  Thomas Rilling.

20      R-I-L-L-I-N-G.

21          THE CLERK:  State your command and shield

22      number.

23          THE WITNESS:  Command is Bureau of Special

24      Operations.  Shield number 2166.

25          THE COURT:  Good morning, Officer Rilling.

- CDF -

1         THE WITNESS:  Good morning, your Honor.

2         THE COURT:  Mr. Rosenblatt, you may inquire.

3         MR. ROSENBLATT:  Thank you, your Honor.

4    DIRECT EXAMINATION BY

5    MR. ROSENBLATT:

6         Q.   Good morning still, Officer Rilling.

7         A.   Good morning.

8         Q.   Tell the Court, do you work?

9         A.   Yes.

10        Q.   What type of work do you do?

11        A.   I'm a police officer for Nassau County.

12        Q.   For how long have you been working for the Nassau

13   County Police Department?

14        A.   Since 2005.  16 years.  17 years.

15        Q.   What's been your experience with the Nassau

16   County Police Department, where have you been assigned?

17        A.   So I started my career in the Second Precinct and

18   then in 2013 I went to the Bureau of Special Operations.

19        Q.   Since 2013, have you been with the Bureau of

20   Special Operations?

21        A.   I'm sorry?

22        Q.   Since 2013, have you been with the Bureau of

23   Special Operations?

24        A.   Yes, that's where I go to work.

25        Q.   What are your duties and responsibilities for the

- CDF -

1    Bureau of Special Operations?

2        A.    So I'm a police officer there.  We do search

3    warrants, we do -- I'm one of the snipers for Nassau

4    County.  We do plainclothes, you know, drug enforcement,

5    narcotics enforcement.

6        Q.    Now, other than working for the police

7    department, do you have other law enforcement experience?

8        A.    I was a Suffolk County Parks cop for about ten

9    months.

10       Q.    Have you served in any other capacity?

11       A.    Yeah, I was in the United States Marine Corp.

12   from '99 to '03.

13       Q.    I want to talk to you now about October 27th into

14   October 28th of 2018.

15             Were you working during that time?

16       A.    Yes.

17       Q.    Back on October 27th into the 28th, on that day

18   or from the 27th into the 28th, were you assigned to the

19   Bureau of Special Operations?

20       A.    Yes.

21       Q.    I want to call your attention that particular

22   shift.

23             Do you remember the hours that you were working

24   those days?

25       A.    I was working 1530, 3:30 in the afternoon

- CDF -

1    until 0130.

2        Q.    Back on October 27th into the 28th, where in the

3    County were you assigned?

4        A.    We were assigned to Hempstead.

5        Q.    In particular, on October 28th, 2018 about 12:45

6    in the morning, were you working alone or with a partner?

7        A.    I was with my partner.

8        Q.    Who was that?

9        A.    Kenneth Kraemer.

10       Q.    On October 28th, were you dressed in a suit, as

11   you are today, or a uniform or something else?

12       A.    I was in plainclothes, jeans and a sweatshirt,

13   hooded sweatshirt.

14       Q.    Back on the 28th, after midnight, were you in a

15   marked or unmarked vehicle?

16       A.    Unmarked.

17       Q.    Do you remember what type of car it was?

18       A.    A gray Chevy Tahoe.

19       Q.    Now, at approximately 12:45 in the morning, who

20   was driving?

21       A.    My partner, Kraemer.

22       Q.    And at 12:45 in the morning on

23   October 28th, 2018, where were you?

24       A.    We were in the vicinity of Vancott in Hempstead.

25       Q.    That area, Hempstead, that's within the County of

- CDF -

1    Nassau?

2        A.    Yes, it is.

3        Q.    In the Village of Hempstead?

4        A.    Yes.

5        Q.    At approximately 12:45 in the morning, tell the

6    Court what happened.

7        A.    My partner and I were traveling east on Vancott.

8    We observed a 2015 black Nissan Altima in front of us and

9    that Altima failed to signal a turn from Vancott on to

10   Lafayette.

11       Q.    When it turned from Vancott to Lafayette, what

12   did you do; meaning, you and Officer Kraemer?

13       A.    Yes.  We closed the gap to that vehicle by

14   driving up that way and then we turned also onto Lafayette

15   and engaged in a traffic stop, we put on the lights and

16   sirens.

17       Q.    After the lights were activated and the car stop

18   took place, did you exit the vehicle?

19       A.    Yes, I did.

20       Q.    Where did you go?

21       A.    I went to the passenger side.

22       Q.    When you approached the passenger side of that

23   Altima, you indicated that earlier you had jeans and a

24   sweatshirt on?

25       A.    Yes.

- CDF -

1      Q.   Did you have any sort of police paraphernalia

2  visible at that time?

3      A.   Yes.  So I have a chain necklace with my shield

4  on it and every time I exit the vehicle my chain necklace

5  comes out.

6      Q.   And at 12:45 in the morning, when Officer Kraemer

7  and you began that car stop, was your shield displayed?

8      A.   Yes, it was.

9      Q.   As your shield was displayed, where did you go?

10     A.   I walked up to the passenger side of the vehicle.

11     Q.   Who did you see when you approached the passenger

12  side?

13     A.   I saw a female driver, April Grant, and a male

14  passenger, Duane Costa.

15     Q.   Now, when you tell us the names of Ms. Grant and

16  Mr. Costa, at the time that you approached that car on

17  October 28th, did you know the driver's name at that time

18  to be April Grant?

19     A.   No.

20     Q.   Did you know the passenger's name to be, at that

21  time, Duane Costa?

22     A.   No.

23     Q.   How did you come to learn that the front seat

24  passenger's name was Duane Costa?

25     A.   So when I approached the vehicle, I noticed the

- CDF -

1  front seat passenger Duane Costa didn't have a seatbelt on.

2  I asked him for ID and he handed me his ID.

3      Q.    When you're talking to us that Mr. Costa was the

4  front seat passenger, do you see him in the courtroom

5  today?

6      A.    Yes.

7      Q.    Can you point and tell us what he's wearing?

8      A.    Sure.  He's got the blue suit and the mask on

9  (indicating).

10             THE COURT:  The record will reflect that the

11          witness has identified the defendant.

12      Q.    Now, as you approached the defendant you said you

13  observed that he wasn't wearing his seatbelt?

14      A.    Yes.

15      Q.    What did you say to him and what did he say to

16  you?

17      A.    I asked him if there was any reason why he wasn't

18  wearing his seatbelt.  He stated no, he was just coming

19  from the bar.  He was on his way home.

20      Q.    When you approached the vehicle and you were

21  speaking to Mr. Costa what, if anything, did you smell?

22      A.    I smelled a strong odor of alcohol coming from

23  the vehicle.

24      Q.    At the time that you smelled that odor of

25  alcohol, could you tell who it was coming from?

1      A.    No.

2      Q.    Tell us what you observed Mr. Costa do when you

3  asked him for identification?

4      A.    So Mr. Costa reached into his left side, pulled

5  out his ID but while he was doing that he pushed down on

6  what looked like a large object in his waistband.

7      Q.    You're indicating that his right arm --

8      A.    Right arm pushed down on a large object while he

9  handed me the ID.

10     Q.    At that time, what did you do?

11     A.    I asked him to step out of the vehicle.

12     Q.    Why did you ask him to step out of the vehicle?

13     A.    I wanted to make sure that there was no weapons

14  there, that we were safe.

15     Q.    What did you say to Mr. Costa at that time?

16     A.    I said would you mind stepping out of the

17  vehicle, I want to make sure we have no weapons on you.

18           He stepped out of the vehicle.

19           Do you want me to continue?

20     Q.    Tell us what happened?

21     A.    He stepped out of the vehicle compliantly, I

22  asked him to put his hands up on the roof of the vehicle.

23  He turned like he was going to put his hands up on the

24  vehicle, gave me a violent shove and began running east on

25  Midwood.

```
 1          Q.    Now, you told us at the time that you asked
 2    Mr. Costa to exit the vehicle you wanted him to put his
 3    hands on the car?
 4          A.    Yes.
 5          Q.    Why is that?
 6          A.    I wanted him away from the waistband.
 7                    MS. GOLOMBEK:  I didn't hear the answer.
 8                    THE WITNESS:  I'm sorry?
 9                    MS. GOLOMBEK:  I didn't hear the answer,
10    Judge.
11          Q.    Can you repeat the answer.
12          A.    I wanted his hands away from his waistband, so I
13    wanted them up on the roof of the car.
14          Q.    Why was that?
15          A.    Because I was going to search him.
16          Q.    Now, you indicated that at the time that you
17    asked him to put his hands on the car he -- what did he do
18    with his hands?
19          A.    So he turned --
20                    MS. GOLOMBEK:  Objection.
21                    Asked and answered.
22                    THE COURT:  Overruled.
23          A.    He turned like he was going to put his hands up
24    on the car, like he was going to be compliant.  And then
25    turned, faced me and shoved me and just turned and ran.
```

- CDF -

1    Q.    You're indicating with your hands that you put

2    them out.

3          Did Mr. Costa do that?

4    A.    He did.  He began to put -- bring them up like he

5    was going to comply and then the hands went on it to my

6    chest.

7    Q.    When Mr. Costa moved his hands towards you, where

8    did he put them?

9    A.    Shoulder area, chest area (indicating).

10   Q.    You're indicating pointing to your shoulder side?

11   A.    Yep.

12   Q.    Describe the force that Mr. Costa used when he

13   pushed you?

14   A.    It was a good shove.  I mean, I kind of braced

15   for it, I kind of saw it coming a little bit.  It didn't

16   send me to the ground but it was enough that I felt it.

17   Q.    As Mr. Costa pushed you, you indicated he took

18   off.  Where did he go?

19   A.    So he ran directly east down Midwood right on the

20   sidewalk.

21   Q.    Now, after he pushed you and ran, how far at that

22   point was the defendant ahead of you?

23   A.    Only five or six feet.

24   Q.    As the defendant pushed you and ran, what did you

25   do?

- CDF -

1    A.    I began chasing.

2    Q.    Describe what happened after Mr. Costa pushed

3    you?

4    A.    So I'm running behind him, straight down the

5    sidewalk on the south side of Midwood.

6          He immediately goes into his waistband, fumbles

7    something, I hear a metallic object collide with the

8    sidewalk and he continues running, so I continue running

9    behind him.

10         The second time into his waistband, this time I

11   see him make a distinct movement, like a racking of a

12   firearm, and I hear the rack of the firearm and at that

13   point I began yelling gun and I drew my firearm on him.

14   Q.    I want to just back up a moment.

15         You indicated that as Mr. Costa ran and he went

16   to his waistband, you heard a metallic item drop.

17         Describe what sound you heard?

18   A.    It sounded like a gun hitting a sidewalk.  I

19   mean, it was pretty distinct and loud.

20   Q.    Did you know at that time what it was?

21   A.    I didn't.

22   Q.    Did you stop?

23   A.    No.

24   Q.    As the defendant went to his waistband and that

25   item dropped, where was his hands?

- CDF -

1  A. They were in front of him.

2  Q. Did he continue to run?

3  A. Yes.

4  Q. At that point when the item dropped, did he stop?

5  A. No.

6  Q. As the defendant continued to run, you indicated

7 with your hands earlier the racking of a gun motion in

8 front of you?

9  A. Yes.

10  Q. Could you see a gun at that moment?

11  A. No, I didn't see it until it came to his side.

12  Q. You told us that you heard the gun rack.

13   Describe that sound to the Court.

14  A. It's pretty distinctive.  If you know firearms,

15 it's the sound of the metal of the slide coming back and a

16 round being chambered into the gun.

17  Q. Based on your years of experience, Officer, with

18 both in the military and working for law enforcement, is

19 that a sound that you had heard before?

20  A. Yes.

21   MS. GOLOMBEK:  Objection.

22   Leading the witness.

23   THE COURT:  Overruled.

24  A. Yes, I've heard that sound.

25  Q. When you heard the gun rack, you indicated at

- CDF -

1     some point the defendant's hands moved.

2           Where did they go?

3     A.    So he racked the gun and then the right hand with

4     the gun came back and it was swinging as he was running.

5     Q.    Could you describe the movements of the

6     defendant's arms as you saw the gun in his hand?

7     A.    So he was running and swinging his arms naturally

8     like you would so you would see the gun for a second and

9     then, you know, it would be in front of him for a second.

10    Q.    You're moving your hands, indicating like a

11    person --

12    A.    Yes.

13    Q.    -- running back and forth with their arms?

14    A.    Right, exactly.  Exactly, you know, how you would

15    think somebody would be running, arms swinging.

16    Q.    At the time that you heard the racking of that

17    gun and saw the defendant, how far ahead of you was he at

18    that point?

19    A.    Still the same distance, you know, six, eight

20    feet, maybe he's gaining a little on me.

21    Q.    Now, you said at some point as you were chasing

22    him you yell gun?

23    A.    Yes.

24    Q.    When did you yell that?

25    A.    When I heard the racking of the gun and it was



- CDF -

1   simultaneous to him, you know, to the gun being visible to

2   me.

3       Q.   After the defendant racked the gun, describe what

4   happened next?

5       A.   So when the defendant racked the gun and I saw

6   the gun I stopped running thinking we were going to have a

7   gunfight, so I stopped running, drew my firearm and I began

8   giving police commands, drop the gun, stop running.

9   Police, don't move.  That type of thing.

10      Q.   When you said you were thinking you were going to

11  have, I think you said a gun battle, what position were you

12  in?

13      A.   I was running and I was coming to a stop so now

14  I'm stopped and I'm in a fighting position, really, a

15  standoff, where he -- I'm sorry, a standing position where

16  I'm drawing my weapon and, you know, coming to the sights.

17      Q.   When you say that, coming to sights, what does

18  that mean?

19      A.   It's just raising the sights up to your eyes so

20  you could get an accurate shot.

21      Q.   So at the time that you heard the racking of the

22  gun, you came to a stop?

23      A.   Yes.

24      Q.   And where was the gun lifted in your hand, your

25  own gun?

- CDF -

1      A.    My came out in front of me, pointed at the
2  defendant.

3      Q.    At that moment your gun was out of the holster
4  and pointed at the defendant?

5      A.    Yes.

6      Q.    And at that point you had stopped running?

7      A.    I'm sorry, did I stop?

8      Q.    At that point you had stopped running?

9      A.    I stopped running, yes.

10     Q.    At the point that you stopped running, what did
11  you see?

12     A.    The defendant did not stop running, so he
13  continued to run, continued to have the gun in his hand and
14  now I'm realizing he's gaining distance on me, he's not
15  listening to my verbal commands and we're not engaged in a
16  gunfight so now I have to get back to chasing again so I
17  began running again.

18     Q.    At that time, when you began to chase the
19  defendant again, what happened?

20     A.    At that time as soon as I started running again
21  the defendant turned, faced and with his right arm extended
22  pointed the firearm at me and fired two rounds.

23     Q.    I want to just focus your attention at the moment
24  that the defendant fired the gun.

25     A.    Sure.





1    Q.    Now, you indicated just a moment ago that the
2    defendant extended his arm.
3          Can you demonstrate for the Court what you saw?
4    A.    Yeah, so he's running forward but his shoulder,
5    his arm and his face come backward.
6          THE COURT:  Indicating to the right?
7          THE WITNESS:  Indicating to the right.
8    Q.    His right arm is extended over his right
9    shoulder?
10   A.    Yes.
11   Q.    And at that point was he still running?
12   A.    Yes.
13   Q.    And as his right arm is extended over his right
14   shoulder and he's turning, could you see the gun?
15   A.    Yes.
16   Q.    As you saw the gun in the defendant's hand as his
17   arm is extended, where was his arm pointed?
18   A.    Directly at me.
19   Q.    At that point as he's running and his arm is
20   extended at you, what did you see?
21   A.    I saw the muzzle flash of the gun and I heard the
22   bang of the shot going off.
23   Q.    When you say you heard the muzzle flash, what did
24   you actually see?  Describe what you observed?
25   A.    The muzzle flash, it's the fire or the flame that

1    comes out of the barrel of the gun from the explosion

2    inside the gun or inside the chamber.  As the bullet exits

3    the front of the gun the flame follows it.  It's pretty

4    distinct, you can see, especially on a dark night, you can

5    see that fire coming out.

6         Q.    As you saw the muzzle flash of the defendant's

7    gun, describe what you heard?

8         A.    Yeah, so I heard the shot go off and I heard what

9    sounded like the round going passed my head.  I'd say it

10   missed me by two to three feet.

11        Q.    Can you describe the sound that you heard as you

12   described the bullet go two to three feet passed you?

13        A.    Yeah, it's kind of a zipping sound or a crack and

14   the only way I could describe it, sound like an angry bee,

15   kind of zipping.

16        Q.    Sounded like?

17        A.    An angry bee.

18              MS. GOLOMBEK:  I didn't hear that.  Sounded

19        like?

20              THE WITNESS:  An angry bee.

21        Q.    You indicated that you felt the bullet two to

22   three feet from you.  What part of your body --

23              MS. GOLOMBEK:  Objection.

24              I don't recall that being said today.

25              THE COURT:  Rephrase that question,

1    Mr. Rosenblatt.

2    Q.    Did you describe how far the bullet was from you?

3    A.    Yeah, I felt it pass and I heard it pass, I think

4    it was within two to three feet.

5    Q.    As you described this bullet approximately two to

6    three feet from you, what part of your body was the two to

7    three feet from?

8    A.    My head, ear.

9    Q.    At the time that that bullet was two to three

10    feet by your ear, did it ever hit the ground?

11    A.    Not that I know of.

12    Q.    Was the gun aimed at your feet?

13    A.    No.

14    Q.    Where was the gun aimed?

15    A.    It was aimed up, it was aimed, you know, directly

16    for me.

17    Q.    And as you heard that angry bee sound two to

18    three feet from your ear, what did you do?

19    A.    So I jumped from the sidewalk to the left toward

20    the street, down the sidewalk there, there's on the

21    sidewalk just between the street and the sidewalk there is

22    a telephone pole.  I was trying to take cover between that

23    telephone pole.  There is a car there as well parked.

24    Q.    When you tell the Court that you were trying to

25    take cover, at that point, was your gun out?

- CDF -

1    A.    Yes.

2    Q.    At that point, did you fire your weapon?

3    A.    No.

4    Q.    At the time, the defendant had fired those I

5    believe you described two -- you heard two gunshots,

6    correct?

7    A.    Yes.

8    Q.    At the time that you heard two gunshots, why

9    didn't you fire your gun at Mr. Costa?

10    A.    It would have been unsafe, I just couldn't take a

11    shot.  I was running full speed, my gun is at my side, you

12    know, swinging, I would rather get off where you call

13    the X, where you're standing where he last saw me.  I would

14    rather move off the stop and take cover.

15                    MS. GOLOMBEK:  Objection.

16                    This is just becoming a narrative and not

17            proper.

18                    THE COURT:  Overruled.

19    A.    I didn't want to get shot with the bullet so I

20    moved off of the sidewalk where he last saw me and firing

21    at me and I moved to the left.

22    Q.    Now, you told us earlier that at the time of the

23    car stop you were with Officer Kraemer?

24    A.    Yes.

25    Q.    During this time, where was he?

1   A.   He was in foot pursuit behind me.

2   Q.   At some point in time, did Officer Kraemer

3   continue to run as you were getting in a position to fire?

4   A.   Yes.   So he ends up -- at that moment when I'm

5   coming off the sidewalk and going north or, you know, going

6   left off the sidewalk, Officer Kraemer now passes me in a

7   foot pursuit.

8   Q.   What was the -- to the best of your ability to

9   recall, when in the series of events that you describe did

10   Officer Kraemer pass you?   Was it before or after the shots

11   were fired?

12   A.   After.

13   Q.   Now, at the time that you went to get cover in

14   the vicinity by the pole near the car that you described,

15   what happened next?

16   A.   Like I said, so I didn't have my -- I had my

17   weapon out so as I got to the pole and the car I put my

18   weapon back up to engage the suspect because, you know,

19   he's now firing at us and I didn't have a shot because my

20   partner had ran, you know, directly in my line of sight,

21   he's right in front of me now so I opted not to shoot.

22   Q.   And at that time that you can't shoot because

23   Officer Kraemer is now in your line of sight, what did you

24   do?

25   A.   I began foot pursuit again but only briefly.   Ran

- CDF -

1. a little bit further and I turned around and went back to
2. the car.
3.      Q.    Now, you indicated after the weapon was fired by
4. the defendant and you took a brief foot pursuit and
5. returned, why did you stop that foot pursuit?
6.      A.    There was a few reasons.  Mainly because our
7. vehicle was -- mainly because I was out of it now, I was so
8. far from Costa and my partner was closer, our vehicle was
9. behind us with the doors open, it's got a lot of SWAT gear
10. in it, I didn't want to leave that open in Hempstead and I
11. also dropped my radio at the beginning of the foot pursuit.
12. As soon as I began running after Costa my portable radio
13. fell out of my pocket, so at that moment when Kraemer took
14. over the foot pursuit, I ran back, retrieved my radio,
15. retrieved the car.
16.      Q.    So now you're headed back to the car and you said
17. you pick up your radio?
18.      A.    Yes.
19.      Q.    As you approach the car, what did you do?
20.      A.    I ran into -- well, April Grant was still there
21. and so I had a brief interaction with her, she had some IDs
22. in her hand and stuff, she had her hands up like this
23. (indicating).  Her hands up over her shoulders.  And she
24. had some IDs and stuff in her hand.  I wanted to make sure
25. I could ID her, I didn't know if my partner had taken her

1    ID already so I took the set of IDs from her and I told her

2    to stay there, wait at the scene.

3            I got in the Tahoe and I fled -- left southbound

4    on Midwood -- I'm sorry, eastbound on Midwood.  Same

5    direction as the foot pursuit.

6        Q.    Now you're inside your Tahoe, correct?

7        A.    Yes.

8        Q.    Are the lights and sirens are?

9        A.    The lights are still on but no siren.

10        Q.    As the lights are on, you're driving on Midwood?

11        A.    Yes.

12        Q.    What is the next cross-street?

13        A.    Clinton.

14        Q.    When you were driving on Midwood towards Clinton,

15    what did you hear, if anything?

16        A.    I heard more gunshots going off.

17        Q.    At that time as you were driving, could you see

18    where the gunshots were coming from?

19        A.    No.

20        Q.    How many gunshots did you hear at that time?

21        A.    I had initially heard three on Midwood when I was

22    involved in the foot pursuit.  As I'm driving down Midwood

23    in the vehicle I hear an additional two.

24        Q.    As you get to Midwood -- excuse me, as you're on

25    Midwood and you get to Clinton, what happened?



- CDF -

1    A.    I pull out onto Clinton, I see the officers,

2    Kraemer, Denehy and the defendant Costa passing through the

3    gas station, so I make the right onto Clinton, south on

4    Clinton and I catch up to where the guys are, where the

5    other officers are.

6    Q.    Now, you told us at some point you observed

7    Officer Denehy.

8         When was the first time you saw him?

9    A.    Earlier in the night, you know, maybe shortly

10   before we did this car stop, I saw him, him and his partner

11   had an arrest going on on Clinton.

12        When this interaction took place the first time

13   I'm seeing him is when I'm making a right onto Clinton.

14   Q.    And when you say you recognized Officer Denehy,

15   had you worked with him previously?

16   A.    Yeah, him and I have worked together for probably

17   five years at that point.

18   Q.    When you say worked together, meaning multiple

19   days of the week over a period of five years?

20   A.    Every day I'm working BSO we work the same squad

21   so we work the same exact days, same exact tour.

22   Q.    Now you're on Clinton, you indicate that you see

23   Denehy and Kraemer running down Clinton as well?

24   A.    Yes.

25   Q.    Where do you drive?

- CDF -

1     A.    I drive south on Clinton and catch up with them
2   right outside of an alleyway and that's where I parked the
3   car and get out.

4     Q.    When you parked the car on Clinton, describe to
5   the Court what happened?

6     A.    So I parked the car, I grabbed an extra magazine,
7   ammo, ammunition, out of the door and we kind of had a
8   huddle there for a second where we were deciding to hold
9   the perimeter or go up the alley.

10       Officer Denehy continued south to start the
11   perimeter and Officer Kraemer and I and I think Officer
12   Bourke began that search up the alley.

13     Q.    What happened as you entered the alley?

14     A.    Nothing.  It turned negative results.  I we went
15   slow.  There were a lot of spots there that were dangerous
16   if the defendant was still there with the gun so we exited
17   that alley pretty slow, we were clearing that alley pretty
18   slow.

19       At some point I end up hearing officers yelling
20   in an adjacent yard, giving police commands, police, don't
21   move, put your hands up.  So it appeared somebody had found
22   the defendant.

23            MS. GOLOMBEK:  Objection as it appeared.
24            Speculation.

25     A.    Somebody had found the defendant.

1          THE COURT:  I'll strike the word appeared

2      and the remainder of the answer, the testimony, will

3      stand.

4      Q.    Now, Officer Rilling, you indicated at some point

5  you heard police commands being given?

6      A.    Yes.

7      Q.    Did you recognize the voice?

8      A.    I recognized it to be Officer Denehy.

9      Q.    As you heard Officer Denehy yelling police

10  commands, where did you go?

11     A.    I hopped the fence in that alleyway to get into

12  another yard.  I ended up making my way out to Meriam

13  Street.

14     Q.    As you hopped the fence and were now on Meriam,

15  what did you see?

16     A.    I saw Officer Denehy and an officer from

17  Hempstead PD walking the defendant out in handcuffs.

18          MR. ROSENBLATT:  I'm going to ask that this

19      photograph be marked as 27, Judge.

20          THE COURT:  Yes.

21          (Whereupon, People's Exhibit 27 was so

22      marked for identification.)

23          THE COURT:  It's marked as People's 27 for

24      identification.

25          Did you want that shown to the witness,

1          Mr. Rosenblatt?

2                    MR. ROSENBLATT:  Yes, I'd ask that be shown

3          to the witness please.

4                    (Whereupon, the exhibit was handed to the

5          witness.)

6      Q.    Officer Rilling, do you have in front of you

7    what's been marked as People's Exhibit 27 for

8    identification?

9      A.    Yes.

10     Q.    Do you recognize that?

11     A.    Yes.

12     Q.    What do you recognize it to be?

13     A.    This is an overhead map of the area where the

14   foot pursuit and --

15                   MS. GOLOMBEK:  I can't hear.  All I hear is

16         map.

17     A.    I'm sorry.

18              It's an overhead map of where this incident took

19   place.

20     Q.    Is that a fair and accurate depiction, as an

21   aerial view of the vicinity of Midwood and Clinton as it

22   appeared on October 28th, 2018?

23                   MS. GOLOMBEK:  Objection.

24                   Let the witness tell us what he knows.

25                   THE COURT:  The witness already told you

- CDF -

1          what it is.

2                    Overruled.

3          A.    Yes, it's fair and accurate.

4                    MR. ROSENBLATT:  Your Honor, I'd ask

5          Exhibit 27 be received as Exhibit 27.

6                    THE COURT:  Let's show it to Ms. Golombek.

7                    (Whereupon, the exhibit was handed to

8          defense counsel.)

9     VOIR DIRE EXAMINATION BY

10    MS. GOLOMBEK:

11         Q.    Is this drawn to scale?

12         A.    I'm sorry, you're asking me?

13         Q.    This is a photograph.  It's not drawn to scale,

14    is it?

15         A.    I don't think so, no.

16                    THE COURT:  It's not drawn, it's a

17         photograph.

18                    MS. GOLOMBEK:  I have no objection, your

19         Honor.

20                    THE COURT:  People's 27 marked in evidence.

21                    (Whereupon, People's Exhibit 27, previously

22         marked for identification, was received in evidence.)

23                    THE COURT OFFICER:  So marked.

24                    THE COURT:  People's 27 has now been marked

25         in evidence and we're now going to take our recess for

- CDF -

1    lunch and I will see everybody back here, I do have an

2    order to show cause I have to address at 2:00 so

3    hopefully by 2:20 we can get back started with the

4    trial.

5                    (Whereupon, a luncheon recess was taken.)

6

7        * * * A F T E R N O O N   S E S S I O N * * *

8

9                    THE CLERK:  Continuing trial,

10    Indictment 1934N of 2018.

11                    All parties are present and accounted for.

12    All appearances remain the same.

13                    THE COURT:  Let's bring in Officer Rilling.

14                    (Whereupon, the witness entered the

15    courtroom.)

16                    THE CLERK:  Officer, I remind you you're

17    still under oath.

18                    Do you understand?

19                    THE WITNESS:  Yes.

20                    THE COURT:  Good afternoon, Officer Rilling.

21                    THE WITNESS:  Good afternoon, your Honor.

22                    THE COURT:  We will continue with your

23    direct examination by Mr. Rosenblatt.

24

25

1    CONTINUED DIRECT EXAMINATION BY

2    MR. ROSENBLATT:

3         Q.   When we left off, prior to lunch, Officer

4    Rilling, we were about to talk about Exhibit 27 that I'm

5    going to ask to be handed to you.  I'm also going to give

6    you a black Sharpie.

7                    (Whereupon, the exhibit was handed to the

8         witness.)

9         Q.   Officer Rilling, if you could, I'm going to ask

10   you if you could use the map and put a star at the corner

11   of where you did the car stop.

12                So what was the corner of the car stop?

13        A.   Lafayette Avenue and Midwood Street.

14        Q.   Can you put a star there.

15        A.   Sure.

16                    (Whereupon, the witness complied.)

17        Q.   And then from that star, can you draw a path of

18   travel of where it was that you chased Mr. Costa.

19        A.   Yes.

20                You want my vehicle as well?

21        Q.   Yes.

22                    (Whereupon, the witness complied.)

23        Q.   With that black Sharpie, if you could just circle

24   the area of where the alley was.

25                    (Whereupon, the witness complied.)

1          MR. ROSENBLATT:  I'm going to take that back

2      and put it on the screen so we can talk about it.

3          (Whereupon, the exhibit was published.)

4   Q.   Can you see that?

5   A.   Yes.

6          MR. ROSENBLATT:  Now, with the Court's

7      permission, if I could have the witness step down.

8          THE COURT:  Sure.  Do you need the pointer?

9          MR. ROSENBLATT:  Yes, that would be great.

10  Q.   Now, can you just point and show us where it was

11  that you indicated you pulled the defendant over?

12  A.   On the star here, Lafayette Avenue and Midwood

13  Street (indicating).

14  Q.   Now, you drew the line.

15      Show us with the pointer where you chased him?

16  A.   So came down to a little past Midwood, a block as

17  I remember, and then I ran back to the car, came back down

18  to Clinton, right on Clinton south and I stopped here

19  (indicating).

20  Q.   Now, you circled the area on Clinton Street, is

21  that indicating where you saw the alley and where he

22  entered?

23  A.   Yes.

24          MS. GOLOMBEK:  Objection.

25          Leading the witness.

- CDF -

1          THE COURT:  Sustained.

2     Q.   Show us on the map where the alley was.

3     A.   The alley is here, in this circle (indicating).

4     Q.   What street is that?

5     A.   Clinton Street.

6     Q.   What street is that between?

7     A.   It's between Vancott and Meriam.

8     Q.   You told us before that at some point you heard

9  Officer Denehy yelling commands and observed the defendant

10  being apprehended?

11    A.   Yes.

12    Q.   Can you show us on the map where that was?

13    A.   Where I was at the time?

14    Q.   Yes.

15    A.   I was in this wooded area right here (indicating)

16  behind the alley.

17          When I jumped the fence, came out onto Meriam, I

18  saw the defendant, Officer Denehy and a Hempstead --

19          MS. GOLOMBEK:  Objection.

20          The second part of the answer is not

21     responsive.

22          THE COURT:  Overruled.

23          MS. GOLOMBEK:  To the question.

24          THE COURT:  Overruled.

25    Q.   You said you then came around and observed

1    Officer Denehy.  Point again where?

2         A.   (Whereupon, the witness indicated.)

3         Q.   You're pointing to?

4         A.   6 Meriam.  It's the corner house on Meriam and

5    Lafayette.

6         Q.   And when ultimately you told us that from the

7    area of 6 Meriam, you returned to where the car stop was.

8              Show us how you went back.

9         A.   So after the defendant got put into the back of

10   the car, my partner and I walked down Lafayette to the area

11   of the car stop (indicating), found the Smith & Wesson

12   right here (indicating).

13              MS. GOLOMBEK:  Objection.

14              Last part of the answer is not responsive.

15              Move to strike it.

16              THE COURT:  Overruled.

17        Q.   When you say you returned, just point again to

18   that area and tell us what you're pointing at?

19        A.   This is the house on Meriam (indicating).  This

20   is the area where I found the handgun that was dropped.

21        Q.   You said Meriam, but you're point to Midwood?

22        A.   I'm sorry, Midwood.

23              MS. GOLOMBEK:  Objection, the officer

24         testified.

25              We're now getting the prosecutor saying

```
 1          something else.
 2                      MR. ROSENBLATT:  It's a clarification
 3          question.
 4                      THE COURT:  Overruled.
 5                      MR. ROSENBLATT:  That's great, Officer, you
 6          can have a seat.
 7          Q.    Officer Rilling, you indicated that after you
 8     observed Police Officer Denehy apprehend the defendant you
 9     returned back to Midwood Street; is that correct?
10          A.    Yes, that's correct.
11          Q.    Tell us what happened when you returned back to
12     Midwood?
13          A.    So I returned back to Midwood Street, I noticed
14     that April Grant and the vehicle was gone.  It was no
15     longer there.  And so I began to walk down Midwood Street
16     with my flashlight looking for whatever object the
17     defendant dropped.
18          Q.    I'm going to hand you --
19                      MS. GOLOMBEK:  Objection.
20                      I move to strike.
21                      There's no testimony that he dropped
22          something.  There was testimony that he heard a
23          metallic sound.  The testimony was not that he dropped
24          something.
25                      THE COURT:  Overruled.
```

- CDF -

1          MR. ROSENBLATT:  I'm going to hand the

2     witness what's in evidence as Exhibit 1 and I'm going

3     to put it on the screen.

4               (Whereupon, the exhibit was handed to the

5     witness.)

6     Q.    Officer Rilling, can you see the screen?

7     A.    Yes.

8     Q.    From the screen, can you compare what's on the

9     screen to what's in front of you as Exhibit 1?

10    A.    Yes.

11    Q.    It's the same?

12    A.    Same.

13    Q.    Do you recognize what's on the screen as what's

14    in evidence as People's Exhibit 1?

15    A.    Yes.

16    Q.    Tell us, what is it?

17    A.    It's a picture of eastbound Meriam -- I'm sorry,

18    eastbound Midwood Street.  It's the sidewalk there and I

19    see the handgun on the right side of the sidewalk.

20    Q.    Now, you told us that on the right side you saw a

21    handgun.

22          Where in relation to when you heard the metallic

23    sound that was dropped, that you described prior to lunch,

24    where is that in relation to the gun that's on Exhibit 1?

25    A.    It's the exact same location.

1    Q.    I'm going to show you what's already in evidence

2    as Exhibit 9 and I'm going to put it on the screen.

3                    (Whereupon, the exhibit was handed to the

4         witness.)

5    Q.    Do you see what's on the screen and what's in

6    front of you?

7    A.    Yes.

8    Q.    Are those the same?

9    A.    Yes.

10   Q.    Do you recognize what's in evidence as Exhibit 9?

11   A.    Yes.

12   Q.    What is it?

13   A.    It's the black handled silver slide

14   Smith & Wesson that I recovered or that I observed on the

15   ground.

16   Q.    Is that a close up -- excuse me, is that a close

17   up of what's contained in Exhibit 1 that you identified

18   moments ago?

19   A.    Yes.

20   Q.    Now Officer Rilling, you told us prior to lunch

21   the first time you heard the defendant fire his weapon at

22   you.

23                Where on the street did that occur?

24   A.    It was on the sidewalk of Meriam -- of Midwood

25   and it was about 200 feet in.





148

1    Q.   When you say 200 feet in, 200 feet from where?

2    A.   From the car stop.

3          MS. GOLOMBEK:  I'm sorry, 200 feet from the

4    car stop?

5          THE WITNESS:  Yes.

6    Q.   Can you describe to the Court the sound -- how

7    long it took for the shots to be fired when you described

8    how many shots you heard prior to lunch, but what was the

9    timeframe of how those shots came out?

10    A.   Yes --

11          MS. GOLOMBEK:  Objection to the form of the

12    question.

13          THE COURT:  Overruled.

14    A.   They were pretty quick in succession, maybe a

15    second or two apart.

16          MR. ROSENBLATT:  Judge, I have no further

17    questions for the officer.

18          Thank you.

19          THE COURT:  Thank you.

20          Ms. Golombek, cross-examination?

21          MS. GOLOMBEK:  Yes, Judge.

22    CROSS-EXAMINATION BY

23    MS. GOLOMBEK:

24    Q.   Officer Rilling, did you speak to Officer Kraemer

25    about his testimony yesterday?

- CDF -

1    A.    No.

2    Q.    Have you discussed the incident that happened on

3  October 28th, 2018 with Officer Kraemer prior to today?

4    A.    Yes.

5    Q.    Did you both go over what happened on that day?

6    A.    Yes.

7    Q.    How many times did you go over it?

8    A.    Maybe five or six.

9    Q.    When was the last time you went over your

10  testimony -- withdraw that.

11         When was the last time you went over what

12  happened on October 28th, 2018 with Officer Kraemer?

13   A.    We walked the street -- we walked the area of the

14  incident a few days ago.

15   Q.    A few days ago?

16   A.    Yes.

17   Q.    And you both discussed what you were going to say

18  in court, correct?

19   A.    No, we just discussed the incident.

20   Q.    You wanted to make sure you'd say the same

21  things, correct?

22   A.    No.

23   Q.    You wanted to say different things?

24   A.    No.

25   Q.    So you wanted to say the same thing?

1           MR. ROSENBLATT:  Objection.

2           THE COURT:  Sustained.

3      Q.   Did you speak to the prosecutor about your

4   testimony here today?

5      A.   I'm sorry?

6      Q.   Did you speak to the prosecutor, DA Rosenblatt

7   about your testimony today?

8      A.   No.

9      Q.   Did you speak to him prior to today?

10     A.   Yes.

11     Q.   Did he tell you what to say?

12     A.   No.

13     Q.   Did you read your Grand Jury testimony?

14     A.   Yes.

15     Q.   When was the last time you read it?

16     A.   A few days ago.

17     Q.   Did you see any videotape regarding this

18  incident?

19     A.   Yes.

20     Q.   Did you see the videotape of 21 Midwood Street?

21     A.   No.

22     Q.   Which video did you -- did you see a videotape

23  regarding the perpetrator running?

24     A.   Yes.

25     Q.   When you saw the videotape, that was a videotape

- CDF -

1  of 21 Midwood Street, correct?

2      A.    No.

3      Q.    That's the street -- the street that you indicate

4  Duane Costa was running down first, that was 21 Midwood

5  Street, correct?

6      A.    He ran down Midwood Street, yes.

7      Q.    And the shots you heard fired, that was on 21

8  Midwood Street approaching Clinton Street, correct?

9      A.    Yes, I heard shots on Midwood Street.  I don't

10  know what house numbers.

11      Q.    Did you see a video regarding Midwood Street?

12      A.    No, I did not.

13      Q.    What you saw in Plaintiff's Exhibit 1, that was

14  Midwood Street, correct?

15      A.    Can I see Plaintiff's Exhibit 1?

16            MR. ROSENBLATT:  Yes.

17            THE COURT:  It's People's exhibit.

18            MS. GOLOMBEK:  People's, I'm sorry.

19            (Whereupon, the exhibit was handed to the

20      witness.)

21      A.    Yes, I saw this.

22      Q.    Is that Midwood Street?

23      A.    Yes, it is.

24      Q.    You saw a video regarding that street, correct?

25      A.    I did not see any video regarding Midwood Street.

1      Q.    Did you see a video regarding who you indicate

2   was Duane Costa running?

3      A.    Yes.

4      Q.    That was Clinton Street, correct?

5      A.    The video that I saw was the gas station.

6      Q.    And the gas station was on Clinton Street,

7   correct?

8      A.    Yes.

9      Q.    When you saw the video, you never saw in the

10  video Mr. Costa -- you never saw on the video the person's

11  hand pointed back, did you?

12     A.    I did not.

13     Q.    So now, this movement that you described

14  Mr. Costa having when he was running, you described a

15  movement of him running and while he's running his right

16  arm is extended backwards, correct?

17     A.    Yes.

18     Q.    And the video would show what happened, correct?

19           MR. ROSENBLATT:  Objection.

20     A.    I didn't see any video.

21           THE COURT:  Sustained.

22     Q.    You indicated you saw the video of Clinton

23  Street, correct?  You saw the video by the gas station,

24  correct?

25     A.    Yes, but that's not where I testified he was

1    pointing his arm back at me.

2        Q.    You never saw him pointing a gun on Clinton

3    Street, correct; yes or no?

4        A.    Correct, yes.

5        Q.    And you also never saw him -- any pointing of a

6    gun on Midwood Street, correct?

7        A.    I saw the defendant point a gun on me at Midwood

8    Street, yes.

9        Q.    As a matter of fact, it's all a lie, correct?

10       A.    No.

11       Q.    You wanted to pin something on Duane Costa,

12   correct?

13       A.    No.

14       Q.    You saw that there were two black persons driving

15   a vehicle at 12:45 in the morning so you wanted to stop

16   them, correct?

17       A.    No.

18       Q.    Well, you testified that you did a traffic stop

19   at 12:45 in the morning, correct?

20       A.    Yes.

21       Q.    When you did the traffic stop at 12:45 in the

22   morning, you were in the passenger seat, correct, of the

23   police vehicle, correct?

24       A.    That's correct.

25       Q.    It was an unmarked police vehicle, correct?

- CDF -

1    A.    That is correct.

2    Q.    And your partner, Police Officer Kraemer, was in

3    the driver's seat, correct?

4    A.    Yes.

5    Q.    And you were the recorder, correct?

6    A.    Yes.

7    Q.    And tell us what a recorder is?

8    A.    It's just a word we use for the passenger of the

9    vehicle.

10    Q.    And you were free to call in to a precinct or

11    alert anybody to any incidents, correct?

12    A.    Yes.

13    Q.    So when you saw this traffic stop, naturally you

14    called in that there was a vehicle that failed to signal,

15    correct?

16    A.    No.

17    Q.    You didn't do that here?

18    A.    I did not.

19    Q.    Isn't it in your course of duty to report

20    incidents to the precinct; yes or no?

21    A.    Not minor ones like that.

22    Q.    Not what?

23    A.    Not minor incidents like that, I don't call in

24    every traffic stop.

25    Q.    Well, you thought it was a suspicious vehicle,

1    right?

2          A.    I thought it just failed to signal.

3          Q.    Well, do you consider that a minor incident?

4          A.    It's a VTL violation, yes.

5          Q.    Let me ask you something.  This minor incident

6    that you claimed, this failure to signal, on this day you

7    were working for BSO, correct?

8          A.    That is correct.

9          Q.    Bureau of Special Operations, correct?

10          A.    Yes.

11          Q.    And Bureau of Special Operations you do work that

12    requires special training, correct?

13          A.    Yes.

14          Q.    Like hostage situations, correct?

15          A.    Yes.

16          Q.    How many hours of training did you get in order

17    to be in Bureau of Special Operations?

18          A.    The SWAT school is about three months long.

19          Q.    And you go to refresher courses, correct?

20          A.    Yes.

21          Q.    And at this time you were working for BSO on

22    October 28th, 2018, you were working for BSO for how many

23    years?

24          A.    2018, I was working for them for five years.

25          Q.    For five years, correct?

1    A.    Yes.

2    Q.    And you were no longer just doing patrol duties,

3    correct?

4    A.    We still do patrol duties.

5    Q.    If there's suspicion of something major, correct?

6    A.    No, we can write a ticket for anything.

7    Q.    So you're saying that special training and on

8    this day you were there roaming around the area just for a

9    minor traffic violation, is that what you're saying?

10    A.    Yes.

11    Q.    Isn't it true this incident was called in?

12    A.    Called in how?  I'm sorry.

13    Q.    On a radio?

14    A.    Yes.

15    Q.    Isn't it true it was called in at the time of the

16    stop?

17    A.    No.

18    Q.    Isn't it true somebody covered up for calling in?

19    A.    No.

20    Q.    Isn't it true that what was called in contained

21    information that would help Mr. Costa?

22            MR. ROSENBLATT:  Objection.

23            Nothing was called in.

24            THE COURT:  Sustained.

25    Q.    Now, you indicate on October 28th, 2018 at

1    about 12:45 you went over to the passenger side of the

2    vehicle, correct?

3        A.   Yes.

4        Q.   Did you have your flashlight out?

5        A.   Yes.

6        Q.   You shined your flashlight in the car?

7        A.   Yes.

8        Q.   Oh, by the way, 12:45, when you went over to this

9    vehicle, it was dark out, correct?

10       A.   Yes.

11       Q.   It was nighttime, correct?

12       A.   It was nighttime.

13       Q.   In fact, it was the middle of the night, correct?

14       A.   It was 12:45 at night, yes.

15       Q.   It was not well-lit, correct?

16       A.   I'm sorry?

17       Q.   It was not well-lit, correct?

18       A.   It was not well-lit, correct.

19       Q.   And there was no light over the black Altima,

20   correct, there was no traffic light on over the black

21   Altima, correct?

22       A.   Not that I recall.

23       Q.   So when you put your flashlight in the vehicle,

24   you put your flashlight on Duane Costa?

25       A.   Yes.

- CDF -

1      Q.    And when you first put your flashlight in, you

2    see this large bulge you described on Duane Costa?

3      A.    I didn't notice it right away.

4      Q.    Well, let me ask you, you take -- now you're

5    trained, you're a trained officer, correct?

6      A.    That is correct.

7      Q.    You're trained to observe certain things,

8    correct?

9      A.    Yes.

10      Q.    And when you see a large bulge, that causes

11    suspicion, correct?

12      A.    Yes.

13      Q.    And one of the reasons when you see a -- one of

14    the things you do when you see a large bulge -- one of your

15    reactions when you see a large bulge is the concern for

16    your safety and everybody's safety, correct?

17      A.    Yes.

18      Q.    And you think that this large bulge may be a gun,

19    correct?

20      A.    I just didn't know what it was.

21      Q.    Well, it's a large bulge.

22            Isn't one of the things that come to your mind

23    when you see a large bulge is it could very well be a gun?

24      A.    Yes.

25      Q.    Now, in this case when you looked in, you're

1    telling us you didn't see the large bulge?

2        A.    I didn't notice it right away.

3        Q.    So with all of your training as a tactical

4    officer, as a Bureau of Special Operations you're trained

5    to notice fine details, correct?

6        A.    Yes.

7        Q.    So you're telling us when -- you had your

8    flashlight, the assistance of something that's going to

9    illuminate the area, at that time you were a trained

10   officer, a trained observer, don't see what you described

11   as a large bulge in the waistband of Duane Costa, correct?

12       A.    That's correct, I didn't see it right away.

13       Q.    That's because there was no large bulge, correct?

14       A.    No.

15       Q.    As a matter of fact, there was no bulge there at

16   all, correct?

17       A.    No.

18       Q.    As a matter of fact, you wanted to pin something

19   on Duane Costa, correct?

20              MR. ROSENBLATT:  Objection.

21              Asked and answered.

22              THE COURT:  Overruled.

23              You can answer, Officer.

24       A.    No.

25       Q.    Now, you say Duane Costa wasn't wearing a

- CDF -

1   seatbelt.

2         Did you think that was a big deal?

3   A.    I thought it was a VTL violation.

4   Q.    But you didn't think it was a big deal, did you?

5   A.    No.

6   Q.    Certainly not something to stop -- not something

7   to stop a vehicle for, including failure to signal, for a

8   BSO officer, correct?

9   A.    What's the question, ma'am?

10  Q.    Certainly not something that a Bureau of Special

11  Operations officer would want to get involved in, correct?

12        MR. ROSENBLATT:  Objection.

13        THE COURT:  Overruled.

14  A.    Yes, I've stopped people for seatbelt violations.

15  Q.    That was when you were on patrol, correct?

16  A.    And since I've been in BSO.

17  Q.    Now, you indicate you only saw the video of

18  Clinton Street?

19  A.    Yes.

20  Q.    Who showed you the video?

21  A.    DA Rosenberg (sic).

22  Q.    Did he show you the video of Midwood Street?

23  A.    No.

24  Q.    Did he show you any other videos?

25  A.    No.

- CDF -





1    Q.    So on that video you don't see Duane Costa

2    extending his arm backwards, correct?

3    A.    In the video at the gas station I did not --

4    Q.    Correct?

5    A.    Yes, correct.

6    Q.    You had heard three more shots.

7          You had heard, what you testified -- excuse me.

8          You testified to two more shots after the initial

9    three shots, correct?

10   A.    Yes.

11   Q.    After the initial three shots then on Clinton

12   Street you heard -- well, you weren't exactly on Clinton

13   Street but you heard two more shots, correct?

14   A.    Yes.

15   Q.    And you're sure of that, correct?

16   A.    Yes.

17   Q.    You're sure about that just like you're sure

18   about the rest of your testimony, correct?

19   A.    Yes.

20   Q.    Do you recall testifying in the Grand Jury?

21   A.    Yes.

22   Q.    And you were under oath on that date?

23   A.    Yes.

24   Q.    And you swore to tell the truth?

25   A.    Yes.

1      Q.   Just like you swore to today?

2      A.   Yes.

3      Q.   I draw the Court's attention to the Grand Jury

4    testimony of Police Officer Rilling on November 26th, 2018.

5           Was that the date you testified in the Grand

6    Jury?

7      A.   Yes.

8      Q.   Were you asked this question and did you give

9    this answer.

10          MS. GOLOMBEK:  I draw the Court's attention

11     to page 14, lines 14 through 25.

12     Q.   Question:  As you drove down the block, what

13                    happened?

14                    Answer:  As I was approaching the end

15                    of the block at the corner I heard

16                    another three rounds go off.  I didn't

17                    see them.  I was in the vicinity but it

18                    wasn't where the guy was shooting.  I

19                    was in the car turning the corner.  So

20                    with that I hear those other three

21                    rounds.  I turn right and I could see

22                    the rest of my partner Kraemer with the

23                    other two officers that joined in the

24                    foot pursuit as they were approaching

25                    that gas station and kind of taking up

- CDF -



```
1                          a defensive position there.
2                So is it two shots you heard after or three shots
3       you heard after?
4            A.    Two shots.
5            Q.    So what you testified to in the Grand Jury, which
6       was closer in time to the incident, that was false,
7       correct?
8            A.    Yes.
9            Q.    So you lied to the Grand Jury, correct?
10           A.    Unintentionally, yeah, I guess.
11           Q.    And you lied when you were under oath, correct?
12           A.    No, I just don't remember whether it was two or
13      three.
14           Q.    So you're testifying to things you don't remember
15      to, is that what you're saying?
16           A.    No, at the time.
17           Q.    But you remember clearer today, as you sit here,
18      three years -- almost three years after the incident,
19      correct, your memory got better, is that what you're
20      telling us?
21           A.    My memory got better?
22           Q.    Yes, than it was in the Grand Jury.
23           A.    Yes, my memory got better.
24           Q.    Now, this adjustment, when you walked over to the
25      black Altima and you walked over to the passenger side on
```

- CDF -



1    October 28th and you spoke to Duane Costa, you asked him

2    for his identification, correct?

3         A.    Yes.

4         Q.    And he had a cellphone, correct?

5         A.    Yes.

6         Q.    And the cellphone was in his hand, correct?

7         A.    Yes.

8         Q.    Which hand was the cellphone in?

9         A.    The cellphone was in his left hand.

10        Q.    He has a cellphone in the left hand and at that

11   time you asked him for his identification, correct?

12        A.    Yes.

13        Q.    He gives you his identification, correct?

14        A.    Yes.

15        Q.    And you stated he gives you his identification by

16   going in his pocket, correct?

17        A.    Yes.

18        Q.    When he goes into his pocket, he didn't use that

19   hand to go to his waistband, correct?

20             THE COURT:   Which hand, Ms. Golombek?

21        Q.    The hand that he goes to the pocket with, that's

22   the right hand, correct?

23        A.    He went into his pocket with his left hand.

24        Q.    And the adjustment was made with the left hand or

25   the right hand?

- CDF -



1    A.    The right hand.

2    Q.    So now this adjustment you're saying was with the

3    right hand, this was after he was in his pocket or before

4    he was in his pocket?

5    A.    It's the same movement.  As he lifts up to go

6    into the pocket with the left hand, it's pushed down on the

7    waist.

8    Q.    So he does a push but you don't know what he's

9    pushing down on, correct?

10    A.    I don't.

11    Q.    When he's pushing you can't see what he's

12    pushing, correct?

13    A.    I don't.

14    Q.    You don't know, maybe he was adjusting his pants,

15    correct?

16    A.    That's correct.

17    Q.    When you see this pushing, is your suspicion up?

18    A.    Yes, because it's a large bulge.

19    Q.    Well, when you say there is a large bulge and

20    suspicion is up, you tell him to put his hands on the

21    dashboard at that point, correct?

22    A.    No.

23    Q.    You want his hands loose?

24    A.    I want him out of the car.

25    Q.    Well, his hands are loose.  If you think this is

- CDF -

1    a gun and his hands are loose he could grab the gun,

2    correct?

3        A.    That's correct.

4        Q.    Weren't you afraid he was going to grab the gun

5    at that point and shoot you?

6        A.    I didn't know it was a gun.

7        Q.    Excuse me?

8        A.    No, I did not know it was a gun.

9        Q.    But you had suspicion, correct?

10        A.    Yes.

11        Q.    And in your training as a BSO officer, you were

12    not going to act on a suspicion that people's safety might

13    be at risk?

14        A.    I did act.  I took him out of the car.

15        Q.    Well, you didn't take him out of the car

16    immediately?

17        A.    Yes, I did.

18        Q.    You let his hands remain loose, correct?

19        A.    No, I took him right out of the car.

20        Q.    You pulled him out of the car?

21        A.    I asked him to get out of the car.

22        Q.    Well, when you see him making what you say is

23    pushing down, is that an adjustment or is that a pushing

24    down?

25        A.    It's both.

- CDF -

1     Q.    You don't take your gun out at that point?

2     A.    No.

3     Q.    Don't you want to defend yourself if he comes at

4 you with a gun at that point?

5     A.    He didn't come at me with a gun at that point.

6     Q.    If something was taken out of his pocket quickly

7 and you don't have a weapon handy, you don't have a weapon

8 available to shoot?

9     A.    I didn't draw my gun.

10     Q.    As a BSO officer with special training you're

11 going to just let anything happen if this is a gun?

12     A.    I'm not going to let anything happen, no.

13     Q.    Well, do you pull him out of the car so he can't

14 make any quick action with his hand?

15     A.    That's exactly what I did, I asked him to step

16 out of the car.

17     Q.    You nicely asked him to step out of the car?

18     A.    Yes.

19     Q.    You didn't quickly get him out of the car to stop

20 him from doing anything further if he had a gun?

21     A.    No.

22     Q.    Did you yell gun to your fellow partner?

23     A.    No.

24     Q.    How long did you see this bulge before you took

25 him out of the car?

- CDF -

1       A.   A second or two.

2       Q.   Well, you testified you wanted his hands away

3   from his waistband because you were concerned, correct?

4       A.   At what point?  I'm sorry.

5       Q.   You testified on direct that you wanted his hands

6   away from his waistband because you were concerned?

7       A.   Yes.

8       Q.   So you waited -- you wanted his hands away from

9   the waistband.  After you saw this adjustment, you first

10  let him hand you his ID, correct?

11      A.   Yes.

12      Q.   Did you look at the ID?

13      A.   No.

14      Q.   You didn't look at the ID?

15      A.   I did not.

16      Q.   But you have his ID, correct?

17      A.   That is correct.

18      Q.   What did you do with his ID when he gave it to

19  you?

20      A.   He handed it to me, I put it right in my back

21  pocket.

22      Q.   And that took time, correct?

23      A.   What's that?

24      Q.   That took time, to put it in your back pocket?

25      A.   Yeah, less than a second, yeah.

1      Q.   You looked to see whether, in fact, he gave you

2   an ID or something else, correct?

3      A.   I saw it was a New York State ID, I put it right

4   in my back pocket.

5      Q.   Did you see if it was Duane Costa's picture?

6      A.   I didn't.  Could have been anyone else.

7      Q.   Did you shine your flashlight to see it?

8      A.   No.

9      Q.   I mean, it's pitch black out.  Don't you want to

10  see he gave an ID of himself and not something else?

11     A.   I'll deal with that later.

12     Q.   Well, did you carry him out, grab him out of the

13  car so he can't do anything with his hands?

14     A.   No.

15     Q.   Do you have him put his hands behind his back so

16  he can't do anything with them?

17     A.   No.

18     Q.   Now, when you asked for the license, Duane Costa

19  complied and he gave you the license, correct?

20     A.   Yes.

21     Q.   And you indicate that when he comes out of the

22  car, you put your hand on his back, correct?

23     A.   Yes.

24     Q.   And you indicate that he shoved you, correct?

25     A.   Yes.

- CDF -

170

1  Q.  How long does it take from when he gets out of

2  the car until he shoves you?

3  A.  About a second.

4  Q.  So this whole thing happens in a matter of

5  seconds you're telling us, correct?

6  A.  The whole thing?

7  Q.  Yes, this whole thing, from the car stop to him

8  being pulled out of the car, that's a matter of seconds,

9  correct?

10  A.  From the car stop to him coming out, maybe a

11  minute.

12  Q.  It's all very quick, correct?

13  A.  It's all very quick, correct.

14  Q.  Where is your flashlight after you're shoved?

15  A.  It's still in my left hand.

16  Q.  Are you shining it at this point?

17  A.  Am I shining it?

18  Q.  The flashlight.

19  A.  It's on constantly so it's shining, yeah.

20  Q.  Is the flashlight in your hand?

21  A.  Yes.

22  Q.  Is your radio in your hand?

23  A.  No.

24  Q.  You indicate that you dropped the radio when you

25  started to chase after Mr. Costa?

- CDF -

1      A.    Yes.

2      Q.    Where was the radio -- where did the radio drop

3   from?

4      A.    From my pocket.  It has a clip, it's clipped onto

5   my front pocket.

6      Q.    Prior to you running after Mr. Costa, do you

7   radio it in?

8      A.    No.

9      Q.    Don't you consider this an urgent situation of

10   somebody who may have a gun is running away and you see him

11   making an adjustment, you don't call it in at that time?

12      A.    No, I do not call it in.

13      Q.    Do you have your partner, your partner on the

14   other side, do you have your partner call it in?

15      A.    I didn't ask him to do that, no.

16      Q.    You're telling me two BSO officers with special

17   training, nobody calls in that somebody, a perpetrator is

18   running, a suspicious person who may have a gun, nobody

19   calls that in, correct?

20      A.    I didn't call it in and I didn't hear it called

21   in.

22      Q.    Now, when you chased after Mr. Costa, you -- his

23   back is to you, correct?

24      A.    Yes.

25      Q.    And his back is to you and you're about 30 feet

1    away?

2        A.   When we initially start, I'm right behind him and

3    as the pursuit goes on down Midwood I lose distance.  The

4    distance gets greater between us.

5        Q.   Now, at the time you hear what you said -- at the

6    time you say Mr. Costa goes into his waistband and he

7    fumbles, he goes into his waistband in the back?

8        A.   No, his front.

9        Q.   How many yards away from him are you at that

10   point?

11       A.   About two yards.

12       Q.   So you're two yards in the dark and you're

13   telling us you're able to see the front of Mr. Costa?

14       A.   I didn't see the front of Mr. Costa.

15       Q.   Now, you indicate you're able to see him go into

16   his waistband.  Do you see him actually go into his

17   waistband?

18       A.   I see him put his hands where his waistband is in

19   the front.

20       Q.   You see him put his hands in the front of the

21   waistband?

22       A.   I see him put his hand -- yes, in the front of

23   the waistband.

24       Q.   Do you have super powers that you can see through

25   somebody's back to the front?

- CDF -

1    A.   I don't have super powers, no.

2    Q.   You couldn't see Mr. Costa's waistband when he's

3   running in front of you and you indicate he goes to the

4   waistband, correct?

5    A.   I couldn't see the front of his waistband but I

6   saw his hands in his waist area.

7    Q.   You saw in the waist area but you don't know what

8   he was doing with his hands, correct?

9    A.   I don't know what he was doing until he fumbled

10   something.

11    Q.   I can't hear you.

12    A.   I don't know what he's doing with them, no.

13    Q.   You can't see him doing anything with his hands,

14   correct?

15    A.   That is correct.

16    Q.   You just know his hands are at his side, correct?

17    A.   No, they're in front of him.

18    Q.   When somebody runs, a natural position could be

19   hands in front of them, correct; yes or no?

20    A.   I run with my hands at my side.

21    Q.   That doesn't mean everybody runs with their hands

22   at their side, correct?

23    A.   Yes, that's correct.

24    Q.   So now you indicate that you hear this

25   metallic -- what you think is a metallic object hit the

1    ground, correct?

2        A.    Yes.

3        Q.    By the way, Mr. Costa, he's not running on the

4    grass, is he?

5        A.    No, he's not.

6        Q.    He's running on the sidewalk, correct?

7        A.    That's correct.

8        Q.    And at no time do you see him running on the

9    grass, correct?

10       A.    That's correct.

11       Q.    And when you indicate you hear this metallic

12   object, you don't see a metallic object, correct?

13       A.    That's correct.

14       Q.    And as a matter of fact, you don't know whether

15   this is a metallic object or not, correct; yes or no, at

16   the time?

17       A.    I don't know what it's made of.  It sounded like

18   a metallic object.

19       Q.    To you you're testifying it sounds like a

20   metallic object, correct?

21       A.    Yes.

22       Q.    And you want it to be a gun because you wanted to

23   pin something on Duane Costa, correct?

24       A.    No.

25       Q.    Now, this part where you indicate you think where

1    Duane Costa's hands are in front of him and you're yards

2    away behind him, you don't stop and measure that distance

3    where you think you hear a metallic sound, correct?

4        A.    No, I did not measure any distance.

5        Q.    So you can't -- so when you testified on direct

6    it was the same spot where you saw Duane Costa go to his

7    waistband, you don't know that for a fact; isn't that

8    correct?

9        A.    No, it was the same spot.

10       Q.    You don't know it's the exact spot, do you?

11       A.    Yes, I do.

12       Q.    Did you measure the distance from when you

13   started running until the distance where you say Mr. Costa

14   had his hands by his waist, did you measure that distance

15   at that time?

16       A.    I answered that.  No, I did not measure any

17   distances.

18       Q.    This was in the dark, correct?

19       A.    Yes, it was in the dark.

20       Q.    And you couldn't see exactly where it was,

21   correct?

22       A.    I didn't see where it landed, no.

23       Q.    Did you shine your flashlight on the area where

24   you think you heard what you say is a metallic sound at

25   that point?

- CDF -

1      A.   No.

2      Q.   So now, you testified that you think that to you

3   it's a metallic sound, correct?

4      A.   Yes.

5      Q.   And then you testify that there is a racking and

6   it's a distinction sound, correct?

7      A.   I didn't hear the word.  There was there was a?

8      Q.   You hear there is racking --

9           THE COURT:  Ratchet?

10          THE WITNESS:  Racking R-A-C-K-I-N-G.

11     Q.   You said it's a familiar sound because you're

12   familiar with that sound, correct?

13     A.   I am familiar with the sound of a racking gun.

14     Q.   So at the point that you hear that -- and you

15   know your partner is behind you, correct?

16     A.   Yes.

17     Q.   Do you yell out to your partner, go get

18   assistance?

19     A.   No.

20     Q.   I think a gun is on the ground?

21     A.   No.

22     Q.   Let me ask you, you think there's a gun on the

23   ground, correct?

24     A.   No I, didn't think there was a gun.

25     Q.   Well, you heard a metallic sound drop?

- CDF -

1    A.    Yes.

2    Q.    Do you think it's a gun?

3    A.    I didn't know what it was.

4    Q.    You thought it could be a gun, right?

5    A.    Sure.

6    Q.    So it could be a gun and you're an officer with
7    special training, correct?

8    A.    Yes.

9    Q.    You leave the gun in that area, is that what
10   you're saying?  You leave what you think is a gun in the
11   area in the dark at 12:46 at night and you continue
12   running?  Is that what you're telling us?

13   A.    Yes.

14   Q.    So in other words, if that's a gun somebody in
15   the area could pick it up and have a gun and shoot anybody,
16   if it's a gun, correct?

17   A.    Yes.

18   Q.    And you're going to let it be left there,
19   correct?

20   A.    Yes.

21   Q.    You're not going to call for any assistance at
22   that time or ask your partner to call for any assistance,
23   you leave a gun which you don't know if it's loaded or not
24   in the area, is that what you're telling us?

25   A.    Yes.

- CDF -

1        MR. ROSENBLATT:  Objection.

2        Asked and answered.

3        THE COURT:  Well, I'm going to sustain the

4    objection because that was several questions in one

5    question.

6        If you want an answer, Ms. Golombek, divide

7    up those questions.

8        MS. GOLOMBEK:  I'll break it up, Judge.

9    Q.    At the time you think it could be a gun, you

10   leave the gun there, you leave what you think is a gun in

11   the area, correct?

12   A.    Yes, I left it there.

13   Q.    You don't stop to investigate further, do you?

14        MR. ROSENBLATT:  Objection.

15        Asked and answered.

16   A.    No.

17        MS. GOLOMBEK:  Well, it was sustained.

18        THE COURT:  Overruled.

19        You can answer.

20   A.    No.

21   Q.    You don't call out to your partner to look in the

22   area and see what was dropped, correct?

23        MR. ROSENBLATT:  Objection.

24   A.    Correct.

25        THE COURT:  Overruled.

```
 1        Q.    Now, when you hear a dropping sound, you can't
 2   tell where the dropping sound is from, correct?
 3        A.    No, I heard it and I saw him fumble it.
 4        Q.    Isn't it true there were other people in the area
 5   at that point?
 6        A.    No.
 7        Q.    Now, this movement that you indicate that you saw
 8   Duane Costa do with his hand extended backwards, are you
 9   shining your flashlight on Duane Costa at this time?
10        A.    No.
11        Q.    And you're telling us you could see this
12   movement?
13        A.    Yes.
14        Q.    And this movement you're at this point you're
15   about twenty feet away, correct, or more?
16        A.    No, probably 15 to 20 feet.
17        Q.    So you're about 20 feet, right?
18        A.    Yes.
19        Q.    And you don't have your flashlight shining,
20   correct?
21        A.    Yes.
22        Q.    And it's fair to say Mr. Costa is an
23   African-American?
24        A.    I'm sorry?
25        Q.    Fair to say he's African-American?
```

- CDF -

1    A.    I don't know what his background is.

2    Q.    He is a black male, correct?

3    A.    Yes.

4    Q.    He has dark skin, correct?

5    A.    Yes.

6    Q.    So the person that was reaching back was dark,

7    correct?

8    A.    Yes.

9    Q.    And you're telling us you were able to see a hand

10   reaching back, a dark hand reaching back, is that what

11   you're able to tell us?

12   A.    Yes.

13   Q.    And you could see this without a flashlight,

14   correct?

15   A.    Yes.

16   Q.    But when you went up to the vehicle, the black

17   Altima, you thought it was necessary to shine a flashlight

18   because you couldn't see, correct?

19   A.    Yes.

20   Q.    So you couldn't see in the vehicle but you're

21   telling us you could see outside when you say Mr. Costa is

22   running with a gun, is that what you're saying?

23   A.    No, I could see in the vehicle, it's just helpful

24   with the flashlight.

25   Q.    But it's not helpful when you're running after

- CDF -

1    somebody that you think might have a gun?

2    A.    It's just uncomfortable to run with a flashlight

3    in front of your face.

4    Q.    So you don't want to be uncomfortable, so you put

5    your comfort at stake over safety, is that what you're

6    saying?  I'm just trying to get this straight.

7    A.    Yeah, if you're trying to get it straight I

8    didn't want to run with my flashlight in front of me

9    because I ran with my hands on my side --

10    Q.    Because you didn't want to be uncomfortable?

11         MR. ROSENBLATT:  Objection.

12         Asked and answered.

13         THE COURT:  Sustained.

14    Q.    But a flashlight would have aided you in seeing,

15    correct?

16         MR. ROSENBLATT:  Objection.

17         THE COURT:  Overruled.

18         You can answer.

19    A.    A flashlight would help me see.  It would impede

20    my running keeping my arm in front of my face.

21    Q.    So without a flashlight -- the reason you're

22    using a flashlight you don't want to misinterpret

23    something, correct?

24         MR. ROSENBLATT:  Objection.

25         THE COURT:  Sustained.

1      Q.    Now, this -- describe -- now, there's movement,

2    this hand behind, what you say is a hand behind Mr. Costa.

3                Mr. Costa was running with his hand?

4      A.    He was running.

5      Q.    You said each shot was a succession, correct,

6    three shots in succession, one second each?

7      A.    I heard two shots about a second apart, the third

8    one was later.

9      Q.    These two shots, are these two shots you're

10   hearing as Mr. Costa is running?

11     A.    Yes.

12     Q.    Now, in this one second you're able to see a hand

13   back and Mr. Costa is running forward, correct?

14     A.    Yeah, he was running east, yes.

15     Q.    Excuse me?

16     A.    Yes, he was running forward.

17     Q.    He's not running backwards, is he?

18     A.    No, he's running forward.

19     Q.    So let me ask you, as he's running forward, first

20   shot, he shoots backwards as he's running forward?

21     A.    Yes, he shot back at us while he was running

22   forward.

23     Q.    And you doesn't turn around, he's running

24   forward, correct?

25     A.    He's running forward, his face and arm are turned



- CDF -



1    around.

2        Q.   Wait.  So you're saying he's running forward but

3    his face -- and you're able to see this in this one second,

4    is that what you're saying?

5        A.   Yes.

6        Q.   So you're able to see a black male with black

7    skin turn his head in the pitch black at 12:45 and his arm

8    forward?

9        A.   Yes.

10       Q.   And his arm is also dark, correct?

11       A.   Yes.

12       Q.   And you're telling us you could see all of this

13   at 12:46 or 12:47 in the morning, correct?

14       A.   That's correct.

15       Q.   Now, let me ask you, as -- so you're saying he's

16   looking back in this one second, correct?

17       A.   Yes.

18       Q.   And you're able to catch this movement in this

19   one second?

20       A.   Yes.

21       Q.   So let me ask you, so he's running forward, are

22   you saying he's running with his feet forward and he's

23   shooting, so he's running backwards, correct, for that one

24   second?

25       A.   He's never running backwards.



1     Q.   Well, he has to turn his head so he can't see

2   what he's looking at, correct?

3     A.   Would it be easier with east and west?  He was

4   running east and shooting back west.

5     Q.   I understand.  You're saying he was shooting

6   back, you're saying as he's shooting back he was looking.

7        Did he then turn his head forward to run again

8   and then take another shot afterwards, is that what you're

9   saying?

10     A.   I think he fired both those shots while looking

11   at me.

12     Q.   Well, you think.

13        Wait a second.

14        I'm not asking you what you think, I'm asking you

15   what you observed, Officer.

16     A.   Yes, I observed him firing both those shots

17   looking back at me.

18     Q.   So you're saying he looked back at you for, is

19   that two seconds or one second?

20     A.   Probably two seconds.

21     Q.   And you're saying he was looking back at you?

22     A.   Yes.

23     Q.   How do you know he was looking back at you --

24   withdraw that.

25        Did he say, Officer -- did he say Officer

1    Rilling, this is for you?

2         A.    It felt like it.

3         Q.    Excuse me?

4         A.    It felt like it.

5         Q.    He didn't say that, did he; yes or no?

6         A.    No, I didn't hear him call my name, no.

7         Q.    Did he call out this is for you?

8         A.    No.

9         Q.    Did you call out to your partner at this time?

10        A.    No.

11        Q.    You see him, you say you see him turning his head

12   and running forward.  Does he fall when he's running

13   forward and looking backwards?

14        A.    No.

15        Q.    So you're saying he's running, he's taking steps

16   forward and as he's -- how many steps does he take forward

17   as he looks backwards and shoots twice, how many steps?

18        A.    I'm going to be honest, I didn't count.

19        Q.    You didn't see that?

20        A.    I just didn't count his footsteps.

21        Q.    Let me ask you something, you're not able to see

22   that, the footsteps, but you're able to see him looking

23   back and extending his arm twice, correct?

24                   MR. ROSENBLATT:  Objection.

25                   THE COURT:  Sustained.

- CDF -

1    Q.   Does he --

2              THE COURT:  Sustained.

3              MS. GOLOMBEK:  I'm asking another question.

4    Q.   Does he extend his arm back twice?

5    A.   No.

6    Q.   Or is it just one extension of his arm?

7    A.   One extension.

8    Q.   And this you could see but you can't see how many

9    steps he takes?

10             MR. ROSENBLATT:  Objection.

11             THE COURT:  Sustained.

12   Q.   Does he fall when he's running around looking the

13   other way?

14   A.   He never fell.

15   Q.   Excuse me?

16   A.   He never fell.

17   Q.   Or didn't you see that?

18             MR. ROSENBLATT:  Objection.

19             THE COURT:  Sustained.

20   Q.   So now for these two seconds that you say

21   Mr. Costa has his hand extended and he's running forward

22   but his hand is extended, now you don't know how many steps

23   he takes, that takes about two seconds, correct?

24             MR. ROSENBLATT:  Objection.

25             MS. GOLOMBEK:  I'm getting --

1                    THE COURT:  Overruled.

2          Q.    How many seconds later is this third shot?

3          A.    Only a few seconds, maybe two or three.

4          Q.    So now on this third shot, does Mr. Costa then

5     turn around and face front?

6          A.    I didn't see him for the third shot.

7          Q.    You only saw two shots?

8          A.    I saw him face me for two shots and I saw the

9     muzzle flash for the third shot.

10         Q.    When you saw two shots, that was on Midwood

11    Street, correct?

12         A.    Yes.

13         Q.    Did you ask to see a tape on Midwood Street?

14         A.    I never asked to see a tape on Midwood Street.

15         Q.    If I showed you a tape of Midwood Street, could

16    you tell us whether that is Midwood Street?

17         A.    Show me the tape, maybe I can.

18                MS. GOLOMBEK:  May I have the tape played

19         for him please?

20         Q.    And one second.

21                You've seen the tape -- you've seen tapes from

22    the District Attorney's office, correct?

23         A.    Yes, I saw one tape.

24                THE COURT:  He's already said he saw the

25         Clinton Street tape.

1    MS GOLOMBEK:  Will the DA stipulate this is

2    the tape of Midwood Street?

3    MR. ROSENBLATT:  Nope.

4    MS. GOLOMBEK:  Then I'm going to ask to be

5    supplied with the person.

6    MR. ROSENBLATT:  Okay.  When we get to that

7    portion of the trial I'll supply whatever witness is

8    needed at that particular time.

9    We're at this particular witness, I don't

10    believe it's appropriate for this particular witness.

11    Q.    Now, this third shot that you say you observed,

12    you didn't see the third shot, correct?

13    A.    I saw the muzzle flash, I didn't see him.

14    Q.    Well, was he on Midwood Street at the time of the

15    third shot?

16    A.    Yes.

17    Q.    How many feet in front of him were you -- was he?

18    A.    He was probably 200 feet from me at this point.

19    Q.    Now, this is -- one minute.

20    (Whereupon, a pause was had in the record.)

21    A.    Can I retract that my distance is off?  He was

22    probably only a hundred feet in front of me for the third

23    shot.

24    Q.    For the third shot you can't see Mr. Costa,

25    correct?

- CDF -

1    A.    That's correct, I didn't see him for the third

2    shot.

3    Q.    So now the third shot was how many seconds -- was

4    a second after the first two shots?

5    A.    I think the first two shots took about two

6    seconds and then the next one was maybe two or three

7    seconds after that, so maybe five seconds.

8    Q.    So two or three seconds Costa had gained all that

9    distance from you, correct?

10    A.    From the time that I stopped running when he

11    started shooting and I saw him fire -- I saw the muzzle

12    flash from the third shot, he was about a hundred feet in

13    front of me at that point.

14    Q.    Well, you heard the two shots.

15         Is it at that point that you stopped to post your

16    gun?

17    A.    Yes.

18    Q.    Well, when you stopped to post your gun, you

19    stopped and go by a telephone pole, correct?

20    A.    Yes.

21         MS. GOLOMBEK:  May I see what's in evidence

22    as People's Number 1?

23         (Whereupon, the exhibit was handed to

24    defense counsel.)

25    Q.    You described -- when you stopped to post up by



- CDF -





1    the telephone pole, there was a parked car there, correct?

2        A.    Yes.

3        Q.    And you went -- you indicated that a shot came by

4    and you hid or ducked down by the parked car, correct?

5        A.    I moved over, yeah.  I moved left toward the

6    telephone pole and the parked car.

7        Q.    Well, I'm going to show you what's been marked as

8    People's Number 1.

9                    (Whereupon, the exhibit was handed to the

10            witness.)

11        Q.    Is this the telephone pole that you stopped by to

12    post up?

13        A.    No.

14        Q.    There's another telephone pole?

15        A.    Yes, there's another one further down the road.

16        Q.    Now, you indicated you went to post up, correct?

17        A.    Yes.

18        Q.    At that point you don't shoot at Duane Costa, do

19    you?

20        A.    No.

21        Q.    Let me ask you, you hear two shots and you

22    believe they were at you, correct?

23        A.    Yes.

24        Q.    You don't shoot back at Duane Costa?

25        A.    I did not shoot back.

1       Q.    Don't you want to protect yourself?

2       A.    Yes.

3       Q.    You have a gun on you, right?

4       A.    Yes.

5       Q.    You don't take your gun out after those two shots

6    and shoot him right then and there?

7       A.    My gun was out, I didn't shoot him.

8       Q.    You want to let him go?

9       A.    No.

10      Q.    Well, you thought he had a gun, right?  You said

11   you saw him running forward pointing back and shoot,

12   correct?

13      A.    Yes.

14      Q.    So you don't shoot back?

15      A.    No.

16      Q.    Well, at that point you had a gun on you, right?

17      A.    I have a gun on me, yes.

18      Q.    At that point you said his face is facing back,

19   correct, he turns his body?

20      A.    Yes.

21      Q.    He turns his body and turns his arm, correct?

22      A.    Yes.

23      Q.    You could have shot at him at that point,

24   correct?

25      A.    Yes.

- CDF -

1    Q.    But you didn't, correct?

2    A.    Yes.

3    Q.    Do you yell out to Officer Kraemer behind you for

4    assistance at that point?

5    A.    No.

6    Q.    You're just going to run after him and not shoot

7    at him?

8    A.    I didn't shoot.

9    Q.    You didn't shoot because he didn't have a gun;

10   isn't that correct?

11   A.    That's not correct.

12   Q.    You didn't shoot because he never extended his

13   arm out, correct?

14   A.    That's not correct.

15   Q.    He never ran forward and extended his arm back to

16   shoot at you, correct?

17   A.    That's not correct.

18   Q.    In your special training as an officer, you are

19   going to let somebody run, take shots in the middle of the

20   night and you're not going to shoot at them?

21   A.    I did not shoot.

22   Q.    You have special training and you hear this sound

23   of racking and you hear the metallic sound of a gun, you

24   don't know how many guns this perpetrator might have and

25   you don't shoot at him, is that what you're saying?

- CDF -

1          THE COURT:  He said he didn't shoot.

2     Q.    Now, you indicate that you heard shots go off and

3  around past your head.  Does this round pass your head, is

4  it the first round?

5     A.    I'm sorry, ma'am, I didn't hear the first

6  question.

7     Q.    The round you said passed your head, let's go

8  into that round.

9          Is that the first round?

10    A.    Yes.

11    Q.    So the first shot that passes your head?

12    A.    Yes.

13    Q.    Now, this first shot passes your head, you don't

14  duck at that point, you wait for another shot, is that what

15  you told us?

16    A.    No.

17    Q.    You duck after the first shot?

18    A.    Yes.

19    Q.    There's two successive shots.  So you have one,

20  two or there's one and you duck down and there's the second

21  one?

22    A.    You're using this word duck down.  I never said

23  that, I just moved, I moved left.

24    Q.    You moved over?

25    A.    Yes.

- CDF -

```
 1        Q.    And now the second shot, you have your flashlight

 2    shining at this point on the second shot?

 3        A.    I never shined my flashlight at him, no.

 4        Q.    So now when you say this bullet passed your head

 5    two or three feet, you measure how many feet?

 6        A.    I did not.

 7        Q.    Do you see this bullet?

 8        A.    I did not.

 9        Q.    Did you ever find a bullet in that area?

10        A.    I did not.

11        Q.    Now, you said this bullet passed your head.

12              Did you see this bullet land?

13        A.    No.

14        Q.    So you testified that this bullet passes your

15    head so you move out of the way and you have no bullet

16    here, correct?

17              THE COURT:  That's what he said.

18        Q.    Isn't it true there was never anything passing

19    your head?

20        A.    No.

21        Q.    Isn't it true you made this up because you wanted

22    to pin something on Duane Costa?

23        A.    No.

24        Q.    You went to the area later on to do a search,

25    correct?
```

1    A.    Yes.

2    Q.    Did you find the bullet?

3    A.    I never found the bullet.

4    Q.    You looked all over, correct?

5    A.    We looked in the vicinity, yeah.

6    Q.    Now, you said you heard zipping around like a

7    bee.  Did it strike you that maybe it was a bug?

8    A.    It didn't.

9    Q.    But it sounded just like one, correct?

10    A.    Yes, it sounded like a crack and a zip.

11    Q.    But you don't know exactly what it was, did you?

12    A.    I heard bullets go past me before so it sounds

13    similar.

14            THE COURT:  Ms. Golombek, you have to wait

15        for the officer to finish his answer.

16    A.    I've heard bullets go passed me before and it

17    sounds similar, just never that close.

18    Q.    Also sounds similar to a bee passing you,

19    correct?

20    A.    That's how I would describe it.

21    Q.    Now, you testified that you didn't fire at Duane

22    Costa because you thought it would be unsafe?

23    A.    Yes.

24    Q.    Did you think it would be safe to let somebody

25    run with what you thought would be a gun, would that be

- CDF -

1    safer?

2         A.    We were trying to apprehend him.  We never let

3    him go.

4         Q.    So you thought it would be safe to let somebody

5    run and not shoot at them --

6                   MR. ROSENBLATT:  Objection.

7         Q.    -- with a weapon?

8                   THE COURT:  Sustained.

9         Q.    And you thought the weapon was loaded, correct?

10                  MR. ROSENBLATT:  Objection.

11                  THE COURT:  Sustained.

12        Q.    Now, when you run -- when you ducked -- or when

13   you hide by this telephone pole, you don't -- and you post

14   up, you don't shoot at this point, correct?

15        A.    I never shot.

16        Q.    You indicate you don't have a shot, correct?

17        A.    Yes.

18        Q.    Because Detective Kraemer is in front of you,

19   right?

20        A.    Officer Kraemer, yes.

21        Q.    Officer Kraemer.

22               Officer Kraemer doesn't shoot, does he?

23        A.    Nope.

24        Q.    He doesn't post up, does he?

25        A.    No.

- CDF -

1    Q.    So neither of you shoot at this person that has

2    let off two rounds?

3                MR. ROSENBLATT:  Objection.

4                Asked and answered.

5                THE COURT:  Sustained.

6                MS. GOLOMBEK:  That wasn't the question,

7    Judge.

8    Q.    Now, you testified later you later heard you said

9    based on your better recollection today was two more shots,

10   correct?

11   A.    Yes.

12   Q.    But you don't see where these shots came from,

13   correct?

14   A.    I didn't see those shots.

15   Q.    As a matter of fact, at this time there's other

16   BSO officers in the area, correct?

17   A.    Yes.

18   Q.    And you don't know -- there's other BSO officers

19   that are making a separate arrest, correct?

20   A.    Yes.

21   Q.    So you don't know whether these other shots come

22   from a separate arrest or whether they're from what you

23   described as Mr. Costa, correct?

24   A.    Yes.

25   Q.    Now, you indicate that you found a weapon.

- CDF -

1          Are you the one that found that weapon or did

2    somebody find it before you when you searched the area of

3    Midwood Street?

4          A.    I found it.

5          Q.    What weapon did you find?

6          A.    .40 caliber Smith & Wesson.

7          Q.    You didn't find any bullets for a .40 caliber,

8    did you?

9          A.    Did I find any bullets, no, I didn't find any

10   bullets.

11         Q.    You didn't find any bullets at all, did you?

12         A.    No, I didn't find any bullets.

13         Q.    The place where you found this weapon, this

14   weapon was found on the grass, correct?

15         A.    Yes.

16         Q.    And Mr. Costa was never on the grass, was he; yes

17   or no?

18         A.    No.

19         Q.    You saw Officer Denehy bring Duane Costa out from

20   Meriam Street, correct?

21         A.    Yes.

22         Q.    You didn't see the apprehension of Mr. Costa, did

23   you?

24         A.    No, I did not.

25               (Whereupon, a pause was had in the record.)

1      Q.   Isn't it true that the other telephone pole is on

2  the corner of Midwood and Clinton?

3      A.   I think there's some pictures.  It will probably

4  better show which pole I'm talking about.

5              MS. GOLOMBEK:  One moment, please.

6              (Whereupon, a pause was had in the record.)

7              MS. GOLOMBEK:  I'm going to ask this be

8  marked as Defendant's A.

9              THE COURT:  All right, Defendant's A for

10  identification.

11              MS. GOLOMBEK:  And I'm going to ask this be

12  marked as Defendant's B for identification.

13              THE COURT:  All right, Defendant's B for

14  identification.

15              (Whereupon, Defendant's Exhibits A and B

16  were so marked for identification.)

17              THE COURT OFFICER:  So marked.

18              THE COURT:  Do you want it shown to the

19  witness?

20              MS. GOLOMBEK:  Yes, I'm going to show you

21  what's been marked as Defense A.

22              (Whereupon, the exhibit was handed to the

23  witness.)

24      Q.   Do you recognize that?

25      A.   Yes.

1      Q.    What do you recognize that to be?

2      A.    This is the corner -- showing the sidewalk on

3  Midwood Street, right by the gas station by Clinton.

4  There's --

5      Q.    Do you recognize that telephone pole?

6      A.    There is a telephone pole there.  That's not the

7  one that I posted up at.

8      Q.    I'm going to show you what's been marked as

9  Defendant's B.

10                (Whereupon, the exhibit was handed to the

11        witness.)

12      Q.    Do you recognize that?

13      A.    Yes.

14      Q.    What do you recognize that to be?

15      A.    This is Midwood, it's basically the same shot as

16  the small photograph that I saw.  It's also not the

17  telephone pole that I was posted up at.

18      Q.    Now, you testified that there was shots fired and

19  you testified there is a bullet, a stray bullet that went

20  over your head about two, three feet, correct?

21      A.    I didn't say a stray bullet.

22      Q.    Well, you testified you heard something go over

23  your head, correct?

24      A.    The bullet that the defendant shot at me went

25  passed my head, yes.

1    Q.   You thought it was a bullet, right?

2    A.   Yes.

3    Q.   Did you look for that bullet?

4              MR. ROSENBLATT:  Objection.

5              Asked and answered.

6              THE COURT:  Sustained.

7    Q.   Did you go knock on any neighbors doors to see --

8              MR. ROSENBLATT:  Objection.

9              THE COURT:  Overruled.

10   Q.   -- if there was a bullet there?

11   A.   No, I did not knock any doors.

12   Q.   Did you go see if anybody was hurt in the area?

13   A.   I did not.

14   Q.   Didn't you want to see if anybody was hit by a

15   stray bullet?

16   A.   I didn't knock on any doors to see if anybody was

17   hit by a stray bullet.

18   Q.   Now, when Mr. Costa came out with Officer Denehy,

19   did he have a gun powder residue on him?

20   A.   I didn't test him.

21   Q.   Did you see any gunpowder residue on what he was

22   wearing?

23   A.   I did not see that, no.

24   Q.   Did you see any bullet casings in that area?

25   A.   In which area?

- CDF -

1    Q.    Did you see any bullet casings in the area where

2    you indicate that there was shots?

3    A.    No, I didn't see any bullet casings.

4    Q.    Isn't it true there was a report of

5    unprofessional conduct by you on April 28th, 2015 and that

6    was April 28th, 2015 and an attorney who's representing

7    somebody said that he was rudely awakened on that date

8    after midnight by three plainclothes detectives from the

9    Second Squad.

10           Were you from the Second Squad at that time?

11   A.    No, but I can reference that if you'd like.

12   Q.    I'm sorry, but you what?

13   A.    I could reference that, I could talk about that

14   if you'd like.

15   Q.    You were accused of allegations of professional

16   misconduct?

17   A.    Yes.

18           MR. ROSENBLATT:  Objection.

19           THE COURT:  Overruled.

20           It was undetermined, correct, Ms. Golombek?

21           MS. GOLOMBEK:  Excuse me?

22           THE COURT:  That was undetermined?

23           MS. GOLOMBEK:  That was undetermined, Judge.

24   Q.    Isn't it true your testimony about Duane Costa is

25   a lie regarding him shooting?

- CDF -

1    A.    That's not true.

2    Q.    Isn't it true he never had a gun and you just

3    wanted to pin something on him?

4    A.    That's not true.

5    Q.    Because he's a black American, correct?

6    A.    Are you accusing me of being racist?

7         THE COURT:  Yes, that's exactly it.

8    A.    That's the second time you've done that.

9         MR. ROSENBLATT:  I think it's more but who's

10   counting.

11        (Whereupon, the defendant and counsel

12   conferred.)

13   Q.    You indicated that Mr. Costa fired shots from 200

14   feet, correct?

15   A.    I did not.

16   Q.    You didn't see any bullet casings in the area

17   where you indicate Duane Costa was shooting, correct; yes

18   or no?

19   A.    I didn't find any.  There were bullet casings

20   found --

21   Q.    I'm asking if you found any?

22   A.    If you're asking me if I found any, no, I did not

23   find any casings.

24   Q.    There were no bullet casings found within 200

25   feet, correct?

1     A.    I don't know what that means.

2     Q.    Did you find any bullet casings?

3     A.    Me, personally, I did not find any bullet

4  casings.

5     Q.    Did you see where any -- did you see if any

6  bullet casings were recovered?

7     A.    I saw photographs of recovered bullet casings in

8  the area.

9     Q.    And they were not in the area where you indicate

10  Duane Costa was shooting, correct?

11     A.    They were on Midwood Street.

12     Q.    They were all the way down the block on Midwood

13  Street, correct?

14     A.    I don't know.  I don't remember exactly where

15  they were, that was Crime Scene.

16     Q.    So you remember exactly the area where the gun

17  was located, where you found the gun and you said that was

18  the exact area Duane Costa was shooting but the bullet

19  casings you don't remember where those were found, correct?

20              MR. ROSENBLATT:  Objection.

21              THE COURT:  Sustained.

22              He didn't find the bullet casings.

23     Q.    You didn't see those bullet casings at the same

24  area where you indicate Duane Costa was running and

25  extended his hands backwards, isn't that correct?

1    A.    Yes, that's correct.  I did not see any bullet

2    casings until I saw the photographs of the bullet casings.

3    Q.    You didn't see where those bullet casings were

4    recovered?

5                    MR. ROSENBLATT:  Objection.

6    Q.    Nor did you recover them, correct?

7                    MR. ROSENBLATT:  Objection.

8    A.    I did not recover them.

9                    MS. GOLOMBEK:  Thank you.  I have no further

10    questions.

11                    THE COURT:  Redirect, Mr. Rosenblatt?

12                    MR. ROSENBLATT:  Yes, please, Judge, thank

13    you.

14    REDIRECT EXAMINATION BY

15    MR. ROSENBLATT:

16    Q.    Officer Rilling, you were asked questions on

17    cross-examination regarding walking the location of the

18    occurrence.

19            Can you tell the Court about that?

20                    MS. GOLOMBEK:  Objection.

21                    The scope of the question.

22                    THE COURT:  You asked him when he had gone

23    back to the scene and last spoke with Officer Kraemer

24    and this witness testified on cross-examination that

25    they walked the scene together.  So that was on

- CDF -

1      cross-examination.

2                 That's what you're referring to, correct,

3        Mr. Rosenblatt?

4                 MR. ROSENBLATT:  Yes, your Honor.

5                 THE COURT:  Overruled.

6        A.    Yes.

7                 So as the scene -- as the defendant was arrested

8     I then walked the scene.

9        Q.    On cross-examination you were asked about

10    preparation with Officer Kraemer walking the incident?

11       A.    Yes.

12       Q.    When did you walk the incident?

13       A.    That was earlier this week, Tuesday or Wednesday.

14       Q.    And who walked the scene with you?

15       A.    You did.  And Ryan.

16                THE COURT:  DA Nelson?

17                THE WITNESS:  DA Nelson.

18       Q.    You were asked questions on cross-examination

19    regarding your BSO assignment on October 27th into the 28th

20    of 2018.

21                Why were you in Hempstead on October 27th into

22    the 28th in 2018?

23                MS. GOLOMBEK:  Objection.

24                It's too broad of a question, Judge, it

25       doesn't refer to anything specific, Judge.

1          MR. ROSENBLATT:  She asked the question,

2     Judge.

3          THE COURT:  Overruled.

4          You can answer.

5     A.   I was in the area -- that was the area I was

6     assigned that night.  There had been a lot of shootings in

7     the area, they wanted to kind of flood the area.  Typically

8     BSO doesn't come into Hempstead, it has its own Village --

9     own police department.  When there is an uptick of

10    shootings, they ask us to go into the area.

11         MS. GOLOMBEK:  Objection.

12         Not responsive, I move to strike the last

13    part of that answer.

14         THE COURT:  Overruled.

15    Q.   Now, you were asked questions regarding the bulge

16    that you observed when Mr. Costa was inside the car.  I

17    want to ask you about that.

18         Where did you observe the bulge on Mr. Costa when

19    he was inside the car?

20    A.   It was in the front of his waistband, mid-belt

21    area.

22    Q.   When Mr. Costa pushed you and began to run, where

23    did he reach?

24    A.   Into that same area.

25    Q.   When the metallic item dropped from the ground,

- CDF -

1    where was Mr. Costa reaching?

2         A.    Into that same area.

3         Q.    And when Mr. Costa removed a firearm and began

4    shooting at you and Officer Kraemer, where was he reaching?

5         A.    The same area.

6         Q.    You told us on cross-examination that at some

7    point during the car stop Mr. Costa gave you an

8    identification card and you put it in your pocket?

9         A.    Yes.

10        Q.    Ultimately, did you look at that card?

11        A.    Yes, eventually --

12              MS. GOLOMBEK:  Objection.

13              That's not the proper scope, Judge.

14              THE COURT:  I'm sorry?

15              MS. GOLOMBEK:  That's not proper.  Beyond

16        the scope, Judge.

17              MR. ROSENBLATT:  She asked him about the

18        identification.

19              THE COURT:  You asked about the card.  And

20        you asked about whether or not he looked at it before

21        he put it in his pocket.

22              MS. GOLOMBEK:  But this is at a later point

23        in time, Judge.

24              MR. ROSENBLATT:  I'm asking about that

25        particular portion.

1          THE COURT:  I'll overrule the objection at

2     this point in time.

3          I'll take it for what it's worth.

4     Q.    Whose identification card were you given?

5     A.    It was Duane Costa's ID card.

6     Q.    Same Duane Costa who sits here today?

7     A.    Yes.

8     Q.    When you observed the individual push you and

9     run, is that the same person who sits here today?

10    A.    Yes.

11    Q.    On October 27th into the 28th -- withdrawn.

12         On October 28th at 12:45 in the morning, when

13    Mr. Costa pushed you, was there anyone else on Midwood that

14    you observed walking?

15    A.    No.

16    Q.    Anyone that you observed running?

17    A.    No.

18    Q.    Other than you and Officer Kraemer, was anybody

19    else running after Mr. Costa?

20    A.    No.

21    Q.    Was anyone running in front of Mr. Costa?

22    A.    No.

23    Q.    Now, you were giving us kind of on

24    cross-examination I believe you were asked by Ms. Golombek

25    about the number of shots that Mr. Costa fired and where

1    his arm was and what you saw.  I want to talk to you just

2    for a moment about that.

3            At the moment Mr. Costa fired his first shot, how

4    was his arm extended?

5    A.    It was straight back, straight down the sidewalk.

6    Q.    When you described on cross-examination and the

7    sound it made, was that shot one, two or three?

8    A.    It was the first shot.

9    Q.    You indicated that a second shot was a short time

10    later.  How soon after the first shot was that?

11    A.    It was a second.

12    Q.    And then you indicated a third shot was after

13    that?

14    A.    Yes.  A couple --

15            MS. GOLOMBEK:  Objection.

16            Repeating the testimony, Judge.  There

17    really is no point to this just to repeat the

18    testimony.

19            THE COURT:  No, he's asking a question, so

20    that's overruled.

21    A.    The third shot was a couple of seconds after the

22    first two.

23    Q.    Now, you indicated on cross-examination that

24    after one of those shots you took cover by a pole; is that

25    correct?

- CDF -

1          A.    Yes.

2          Q.    Which shot -- after which shot did you take

3     cover?

4          A.    As soon as I saw the muzzle flash of the first

5     one I began moving left.  I observed the second shot as

6     well and that's when I got behind the cover.

7                    MR. ROSENBLATT:  I want to show you some

8          photographs.

9          Q.    You told us on direct examination that in

10    Exhibit 1 there's a light post and that was not the one

11    that you hid, correct?

12                    (Whereupon, the exhibit was handed to the

13         witness.)

14         Q.    When I said hid, I mean took cover?

15         A.    Yes.

16         Q.    I'm going to show you what's been received into

17    evidence as Exhibit 2 and as well as what's been premarked

18    as Exhibits 12 and 13?

19                    (Whereupon, the exhibits were handed to the

20         witness.)

21         Q.    Now, 2 is in evidence.

22               Can you tell us, do you see a pole in that

23    photograph?

24         A.    Yes.

25         Q.    Now take a look at Exhibits 12 and 13.

1              What is Exhibit 12?

2         A.    Exhibit 12 is a shot on Midwood facing west

3    toward the car stop and it's the sidewalk there where we

4    had the foot pursuit.

5         Q.    And what is Exhibit 13?

6         A.    Exhibit 13 is further down Midwood, it's almost

7    to the gas station and there's also -- this photo is facing

8    east and there's also a telephone pole there.

9         Q.    Do Exhibits 12 and 13 fairly and accurately

10   depict Midwood Street on October 28th, 2018 at

11   approximately 12:45 in the morning?

12        A.    Yes.

13              MR. ROSENBLATT:  I ask they be received in

14        evidence.

15              THE COURT:  Let's show them to Ms. Golombek.

16              (Whereupon, the exhibits were handed to

17        defense counsel.)

18              MS. GOLOMBEK:  I have no objection.

19              THE COURT:  All right, People's 12 and 13

20        are marked in evidence.

21              (Whereupon, People's Exhibits 12 and 13,

22        previously marked for identification, were received in

23        evidence.)

24              (Whereupon, the exhibits were handed to the

25        witness.)

1              THE COURT OFFICER:  So marked.

2         Q.    I'm going to have you take a look at what's in

3    evidence as Exhibit 2 first.

4              Do you have that in front of you?

5         A.    Yes.

6         Q.    Do you see what's on the screen?

7         A.    Yes.

8         Q.    Are those the same?

9         A.    Yes.

10        Q.    I'm going to zoom in to the area next to that

11   car.

12             What's next to the tree?

13        A.    A pole.

14        Q.    What's in the middle of the block?

15        A.    Another telephone pole.

16        Q.    And I want to go now to exhibit what you have

17   next, 12?

18        A.    I have 12 and 13, here.

19        Q.    Let's take a look at 12.

20             What's on the right side?

21        A.    A telephone pole.

22        Q.    Is that pole indicated in the last pole photo?

23        A.    Yes.

24        Q.    Where that photo is, the pole indicated in

25   Exhibit 12?



214

1        A.    In Exhibit 12 it's on the right-hand side there.

2        Q.    How about in Exhibit 2, the same pole?

3        A.    It's the middle.

4        Q.    Exhibit 13, what's on the left side of the

5   screen?

6        A.    It's a telephone pole.

7        Q.    Is that another telephone pole?

8        A.    It's another telephone pole on that block.

9        Q.    Different than the one I zoomed in on in

10  Exhibit 2?

11       A.    Yes.

12       Q.    And different than what's in Exhibit 12?

13       A.    Yes.

14       Q.    Do any of these photographs depict the pole that

15  you tried to seek cover on as the defendant was firing?

16       A.    Yes.

17       Q.    Which one?

18       A.    The one on Exhibit 2 on the left -- in the middle

19  and also the one on 12.

20       Q.    Let's look at 2 first.

21             THE COURT:  Let me just ask you, Officer, so

22       the one by the gray house that we've seen on Midwood?

23             THE WITNESS:  Yes.

24       Q.    This pole on Exhibit 12 by the gray house, as the

25  Court just indicated, that's the one you saw sought cover?

1    A.    Yes.

2    Q.    As the defendant was firing on you, at that point

3    approximately how far ahead of you was he?

4    A.    Twenty feet.

5    Q.    Now, you were asked questions on

6    cross-examination how come you didn't shoot the defendant

7    when he shot at you.

8            Why didn't you shoot the defendant?

9            MS. GOLOMBEK:  Objection.

10           THE COURT:  Basis?

11           MS. GOLOMBEK:  Asked and answered.

12           THE COURT:  No.

13           This is redirect and you spent quite a lot

14       of time on that issue, Ms. Golombek, so I'm going to

15       overrule the objection.

16    A.    So the first time when I saw him draw the gun and

17    hold it at his side I didn't shoot there because I wasn't

18    comfortable shooting him in the back as he's running away,

19    he hadn't fired yet.

20           The second time when he did begin firing I was

21    busy trying not to get shot.

22           And eventually when I did have the sights,

23    Officer Kraemer was in my line of sight.

24           MS. GOLOMBEK:  Objection to the last part.

25       It's just an added narrative, Judge, he just added

- CDF -

1      that in.  Not responsive.

2                  THE COURT:  Overruled.

3      Q.    Now, you were also asked questions as you got

4   into the car and you approached Clinton Street you heard an

5   additional number of shots; is that correct?

6      A.    Yes.

7      Q.    As you sit here today, do you know how many shots

8   you heard?

9      A.    Two.

10                 MR. ROSENBLATT:  I have no further

11   questions, your Honor.  Thanks.

12                 THE COURT:  Recross?

13                 MS. GOLOMBEK:  Judge, I'm going to ask --

14   may I, Judge?

15                 THE COURT:  Do you have any recross?

16                 MS. GOLOMBEK:  I do.

17                 I'm going to ask that the witness -- I'm

18   going to ask the DA to display People's number 2.

19   RECROSS-EXAMINATION BY

20   MS. GOLOMBEK:

21      Q.    You indicated this is the pole that you went to

22   at the post up?

23      A.    Yes.

24      Q.    And you indicated that there is a car that you

25   ducked down by, correct?



1    A.    Yes.

2    Q.    Do you see the car in the picture?

3    A.    I do not.

4    Q.    So this is not an accurate picture of what the

5    scene looked like on the night -- on the early morning

6    hours on October 28th, 2018 at about 12:45 a.m., correct?

7    A.    Yes.

8            MS. GOLOMBEK:  I'm going to ask you if you

9       could please display Exhibit 12.

10            (Whereupon, the exhibit was published.)

11    Q.    Is this the same telephone pole that you

12    indicated that you went to to post up?

13    A.    Yes.

14    Q.    And you hid by a car in order to avoid getting

15    shot?

16    A.    Yes.

17    Q.    And that's not in this picture either, correct?

18    A.    Correct.

19    Q.    So this picture doesn't accurately display the

20    cars that were out on the road at 12:46 or 12:45 a.m. on

21    October 28th, 2018, correct?

22    A.    Correct.

23    Q.    And it doesn't display any other cars that were

24    on the road at that night, correct?

25    A.    I don't remember if there were other cars on the

- CDF -

1   road.

2       Q.    And it doesn't display the persons that may have

3   been on the road that morning, correct?

4       A.    Yes.

5       Q.    And is that is not an accurate representation of

6   what the scene looked like on that night, on that morning,

7   correct?

8       A.    Correct.

9       Q.    As a matter of fact, none of the pictures you've

10  identified accurately depicts what it looked like on

11  October 28th, 2018, between 12:45 a.m. and 12:55 a.m.,

12  correct?

13      A.    I'd have to go through them individually to see

14  which ones are accurate and which ones aren't.

15              MS. GOLOMBEK:  I have no further questions

16      at this time.

17              THE COURT:  Thank you.

18              Thank you, Officer Rilling, you're excused.

19      Have a good rest of the day.

20              THE WITNESS:  Thank you, you too.

21              (Whereupon, the witness was excused from the

22      courtroom.)

23              THE COURT:  Ms. Golombek, what is your

24      preference, it's five after 4:00.  Officer Denehy

25      would be the next witness.

1    My thought is we wouldn't be able to get

2    that much going and then a long break until next

3    Wednesday before we start again, so maybe it would be

4    better to start fresh with him on Wednesday but --

5    MS. GOLOMBEK:  That's fine, Judge.

6    THE COURT:  You tell me what your pleasure

7    is.  Mr. Rosenblatt has indicated he doesn't care

8    whatever we do.

9    MS. GOLOMBEK:  I don't want to start

10    cross-examining and being caught in the middle of his

11    cross-examination.

12    THE COURT:  You wouldn't be, I think

13    Mr. Rosenblatt would be caught in the middle of his

14    direct but in any event, I will make the decision and

15    we will adjourn until October 20th at 11:00 a.m.

16    Have a good night everybody.

17    MR. ROSENBLATT:  Judge, I just have an

18    application.

19    Judge, earlier and during this trial the

20    gentleman in the audience in the white shirt was

21    taking live video of the testimony --

22    THE AUDIENCE MEMBER:  No, I wasn't here.

23    MR. ROSENBLATT:  If he wasn't, I apologize.

24    I want to make sure the person that took the video

25    earlier isn't in the courtroom.  I'll take that

1    gentleman's representation that he wasn't here.

2                    THE AUDIENCE MEMBER:  I wasn't here.

3                    THE COURT:  That's fine.  Everyone in the

4    audience knows it's not permitted.  There's a sign

5    outside but sometimes people don't see the signs or

6    read the signs.

7                    I'll see you all next Wednesday as well.

8

9                    *              *              *

10                   (Whereupon the trial was adjourned to

11   Wednesday, October 20, 2021.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

221

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 38

3    ------------------------------------------X
                                               : Indictment
4    THE PEOPLE OF THE STATE OF NEW YORK,      : No. 1934N-18
             -against-                         :
5                                              :
     DUANE COSTA,                              :
6                                              :
                      Defendant.               : Trial
7    ------------------------------------------X

8                             October 21, 2021

9                             262 Old Country Road
                              Mineola, New York
10

11   B E F O R E:

12       HONORABLE PATRICIA HARRINGTON,
                      Acting Supreme Court Justice
13

14   A P P E A R A N C E S:

15   (As Previously Noted)

16
              *         *         *         *         *
17

18              THE CLERK:  For the record, Indictment 1934N

19       of 2018, the People v. Duane T. Costa.

20              Counsel, your appearance.

21              People.

22              MS. PULASKI:  Ania Pulaski, for the People.

23              MR. NELSON:  Ryan Nelson.

24              MS. GOLOMBEK:  Lori Golombek, 114 Old

25   Country Road, Mineola, New York, for Duane Costa.

- CDF -

222

1        Your Honor --

2        THE CLERK:  Sir, you are Duane T. Costa?

3        THE DEFENDANT:  Yes.

4        THE COURT:  Good afternoon, Mr. Costa.

5        THE DEFENDANT:  Good afternoon.

6        MS. GOLOMBEK:  Your Honor, I understand the

7   People are calling a witness, I understand that

8   witness, Paul Green -- I will have an application

9   before we call for him I will need a break immediately

10  before that witness.

11       However, I do have another application,

12  Judge.

13       I had brought this up to DA Rosenblatt.  I

14  had asked to be provided -- I asked whether he was

15  playing the videos and if he wasn't playing the videos

16  of Clinton and Midwood Street I asked to be provided

17  for the information whom I could subpoena or have that

18  witness available.

19       My client is quite upset that I have not

20  been able to get that information yet, Judge, and to

21  be honest with you, so am I.  I should be provided

22  with that information.

23       I was told by DA Rosenblatt, who is not here

24  today, let's see if it comes in on the other witnesses

25  and we'll speak about that.

Proceedings

223

1          Judge, I should be able to cross-examine
2    witnesses that testify regarding whether it's
3    relevant, Judge.
4          THE COURT:  I don't disagree with you.
5          Mr. Nelson, I'm sure, you've been involved
6    in this case, maybe you could look into that
7    information and provide that information to
8    Ms. Golombek in Mr. Rosenblatt's absence.
9          MR. NELSON:  Of course, Judge.
10         THE COURT:  You'll provide Ms. Golombek with
11   people that would need to be called in in order to
12   introduce the videotapes from the scene.
13         MR. NELSON:  Yes, Judge.
14         MS. PULASKI:  Is there a particular are
15   she's inquiring about?
16         You know?
17         MR. NELSON:  Yes.
18         MS. GOLOMBEK:  It's Midwood Street and
19   Clinton Street videos and actually everything, I think
20   he wants everything available, BP gas station.
21         MR. NELSON:  Judge, I will speak to ADA
22   Rosenblatt and get back to Ms. Golombek as soon as
23   possible.
24         MS. GOLOMBEK:  Thank you.
25         THE COURT:  Are we ready to proceed with the

Rauche - People - Direct

224

1      trial?

2              MS. PULASKI:  Yes, your Honor.

3              MS. GOLOMBEK:  Well, I'm ready to proceed

4      with the ballistics expert.  I am not ready to proceed

5      with Paul Green.

6              THE COURT:  Okay, Ms. Golombek, I understand

7      that.  I've explained how we're going to handle that

8      this afternoon.

9              Ms. Pulaski, would you call your witness

10     please.

11             MS. PULASKI:  The People call Maria Rauche.

12             (Whereupon, the witness entered the

13     courtroom.)

14

15     M A R I A   R A U C H E, a witness called on behalf of the

16     People, after having first been duly sworn by the Clerk of

17     the Court, took the witness stand and testified as follows:

18

19             THE CLERK:  Please state your name and spell

20     your name for the record.

21             THE WITNESS:  Maria, M-A-R-I-A, Rauche,

22     R-A-U-C-H-E.

23     DIRECT EXAMINATION BY

24     MS. PULASKI:

25     Q.    Good afternoon, Ms. Rauche.

Rauche - People - Direct

225

1        A.    Good afternoon.

2        Q.    Are you currently employed?

3        A.    Yes, I am.

4        Q.    Where do you work?

5        A.    I work for a private school.

6        Q.    In what capacity?

7        A.    I am a fifth and sixth grade teacher.

8        Q.    How long have you been doing that?

9        A.    About six weeks.

10       Q.    Prior to that, did you work anywhere else?

11       A.    Yes, I did.

12       Q.    Where was that?

13       A.    I worked for the New York State Police

14   Investigations Center.

15       Q.    How long were you worked by the New York State

16   Police at that center?

17       A.    About 14 years.

18       Q.    Did you work there in 2018 and 2019?

19       A.    Yes, I did.

20       Q.    In what capacity?  What was your role there?

21       A.    I was a forensic scientist and a firearms

22   examiner.

23       Q.    How long did you work in the Firearms Section of

24   the laboratory?

25       A.    About nine years.

1     Q.    Is that also forensic analysis as well?

2     A.    Yes.

3     Q.    Ms. Rauche, are you being compensated for your

4  time here today for travel and being away from your regular

5  employment?

6     A.    I am.

7     Q.    Prior to working for the New York State Police as

8  a firearms examiner, can you explain to the Court any

9  educational background you received.

10    A.    I have a Bachelor's in biology, a Masters in

11 teaching and a five/six extension that allows me to teach

12 down to fifth grade.

13    Q.    Now, going back to your role as a forensic

14 firearms examiner, can you explain to the Court what some

15 of your duties were when you worked for the State Police?

16    A.    As a firearms examiner I was responsible for

17 testing firearms for operability; did they work, did they

18 not work.

19          I conducted microscopic comparison of fired

20 components.

21          I also conducted gunshot residue analysis,

22 specifically to distance determination.

23          I also entered and compared items into NIBIN or

24 the National Integrated Ballistic Information Network.

25          I also assisted in the training of other

1  employees.

2      Q.    Did you receive any training for that position?

3      A.    Yes, I did.

4      Q.    What was that training?

5      A.    I received in-house training specific to

6  firearms, NIBIN and maintenance of the reference

7  collection.  And I also attended a yearlong training

8  program at the National Firearm Examiner Academy which is

9  put on by the Bureau of Alcohol Tobacco Firearms and

10  Explosives in Lanham, Maryland.

11      Q.    Can you briefly describe some of the training

12  programs or things covered in the training programs?

13      A.    Sure, at that training program at NFEA, we

14  learned things such as the history of firearms, the history

15  of ammunition, operability of firearms, microscopic

16  comparison of fired components, serial number restoration,

17  distance determination, trajectory analysis and much, much

18  more.

19      Q.    Once you began your employment -- withdrawn.

20          Did you have to take any tests in connection with

21  the training?

22      A.    Yes, I did.

23      Q.    Can you describe those to the Court.

24      A.    At the end of each segment a quiz and a test were

25  given to prove that we could pass, if we were proficient in

Rauche - People - Direct

228

1    the area we were just educated on.

2        Q.    Is that both with respect to the in-house

3    training and the ATF training?

4        A.    Yes, it is.

5        Q.    How were those tests scored?

6        A.    Pass/fail.

7        Q.    Did you pass those tests?

8        A.    Yes, I did.

9        Q.    Have you testified previously in court with

10   respect to your role as a firearms examiner?

11       A.    Yes, I have.

12       Q.    In what jurisdictions?

13       A.    Many throughout the State of New York.

14       Q.    That includes Nassau County?

15       A.    Yes, it does.

16       Q.    Have you specifically testified with respect to

17   firearm operability and microscopic comparison in that

18   capacity?

19       A.    Yes, I have.

20       Q.    Do you recall on approximately how many

21   occasions?

22       A.    Around 50 times.

23       Q.    Have you been qualified as an expert previously?

24       A.    I have.

25       Q.    I'd like to talk to you now about the State

Rauch - People - Direct

229

1   Police Firearms Section where you were employed in 2018

2   and 2019.

3          At that time was the lab accredited?

4   A.    Yes, it was.

5   Q.    Can you explain to the Court what that means.

6   A.    Accreditation means that an outside accrediting

7   body or a group of people come in to the laboratory to

8   ensure that the laboratory is doing what they say they said

9   they're doing and that they're doing it to the best of

10  their ability.

11  Q.    As part of the accreditation, are you required to

12  take any sort of exams or tests?

13  A.    Yes.

14  Q.    What are those?

15  A.    Proficiency and competency exams.

16  Q.    Essentially, what are proficiency exams?

17  A.    They are -- they remind me of standardized

18  testing.  They are exams that are given by an outside body

19  to test the ability of an examiner to do his or her job.

20  Q.    How are those tests scored?

21  A.    Pass/fail.

22  Q.    Did you pass the tests associated with

23  accreditation during your time with the State Police Lab?

24  A.    Yes, I did.

25  Q.    I'm now going to ask you some specific terms

- CDF -

1    relative to your field.

2              Could you explain what a firearm is?

3    A.    A firearm is an object capable of propelling a

4    projectile through space and air using the powers of

5    combustion.

6    Q.    Would one of those objects, could it be a bullet?

7    A.    Absolutely.

8    Q.    What about a semiautomatic firearm?

9    A.    A semiautomatic firearm, when a trigger is pulled

10   a single shot is fired, the gun proceeds to go through its

11   cycle of fire and loads the next cartridge ready to be

12   fired but does not fire until the trigger is pulled the

13   second time.

14   Q.    Can you explain what a cartridge is?

15   A.    A cartridge, which is commonly referred to as

16   ammunition, is comprised of a cartridge case, a propellent,

17   a primer and a projectile.

18   Q.    Now, with respect to those terms, can you explain

19   to the Court essentially how they function together for a

20   cycle of fire.

21   A.    A cartridge is loaded into a semiautomatic pistol

22   or semiautomatic firearm.  The majority of semiautomatic

23   firearms have a slide component on top.

24             A slide is moved to the rear, which locks -- I'm

25   sorry, which brings the firing-pin to the rear and locks it

1    in place.

2              As the slide moves forward it will take the first

3    round of ammunition that's ready and waiting and it will

4    load it into the chamber where it locks it into place in

5    the chamber.

6              When the trigger is pulled the firing-pin comes

7    forward, strikes the back of the primer, causes the

8    combustion explosion affect within the primer of the

9    propellent and the propellent that is inside the cartridge

10   case undergoes combustion.

11             One part of the combustion is gas.  As the gas

12   builds and the pressure builds it forces the bullet or

13   projectile to leave the cartridge case and go down the

14   barrel of the firearm.

15             The same forces cause the slide to be pushed to

16   the rear which allows the chamber to be unlocked.

17             As the slide moves to the rear it has something

18   called an extraction hook.  That hook grabs the edge of the

19   now empty cartridge case and pulls it to the rear.

20             Once the cartridge case has moved to the rear, it

21   hits an ejection bar and the expended -- I'm sorry, and the

22   cartridge case is then expended from the firearm.

23   Q.   Is that essentially that the firearm is ready to

24   fire another projectile again?

25   A.   Yes, the slide will close again making the next

1    ammunition locked into place ready to be fired.

2        Q.    As part of your duties with the State Police Lab

3    you indicated that you did comparisons of casings and

4    cartridge casings?

5        A.    Correct.

6        Q.    Can you explain a little bit about how that

7    testing is undertaken.

8        A.    Microscopic comparison of two items.  First

9    begins with a comparison of the class characteristics which

10   are most of the characteristics visible with the naked eye.

11            After a comparison of class characteristics, a

12   comparison microscope is used to compare two objects

13   side-by-side under high magnification to look at

14   microscopic characteristics which are very fine and

15   difficult to see.

16       Q.    Let me ask you about class characteristics first.

17            What types of things are you able to determine by

18   examining a casing with the eye?

19       A.    Using the naked eye and a cartridge casing it is

20   possible to determine the size or the caliber of the

21   cartridge case.  It is also possible to determine the shape

22   of the firing-pin impression left behind; be it a circle, a

23   hemisphere, square, triangle, et cetera.

24            It is also possible to see things such as the

25   breechface characteristics.

1          So the breechface is the back part of the firearm

2     that the cartridge case rests against and when the

3     cartridge is detonated it does pick up an impression from

4     the back of the firearm.

5          Sometimes those are parallel marks, they can be

6     circular marks, they could be wavy marks.  Those are all

7     things you can see with the bare eye.

8          Q.    Are you able to determine on a visual examination

9     only whether two casings were fired from the same firearm?

10          A.    I can determine exclusions.

11          Q.    What do you mean by that?

12          A.    Exclusions would mean that it's easy to determine

13     if two cartridge cases were not fired in the same firearm

14     based on class characteristics.

15          So a firearm that leaves behind say a

16     hemispherical firing-pin impression cannot also leave

17     behind a square firing-pin impression.

18          Q.    So then once you move passed the visual class

19     characteristics you indicated you did do a microscopic

20     examination.

21          Can you explain what that entails?

22          A.    The microscopic examination requires a comparison

23     microscope.  A comparison microscope is two compound

24     microscopes joined together by an optical bridge.

25          What that really means is that there are two

1  stages to mount two different objects to compare them using
2  magnification.  One set of magnification for each object
3  and look through one set of eye pieces to view both objects
4  simultaneously side-by-side and that allows the examiner to
5  see those microscopic details that cannot be seen with the
6  bare eye normally.

7      Q.    Generally what types of details are those?

8      A.    They're very fine marks, scratches, they can be
9  lines, there's usually patterns we're looking for.  The
10  technical term is stria that we are examining.

11      Q.    What is it about that detail that allows you to
12  correlate that particular cartridge casing to a firearm?

13      A.    Through use of a firearm, through the tooling
14  used to make the firearm there are a series of unique marks
15  left behind on that firearm and then that firearm passes
16  those marks onto the fired components that pass through and
17  leave that firearm.

18      Q.    So using those microscopic comparisons, are you
19  able to both compare casings to one another as well as
20  casings to an individual of a particular firearm?

21      A.    Yes and no because you asked a two-part question.
22            Cartridge cases can be compared to other
23  cartridge cases.  So a cartridge case cannot be compared
24  directly to another firearm but can be compared to fired
25  evidence from that firearm.

1    Q.    A test-fire essentially?

2    A.    Yes.

3    Q.    With respect to microscopic testings,

4    approximately how many evaluations have you performed in

5    the course of your career with the State Police Lab?

6    A.    Thousands.

7    Q.    You also previously mentioned that one of your

8    duties and responsibilities involved testing firearm

9    operability.

10        Can you just explain what that is?

11    A.    To test firearm operability I receive a firearm

12    and first ensure that it is safe to be fired.  There's no

13    obstructions in the barrel, it appears to be functioning in

14    a safe manner the way the manufacturer intended.  And then

15    I'll proceed to use live ammunition to test if that firearm

16    truly does function the way the manufacturer intended.

17    Q.    Does that essentially means that it fires a

18    projectile?

19    A.    Yes, it does.

20        MS. GOLOMBEK:  Objection.

21        Leading the witness.

22        THE COURT:  Overruled.

23    Q.    With respect to firearm operability,

24    approximately how many evaluations have you done during

25    your time with the State Police?

1    A.    Also thousands.

2    Q.    Did there come a time when you were working for

3    the State Police as a firearms examiner in 2019 that you

4    received evidence in connection with Case Number

5    218CR0055811?

6    A.    Yes.

7    Q.    Was that also assigned a lab case number of

8    18HL06418?

9              MS. GOLOMBEK:  Objection.

10             Leading the witness.

11             THE COURT:  Overruled.

12   A.    Yes.

13   Q.    What items did you receive in connection with

14   those lab numbers?

15   A.    I received two firearms for analysis, fired

16   cartridge cases, intact cartridge cases and magazines.

17   Q.    I'm going to break that down a little bit more.

18         I'm going to start with -- is there anything that

19   would refresh your recollection or do you know which --

20   what type of firearms you received?

21   A.    Could you repeat the question?

22   Q.    Yes.

23         Do you know what types of firearms you received?

24   A.    I received semiautomatic pistols.

25   Q.    Are you able to further describe the

1    characteristics of the pistols you received?

2        A.    Yes.

3        Q.    What were they?

4        A.    One was a .40 caliber Smith & Wesson

5    semiautomatic pistol.

6            And the other was a 7.62 Tokarev semiautomatic

7    pistol.

8        Q.    Tokarev, T-O-K-A-R-E-V?

9            MS. GOLOMBEK:  Objection.

10            Leading the witness.

11            THE COURT:  Overruled.

12        A.    Yes.

13        Q.    Do you recall the serial numbers of both of those

14    firearms?

15        A.    No, I do not.

16        Q.    Is there anything that would refresh your

17    recollection as to the serial numbers?

18        A.    Yes, there is.

19        Q.    What's that?

20        A.    Either a report or the notes that I generated.

21            MS. PULASKI:  Your Honor, with the Court's

22        permission I'd like to show the witness the three-page

23        firearms report.

24            THE COURT:  That will be marked as

25        People's 28 for identification.

Rauche - People - Direct

238

1              (Whereupon, People's Exhibit 28 was so

2        marked for identification.)

3              THE COURT OFFICER:  So marked.

4              MS. PULASKI:  If it could please be shown to

5        the witness.

6              (Whereupon, the exhibit was handed to the

7        witness.)

8    Q.    I'm going to first ask you about the

9    Smith & Wesson .40 caliber firearm.

10             If you could take a look at that report and see

11   if it refreshes your recollection as to the serial number

12   on that firearm and look up when you're done.

13             Does it?

14   A.    It does.

15   Q.    What's the serial number for that firearm?

16   A.    FWL6311.

17   Q.    Now, with respect to the second firearm you

18   described, the Tokarev caliber pistol, can you take a look

19   and see if People's 28 for identification in front of you

20   refreshes your recollection as to the serial number for

21   that particular item?

22   A.    It does.

23   Q.    What's the serial number for that item?

24             MS. GOLOMBEK:  Objection.

25             People's 28 hasn't been marked.

- CDF -

1              THE COURT:  It was marked as People's 28 for

2       identification.  It's only being used to refresh her

3       recollection.

4              MS. GOLOMBEK:  I was not informed of the

5       marking.

6              THE COURT:  You can proceed.

7       Q.   Does that -- what's the serial number for that

8  particular item?

9       A.   V18006.

10      Q.   I'm going to ask you again specifically now,

11  without referring to the report, do you recall what items

12  you received in connection with the .40 caliber

13  Smith & Wesson firearm?

14      A.   Not without looking at the report.

15      Q.   Can you take a look at that and see if it

16  refreshes your recollection as to the items that came with

17  that firearm?

18      A.   Okay.

19      Q.   What were those items?

20      A.   One magazine, 11 cartridges and one additional

21  envelope.

22      Q.   And with respect to the other firearm, the

23  Tokarev, what items -- do you recall what items you

24  received with that firearm?

25      A.   A magazine.

1    Q.    Were there any additional items submitted to you

2    in connection with that lab number?

3    A.    Yes, there were.

4    Q.    What were those?

5    A.    Expended cartridge cases.

6    Q.    Approximately how many?

7    A.    Five.

8         MS. GOLOMBEK:  Objection.

9         Was that using the report to refresh her

10    recollection, your Honor?

11    A.    No, I was counting in my head.  I'm sorry.

12    Q.    Now, with respect to the caliber of those

13    particular five cartridge casings, do you know what caliber

14    those were?

15    A.    7.62 Tokarev.

16        MS. PULASKI:  Thank you.

17        You can remove People's 28 for

18    identification.

19        At this time I'm going to ask this item be

20    marked People's 29 for identification.

21        THE COURT:  People's 29 for identification.

22        MS. PULASKI:  For the record, your Honor,

23    with respect to People's 29 and what I'm going to ask

24    to be marked as People's 30, as well as the items

25    contained therein, they were opened in the presence of

1   the Court and defense counsel and this witness prior

2   to her taking the stand for safety reasons but were

3   otherwise in a sealed condition.

4              THE COURT:  Mr. Costa, let me explain to you

5   what happened.

6              The court officers need to make sure that

7   any time there is a gun that's being brought into the

8   courtroom is safe, meaning there's nothing -- there's

9   no cartridge ready to go, that there's no magazine in

10  the gun, so that was done -- so the boxes were

11  unsealed just before you came up.

12             Your lawyer was here, this witness was here

13  and Ms. Pulaski and Mr. Nelson was here and the two

14  boxes were open and the sergeant made sure they were

15  safe and then just returned the box the way it was.

16             THE DEFENDANT:  Okay.

17             THE COURT:  You can proceed.

18             THE COURT OFFICER:  People's.

19             (Whereupon, People's Exhibit 29 was so

20  marked for identification.)

21             THE COURT OFFICER:  People's 29 marked for

22  identification.

23             MS. PULASKI:  If that could please be shown

24  to the witness.

25             (Whereupon, the exhibit was handed to the

Rauche - People - Direct

242

1      witness.)

2         Q.    Ms. Rauche, do you recognize what's been marked

3      People's 29 for identification?

4         A.    Yes, I do.

5         Q.    What is that?

6         A.    This is a box that I received in this case.

7         Q.    Do you know what's contained within that box?

8         A.    I do.

9         Q.    What is it?

10        A.    There is a firearm contained within inside and a

11     magazine.

12        Q.    With respect to that box -- with respect to that

13     item, how do you know it's the same box that you received

14     in connection with this particular case?

15        A.    On the outside of the box there are yellow State

16     Police Laboratory labels that contain the State Police

17     Laboratory case number and the item numbers.

18              There is also on the underside of the box where

19     the box is sealed there are my initials and the date that I

20     placed those initials on the box from both when it was

21     sealed today and when I sealed it at the laboratory.

22        Q.    Can you open up People's 29 and just take a look

23     inside.

24              Which of the two firearms that you described were

25     contained within People's 29?

1    A.    Can you repeat the question please?

2    Q.    Which of the firearms is contained within

3    People's 29?

4    A.    The .40 caliber Smith & Wesson.

5    Q.    What, if anything, else is contained within

6    People's 29?

7    A.    There is a magazine and there is also a set of

8    test fires.

9    Q.    How are the test fires packaged?

10    A.    The test fires are packaged in individual white

11    envelopes and the white envelopes were placed in a

12    heat-sealed plastic bag.

13    Q.    Who did that?

14    A.    I did.

15    Q.    Now, you previously indicated that People's 29 or

16    the .40 caliber Smith & Wesson, had additional items

17    contained within that box, I believe an envelope with 11

18    cartridges and an additional envelope.

19         Do you see those within the box?

20    A.    No, they are not.

21         MS. PULASKI:  Your Honor, I'm going to ask

22    that these items be shown to the witness.

23         THE COURT:  Yes, we'll mark them --

24         MS. PULASKI:  Maybe I can have the test

25    fires marked as 29A and the two envelopes marked as B

1    and C.

2                    MS. GOLOMBEK:  The box you're marking as 29?

3                    MS. PULASKI:  The box with the firearm and

4    the magazine is 29.

5                    MS. GOLOMBEK:  .40 caliber, the magazine and

6    what else?

7                    MS. PULASKI:  Would be 29.

8                    MS. GOLOMBEK:  Magazine and firearm.

9                    THE COURT:  29A would be the test fires, 29B

10   the envelope with the -- the larger envelope with the

11   cartridges and 29C, the smaller envelope.

12                   (Whereupon, People's Exhibits 29A, 29B

13   and 29C were so marked for identification.)

14                   THE COURT OFFICER:  29A, 29B and 29C marked

15   for identification.

16                   MS. PULASKI:  Thank you.

17                   If they could please be shown to the

18   witness.

19                   THE COURT:  Yes.

20                   (Whereupon, the exhibits were handed to the

21   witness.)

22   Q.   Ms. Rauche, I'm going to start with first the

23   firearm and the magazine contained within People's 29 in

24   evidence.

25                   Do you recognize the item --

- CDF -

1                      MS. GOLOMBEK:  Objection.

2                      It's not in evidence.

3                      MS. PULASKI:  I'm sorry, for identification.

4       Q.    Do you recognize the items contained within that

5    box?

6       A.    Yes, I do.

7       Q.    What are they?

8       A.    They are a .40 caliber Smith & Wesson pistol and

9    a magazine.

10      Q.    Are those -- is that the same firearm that you

11   described receiving in connection with the lab number, the

12   State Police Lab number you previously testified to?

13                     MS. GOLOMBEK:  Objection.

14                     Leading the witness.  She can testify as to

15          what it is.

16                     THE COURT:  Overruled.

17      A.    Yes, they are.

18      Q.    When you received those items at the lab, in what

19   condition did you receive the items and their packaging?

20      A.    I actually don't recall.

21      Q.    Did you, yourself, when you handled the items

22   seal the packaging?

23      A.    Can you repeat that?

24      Q.    Did you, yourself, when you handled the items and

25   examine them, seal the packaging after you were done?

1      A.    I did.

2      Q.    Did you see those seals on that box today?

3      A.    Yes, I did.

4      Q.    With respect to 29A, do you know what's contained

5  within that envelope?

6      A.    Yes, I do.

7      Q.    What's contained within that envelope?

8      A.    Within each of the two envelopes that are present

9  each one contains an expended cartridge case and expended

10 bullet or projectile.

11     Q.    How do you know those are the items contained

12 within those envelopes?

13     A.    Two ways.

14           One is I placed them there, I created them, I

15 created the envelopes, created the labels, placed them

16 there.

17           And the second is we verified it earlier today.

18     Q.    When you say you verified it earlier today, how

19 did you do so?

20     A.    Actually, I verified it with the DA and we opened

21 the contents and verified what was inside.

22     Q.    Are those the same items that you previously

23 testified receiving in connection with that case 06418

24 of '18?

25     A.    Yes.

Rauche - People - Direct
310

247

1      Q.  Now, with respect to 29B, what's contained within

2   that envelope?

3      A.      There are nine intact cartridges.

4      Q.      How do you know that's contained within that

5   envelope?

6      A.      Two ways.

7              One is that when I received it at the laboratory

8   I took an inventory of what was inside.  There were 11.  I

9   used two to conduct my test-fire.

10             I then additionally today, prior to coming into

11  the courtroom, the envelope was opened and they were -- the

12  cartridge cases were counted to verify contents.

13     Q.      Did you reseal it after?

14     A.      Yes.

15     Q.      Are those the same items that you received with

16  People's 29 for identification prior to conducting your

17  analysis on that firearm?

18     A.      Yes.

19     Q.      Are they in the same or substantially the same

20  condition as when you received them?

21     A.      Yes.

22     Q.      With respect to 29C, what's contained within

23  that?

24     A.      I have no idea.

25     Q.      Did you ever undertake any analysis or open 29C

1    at all?

2        A.    No.

3              MS. PULASKI:  Your Honor, at this point I

4    would offer 29, 29A and 29B in evidence.

5              MS. GOLOMBEK:  Objection.

6              THE COURT:  I'm going to show them to you,

7    Ms. Golombek.

8              (Whereupon, the exhibits were handed to the

9    defense.)

10             MS. GOLOMBEK:  May I have a short voir dire,

11   your Honor?

12             THE COURT:  Yes.

13   VOIR DIRE EXAMINATION BY

14   MS. GOLOMBEK:

15       Q.    Good afternoon.

16       A.    Good afternoon.

17       Q.    What you testified as being in item 29A, who did

18   you receive that item from?

19             THE COURT:  When?

20       Q.    When you first -- when did you first receive

21   what's enclosed in item 29?

22       A.    Wait, 29 or 29A?

23       Q.    29.

24       A.    I don't recall the date when I received 29.

25       Q.    Who gave you item 29?

1          A.    I received it from the evidence receiving section
2     of the laboratory.
3          Q.    Who gave you item number 29A?
4          A.    29A was originally submitted as part of 29B,
5     which then I then later separated out and used it and
6     became a new item number.
7          Q.    Who gave you item 29B?
8          A.    29B was submitted in the same box as 29
9     originally.
10         Q.    Who submitted it to you?
11         A.    I don't know.
12         Q.    You don't know where that person got that item
13    from, correct, whoever that person is, correct?
14         A.    Correct.
15         Q.    And the same thing with item 29A, you weren't
16    present when that item was recovered, correct?
17         A.    Correct.
18         Q.    You don't know where that item was recovered
19    from, correct?
20         A.    Correct.
21         Q.    You don't know anything about the handling of
22    that item prior to your receiving it, do you?
23         A.    No, I do not.
24         Q.    You don't know what was done to that item prior
25    to your receiving it, do you?

1      A.    No, I do not.

2      Q.    Nor do you know what was done to item 29A prior

3  to you receiving it, correct?

4      A.    That's incorrect.  29A did not exist until I made

5  it.

6      Q.    29B, the cartridges that you testified to that

7  were intact, you didn't see who recovered those cartridges,

8  correct?

9      A.    Correct.

10     Q.    You didn't see where they were recovered from,

11 correct?

12     A.    Correct.

13     Q.    You didn't see who recovered it, correct?

14     A.    Also correct.

15     Q.    And you didn't see who brought it to the person

16 who ultimately gave it to you, correct?

17     A.    Correct.

18           MS. GOLOMBEK:  Your Honor, I'm going to

19     object to these items.

20           There is no proper Chain of Custody.  Those

21     persons did not testify here, your Honor.

22           MS. PULASKI:  Your Honor, the People would

23     submit these items to the Court subject to connection

24     via other witnesses that have not yet been called with

25     respect to the recovery of these items.

1          THE COURT:  People's 29, 29A and 29B will be
2     marked in evidence, subject to connection.
3          (Whereupon, People's Exhibits 29, 29A
4     and 29B, previously marked for identification, were
5     received in evidence.)
6          THE COURT OFFICER:  People's 29, 29A and 29B
7     marked for evidence.
8          MS. GOLOMBEK:  Subject to connection.
9          THE COURT:  Yes, I said that.
10    CONTINUED DIRECT EXAMINATION BY
11    MS. PULASKI:
12         Q.    Ms. Rauche, with respect to item 29, the .40
13    caliber Smith & Wesson firearm, what kind of firearm is
14    that?
15         A.    It is a semiautomatic pistol.
16         Q.    What analysis did you undertake on that pistol
17    when you received it?
18         A.    I conducted operability for function testing on
19    this pistol.
20         Q.    Can you explain to the Court how an operability
21    test is conducted?
22         A.    To conduct an operability test, first I examine
23    the firearm for any safety concerns, things such as an
24    obstruction in the barrel, loose triggers, anything that
25    might cause the firearm to malfunction or be of concern to

1    myself when firing it for my own safety.

2             Once I have determined that the firearm appears

3    safe to fire I then take either submitted ammunition or

4    laboratory stocked ammunition, depending on what was

5    submitted with the firearm.

6             I take two cartridges, I will mark them with case

7    number, item number, my initials and then I proceeded into

8    the watertank room.

9             In the watertank room there is a watertank full

10   of approximately 500 gallons of water and the semiautomatic

11   pistol is then discharged.

12            So I load the pistol with the ammunition and fire

13   it myself, discharged it into the watertank.  The watertank

14   allows an examiner to recover both fired components, both

15   the projectile and the cartridge case and retain them for

16   any type of further analysis.

17       Q.   So with respect to this particular item,

18   People's 29, did you inspect it and ensure it was safe?

19       A.   Yes, I did.

20       Q.   Was it?

21       A.   It was safe to fire, yes.

22       Q.   You indicated that you either used lab or

23   submitted ammunition.

24            What did you use in this particular case?

25       A.   In this particular case this firearm was

1    submitted with ammunition, so I used submitted ammunition.

2        Q.    Is that the cartridges that you indicated had

3    been submitted in People's 29B?

4        A.    Yes.

5        Q.    How many of those cartridges did you select?

6        A.    Two.

7        Q.    Did you then, like you described, test fired them

8    into the water?

9        A.    Yes.

10       Q.    What happened when you test fired those two

11   cartridges into the water?

12       A.    They discharged properly and the firearm

13   functioned as expected.

14       Q.    Did you then reach an opinion as to whether

15   that .40 caliber firearm contained within People's 29 was

16   operable?

17       A.    Yes, I did.

18       Q.    What was it?

19       A.    It was operable as received.

20       Q.    With respect to the test fires, did you retrieve

21   them from the water?

22       A.    Yes, I did.

23       Q.    You indicated that you would place markings on

24   them.  Did you do so in this case?

25       A.    Yes, I did.

1    Q.    What were those markings?

2    A.    Those markings include things such as on the

3    cartridge case, the laboratory case number, the item

4    number.  So 1TF1 or 1TF2.  And my initials.

5          On the projectile or the bullet portion there

6    really isn't room for a case number so I was able to do

7    1TF1 and 1TF2 and my initials.

8    Q.    Are those markings contained within the items

9    contained in People's 29A?

10   A.    Yes, they are.

11         MS. PULASKI:  I'm now going to remove

12   People's 29 in evidence and ask you some questions

13   about People's 30.

14         I'm sorry, I ask it be marked as People's 30

15   for identification please.

16         THE COURT:  People's 30 for identification.

17         (Whereupon, People's Exhibit 30 was so

18   marked for identification.)

19         THE COURT OFFICER:  People's 30 marked for

20   identification.

21         MS. PULASKI:  If it could please be shown to

22   the witness.

23         (Whereupon, the exhibit was handed to the

24   witness.)

25   Q.    Do you recognize what is before you as

1    People's 30 for identification?

2         A.    I do.

3         Q.    What is that?

4         A.    This is a second box that I received in this

5    case.

6         Q.    What's contained within that box?

7         A.    Within this box there is a semiautomatic pistol

8    and a magazine.

9         Q.    What type of pistol?

10        A.    7.62 Tokarev semiautomatic.

11        Q.    How do you know that's contained within

12   People's 30?

13        A.    I know that's what's inside based on the presence

14   of the lab number, the New York State Police laboratory

15   number, the item numbers and my initials which have been

16   placed on this box.

17             I also know what is inside of this box because

18   earlier today in this courtroom when it was opened to check

19   for safety I was able to verify the contents.

20        Q.    Prior to looking at the contents in the

21   courtroom, did you also look at the contents earlier today?

22        A.    Yes, I did.

23        Q.    Did you, after looking at the contents, reseal

24   the package and initial and date it?

25        A.    Yes, I did.

1    Q.    The item -- was there anything else contained
2    within People's 30 for identification when it was submitted
3    to the lab?
4    A.    I don't recall anything else being in the box.
5    Q.    Were there other items that were submitted to the
6    lab that you previously described that were linked to
7    People's 30 for identification?
8    A.    Yes, there are.
9    Q.    What were those items?
10    A.    Those were the five expended cartridge cases.
11                MS. PULASKI:  I'm going to ask this be
12    marked People's -- I'll have this marked People's 31
13    for identification.
14                THE COURT:  People's 31 for identification.
15                (Whereupon, People's Exhibit 31 was so
16    marked for identification.)
17                THE COURT OFFICER:  People's 31 marked for
18    identification.
19                MS. PULASKI:  Could it be shown to the
20    witness.
21                (Whereupon, the exhibit was handed to the
22    witness.)
23    Q.    Do you recognize what's in People's 31 for
24    identification?
25    A.    Yes, I do.

1      Q.    What's contained within People's 31?

2      A.    Within People's 31 there are five expended

3   cartridge cases.

4      Q.    How are those five cartridge cases related to

5   People's 30 in evidence?

6      A.    The five cartridge cases that are present in

7   People's 31 were submitted to the laboratory for

8   microscopic comparison to People's 30.

9      Q.    Were those both -- were both 30 and 31 submitted

10   under that same case report you previously described,

11   18HL06418?

12      A.    Yes, they were.

13      Q.    Did they have the corresponding case of

14   218CR0055811?

15      A.    Yes, they do.

16      Q.    Did you receive those items in a sealed

17   condition, do you recall?

18      A.    Yes, I did.

19      Q.    What did you do upon receiving those items?

20      A.    Upon receiving item -- People's item 31 I opened

21   the exterior packaging and began to inventory the interior

22   contents.

23      Q.    What was contained within People's 31?

24      A.    So within People's 31 there are five individual

25   white envelopes which are all sealed and came to me sealed.

1        Within each of those envelopes is a plastic jewel
2   case.  Within the plastic jewel case is one expended 7.62
3   Tokarev caliber cartridge case.
4        Q.   Those items were submitted for analysis along
5   with the firearm?
6        A.   Yes.
7             MS. GOLOMBEK:  Objection.
8             Leading the witness.
9             THE COURT:  Overruled.
10       Q.   How do you know that those are the items
11  contained within those envelopes?
12       A.   Earlier today prior to coming into court they
13  were opened in my presence and I was able to view them all
14  and verify the contents.
15       Q.   Are items 30 and 31 before you in the same
16  condition as they were when you received them for your
17  analysis initially?
18       A.   Relatively, yes.
19       Q.   What do you mean by that?
20       A.   They've been opened more times, including by
21  myself, since I originally received them.
22       Q.   So they've been sealed and resealed since you
23  viewed them but the actual items themselves, are they the
24  same items you received and analyzed?
25       A.   Yes, they are.  With the addition of my

Raucher - People - Direct

259

1    handwriting on those items.

2        Q.   Is that one of the ways you recognize the items

3    to be one of those that you analyzed?

4        A.   It is, yes.

5             MS. PULASKI:  Your Honor, at this time I

6        offer People's 30 and 31 into evidence, subject to

7        connection by additional witnesses.

8             THE COURT:  Let's show it to Ms. Golombek.

9             (Whereupon, the exhibit was handed to

10       defense counsel.)

11            MS. GOLOMBEK:  Could I have a short voir

12       dire even though subject to connection?

13            THE COURT:  Yes.

14   VOIR DIRE EXAMINATION BY

15   MS. GOLOMBEK:

16       Q.   You indicated item 30 was opened.

17            Was that in the courtroom here today?

18       A.   Yes, it was.

19       Q.   Was it opened by somebody in the DA's office

20   earlier today?

21       A.   Yes, it was.

22       Q.   Who was it opened by in the DA's office?

23       A.   ADA Pulaski.

24       Q.   ADA Pulaski.  Was anybody else present?

25       A.   Yes.

1    Q.    Who else was present?

2    A.    I'm sorry, I only know your first name.  Ryan.

3    Q.    Was anyone else present?

4    A.    Just myself.

5    Q.    Was that recorded?

6    A.    No.  I don't know.

7    Q.    Item number 31, was that also opened in the

8    presence of ADA Pulaski and ADA Ryan Nelson?

9    A.    Yes.

10   Q.    Anyone else present for that?

11   A.    Just myself.

12   Q.    Was that recorded?

13   A.    Not that I'm aware.

14   Q.    Was it opened prior to you being with ADA Nelson

15   and the ADA from the time you sealed it?

16   A.    I don't know.

17   Q.    So you don't know how many times it was opened

18   prior to today, correct?

19   A.    Correct.

20   Q.    You were present for the opening of it twice

21   today, once in the courtroom and once earlier today with

22   the DAs, correct?

23   A.    Correct.

24   Q.    That's on items 30 and 31, correct?

25   A.    Item 31 was not opened in the courtroom, only

- CDF -

Rauche - People - Direct

261

1    item 30.

2        Q.    That also applies to item 29, correct?

3                THE COURT:  Sustained.

4        Q.    As far as when it was opened by yourself in front

5    of ADA Pulaski and ADA Nelson, who did you receive it from?

6        A.    From the evidence receiving section of the

7    laboratory.

8        Q.    Do you know who you received it from in the

9    evidence receiving section?

10       A.    No, I do not.

11       Q.    When you say you test fired within item

12   number 30, are you the only person -- as far as you know,

13   are you the only person to have test fired that item?

14                MS. PULASKI:  Objection.

15                I don't believe there's any item --

16                THE COURT:  Sustained.

17                There's been no testimony regarding the test

18        firing of the gun in 30.

19       Q.    As to the item in item number 29 --

20                THE COURT:  Sustained.

21                MS. PULASKI:  Objection.

22                MS. GOLOMBEK:  Certainly, your Honor.

23                I have no more questions at this time.

24                THE COURT:  Are you objecting?

25                MS. GOLOMBEK:  I am objecting, your Honor.

1          THE COURT:  People's 30 and 31 are going to
2    be marked in evidence, again, subject to connection.
3          (Whereupon, People's Exhibits 30 and 31,
4    previously marked for identification, were received in
5    evidence.)
6          THE COURT OFFICER:  So marked.
7          MS. GOLOMBEK:  The record noting my
8    exception, your Honor.  We don't know how many times
9    this item was opened, Judge, prior to being opened
10   today in the courtroom.
11         THE COURT:  You have your exception.
12         MS. PULASKI:  Your Honor, before we continue
13   this might be a good time if the Court is willing to
14   give me two minutes like I indicated earlier.
15         THE COURT:  We're going to take a very brief
16   recess and then we'll continue -- not a recess, just a
17   moment.
18         (Whereupon, a pause was had in the record.)
19   CONTINUED DIRECT EXAMINATION BY
20   MS. PULASKI:
21   Q.   Ms. Rauche, with respect to the marked item 32
22   for identification --
23         THE COURT:  You haven't asked that be marked
24   yet.
25         MS. PULASKI:  I'm sorry.

Rauche - People - Direct

263

1        Q.    With respect to item 30, the Tokarev firearm,

2   what did you do when you received that item in the lab?

3        A.    When I received item 30 I conducted the same type

4   of operability testing that I did on, I forget the number,

5   the previous pistol, where I examined it for safety

6   concerns.  I examined it to see if it would fire as the

7   manufacturer intended before using live ammunition.

8             MS. GOLOMBEK:  I'm sorry, I didn't hear that

9        whole thing.

10       Q.    Can you describe again what you did when you

11  received the firearm?

12       A.    When I received it, I examined it for safety

13  concerns first and then I examined it or -- I'm sorry.

14            I proceeded to determine if it would be safe to

15  fire using live ammunition.  And then using ammunition I

16  was able to move forward with the test-fire in the

17  watertank room.

18       Q.    You followed the same steps that you previously

19  described with respect to People's 29 in evidence?

20       A.    Yes, I did.

21            MS. GOLOMBEK:  Objection.

22            THE COURT:  Overruled.

23       Q.    Now, what ammunition did you use to test-fire

24  this particular firearm, People's 30 in evidence?

25       A.    People's 30 was not submitted with any type of

Rauche - People - Direct

264

1    ammunition, so I used laboratory stocked ammunition.

2         Q.    When you received People's 30 it was just the

3    firearm and the magazine in the box?

4         A.    That's correct.

5              MS. GOLOMBEK:  Objection.

6              Repeating the testimony.

7              THE COURT:  Overruled.

8         Q.    When you say you used laboratory ammunition, can

9    you describe what that means?

10        A.    The New York State Police Forensic Center

11   Laboratory has a collection of ammunition of various

12   calibers and various types of ammunition and so when a

13   firearm is submitted without ammunition or if additional

14   ammunition is needed an examiner can use ammunition that is

15   in the laboratory reference collection and so ammunition

16   was selected from that collection in order to complete and

17   conduct a test-fire on this particular item.

18        Q.    How many rounds of ammunition did you use to

19   conduct the test-fire?

20        A.    Two.

21        Q.    How did you conduct the test-fire?

22        A.    I chose two pieces of ammunition from the

23   laboratory reference collection and I took those, along

24   with this particular firearm and magazine, into the

25   watertank room.

1          Both pieces of ammunition were marked with case

2    number, item number and my initials, with the bullets being

3    marked with the item number and my initials.

4          And then I proceeded to load them into the

5    magazine and discharge the firearm into the watertank.

6          And that allowed me to retrieve the fired

7    components and use them for further analysis.

8       Q.    When you fired the weapon both of those times,

9    did it fire properly?

10      A.    Yes, it did.

11      Q.    Based on that, did you form an opinion as to

12   whether that Tokarev pistol was operable?

13      A.    Yes, I did.

14      Q.    What was that opinion?

15      A.    That this pistol was operable as received.

16      Q.    With respect to those test fires you indicated

17   you retrieved them from the tank, what did you do with

18   them?

19      A.    I used those test fires to conduct further

20   examination on additional pieces of evidence.

21          MS. PULASKI:  I'm going to ask this be

22      marked People's 32 for identification.

23          THE COURT:  32 for identification.

24          (Whereupon, People's Exhibit 32 was so

25      marked for identification.)

Rauche - People - Direct

1          THE COURT OFFICER:  People's 32 marked for

2     identification.

3          MS. PULASKI:  If it could please be shown to

4     the witness.

5          THE COURT:  Yes.

6          (Whereupon, the exhibit was handed to the

7     witness.)

8     Q.   Ms. Rauche, do you recognize what's in

9     People's 32 for identification?

10    A.   Yes, I do.

11    Q.   What's contained therein?

12    A.   Within People's 32 there are two expended

13    cartridge cases and two expended projectiles from the test

14    fires.

15    Q.   Is that from the test-fire you just described

16    with respect to People's 30 in evidence?

17    A.   Yes, it is.

18    Q.   How do you know that's what's contained

19    within 32?

20    A.   I know that is contained within People's 32

21    because I created the items for People's 32, generated from

22    the test fires and just now they were opened here in the

23    courtroom and I was able to verify the contents of the

24    envelopes.

25    Q.   Was that here in court in the presence of both me

1    and the defense attorney?

2        A.    Yes.

3        Q.    What caliber ammunition was used to test-fire

4    that particular weapon?

5        A.    7.62 Tokarev.

6        Q.    Is that what's contained within the envelope?

7        A.    Yes, it is.

8        Q.    Are 31 the same test fires that you received from

9    the -- withdrawn.

10            Does People's 32 for identification contain the

11    same test fires that you just described conducting in

12    connection with the operability tests for People's 30?

13        A.    Yes.

14            MS. PULASKI:  Your Honor, at this point I

15        offer People's 32 into evidence.

16            THE COURT:  Show it to Ms. Golombek.

17            (Whereupon, the exhibit was handed to

18        defense counsel.)

19            MS. GOLOMBEK:  May I have a voir dire?

20            THE COURT:  Yes.

21    VOIR DIRE EXAMINATION BY

22    MS. GOLOMBEK:

23        Q.    Where did you receive these items from?

24        A.    Which items in question?

25        Q.    Item number 32 for identification.

- CDF -

1       A.    Number 32, I generated those in the laboratory.

2       Q.    Did you receive anything in item 32 that was

3    given to you by anyone else?

4       A.    No.

5              MS. GOLOMBEK:  Objection, your Honor, I

6    believe there's not a proper foundation.

7              THE COURT:  I'm going to overrule your

8    objection.

9              People's 32 is admitted into evidence.

10             Again, as with all the other pieces of

11   evidence from item 29, is all subject to connection.

12             MS. PULASKI:  Your Honor, the People would

13   argue that this particular item is not subject to

14   connection as it was an item that was provided by the

15   State Police Laboratory and not collected by any

16   additional person from an outside law enforcement

17   agency.

18             It was all maintained within the lab, so

19   therefore, unlike the other evidence that was

20   submitted to the lab, this evidence was provided by

21   the analyst for use in the test-fire.

22             MS. GOLOMBEK:  May I have a few more

23   questions, your Honor?

24             THE COURT:  No.

25             I'm going to say it is subject to

Rauche - People - Direct

269

1    connection, because the weapon that was test-fired
2    still has not been connected to anybody in this trial.
3              MS. PULASKI:  I understand, your Honor.
4              Other than the weapon itself, once that's
5    connected this item will follow.
6              THE COURT:  Yes.
7              MS. PULASKI:  Thank you, your Honor.
8              (Whereupon, People's Exhibit 32, previously
9    marked for identification, was received in evidence.)
10              THE COURT OFFICER:  So marked.
11   CONTINUED DIRECT EXAMINATION BY
12   MS. PULASKI:
13        Q.    I'm going to ask you some questions about
14   items 31 and 32 in evidence.
15              Item 31, the five cases, those were submitted to
16   you with the firearm?
17        A.    They were submitted as their own items but yes.
18        Q.    And items -- the items contained within
19   People's 32 were the State supplied ammunition that you
20   just described?
21        A.    That's correct.
22        Q.    What, if any, analysis or steps did you undertake
23   with respect to items 31 and 32?
24        A.    In regards to the items submitted in item 31, so
25   the five individual cartridge cases, I microscopically

- CDF -

1    compared them to each other after determining the agreement

2    of class characteristics.

3        Q.    Let me stop you there for a second.

4            When you say an agreement of class

5    characteristics, what does that mean?

6        A.    That means that all five of the cartridge cases

7    that were submitted to me were of the same caliber.  So

8    they were the same size and the same type.  They all

9    exhibited these same firing-pin impression shape and

10   therefore I wanted to move forward with microscopic

11   comparison of their individual characteristics and their

12   finer details.

13       Q.    With respect to microscopic comparison, what was

14   actually compared?

15       A.    When comparing the five cartridge cases that were

16   submitted as part of People's 31, I microscopically

17   compared breechface characteristics, firing-pin impression.

18   There was a mark on each rim of the cartridge case that was

19   repeatable.  And there were additional marks present on the

20   heads of the cartridge cases.

21       Q.    Do you mean just those five cartridge cases with

22   respect to one another?

23       A.    Just those five --

24            MS. GOLOMBEK:  Objection.

25            Leading the witness.

- CDF -

1              THE COURT:  Overruled.

2       A.    Just those five cartridge cases with respect to

3    one another.  They were first compared to each other.  So

4    those five alone microscopically compared to one another.

5       Q.    What, if any, determination did you make with

6    respect to those five items within People's 31 upon your

7    microscopic comparison?

8       A.    I came to the conclusion that the five cartridge

9    cases submitted as part of People's 31 were all fired in

10   the same firearm.

11      Q.    After you made that determination what, if any,

12   additional steps did you take?

13      A.    After concluding that I took the two test fires

14   which were in part of People's item 32 and I compared the

15   two cartridge cases to each other.  Again, looking for

16   areas of similarity or difference which would indicate to

17   me how the particular firearm would mark, what type of

18   consistent marks would be left behind.

19             I was then able to take one cartridge case from

20   item 31 and compare it to one of the test fires from

21   item 32 and conduct a microscopic comparison of those

22   marks.

23      Q.    When you conducted that microscopic comparison,

24   what did you find?

25      A.    I found repeatability of marks in various

Rauche₃₃₅ People - Direct

272

1    locations on the cartridge cases that were present,

2    including in the firing-pin impression, in the breechface

3    marks and in the extraneous marks on the rim and the head

4    of the cartridge cases themselves.

5         Q.    Based on that microscopic observation that you

6    just described, what, if any, conclusions did you make?

7         A.    I was able to conclude that the items that were

8    submitted as part of People's 31 were fired in the same

9    firearm that generated the test fires in People's 32.

10        Q.    Those test fires in People's 32 were fired from

11   People's 30, the submitted firearm?

12                    MS. GOLOMBEK:  Objection.

13                    She's testifying -- the ADA is now

14             testifying, your Honor.  That was not said by

15             Ms. Rauche.

16                    THE COURT:  Sustained.

17        Q.    Where did the test fires from People's 32 in

18   evidence come from?

19        A.    They were test fired in the firearm submitted as

20   part of People's 30.

21        Q.    With respect to -- did that complete your

22   examination or did you do anything else?

23        A.    These test fires were also entered into the NIBIN

24   system to search for any additional correlations.

25        Q.    After you were done, did you repackage and reseal

1   all of the items?

2              MS. GOLOMBEK:  Objection.

3              Leading the witness.

4              THE COURT:  Overruled.

5   A.   Not immediately I did not.

6   Q.   What did you do?

7   A.   After a microscopic comparison has been conducted

8   the New York State Police has a secondary peer review

9   process where a second firearm examiner conducts the same

10  microscopic comparisons that I did and comes to his or her

11  own independent conclusion as to the origin of those marks

12  and cartridge cases.

13  Q.   Was that done with respect to this analysis?

14  A.   Yes, it was.

15  Q.   And what --

16             MS. GOLOMBEK:  Objection.

17             I don't --

18             THE COURT:  Wait for the question.  Wait for

19  the question please.

20             MS. GOLOMBEK:  That was the question.

21             MS. PULASKI:  I asked if that was done in

22  connection with this analysis.

23             THE COURT:  Overruled.

24             Whether it was done?  Overruled.

25             MS. GOLOMBEK:  Was she present?

1          THE COURT:  Was it done?

2          Overruled.

3          Ask your next question, Ms. Pulaski.

4     Q.    How was the verification process undertaken?

5     A.    The verification process is undertaken in an

6  independent setting where the second examiner takes the

7  evidence or comes into what was my room at the time and

8  used the evidence and the microscope at that point and they

9  complete a verification sheet that states if they agree or

10  disagree with the original analyst's findings.

11          MS. GOLOMBEK:  Objection.

12          She's testifying to what somebody else did.

13  There's been no showing she was present.  That witness

14  would be needed to testify to that, your Honor.

15          THE COURT:  Were you present, Ms. Rauche,

16  when the second examination was done?

17          THE WITNESS:  I honestly don't recall.

18          MS. GOLOMBEK:  Judge, I'm going to move to

19  strike that answer.

20          THE COURT:  Sustained.

21          That testimony will be stricken.

22     Q.    Are you aware whether the verification process

23  was done and your work reviewed?

24     A.    Yes, I was.

25          MS. GOLOMBEK:  Objection, your Honor.

1          THE COURT:  Overruled.

2     A.    Yes, I am aware that it happened.

3          MS. PULASKI:  I have no further questions

4     for this witness.

5          Thank you, your Honor.

6          THE COURT:  Cross-examination, Ms. Golombek?

7          MS. GOLOMBEK:  Yes, your Honor.

8  CROSS-EXAMINATION BY

9  MS. GOLOMBEK:

10    Q.    Ms. Rauche, you indicated that you've testified

11 before in court, correct?

12    A.    Yes.

13    Q.    Did you ever -- and you've only testified as a

14 prosecution witness, correct?

15    A.    That's also correct.

16    Q.    You never testified then as a defense witness,

17 correct?

18    A.    No, I have not.

19    Q.    At the time you testified as a prosecution

20 witness, at that time you were employed by a forensic lab

21 for the -- you worked for the New York State Police

22 Forensics, correct?

23    A.    Yes.

24    Q.    And you indicated that you did testing during --

25 you worked for the New York State Police Forensics during

1   2018 and 2019, correct?

2       A.    That's correct.

3       Q.    And when was the last time you received any

4   training in the area as a forensic scientist?

5               THE COURT:  Prior to 2018?

6       Q.    Prior to 2018.

7       A.    I don't recall the exact date but I did obtain --

8   I'm sorry, I did attend an annual training seminar every

9   year so I would have attended one in 2017 and 2018.

10      Q.    On what date did you first examine the .40

11  caliber weapon as well as the 7.62 Tokarev?

12      A.    I don't recall.

13      Q.    Is there anything that would refresh your

14  recollection?

15      A.    My original notes would.  I don't have access to

16  those right now.

17      Q.    Would your report indicate the date that you

18  tested the items?

19      A.    No, it would not.

20      Q.    Did you test the items in 2018?

21      A.    I really do not recall.

22      Q.    Did you test the item in 2019?

23      A.    I don't recall when I started the analysis.

24      Q.    You indicated that you tested the .40 caliber

25  weapon to see if it was operable, correct?

Rauche - People - Cross



1    A.    Yes.

2    Q.    Are you familiar with an Investigator John

3  Seymour?

4    A.    No, I am not.

5    Q.    Are you the only -- as far as you know, are you

6  the only person that tested the operability of this weapon?

7    A.    I do not know.

8    Q.    So you don't know whether anybody tested this

9  weapon prior to it coming into your possession, correct?

10    A.    That's correct, I do not know.

11    Q.    And you don't know whether anything was done to

12  this weapon prior to it coming into your possession,

13  correct; yes or no?

14    A.    Correct.

15    Q.    As far as the 7.62 Tokarev weapon, you don't know

16  whether anybody test fired it prior to you receiving it,

17  correct?

18    A.    That's correct.

19    Q.    And you don't know if anybody tampered with that

20  in any way prior to your receiving it; is that correct?

21          MS. PULASKI:  Objection.

22          THE COURT:  Overruled.

23    A.    That's correct.

24    Q.    After the .40 caliber left your possession, you

25  don't know whether anybody opened it or tampered with it in

Rauche4± People - Cross

1    any way, correct?

2         A.    That's correct.

3         Q.    And after the 7.62 Tokarev weapon left your

4    possession.  You don't know whether anybody opened it or

5    tampered with it in any way, correct?

6         A.    Correct.

7         Q.    And other than the expended cartridges, you don't

8    know whether anybody tampered with that in any way after it

9    left your possession, correct?

10        A.    Which cartridges?

11        Q.    The five expended cartridges, correct?

12        A.    Correct, I do not know what happened to them.

13               MS. GOLOMBEK:  One moment please.

14               THE COURT:  Yes.

15               (Whereupon, a pause was had in the record.)

16        Q.    Other than any of the other cartridges that you

17   looked at in item 29B, you don't know whether anybody

18   tampered with that after it left your possession, correct?

19        A.    Correct.

20        Q.    You don't know whether anybody tampered with

21   what's in item 29B before it was in your possession,

22   correct?

23        A.    29B?  Can you please refresh me on what 29B was.

24        Q.    That was the box with the cartridges.

25               THE COURT:  The intact cartridges.

1     A.    The intact cartridges? I do not know what

2    happened to those prior to my receiving them.

3          I do know that there was a presence of

4    handwriting marks on them.  I don't know who placed them

5    there.  I know it wasn't myself.

6     Q.    It wasn't yourself?  So there are markings

7    appearing that you didn't place there, correct?

8     A.    That's correct.

9     Q.    And were there markings that appeared on the .40

10   caliber weapon that you didn't place there?

11    A.    I don't recall.

12    Q.    And were there markings on the 7.62 Tokarev

13   weapon that you didn't place there?

14    A.    I also don't recall.

15    Q.    Were there markings on any of the other

16   cartridges that you didn't place on them?

17    A.    I don't recall.

18    Q.    You didn't see where these five expended

19   cartridges were recovered from, did you?

20    A.    No, I did not.

21    Q.    You didn't see where the .40 caliber weapon was

22   recovered from, correct?

23    A.    Correct.

24    Q.    And you didn't see where the 7.625 (sic) Tokarev

25   weapon was recovered from, correct?

1      A.    Correct.

2      Q.    And you didn't see where any of the bullet cases

3   were recovered from, correct?

4      A.    Correct.

5      Q.    You don't know when any of those items were

6   recovered, correct?

7      A.    Also correct.

8      Q.    As far as the -- you used some bullets for test

9   firing, correct?

10      A.    I did, yes.

11      Q.    And some of these bullets were from the

12   laboratory, correct?

13      A.    Correct, two cartridges were from the laboratory.

14      Q.    And you don't know who put those cartridges

15   there, correct?

16      A.    Incorrect.

17      Q.    Who put those cartridges there?

18      A.    I did.

19      Q.    Prior to your placing them there, you don't know

20   whether anything was done to those cartridges, correct?

21      A.    I don't know what was done to them.  I can only

22   trace them back to the store that I bought them from.

23      Q.    You don't know what happened at the store prior

24   to your coming into possession of those cartridges,

25   correct?



THE COURT:  Of course she doesn't know.

Let's move on.

Q.    Now, you indicated that as a forensic scientist your duties were testing firearms for operability which you talked about, correct?

A.    Yes.

Q.    And you don't know whether on either of the weapons whether anybody tested the operability before you, correct?

THE COURT:  Asked and answered.

Q.    Part of your duties are also gunshot residue analysis, correct?

A.    Yes.  With respect to distance determination.

Q.    Well, let me ask you, on the .40 caliber weapon that you examined, was there any gunpowder residue?

MS. PULASKI:  Objection.

THE COURT:  I guess the question should be did you test it for gunshot residue, Ms. Rauche, the Smith & Wesson?

THE WITNESS:  May I clarify gunshot residue with respect to distance determination?

THE COURT:  Yes.

A.    When discussing gunshot residue and with respect to distance determination it is possible to look at a fired object, something that has been fired upon, say a door, a

Rauche - People - Cross
345

282

1    piece of clothing, et cetera, look at the powder residue

2    that is left behind and compare that to powder residue left

3    behind by additional ammunition in that particular firearm.

4              So it's not examining whether or not the firearm

5    has been fired but it's looking at the patterns to

6    determine the distance, approximately, from which the gun

7    was fired to whatever it was it was fired upon.

8         Q.   The .40 caliber, did it have any gunpowder

9    residue on it?

10                  MS. PULASKI:  Objection.

11                  THE COURT:  She just said.

12                  Sustained.

13         Q.   How about the 7.625 weapon, did you determine if

14    that weapon had been fired prior to you seeing it?

15         A.   I did not determine if it had been fired.

16         Q.   Did you examine it for any gunpowder residue?

17                  MS. PULASKI:  Objection.

18                  THE COURT:  Sustained.

19                  MS. GOLOMBEK:  She testified before about

20         the .40 caliber.

21                  THE COURT:  No, she testified about what she

22         does when she looks for gunshot residue and it's not

23         on the weapon.  On the weapon itself.

24         Q.   Did you look for any gunpowder residue on any of

25    the submitted items that you received?

1          MS. PULASKI:  Objection.

2          THE COURT:  Overruled -- I mean sustained.

3     I'm sorry.  Sustained.

4     Q.    Did you test any -- did you see if there were any

5     prints on any of the items?

6          MS. PULASKI:  Objection.

7          THE COURT:  Sustained.

8          This is not a fingerprint expert or

9     fingerprint person.

10    Q.    Now, you indicated that when you do a visual

11    examination you indicated that you compare cartridges and

12    the first thing you did was a visual examination using the

13    naked eye, correct?

14    A.    Yes.

15    Q.    And when you do the visual, what you do is

16    compare cartridge to cartridge, correct?

17    A.    Yes.

18    Q.    So you don't compare the cartridge to the

19    firearm, correct?

20    A.    Incorrect.

21    Q.    Well, at the time of the visual, you don't

22    compare the cartridge to the firearm?

23    A.    That's correct.

24    Q.    At the time of the visual, you just compare the

25    cartridges, correct?

- CDF -

1    A.    Yes.

2    Q.    So at the time of the visual you can't say

3  whether the cartridges came from a particular firearm,

4  correct?

5    A.    That's correct.

6    Q.    And now when you do the microscopic, you look for

7  certain marks, certain patterns, correct?

8    A.    Yes.

9    Q.    And you look for these on the cartridges,

10  correct?

11    A.    Yes.

12    Q.    And you testified some of the cartridges here had

13  markings that you don't know where they came from, correct?

14    A.    Correct.

15    Q.    So when you examine something and say that the

16  cartridge came from -- when you examine something

17  microscopically, you still compare the cartridges to other

18  cartridges, correct?

19    A.    Just confirming, you said microscopically?

20    Q.    In the microscope, correct.

21    A.    Yes, correct.

22    Q.    And in this case you said there were marks that

23  you don't know where they came from, correct?

24    A.    Correct.

25    Q.    In this case you can't tell whether the cartridge

1    came from the same weapon that you examined, correct?

2        A.    Incorrect.

3        Q.    You can't tell whether it came from the 6.25

4    cartridges, correct?

5        A.    There was no 6.25.

6        Q.    The 7.62 Tokarev cartridge, caliber cartridge,

7    correct?

8        A.    What is the question about the 7.62?

9        Q.    You can't tell whether the cartridges that were

10   expended came from that particular 7.62 Tokarev pistol,

11   correct?

12       A.    I can tell that they came from the same pistol as

13   the 7.62 Tokarev.

14       Q.    And you don't know -- you didn't see who used

15   that 7.625 pistol, correct?

16       A.    Correct.

17       Q.    And you don't know whether those cartridges were

18   expended that year or several years prior thereto, correct?

19       A.    Correct.

20       Q.    Now, as far as the .40 caliber, you didn't test

21   any expended cartridges with regard to that, correct?

22       A.    Correct, there were none submitted.

23       Q.    And you didn't see where these cartridges were

24   recovered, the expended cartridges, were recovered from,

25   correct?

1           THE COURT:  Nothing was submitted she just

2      said.  There were intact cartridges submitted, if that

3      makes a difference to you, Ms. Golombek.

4      Q.   Now, you indicated that your work was reviewed,

5  correct?

6      A.   Yes.

7      Q.   And you weren't present when that work was

8  reviewed, correct?

9      A.   I do not recall.

10          MS. GOLOMBEK:  One moment.

11          (Whereupon, a pause was had in the record.)

12     Q.   Were you paid to come to court today?

13     A.   Yes, I was.

14     Q.   How much were you paid?

15     A.   I don't know.  It hasn't been calculated yet.

16     Q.   What was your agreement in coming here today, as

17  far as payment?

18     A.   Reimbursement for travel.

19     Q.   Other than reimbursement for travel, are you paid

20  anything else other than reimbursement for travel?

21     A.   Today I am, yes.

22     Q.   What are you paid for the day today?

23     A.   I don't remember.

24     Q.   Well, when you say that it hasn't been

25  calculated.  Does that depend on how you testify?

Raucho - People - Cross

1      A.    No.

2      Q.    Well, why is it that you don't know how much

3  you're being paid?

4      A.    I did not ask for any reimbursement except for my

5  travel expenses.

6      Q.    But you are getting other monies, correct?

7      A.    Yes.

8      Q.    And that's dependent on your testimony, correct?

9      A.    No, it is not.

10     Q.    You went over your testimony today with the ADA,

11  correct?

12     A.    Briefly, yes.

13     Q.    And prior to today, did you go over your

14  testimony with the ADA?

15     A.    No.

16     Q.    Did you review your notes prior to today?

17     A.    No.

18     Q.    Did she or he tell you what to say?

19     A.    No.

20     Q.    Did you review your reports prior to testifying

21  here today?

22     A.    Only in the hour prior to testifying here today.

23     Q.    And your testimony is based on your reports and

24  not your independent recollection; is that correct?

25     A.    It is based on the combination of both.

1    Q.    When you spoke to the ADA, did you speak to her

2    about gunpowder residue testing?

3    A.    No.

4    Q.    Was there anything on the presence of any of

5    these items that lead you to believe there was gunpowder

6    residue?

7                THE COURT:  Sustained.

8                MS. GOLOMBEK:  I have no further questions.

9                THE COURT:  Any redirect?

10               MS. PULASKI:  Briefly, your Honor, thank

11   you.

12   REDIRECT EXAMINATION BY

13   MS. PULASKI:

14   Q.    Ms. Rauche, you indicated on cross-examination

15   that some of the items that were submitted had markings

16   that you didn't know where they came from.

17               Do you recall that?

18   A.    That's correct.

19   Q.    What kind of markings are you talking about?

20   A.    May I just clarify?  Are you talking about

21   handwritten markings or microscopic markings?

22   Q.    I guess that's what I'm asking you.

23               When you're referring to markings, you didn't

24   know where they came from.  Can you distinguish what you

25   mean?

1    A.    Certainly.  Some of the cartridge cases that were

2    submitted -- no, not cartridge cases, I'm sorry.

3          Some of the cartridges that were submitted with

4    the .40 caliber Smith & Wesson had handwritten marks on

5    them.  I don't know who placed them there, I know I didn't

6    place them.

7          In regards to the marks of unknown origin that

8    were microscopic, those are in relationship to the 7.62

9    Tokarev.  I could not identify specifically which part of

10   the gun was leaving those marks behind but looking at the

11   cartridge cases that were submitted for analysis and the

12   cartridge cases generated at the laboratory from test-fire

13   there were three -- I believe there were three different

14   manufacturers.  There were at least two different

15   manufacturers present.  Therefore, I was able to rule out

16   manufacturing marks.  I was able to rule in that there were

17   some repeatable mark left behind by the firearm.

18                MS. GOLOMBEK:  Objection.

19                Speculation.

20                The testimony is she believes, your Honor,

21        doesn't recall.

22                THE COURT:  Overruled.

23   Q.    With respect to the handwritten markings, did

24   those have any impact on your analysis of the expended

25   Tokarev cartridge casings?

1           MS. GOLOMBEK:  Objection.

2           Not the proper scope of redirect, your

3   Honor.

4           MS. PULASKI:  This goes to the markings

5   still, your Honor.

6           THE COURT:  Overruled.

7   A.    There were no handwritten marks on the expended

8   submitted Tokarev cartridge cases.

9           MS. PULASKI:  Thank you.

10           I have no further questions.

11           THE COURT:  Thank you.

12           Any recross, Ms. Golombek?

13           MS. GOLOMBEK:  No, your Honor.

14           THE COURT:  Thank you so much, Ms. Rauche.

15           (Whereupon, the witness was excused from the

16   courtroom.)

17           MS. PULASKI:  May I just take two minutes?

18           THE COURT:  Yes.

19           (Whereupon, a pause was had in the record.)

20           THE COURT:  Your next witness is going to be

21   Mr. Paul Green from ShotSpotter; is that right?

22           MR. NELSON:  Yes, Judge.

23           THE COURT:  Ms. Golombek, you have an

24   application with regard to that?

25           MS. GOLOMBEK:  Yes, Judge.  I'm asking for a

Proceedings

291

```
1    dismissal of this case.

2              THE COURT:  A dismissal of the case?

3              MS. GOLOMBEK:  Of the whole case, Judge.

4         I believe --

5              THE COURT:  I'm asking you about Mr. Green

6    from ShotSpotter.

7              MS. GOLOMBEK:  Yes, Judge, and I'm asking

8    for a dismissal of the case.  I believe there is a

9    violation of discovery, Judge.

10             This morning at 11:19 I received an E-mail

11   on my phone, I was sitting in a court, I had a hearing

12   this morning that didn't go, I'm sitting in court in

.13   Queens and I get a 75 page case.  In addition to the

14   75 page case I got a resume.

15             I did have the resume before, however, the

16   75 page case I had to look at phone -- from my phone.

17   I couldn't review 75 pages which has over 319

18   allegations against in the complaint.

19             I tried to read it, I was not able to do

20   that.  I had to leave Queens as soon as I was able to

21   get out of court this morning, get to my car, which

22   was not walking distance but got a ride to my car

23   because there is no parking by the Queens court.

24             I got there, I got back to my office

25   about 1:20 and I E-mailed the Court informing them how
```

1    many pages of discovery I received.

2                This can't be a trial by ambush.  This can't

3    be something where discovery is received at the last

4    minute.

5                Not only did I receive police officer

6    misconduct papers immediately before we started with

7    the testimony of Officer Kraemer and I objected at

8    that time but now it's being done again.  Not only is

9    it being done again, that witness was called.

10               I have to print out all 75 pages during

11   whatever I had left of lunch and try to skim through

12   it as quick as I could.

13               This is trial by ambush.  This is totally

14   ridiculous.

15               I'm asking for a dismissal of this case and

16   I'm asking for it at this time because I was not able

17   to make it at the time I was first walked in, I was

18   told to wait for the witness.

19               This is a total outrage that this is all

20   being turned over to me or this was turned over to me

21   at 11:17 or 11:19.  That's not the way this trial is

22   supposed to be conducted, that's not the purpose of

23   discovery rules.

24               The violation of the repeal of 50-a came

25   about a while ago, it didn't come about yesterday, it

1    didn't come about this morning, it didn't come out

2    last night.

3              THE COURT:  And this witness has nothing to

4    do with 50-a whether it's repealed or not, right?

5              MS. GOLOMBEK:  Well, there is officer

6    misconduct here.

7              THE COURT:  For Paul Green?  He is not an

8    officer, he is a civilian.

9              MS. GOLOMBEK:  He's now a civilian but he

10   was a member -- Judge, I reviewed this, I have to tell

11   you, I tried to review this on my phone which is why

12   I'm saying I didn't get a chance to review this but

13   what -- and I skimmed through 75 pages in a matter of

14   minutes because I had to go from my office to here,

15   get ready, use the facilities, do whatever else I had

16   to do in order to get here, which is really not time

17   for me to read 75 pages.

18              I went through and it looked to me like he

19   was a member of the police department, Paul Whiter

20   (sic) gave the information.

21              Paul Whiter is a member --

22              THE COURT:  He's not Paul Whiter, he's Paul

23   Green.

24              MS. GOLOMBEK:  I understand.  He supplied

25   it.

- CDF -

Proceedings

294

1          THE COURT:  Excuse me?

2          MS. GOLOMBEK:  He supplied it to

3    ShotSpotter.  This complaint -- I believe a member of

4    the police department went to Paul Green who was

5    totally responsible for ShotSpotter and he indicated

6    to him the first report that was generated by

7    ShotSpotter that was approved by Paul Green showed

8    four shots in the case.

9          Because there were allegations of it being

10   altered and there were five not four shots he was

11   asked to enlarge the scope of looking at whatever it

12   is he was viewing on the ShotSpotter and then he comes

13   out with a regenerated report.

14         The allegations in the complaint is that

15   there was altering of ShotSpotter reports.  That's

16   very relevant to the defense here.  An altering --

17         THE COURT:  Paul Green is not a member of

18   law enforcement, he's a civilian.

19         MS. GOLOMBEK:  Who managed the ShotSpotter

20   system.

21         THE COURT:  Correct.  But he is a civilian.

22         MS. GOLOMBEK:  But he was told by a police

23   officer, so --

24         THE COURT:  We don't know if he was lied to,

25   we just know he ultimately altered a ShotSpotter

Proceedings

295

1   report after he was asked to look at it again.  That's

2   what we know.

3   MS. GOLOMBEK:  It appears to me, from my

4   skimming of this, that that's what he did, Judge.  It

5   should have been turned over before, Judge.  We have

6   liberal discovery rules --

7   THE COURT:  Ms. Golombek, we do have liberal

8   discovery but the People do not have to turn over

9   things with regard to civilians unless there are

10  criminal convictions.  They don't have to search for

11  this kind of thing if there's any action pending

12  against anybody.  They don't have to do that.

13  As a matter of fact, you probably could have

14  put ShotSpotter into the computer to see if there's

15  any civil actions against them.  Actually, I can tell

16  you on the news there's been things about ShotSpotter,

17  so they don't have to give you all of this information

18  with regard to civilian witnesses.

19  That's the bottom line.  I mean, as it turns

20  out today -- and I appreciate what you're saying that

21  you're just getting this now and it could be good

22  information in there for you for cross-examination and

23  I'm certainly permitting the adjournment to happen but

24  I'm certainly not dismissing the case because of it

25  because there's nothing to dismiss the case for.

- CDF -

Proceedings

296

1          At the worst if this were a police witness,
2   preclusion would be a remedy, not dismissal of the
3   case but it's not a police witness, but I will give
4   you the adjournment so that you can properly prepare
5   for his cross-examination.
6          Now, I know he comes from someplace else,
7   correct, Ms. Pulaski?
8          MS. PULASKI:  California, your Honor.
9          THE COURT:  There's not enough time today in
10  any event.
11         MS. PULASKI:  Can I see what his travel
12  plans were tomorrow for possibility?
13         MS. GOLOMBEK:  I thought we were adjourned
14  for the 15th?
15         THE COURT:  It's adjourned for November 15th
16  so if he's available the 15th, 16th and 17th we're
17  scheduled for those days.
18         MS. PULASKI:  May I check his availability?
19         THE COURT:  Yes, go right ahead.
20         (Whereupon, a pause was had in the record.)
21         THE COURT:  Ms. Pulaski, you found out what
22  about Mr. Green?
23         MS. PULASKI:  I spoke to Mr. Green, your
24  Honor, he does travel here from California, he is
25  scheduled to fly out tomorrow, his next trial

1    availability due to booked matters already, he

2    indicated would be after Thanksgiving and he indicated

3    he would work with the Court and Mr. Rosenblatt to

4    work out a date for his reappearance.

5           Additionally, just with respect to the

6    timing of the lawsuit, I did receive it this morning

7    in my preparation with Mr. Green when I first met with

8    him.  He arrived at the office around ten o'clock,

9    started preparing for the testimony and the subject

10   came up so because he forwarded it to me I then

11   immediately forwarded it to Ms. Golombek so she would

12   have what I had in connection with the case, as it

13   came up in discussion.

14          I wanted to put that on the record as well.

15          THE COURT:  Then we're going to adjourn to

16   November 15th at two o'clock to continue the trial and

17   on that date I'm sure Mr. Rosenblatt will have some

18   information about when we can schedule the witness

19   Paul Green and that gives you plenty of time,

20   Ms. Golombek, to prepare for him.

21          MS. GOLOMBEK:  Thank you, your Honor.

22          MS. PULASKI:  Thank you, your Honor.

23          *              *              *

24          (Whereupon the trial was adjourned to Monday,

25   November 15th, 2021.)

1    SUPREME COURT OF THE STATE OF NEW YORK
           COUNTY OF NASSAU :   PART 38
2    --------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4
                   -against-                 Indictment No. 1934N/18
5
                                             BENCH TRIAL
6    DUANE COSTA,

7                        DEFENDANT.
     --------------------------------------x
8
                          Mineola, New York
9                         November 15, 2021

10               .
11   B E F O R E:    HON. PATRICIA HARRINGTON
                     Acting Supreme Court Justice
11

12                                               .

13   A P P E A R A N C E S:

14
                 HON. JOYCE SMITH
15               Acting District Attorney of Nassau County
                 BY:   JARED ROSENBLATT, ESQ.      .
16                     RYAN NELSON, ESQ.
                 Assistant District Attorneys
17               For the People                        .

18

19               LORI GOLOMBEK, ESQ.
                 114 Old Country Road
20               Mineola, New York  11501
            .    Attorney for Defendant
21   .

22

23                         .

24                                             .    .
                         Kathi A. Fedden
25                       Senior Court Reporter
                                     .


                    Kathi A. Fedden, Sr. Court Reporter

1           THE CLERK:  This is Indictment 1934N of 2018,

2    the People versus Duane Costa.

3           Counsels, appearances.

4           MR. ROSENBLATT:  For the People, Assistant

5    District Attorney Jared Rosenblatt.  Good afternoon,

6    your Honor.

7           THE COURT:  Good afternoon.

8           MR. NELSON:  For the People, Assistant

9    District Attorney Ryan Nelson.  Good afternoon, Judge.

10          THE COURT:  Good afternoon.

11          MS. GOLOMBEK:  Good afternoon, your Honor, for

12   Duane Costa, Lori Golombek, 114 Old Country Road,

13   Mineola, New York.

14          THE COURT:  Good afternoon.

15          THE CLERK:  Sir, you are Duane T. Costa?

16          THE DEFENDANT:  Yes.

17          MS. GOLOMBEK:  Your Honor, I had made

18   applications that the video be played to the witnesses

19   that have already testified.  That was denied at the

20   time, your Honor.  I have asked ADA Jared Rosenblatt and

21   ADA Ryan Nelson for the information who I need to

22   subpoena or whether they can make them available if I

23   have to put on a case, your Honor.  I have not been

24   provided with that information to date.

25          MR. ROSENBLATT:  Well, may I respond, your

1     Honor?

2              THE COURT:  All right.

3              MR. ROSENBLATT:  First of all, all the names

4     of the witnesses that are needed in this case were

5     provided on the ADF form.  I have been more than

6     courteous with Ms. Golombek letting her know more than

7     24 hours in advance, sometimes weeks in advance who we

8     are calling and what day.  At the time I rest, if it's a

9     police officer, I'll notify them and make them

10    available.  If it's a civilian, then Ms. Golombek, as a

11    lawyer, will have to figure out who she needs to call

12    and how to call them.

13             While I was gone, as the Court was aware, I

14    said I would try this case to Judge Corrigan and to your

15    Honor with the understanding that my wife was about to

16    give birth when I announced ready.  Judge Corrigan and

17.   your Honor were more than courteous with me as to the

18    schedule.  I notified everybody before my wife gave

19    birth weeks ago that I had two witnesses coming from out

20    of state or coming from out of jurisdiction, a ballistic

21    expert from upstate New York and a ShotSpotter witness

22    from California.  I told everyone when they were coming.

23    I told them who was coming.

24             While I was gone, in an abundance of caution,

25    we turned over a civil lawsuit between ShotSpotter and

1    another party.  We were under no obligation to do it,
2    but we did it in an abundance of caution.  And my
3    witness flew here from Sacramento and flew home without
4    testifying.  I have given Ms. Golombek every courtesy in
5    this trial that she asked.  The one thing I needed was
6    this witness to get on the stand and Ms. Golombek went
7    out of her way to make sure that witness didn't testify
8    when he flew here from California.

9            THE COURT:  I'm going to stop you there.  I
10   will explain to you because I was sitting right here, we
11   first had oral argument regarding the civil lawsuit that
12   had been provided to Ms. Golombek that day and then
13   Ms. Pulaski said she wanted to call the ballistic expert
14   first because she had a 4:40 train she had to get and
15   she said the other expert would be here until the next
16   morning.  I said fine.  That witness was not finished
17   until 4:00 and then there were further applications made
18   with regard to the civil lawsuit.  So at that point in
19   time we couldn't put on the ShotSpotter expert because
20   there was no time.

21           MR. ROSENBLATT:  Judge, I read the minutes and
22   obviously I wasn't here, but the minutes where
23   Ms. Golombek asked for an adjournment to review this
24   lawsuit that your Honor even indicated is available when
25   you type in the term via Google.  I turned it over in an

1      abundance of caution as a courtesy.

2              THE COURT:  Even if you didn't turn it over,

3      the only extra time was the argument about what should

4      happen as a result.  The ballistics expert testified for

5      quite a while.

6              MR. ROSENBLATT:  Okay, I wasn't here.  My

7      point is --

8              THE COURT:  Mr. Nelson was here.  He can

9      substantiate what I said.

10             MR. ROSENBLATT:  But the ShotSpotter witness

11     could have got on that day.  He could have began his

12     testimony and we could have finished at an another

13     mutually agreeable time to the witness.  Now I'm left in

14     a situation where I have already paid for this witness

15     to fly from California to New York.  He left without

16     testifying, without being sworn in.  I'm left to now

17     coordinate that with his schedule.  Had he been on the

18     stand, had he been sworn in, it would have been a

19     different situation and so I understand that.  But for

20     Ms. Golombek to say she's asked for time and time again

21     as to the names of these witnesses, I have done

22     everything in my power to abide by the law in this case,

23     give her the courtesy of whom I'm calling.  As your

24     Honor knows, I don't need to do that, but I'm not trying

25     this case by ambush.  I'm telling her everybody I'm

1    calling and how.

2            I had asked if we could take his testimony

3    virtually.  This isn't an eyewitness to the case.  It's

4    a witness who is moving in an audio and a report

5    generated from California and I was told no.  So I have

6    gone out of my way to give her every courtesy and I

7    haven't asked for any.  I'm the one who tried the case

8    while my wife was nine months pregnant.  I'm the one

9    that was coordinating witnesses from the hospital when

10   she went into labor and I think it's slightly unfair,

11   slightly unfair for her to make that accusation against

12   me and when the only courtesy I have asked for is can

13   this guy testify virtually.  That's my point on this.

14            I'm not making accusations against your Honor.

15   I wasn't here.  I understand it was late in the day.  I

16   can tell by the minutes it was a lengthy direct

17   examination and a lengthy cross and I'm not begrudging

18   anyone on that.  I'm trying to resolve the case as

19   quickly as possible because Mr. Costa wanted to move.  I

20   said I'll try the case as fast as possible.  That's kind

21   of why I'm a little upset when I'm trying to move it

22   along.

23            MS. GOLOMBEK:  Judge, I have a client, as you

24   know, and I need my client's consent for almost

25   everything that I do except the one thing, which is

Kathi A. Fedden, Sr. Court Reporter

1    whether he wants to take the stand or not, Judge.  Other

2    than that, I do need his consent and I do speak to him

3    about every issue.

4            But I want to clear one thing up for the

5    record.  I in no way delayed this ShotSpotter, as you

6    have indicated, from testifying.  I was here, I was

7    ready to go that day.  I did not delay.  I did not do

8    anything to delay it.  The hour was late.  There is no

9    way you were going to finish it if we were going to

10   adjourn normal time and I know that and the Court knew

11   that and ADA Ryan [sic] knew that and Ania Pulaski who

12   was covering for Jared Rosenblatt knew that, Judge.  I

13   didn't go out of my way.  That is totally untrue.

14           Second of all, for the record, you needed time

15   off for your wife I had absolutely no problem.  I

16   indicated that to Judge Corrigan, I indicated that to

17   you.  I wished you lots of luck.  I wished your wife and

18   your family lots of luck.  Absolutely not, I did not do

19   anything at all.  You wanted time, fine, fine.  Actually

20   I would have started the trial later on.  My client had

21   wanted to start as soon as possible, but I told you I

22   would have first started in December.  I had no problem

23   with that.  So as far as that, that is really inaccurate

24   and that is not fair to me.  I did not delay the

25   ShotSpotter.

1              I am more than happy to proceed with things as

2    they go along each day.  I am certainly not trying to

3    delay this in any way.  My client wants every full and

4    fair opportunity for a fair trial.  That's all we're

5    asking for, Judge.  It wasn't my fault that the

6    ShotSpotter didn't go on.

7              THE COURT:  You know, I already said that, so

8    I don't know why you are going on about it.

9              MS. GOLOMBEK:  I can't cut witnesses'

10   cross-examination short.

11             THE COURT:  I already said this.  I already

12   said that it was nobody's fault that the ballistics

13   expert took quite a while and, I don't know, had I known

14   that if I at least swore the guy in, different

15   arrangements could have been made, I could have done

16   that.  Then we can get him back here more quickly if

17   that was the situation.  Nobody mentioned that.  So, you

18   know, we do the best that we can with the time that we

19   have.

20             I'm sorry that we inconvenienced him from

21   coming here from Sacramento and, you know, more than

22   that, I can't say.  I know that the ballistic expert

23   herself was supposed to get the 4:40 train and she

24   didn't get that either.  It was just one of those

25   afternoons where things took longer than maybe one might

1    have thought.  There were a lot of documents, items that
2    were put into evidence through her that took a while, so
3    these things happen.
4              What I would like to know now is if we can
5    talk about further scheduling.  We have this afternoon.
6    We have all day tomorrow.  We have all day Wednesday.
7    So I know that you have two witnesses for this
8    afternoon, Mr. Rosenblatt and if we don't finish the
9    second one he will come back tomorrow and you will have
10   three additional witnesses for tomorrow, correct?
11             MR. ROSENBLATT:  Yes.
12             THE COURT:  And then after that?
13             MR. ROSENBLATT:  Then depending on how
14   tomorrow plays out, I may be resting on Wednesday.  I
15   need to see what happens tomorrow with some more of the
16   evidence that was admitted subject to connection, then I
17   may rest on Wednesday.
18             THE COURT:  All right.
19             MR. ROSENBLATT:  So you know, I was, depending
20   on what the schedule is, because I know we had outlined
21   this well in advance.
22             THE COURT:  Yes.
23             MR. ROSENBLATT:  I was just trying to figure
24   out would I rest on Wednesday or would I potentially ask
25   your Honor for another date, but, you know, that's kind

1     of where my schedule is at.

2             THE COURT:  All right.  Then, Ms. Golombek,

3     will you be putting on a case?

4             MS. GOLOMBEK:  I may be, Judge.  I won't know.

5     It depends on how the People's case goes and it depends

6     on whether my client decides to testify.

7             THE COURT:  When will you know?

8             MS. GOLOMBEK:  Well, it seems like I'll know

9     after the People put on their case.  If I know sooner, I

10    can let you know sooner.

11            THE COURT:  I'm trying to schedule additional

12    days because we don't have any additional days

13    scheduled.

14            MS. GOLOMBEK:  I understand, but there is a

15    video issue and I don't know what's going to go on with

16    that, Judge.

17            MR. ROSENBLATT:  It is fair to assume that

18    either the video will be moved in on Wednesday or those

19    witnesses will be here on Wednesday for Ms. Golombek.

20    That will take us to Wednesday before lunch.

21            THE COURT:  Do you anticipate putting the

22    video in as part of your case?

23            MR. ROSENBLATT:  As of right now I would say

24    I'm inclined to put the video in on Wednesday.  I don't

25    want to be locked into anything, but I didn't open on

```
 1        the video.  But if it's going in, it will go in on
 2        Wednesday.
 3                 THE COURT:  All right, we'll wait till
 4        Wednesday to see where we are going to go from
 5        Wednesday.
 6                 MS. GOLOMBEK:  That's fine.
 7                 MR. ROSENBLATT:  So if the defendant is going
 8        to testify, would he start Wednesday afternoon?
 9                 THE COURT:  If there was no other witnesses
10        for the defense, then he could testify Wednesday
11        afternoon.
12                 MR. ROSENBLATT:  Excellent.  Thank you, Judge.
13        If not, should we be prepared to sum up Wednesday
14        afternoon?
15                 THE COURT:  Yeah.  If Ms. Golombek is not
16        putting on a defense case, then yeah, then be prepared
17        on Wednesday to sum up.
18                 MR. ROSENBLATT:  Great.
19                 MS. GOLOMBEK:  That's fine.
20                 MR. ROSENBLATT:  Thank you, Judge.
21                 THE COURT:  Thank you all.
22                 MS. GOLOMBEK:  If not, Judge, I already
23        scheduled something for 4:00 on the 23rd that I cannot
24        change, but it's right in the area, so I would have to
25        leave at about 3:30 on the 23rd.
```

1              THE COURT:  I don't have the 23rd anyway.  My

2       next date we would be talking about is the 29th.

3              MS. GOLOMBEK:  Okay, Judge, because I just

4       want to make sure because I contacted your law secretary

5       and we didn't know the schedule, so I tried to do the

6       safest date.

7              THE COURT:  Not a problem.  We'll work around

8       all those things.

9              All right, anything further for the record

10      before we continue with witnesses?

11             MR. ROSENBLATT:  Judge, I wasn't sure, as

12      Mr. Nelson and I were reviewing the material, there is

13      ten pages that I have turned over to Ms. Golombek today.

14      I don't know if they were turned over or not.  I wasn't

15      certain.  It's a letter from Matt Perry to the

16      Cellebrite company.  There are screen printouts of what

17      appears to be something the Cellebrite company had sent

18      to ADA Perry.  A bill that our office paid to the

19      Cellebrite company, and an email between Cellebrite --

20      excuse me, between Joe Brady who is testifying tomorrow

21      and Matt Perry regarding the extraction being completed.

22      Another email from Cellebrite and a confirmation.  Ten

23      total pages.

24             Quite frankly, Judge, I don't know that this

25      is related to the subject matter of the case, but you

1    know, because we're kind of in this unknown situation

2    and I can't be certain that she has this, I gave it to

3    her again.  I can hand it up to the Court if the Court

4    wants to look at it, otherwise it's ten pages of what

5    may have already been turned over.

6              MS. GOLOMBEK:  I have seen it already, Judge.

7    I would ask for exclusion of any testimony or any photos

8    regarding the cell phone.  It should have been turned

9    over beforehand, Judge.  Based on the fact that it's

10    turned over after the trial began, your Honor, I would

11    ask for preclusion of any testimony regarding any

12    information derived from the cell phone.

13              THE COURT:  Are you talking about a witness to

14    talk about information derived from the cell phone?

15              MR. ROSENBLATT:  Detective Brady will testify

16    regarding the download of the cell phone, yes, as it

17    relates to his testimony.  And this information, I think

18    the most relevant piece, is the email that he said to

19    Matt Perry, it says, Spoke to soon.  The extraction is

20    not included but the expedited, if we have to pay $2,000

21    for the unlock, the extraction will be included.  Here

22    is your part.  There is paperwork that needed to get

23    completed same as before.  Let me know what you need.

24    Joe.

25              THE COURT:  All right.

```
 1                    MR. ROSENBLATT:  Also, Judge, I'm sorry, I

 2          can't be certain that she doesn't have it.  I'm just

 3          turning it over again because I can't be sure.

 4                    THE COURT:  Okay.  And I don't have any idea

 5          what relevance this might have at all to any testimony

 6          that there would be about the cell phone at this point,

 7          so I would ask both Mr. Rosenblatt and Ms. Golombek to

 8          check all of the discovery that was previously given,

 9          specifically with regard to the cell phone, and see what

10          that was, okay.

11                    Anything further before we bring in the next

12          witness?

13                    MR. ROSENBLATT:  No.

14                    THE COURT:  Ms. Golombek?

15                    MS. GOLOMBEK:  No, your Honor.

16                    THE COURT:  Call your next witness then,

17          Mr. Rosenblatt.

18                    MR. ROSENBLATT:  The People call Dale Denehy.

19   R E T.  P. O.  D A L E   D E N E H Y, formerly assigned to

20              the Bureau of Special Operations of the Nassau County

21              Police Department, having been called as a witness

22              on behalf of the People, having been duly sworn by the

23              Clerk of the Court, was examined and testified as

24              follows:

25                    THE CLERK:  State your name.
```

1          THE WITNESS:  Dale, D-A-L-E, Denehy,

2     D-E-N-E-H-Y.

3          THE COURT:  Good afternoon, Detective.

4          THE WITNESS:  Good afternoon.

5          THE COURT:  Is it Detective?

6          THE WITNESS:  I'm actually retired.  I was a

7     police officer.

8          THE COURT:  Very good.

9          So, Mr. Rosenblatt, you may inquire.

10          MR. ROSENBLATT:  Thank you, your Honor.

11   DIRECT EXAMINATION

12   BY MR. ROSENBLATT:

13     Q.   Good afternoon.

14     A.   Good afternoon.

15     Q.   Tell the court do you currently work?

16     A.   No, I don't.

17     Q.   Did you previously work?

18     A.   Yes, I did.

19     Q.   What type of work did you do?

20     A.   I was in law enforcement.  I was a police officer.

21     Q.   For how long were you working in law enforcement?

22     A.   A little over 27 years.

23     Q.   What department did you work for when you were

24   working in law enforcement?

25     A.   I started out with the New York City Transit Police

Deheny-People-Direct

1    Department.  From there I went to the N.Y.P.D. Police

2    Department and then I was with Nassau County Police

3    Department.

4         Q.   What year did you retire?

5         A.   July of 2019.

6         Q.   And when you retired, what unit were you assigned?

7         A.   I was assigned to the Bureau of Special Operations.

8         Q.   For how long did you work for the Bureau of Special

9    Operations?

10        A.   Close to 13 years I think it was or 13 years.

11        Q.   I want to talk to you now -- well, withdrawn.

12             When you retired, what was your rank?

13        A.   Police officer.

14        Q.   I want to talk to you now about October 27th into

15   October 28th of 2018.  Were you working during that time?

16        A.   Yes, I was.

17        Q.   And during that time, that is October 27th into the

18   early morning hours of October 28th, were you assigned to the

19   Bureau of Special Operations?

20        A.   Yes, I was.

21        Q.   Back then were you working alone or with a partner?

22        A.   Yes, I was, I was working with Officer Niall

23   Bourke, N-I-A-L-L  B-O-U-R-K-E.

24        Q.   Back in the evening of October 27th into the early

25   morning hours of October 28th when you were working with



```
 1   Officer Bourke, were you wearing plainclothes or uniform?

 2        A.   I was in plainclothes.

 3        Q.   Were you in a marked or unmarked vehicle?

 4        A.   Unmarked vehicle.

 5        Q.   Now, I want to turn your attention to October 28th

 6   at approximately 12:45 in the morning, approximately.  On

 7   that day and at around that time where were you?

 8        A.   I was on Clinton Avenue just north of, what's the

 9   street, Midwood.

10        Q.   And is that Clinton Street in Hempstead?

11        A.   That is correct, yes.

12        Q.   And when you were at the location of Clinton Street

13   near Midwood in Hempstead at around 12:45 in the morning,

14   what, if anything, did you hear?

15        A.   At that point Officer Bourke and I had a car

16   stopped and we had someone under arrest at that location on

17   Clinton.

18             MS. GOLOMBEK:  Objection, not responsive.

19             THE COURT:  Sustained.  It's not responsive.

20        Q.   What happened?

21        A.   At some point I heard gunshots.

22        Q.   Tell us what were you doing when you heard the

23   gunshots.

24        A.   I was searching a vehicle that we had stopped.  I

25   was on the driver's side.  At some point I heard a couple of
```

Kathi A. Fedden, Sr. Court Reporter



```
 1   gunshots.  I thought Officer Bourke and myself were being
 2   shot at it was so loud.  I ducked.  I withdrew my weapon.  I
 3   turned around.  I thought maybe a car drove by shooting at us
 4   or someone from the roof.  I scanned the location and I
 5   didn't see anything.
 6        Q.   After you heard that, what did you do?
 7        A.   At that point I proceeded across Clinton Avenue.
 8        Q.   Clinton Street?
 9        A.   Clinton Street, sorry, towards Midwood.
10        Q.   Now, as you approached Midwood and from Clinton
11   where you were by the car stop, what happened?  What did you
12   see?
13        A.   At that point I saw the defendant, Mr. Costa
14   wearing the red tie and blue suit coming towards me on
15   Midwood attempting to make a turn onto Clinton.
16             MR. ROSENBLATT:  Your Honor, would the record
17        reflect the witness has identified Mr. Costa seated
18        here?
19             THE COURT:  Well, just so that the record is
20        clear, Mr. Costa wasn't a wearing a red tie and blue
21        suit when you saw him on October 28th.
22             THE WITNESS:  No, he was wearing a black
23        jacket and blue jeans.
24             THE COURT:  Today you are identifying the
25        person you saw as --
```



1          THE WITNESS:  The same person I saw on October

2     28th.

3          THE COURT:  The record will reflect the

4     witness has identified the defendant.

5     Q.   You told us as you crossed Clinton towards Midwood

6     you observed the defendant?

7     A.   As I was coming across.  It's a four-lane road, so

8     it wasn't that.  As I was crossing, I saw the defendant, yes.

9     Q.   And as you were crossing over Clinton and observed

10    the defendant, what, if anything, did you say?

11    A.   At some point I yelled at him, Police, don't move.

12    Stop running.  Police, don't move.  He proceeded to keep

13    running.

14    Q.   As he was running, you told us that he was wearing

15    certain clothes.  What did you observe him wearing that day?

16    A.   A black jacket with blue jeans.  That's what I

17    remember him wearing.

18    Q.   And as you observed Mr. Costa running, could you

19    see what, if anything, was in his hand?

20    A.   At some point I did see him start to raise his hand

21    and it appeared to be a weapon, but I couldn't tell exactly.

22    Q.   When you say you couldn't tell exactly, how far

23    were you approximately from Mr. Costa when you saw him?

24    A.   Like I said, I was crossing that street, so I don't

25    know the width of that street and then he was on the sidewalk

Kathi A. Fedden, Sr. Court Reporter

1   or cutting through the gas station, so probably from here

2   maybe to the wall maybe, give or take a few feet.

3       Q.   About --

4                MS. GOLOMBEK:  Objection; speculation.

5                THE COURT:  Overruled.

6                MS. GOLOMBEK:  Can we have an estimate?

7                THE COURT:  Yeah.

8                MS. GOLOMBEK:  From where he is to the wall,

9   please.  And how many feet are we talking about?

10               THE WITNESS:  I can't tell you in feet.  I

11  never took the measurements.  I said approximately.

12               THE COURT:  To the back wall?

13               THE WITNESS:  Yeah, give or take, like I said.

14               THE COURT:  Well, can we agree that it's about

15  48 feet?

16               MR. ROSENBLATT:  Sure.

17               MS. GOLOMBEK:  Well, I don't know.  I don't

18  know if he was a few feet further or a few feet closer.

19               MR. ROSENBLATT:  We're approximating the

20  witness to the back wall.

21               THE COURT:  Right, from the witness to the

22  back wall.  I'm saying can we agree it's about 48 feet?

23               MS. GOLOMBEK:  Judge, I don't have a chart, so

24  I have no way of knowing.

25               THE COURT:  I have this.



```
1              MS. GOLOMBEK:  If you have a chart.
2              THE COURT:  Why don't you all look at it.  See
3      if it works for you and if you can agree on something.
4              MR. ROSENBLATT:  I agree.
5              THE COURT:  Thank you.
6              MS. GOLOMBEK:  Yes, Judge.
7              THE COURT:  So the record will be clear that
8      the distance that the retired officer has testified
9      about from here, meaning the witness stand, to the back
10     wall in the courtroom is approximately 48 feet.
11  BY MR. ROSENBLATT:
12     Q.   Now, you told us that as you approached Midwood the
13  defendant was running on the sidewalk.  Describe what he was
14  doing or what you observed.
15     A.   What I observed was him coming up the block.  I
16  also saw someone else behind him, so I didn't know who that
17  person was.  I didn't know if it was a running gun battle
18  going on.  I didn't know what was going on at that time.  But
19  at that point I seen him turning the corner and I heard the
20  gunshots.  I heard more gunshots when he was coming up and
21  then turning.  I saw what I believed to be a weapon in the
22  hand, but I couldn't tell for sure.  I had my weapon drawn.
23             MS. GOLOMBEK:  Objection, not responsive.
24             MR. ROSENBLATT:  I asked him what happened,
25     Judge.
```



1          THE COURT:  Overruled.

2      A.    I had my weapon drawn.  I was trying to give him

3  verbal commands to stop.  He wasn't responding to my verbal

4  commands.  At that point he proceeded to run south on

5  Clinton.  I saw his arm going up, but then I saw the other

6  person coming so I didn't know who was going to be more of

7  the threat at this point because now I'm getting closer

8  across the street.

9          At that point I still kind of had him in my

10  peripheral vision but my main concern was the other guy

11  coming was more of a threat because he was coming right at me

12  at that point.

13              MS. GOLOMBEK:  Objection.  This is his

14      feelings.  This is not what he saw happening, Judge.

15              THE COURT:  This is exactly what he saw

16      happening, that he saw the defendant heading south on

17      Clinton and he saw this other person still coming up

18      Midwood.  That's exactly what he saw or that's what he

19      testified that he saw, so overruled.

20      Q.    Now, you indicated that after Mr. Costa ran past

21  where you were or made the right, you indicated you observed

22  somebody else?

23      A.    Yes, I did.

24      Q.    Tell us what happened as you approached that other

25  individual.

Kathi A. Fedden, Sr. Court Reporter



1    A.    As that person was coming up, like I said, I didn't

2    know how much more of a threat he was and I thought I had a

3    better opportunity to stopping this second person.  I found

4    some cover, concealment with a telephone pole to try and give

5    me a little bit of cover.  I yelled, Police, don't move one

6    more time.

7         That person yelled, Blue, blue, blue and put his

8    hands up right away.  At that point I recognized who that

9    person was.

10    Q.    Now, you indicated that with your arms that you had

11    your firearm extended; is that correct?

12    A.    Correct.

13    Q.    And when you said you recognized the person who was

14    coming towards you, who did you recognize that person to be?

15    A.    I recognized him as Officer Kraemer.

16    Q.    And is that Officer Ken Kraemer?

17    A.    Officer Kenneth Kraemer, correct, yes.

18    Q.    And back in October of 2018, specifically on that

19    day, was he assigned BSO?

20    A.    Yes, he was.

21    Q.    Now, as you had your firearm extended at one of the

22    members of your BSO team, what happened next?

23    A.    So at that point I give him the verbal commands.

24    He gives me -- yells something back to me and at that point I

25    don't know if I yelled are you shooting and at that point, at



Kathi A. Fedden, Sr. Court Reporter



1    some point we hear more gunshots and he goes, No, he's

2    shooting at us and that's when I still could see him running

3    down the block.   I disengage with Officer Kraemer and I gave

4    chase to the defendant, Mr. Costa.

5        Q.    Now, you indicated at some point as you were -- as

6    your gun was pointed at Officer Kraemer that you heard

7    gunshots?

8        A.    That's correct.

9        Q.    Where did you hear the gunshots coming from, what

10   direction?

11       A.    It would have to be my left, which was south.

12   South of me on Clinton Avenue.

13       Q.    As you heard the gunshots could you see -- what did

14   you see?

15       A.    I wasn't seeing anything.   My focus, my attention

16   was on Officer Kraemer at that point.

17       Q.    Okay.

18            Now you indicated at some point that you observed

19   the defendant's clothing that day.   I think you said a black

20   jacket and blue jeans?

21       A.    Yes, that's correct.

22       Q.    And after you disengaged with Officer Kraemer, what

23   did you do?

24       A.    I gave chase of the defendant south on Clinton

25   Avenue where I could still see him running south on Clinton

1    Avenue.

2        Q.   And as you continued to run, where did you go?

3        A.   He went south on Clinton and at some point the

4    defendant went between two buildings.  I still gave chase.  I

5    ended up at the corner of those two buildings.  It ended up

6    being an alleyway that split into two sections.  I held

7    there.  I wasn't going to go in alone.  I didn't want to be

8    ambushed.  I was in fear.  I was just being shot at.  So my

9    best course of action was stop there and wait for backup to

10   come.

11       Q.   Now, when you reached that alley, did you -- you

12   indicated you were waiting for backup.  Did backup come?

13       A.   Yes, he did.

14       Q.   Who arrived?

15       A.   My partner at that time, Officer Bourke.  Officer

16   Kraemer was running behind me at some point.  He ended up

17   there.  Officer Rilling.  Several other officers.  Hempstead

18   officers and other officers from Nassau County ended up

19   there.

20       Q.   Now, at some point when other people arrived at

21   that alley, what did you do?

22       A.   I basically said don't go in, stay here and I ran

23   around the block.  I ran south to the corner of Van Cott and

24   Clinton, proceeded west on Van Cott to Lafayette at which

25   point I observed a Hempstead officer, a marked Hempstead car.

1    I told him to come with me.  Because I was in plainclothes, I

2    didn't want to be mistaken being a subject with the gun out,

3    so I had him come with me at that point.

4        Q.    And as you asked a member of the Hempstead Police

5    Department who was uniformed to come with you, where did you

6    go?

7        A.    At that point I had my flashlight out and I was

8    trying to search driveways and yards on Lafayette.  I had my

9    flashlight shining.  At some point I heard a noise.  I heard

10   rumbling, a noise.  I heard a noise that wasn't a normal

11   noise that you would hear.  At that time I said to the other

12   police officer, I didn't know his name at the time, I said,

13.  Did you hear that?

14            He goes, I think so.

15            I said, Sit tight.  I said come with me.  Keep

16   walking.  Because where I went to the direction of the noise

17   was on Lafayette which was between two houses.  I shined my

18   flashlight between two houses.  At that point I saw the

19   defendant jump up from between the houses and start running

20   through the yard of I want to say it's 6 Meriam.  I think I

21   yelled again.  Then I started yelling, He's running towards

22   Clinton at the top of my lungs.  I didn't even go over my

23   radio.  I think it was in my pocket.  I started yelling to

24   the other officers, He's running, he's running.

25            I ran around the house on Meriam, at which point we

1    were able to see him in the backyard of 6 Meriam I think it
2    was.  I gave him verbal commands.  At that point he responded
3    to my verbal commands.  He listened, he went down to the
4    ground.  The Hempstead officer and myself entered -- we gave
5    him commands at gunpoint.  It wasn't just yelling.  He
6    listened to our commands.  The officer and myself went into
7    the rear yard, handcuffed him and placed him into custody.
8        Q.    I want to show you what's in evidence as Exhibit 27
9    and I'm going to hand you this green marker as well.  This is
10   Exhibit 27 in evidence.
11              (Handed to witness.)
12       Q.    First of all, take a look at it.  Do you recognize
13   that map?
14       A.    Yes, I do.
15       Q.    And what is that map?
16       A.    That is the vicinity of the area of where all this
17   had taken place in the Hempstead village.
18       Q.    And is that here in the County of Nassau?
19       A.    Yes, it is.
20       Q.    With that green marker, can you draw from the point
21   where you initially heard the gunshots and where you ran and
22   eventually apprehended the defendant?
23       A.    (Indicating.)
24             You want me to do the whole route?
25       Q.    Yeah, run the whole route and then I'm going to

1    publish it on the screen.

2         A.    (Indicating.)

3              It's the best I can do.

4                   MR. ROSENBLATT:  I'm going to put it on the

5         screen, Judge.

6                   THE COURT:  Is that actually in evidence?

7                   MR. ROSENBLATT:  Yes.

8                   COURT OFFICER:  Yes, People's 27.

9                   THE COURT:  Not for ID?  Actually in evidence?

10                  COURT OFFICER:  Yes, ID is crossed out and

11        evidence is written.

12                  THE COURT:  Okay.

13                  MR. ROSENBLATT:  Judge, with the Court's

14        permission, if the witness can step down and use your

15        Honor's pointer again if it's still available.

16                  THE COURT:  Yes.

17        Q.    If you can just point to where you started drawing

18   with the green marker.

19        A.    Approximately this area is where we had the car

20   stopped.

21        Q.    And just for the record, there is a green mark

22   right under La Hacienda.  Is that where you started it?

23        A.    Approximately that area.

24        Q.    Ballpark?

25        A.    Yeah.

1        Q.    And if you can just show us and tell us with the

2    pointer where you drew the green line?

3        A.    This is where we first heard the gunshots.  I start

4    coming across the street.

5        Q.    Towards the bodega, deli?

6        A.    Yeah.  I guess I saw him probably, the defendant,

7    probably about here.  I was probably about here (indicating).

8        Q.    Hold on.  So when you say you saw the defendant

9    here?

10            MS. GOLOMBEK:  That wasn't what he said.  He

11        said I guess and I object to that.  It's speculation.

12            THE COURT:  It's not speculation, it's just

13        not what he's testified to.

14            So Officer Denehy, if you can just go back to

15        where you started from and that would be on Clinton

16        Street; is that correct?

17            THE WITNESS:  That is correct.

18            THE COURT:  And then you traveled south on

19        Clinton Street?

20            THE WITNESS:  South and west across the

21        street, yes.

22            THE COURT:  Then you get to that next street

23        which is Midwood.  Then what happens?

24            THE WITNESS:  As I was crossing the street on

25        Clinton Avenue, I see the defendant before I make it

Kathi A. Fedden, Sr. Court Reporter



1    across the street.

2              THE COURT:  And you see the defendant on

3    Midwood?

4              THE WITNESS:  On Midwood.

5              THE COURT:  All right.

6              THE WITNESS:  So as I'm crossing the street I

7    see the defendant.  It's probably not until he gets to

8    the corner I start giving verbal commands to him where I

9    know he's going to hear me and see me.  He looks right

10   at myself and Officer Bourke's direction.  From there I

11   gave him verbal commands.  He proceeds south.  This is

12   where I encounter Officer Kraemer.  We have our

13   exchange.  I'm here.

14             THE COURT:  Again, that's like the

15   intersection of Clinton?

16             THE WITNESS:  Yeah, that's the intersection.

17   I make it across the street at that point when I

18   encounter Officer Kraemer.  The defendant is still

19   running south on Clinton at that point.  I engage

20   Officer Kraemer.  At some point we hear gunshots.  I

21   talk to him, have a brief conversation with Officer

22   Kraemer and knowing it's him, he's not a perpetrator, I

23   proceed south on Clinton giving foot pursuit to the

24   defendant.

25   BY MR. ROSENBLATT:

1        Q.    Just for the record, you are indicating with the
2    pointer moving down Clinton Street?
3        A.    Correct.  I go straight down.  I think I'm even on
4    the sidewalk on Clinton until I get to an area over here
5    where there is the alleyway.
6        Q.    Just you are indicating in the vicinity between La
7    Familia deli and Tiny Baby Store.com on the map?
8        A.    Correct.  That's where I stop.  I see I'm alone at
9    that point.  I'm not going to enter, not by myself,
10   especially after being shot at.  Backup shows up.  I say,
11   Stay here.
12       Q.    You are indicating back to the Tiny Baby Store
13   circle?
14       A.    Correct.  At that point I go by myself.  I run
15   around the block.  I encounter --
16       Q.    Just for the record, you have indicated down
17   Clinton?
18       A.    South of Van Cott, west on Van Cott and back north
19   on Lafayette.  On Lafayette is where a Hempstead police
20   officer pulls up.  I had a brief conversation with him.  I
21   tell him to come with me.  We proceed together to walk down
22   Lafayette shining our flashlights into the rear yards and
23   then between -- it's tough to tell in the pictures, but
24   between the two houses, the corner house and the first house
25   in is where I shine my flashlight again.  I see the

1    defendant.  He jumps up and he starts running.  At that point

2    I run around the corner on the sidewalk, get to about here

3    (indicating).

4         Q.    When you say here, you are indicating the dot?

5         A.    On Meriam, yeah.  On the backyard part fence on

6    Meriam.  At that point I give him the verbal commands and he

7    listens.  He goes down, puts his arms out.  We enter the

8    yard, we take him into custody.

9         Q.    Just so we're clear, when you say you were giving

10   verbal commands, that's the green dot that ends your line

11   that you began?

12        A.    Correct, yes.

13              MS. GOLOMBEK:  Objection.  The ADA is

14        testifying.  You don't have to be clear.  His testimony

15        stands.

16              THE COURT:  All right, overruled.

17              MR. ROSENBLATT:  Judge with that, may the

18        witness step back to the witness stand?

19              THE COURT:  Yes, of course.

20              (Whereupon, the witness returned to the

21        witness stand.)

22        Q.    Did there come a point in time after you

23   apprehended the defendant that you went into the different

24   yards in the vicinity that is on that screen, Exhibit 27?

25        A.    Yes, we were searching for evidence and other

```
 1   weapons -- for the weapons because he didn't have any weapons
 2   on him at that point.
 3        Q.   Now, at the time that you apprehended the
 4   defendant, what, if anything, was he wearing?
 5        A.   At that time he wasn't wearing a jacket.  I forget
 6   the color of the shirt he had on, but he still had his blue
 7   jeans on, but his jacket was gone at that point.
 8        Q.   Did there come a point in time in the early morning
 9   hours of October 28th that you observed his jacket?
10        A.   Yes, I did.
11        Q.   Tell us what happened.
12        A.   As we were doing a yard search on that block
13   between Meriam, Van Cott, Clinton and Lafayette, I observed
14   between 20 Meriam on the side of 20 Meriam the black jacket
15   the defendant was wearing.
16        Q.   I want to show you what's been received into
17   evidence as Exhibit 6 and 7.
18                    (Handed to witness.)
19                    MR. ROSENBLATT:  I'll put six and seven on my
20        screen.
21        Q.   I have on the screen Exhibit 6.  You have it in
22   front of you, the same photograph?
23        A.   Yes, I do.
24        Q.   Do you recognize what's on the screen and what's in
25   your hand as Exhibit 6?
```

1          A.    That is the jacket I recovered on the side of 20

2     Meriam.

3          Q.    And I now have Exhibit 7 on the screen.  Do you

4     recognize that photograph?

5          A.    Yes, I do.

6          Q.    And is Exhibit 7 on the screen the same as the

7     photograph in your hand?

8          A.    Yes, it's just an another angle.

9          Q.    Another angle than Exhibit 6?

10         A.    Of Exhibit 6 which is the jacket which I recovered.

11         Q.    And what do you observe -- you said the jacket.

12    Where in that photo is the jacket?

13         A.    The jacket is on the bottom half of the photo.

14         Q.    If you can just show us on your photo?

15         A.    It's the black jacket.

16         Q.    That's on the bottom middle of the photo?

17         A.    Yes.

18         Q.    And is that black jacket that you observed in

19    Exhibit 6 and 7, did it appear to be the same black jacket

20    that you observed the defendant running away from you in?

21         A.    Yes, it is.

22               MR. ROSENBLATT:  Judge, I believe we're up to

23         Exhibit 33 if that's correct.

24               THE COURT:  Yes.

25               MR. ROSENBLATT:  If I can have this marked as

Kathi A. Fedden, Sr. Court Reporter

1    Exhibit 33.

2           THE COURT:  All right, People's 33 for

3    identification.

4           (Whereupon, People's Exhibit 33 was marked for

5    identification, only.)

6           COURT OFFICER:  People's Exhibit 33 marked for

7    ID.

8           MR. ROSENBLATT:  May it be shown to the

9    witness, please?

10          THE COURT:  Yes.

11          (Handed to witness.)

12   Q.   Do you recognize what's in front of you that's

13   Exhibit 33 for identification?

14   A.   Yes, it is a still photo of where I was that night

15   on October 28th.

16   Q.   Does that still photograph fairly and accurately

17   depict the area of where you first observed the defendant

18   running towards you on October 28th, 2018?

19   A.   Yes, it does.

20          MR. ROSENBLATT:  Your Honor, I would ask that

21   Exhibit 33 be received for that limited purpose.

22          THE COURT:  Show it to Ms. Golombek.

23          MS. GOLOMBEK:  Objection.  The testimony

24   wasn't that he was running towards him.

25          THE COURT:  That who was running towards who?

1              MS. GOLOMBEK:  The testimony wasn't that the

2         person who was running was running towards Police

3         Officer Denehy.  The testimony is that he saw a person

4         running, Judge.

5              THE COURT:  Towards him.  Towards his

6         direction.

7              MS. GOLOMBEK:  He didn't say towards him.

8              THE COURT:  Overruled.  Do you want to see the

9         photograph?

10             MS. GOLOMBEK:  I do.

11             (Handed to counsel.)

12             MS. GOLOMBEK:  I have a voir dire, your Honor.

13             THE COURT:  Yes.

14   VOIR DIRE EXAMINATION

15   BY MS. GOLOMBEK:

16        Q.   Do you know where this still photo comes from?

17        A.   I think it comes from a camera in the gas station.

18   I think it's a BP gas station at the corner of Clinton and

19   Midwood.

20        Q.   Did you see any video from the gas station?

21             MR. ROSENBLATT:  Objection.

22        Q.   From the BP gas station?

23             MR. ROSENBLATT:  Objection, Judge.

24             THE COURT:  Overruled.

25             MR. ROSENBLATT:  I offered it for a limited

1    purpose.

2              MS. GOLOMBEK:  I'm doing a voir dire.  I don't

3    know what it purports to be, your Honor.

4              THE COURT:  Okay.  Since this witness

5    testified that it was from the BP gas station, I will

6    allow that question.  Your objection is overruled.

7    Q.   Have you seen the video?

8    A.   From that gas station video?

9    Q.   Yes.

10   A.   Yes, I have.

11             MS. GOLOMBEK:  Judge, I'm going to object to

12   this.  I don't know, this may be taken out of context

13   since he saw the video.  I would ask that the video be

14   played and not the still photo be shown since this is

15   not in context to the whole video, your Honor.

16             THE COURT:  But that's the --

17             MS. GOLOMBEK:  I don't know if it's been

18   altered.  I don't know if it's been changed in any way.

19   The video will tell us that.

20             THE COURT:  All right.  I'm going to overrule

21   your objection.  This will be marked as People's 33 in

22   evidence for the limited purpose of showing the street

23   that the defendant was running down at the time that

24   Officer Denehy saw him and this officer said that fairly

25   and accurately represents that location.

Kathi A. Fedden, Sr. Court Reporter

```
 1                    MS. GOLOMBEK:  Well, I will still ask him

 2         questions.

 3         Q.   Do you see any person running down the street in

 4    this photo?

 5         A.   I can see myself in that photo.

 6                    THE COURT:  That wasn't the question, Officer

 7         Denehy.  Do you see anybody running down the street?

 8                    THE WITNESS:  I can't tell from that photo.

 9         Q.   Do you see anybody with a gun?

10                    MR. ROSENBLATT:  Objection, Judge.

11         Q.   Do you see anybody with a gun in that picture?

12                    MR. ROSENBLATT:  Objection, Judge.

13                    THE COURT:  Sustained.

14         Q.   If we played the video -- well, you have played the

15    video, correct?

16         A.   I never played the video.

17                    MR. ROSENBLATT:  Objection.

18         Q.   You have seen it, correct?

19                    MR. ROSENBLATT:  Objection.

20                    THE COURT:  Sustained.

21                    So this will be marked as People's 33 in

22         evidence.

23                    (Whereupon, People's Exhibit 33 was received

24         in evidence.)

25                    COURT OFFICER:  So marked.
```

1              MR. ROSENBLATT:  If that can be shown to the

2       witness, please.

3                   (Handed to witness.)

4    DIRECT EXAMINATION (Cont'd)

5    BY MR. ROSENBLATT:

6       Q.   Officer, retired Officer Denehy, take a look at the

7    screen.  Is that the same image as what's in front of you in

8    your hand as Exhibit 33?

9       A.   Yes, it is.

10       Q.   Now, when Ms. Golombek was asking you questions,

11    you indicated that that photo depicts yourself?

12       A.   That is correct.

13       Q.   Can you tell us where in that photo does it depict

14    you?

15       A.   If you look -- it's tough.  I can point it out on

16    the screen.  If you look past the cab that's there and the

17    flashing lights or the taillights to the other car, I'm

18    between the two.

19       Q.   I have zoomed in on the photograph that's on the

20    screen.  Do you see the outline of yourself in that

21    photograph?

22       A.   Yes, I do.

23       Q.   And where is it?

24       A.   That is at the corner just past the cab in the top

25    middle of the screen.

                Kathi A. Fedden, Sr. Court Reporter

1          Q.    Try the red Sharpie and see if it's any better than
2    the green one and circle yourself on the photograph.
3          A.    Sure (indicating).
4          Q.    If you need to, make an area to the white area so
5    it's clear.
6          A.    I'm sorry?
7          Q.    Draw a line to the top of where it's white on the
8    page so we can see where it is.
9          A.    (Indicating.)
10         Q.    In this photograph can you see where your
11   initial -- where you initially heard the gunshots?
12         A.    Yes, I can.
13         Q.    And where in that photograph?
14         A.    If you look at the top, just left of off center,
15   you can see the taillights.  That is our vehicle that is
16   stopped on Clinton Avenue with the other vehicle we had
17   stopped.
18         Q.    If you can use the green marker to circle where you
19   were when you initially heard the gunshots?
20         A.    (Indicating.)
21         Q.    And again, if you can just put that line to the
22   white so we can see where it is.
23         A.    Yep (indicating).
24         Q.    Now, Officer Denehy or retired Officer Denehy, when
25   you told us that you apprehended the defendant, did you

Kathi A. Fedden, Sr. Court Reporter

1    search him?

2         A.    Yes, I did.

3         Q.    And what, if anything, did he have on him at that

4    time?

5         A.    We didn't recover anything on him at that time.

6         Q.    Meaning no gun?

7         A.    No weapons, no contraband, uh-uh.

8         Q.    At the time he was arrested or apprehended by you,

9    what happened next?

10        A.    At that point we picked him up off the ground and

11   we placed him into a vehicle.

12              MR. ROSENBLATT:  If I can have a brief moment,

13        your Honor.

14              THE COURT:  Yes.

15              (Pause in the proceedings.)

16              MR. ROSENBLATT:  I have no further questions,

17        your Honor.

18              THE COURT:  Ms. Golombek, cross-examination.

19              MS. GOLOMBEK:  Yes, Judge, thank you.

20   CROSS-EXAMINATION

21   BY MS. GOLOMBEK:

22        Q.    Officer Denehy?

23        A.    Yes.

24        Q.    Prior to your testifying here today have you spoken

25   with any assistant district attorney on this case earlier

Kathi A. Fedden, Sr. Court Reporter

```
 1   today?

 2        A.   Yes, I did.

 3        Q.   You spoke with ADA Rosenblatt?

 4        A.   That is correct.

 5        Q.   Did he tell you what he was going to ask you?

 6        A.   He stated we were going to go over the events of

 7   the night in question.

 8        Q.   Did he tell you what to say?

 9        A.   No, he did not.

10        Q.   Your testimony today -- and you reviewed your prior

11   grand jury testimony, correct?

12        A.   I have, yes.

13        Q.   Excuse me?

14        A.   I have reviewed my grand jury minutes, yes.

15        Q.   And your testimony is based on what you reviewed in

16   the grand jury testimony today, correct?

17        A.   My testimony is based on the events of that night,

18   not what --

19        Q.   Is your --

20             THE COURT:   Ms. Golombek, you can't ask the

21        question until the officer has finished his answer.

22        Q.   Is your testimony based on what you reviewed in the

23   grand jury testimony, yes or no?

24        A.   My grand jury minutes reflect the events of that

25   night.
```

Kathi A. Fedden, Sr. Court Reporter

 1        Q.    That's not responsive.  My question is your grand

 2   jury testimony -- is your testimony here today based on the

 3   grand jury testimony?

 4                 MR. ROSENBLATT:  Objection.

 5        A.    I'm not understanding.

 6                 THE COURT:  Are you asking if it's solely

 7        based on the grand jury testimony?

 8        Q.    Is it based solely on your grand jury testimony,

 9   yes or no?

10        A.    It's based on the events of that night.  My grand

11   jury moments -- minutes reflect my testimony as to what

12   happened that night.  I don't know what else to say.

13        Q.    So you don't want to answer my question in other

14   words?

15                 MR. ROSENBLATT:  Objection.

16                 THE COURT:  Sustained.

17        Q.    Let me ask you, prior to testifying here today did

18   you see videotapes regarding the incident that happened on

19   October 27th into October 28th?

20        A.    Yes.  As I testified earlier, I did observe this

21   videotape, correct.

22        Q.    So you observed the videotape from the BP gas

23   station, correct?

24        A.    Yes, that is correct.

25        Q.    And you observed other videotapes as well, correct?

1          A.    There might have been a different angle that I

2     might have observed from the gas station, but that's the

3     videotapes I saw.

4                    MS. GOLOMBEK:  I would ask that the videotape

5          be played for Officer Denehy.

6                    THE COURT:  On what grounds?  What basis?

7                    MS. GOLOMBEK:  He has testified that he has

8          seen it.  I would ask that I --

9                    THE COURT:  He's seen it, you have seen it, so

10         ask the question.

11         Q.    Are you familiar with it?

12         A.    Yeah, I recognize it as the videotape that I

13    observed of the events of that night, yes.

14         Q.    And what's been mashed into evidence as I believe

15    it's People's 33, that's based on the videotape?  That's from

16    the videotape, correct?

17         A.    The one that I testified to earlier, yes, that is

18    correct.

19         Q.    And in the videotape that you observed, you didn't

20    see anybody with a gun out in the video, correct?

21         A.    I saw what I possibly believed to be a weapon, but

22    not in that still photo, no.

23         Q.    In the still can you see anybody with a gun?

24         A.    Yes.

25         Q.    Show us where the gun is.

1          A.    It's in my hand, ma'am.

2          Q.    So you had the gun?

3          A.    I have my firearm out, that is correct.

4          Q.    And the person that you said you saw running, show

5    us in the video where you see a gun on that person?

6          A.    He's not in that still photo, ma'am.

7          Q.    Show us in the video if anybody has their hand

8    extended with a gun?

9          A.    It's not in that folder.

10               MR. ROSENBLATT:  Objection.  The video is not

11          in evidence.

12               THE COURT:  Sustained.  It's not in evidence.

13         Q.    I would like to show you the video then.

14               THE COURT:  Based on what?

15               MS. GOLOMBEK:  He said he's seen it.  I would

16         like to question him on it, Judge.  It's

17         cross-examination.  What he can see in the video.

18         Q.    The video would depict what you observed, correct?

19         A.    A partial depiction.  It's not the whole -- what's

20   in that picture is what I can tell you right now.

21         Q.    And that's not the only thing you observed,

22   correct?

23         A.    That night, no, it's not the only thing I observed

24   that night.

25         Q.    And the video would help you explain to us what

Kathi A. Fedden, Sr. Court Reporter

1  happened that night, correct?

2      A.   I don't know what you want me to explain.  Can you

3  help me out so I can help you out?

4      Q.   Yes.  If I showed you the video, I'm going to ask

5  you to walk us through what you can see in the video.

6      A.   I don't think that's my decision.

7           MS. GOLOMBEK:  Judge, at this time I would

8      like the video to be shown to my client.  I believe the

9      ADA has it on his laptop.

10          THE COURT:  Mr. Rosenblatt.

11          MR. ROSENBLATT:  I'm sorry, Judge?

12          THE COURT:  Ms. Golombek is asking you play

13      the videotape.

14          MR. ROSENBLATT:  Well, it's not in evidence,

15      Judge.

16          MS. GOLOMBEK:  At this time I would like it to

17      be marked as Defense Exhibit A.  I believe we're up to

18      actually Defense Exhibit B.

19          THE COURT:  Do you have it and you can have it

20      marked and see if this officer recognizes it?

21          MS. GOLOMBEK:  I believe the ADA has it.  I'm

22      going to show you this and ask that it be marked as

23      Defense A or B.

24          THE COURT:  Well, it's C.

25          MS. GOLOMBEK:  C.

1          (Whereupon, Defendant's Exhibit C was marked

2      for identification, only.)

3          THE COURT:  Marked for identification and it's

4      Defendant's C.

5          COURT OFFICER:  Defense Exhibit C marked for

6      identification.

7          MS. GOLOMBEK:  I would like it to be shown to

8      the witness.

9          THE COURT:  All right.

10         (Handed to witness.)

11  BY MS. GOLOMBEK:

12     Q.   Do you recognize that?

13     A.   I recognize it as a DVD.  I don't know what's on

14  it.  It's a DVD that you presented to me.  That's all I know

15  what it is.

16         MS. GOLOMBEK:  I would ask the DA to stipulate

17     that's the disc he provided of the BP gas station.

18         MR. ROSENBLATT:  I have no idea what you just

19     handed him.

20         MS. GOLOMBEK:  Well, I would like it to be

21     shown to ADA Rosenblatt.

22         THE COURT:  Let's show it to Mr. Rosenblatt.

23         (Handed to counsel.)

24         MR. ROSENBLATT:  I mean, Judge, I'll stipulate

25     that it is what it purports to be, which is a DVD that

1       my office probably gave to her, but I'm not going to

2       stipulate it into evidence.

3               THE COURT:  All right.

4               Ask another question, Ms. Golombek.

5       Q.   Now, you indicated on this day you worked for BSO,

6   correct?

7       A.   I worked in the Bureau of Special Operations Unit

8   under the Nassau County Police Department, correct.

9       Q.   And as a police officer working in the Bureau of

10  Special Operations, your duties included tactical situations,

11  correct?

12      A.   That is correct, yes.

13      Q.   And hostage situations, correct?

14      A.   We train in that, yes.

15      Q.   And you had special training for these things,

16  correct?

17      A.   Yes, we have.

18      Q.   It's highly specialized, correct?

19      A.   It's specialized training.  There could be always

20  more training to do.

21      Q.   Now, you indicate on October 27th to the early

22  morning of October 28th at about 12:45 you were stopping

23  another car and searching it, correct?

24      A.   That is correct.  We had someone under arrest

25  already and we were continuing to search the vehicle for



Kathi A. Fedden, Sr. Court Reporter

1    contraband.

2        Q.    And you were with your partner, correct, Officer

3    Bourke?

4        A.    That is correct, yes.

5        Q.    And at that time you indicated that you heard

6    shots, correct?

7        A.    Yes.

8        Q.    Now, you testified -- okay.

9            Isn't it true that you don't know where those shots

10   came from?

11       A.    At the moment they were going on, no, I did not

12   know where they were coming from, that is correct.

13       Q.    So when you testified that you heard them in a

14   southbound direction, isn't it true that at that moment that

15   you are searching another car, you didn't know where the

16   shots were coming from?

17       A.    I don't know if I said I heard them coming from a

18   southbound direction.  I know that I heard them from behind

19   me and I had my back towards the noise, towards the gunshots.

20       Q.    Now, you recall testifying in the grand jury,

21   correct?

22       A.    Yes, I do.

23       Q.    And that was on November 20, 2018, correct?

24       A.    I would have to look at it to confirm the date, but

25   I imagine so.



Denehy-People-Cross

```
 1        Q.    I can show you.

 2        A.    Okay.

 3        Q.    Do you have it with you, otherwise I will show it

 4   to you?

 5        A.    No, I do not.

 6              THE COURT:  Can we just stipulate,

 7        Mr. Rosenblatt, on the date that Officer Denehy

 8        testified in the grand jury?

 9              MR. ROSENBLATT:  Sure.  I believe it was

10        November 20, 2018.

11              THE COURT:  Is that the date you indicated,

12        Ms. Golombek?

13              MS. GOLOMBEK:  That's the date I indicated,

14        Judge.

15   BY MS. GOLOMBEK:

16        Q.    And you were under oath that day, correct?

17        A.    Yes, I was, ma'am.

18        Q.    Just like you are under oath today, correct?

19        A.    That is, yes.

20        Q.    And you were asked this question and you gave these

21   answers:

22              MS. GOLOMBEK:  I draw the Court's attention to

23        page 33, line 16.

24        Q.    Now, you were you asked this question and did you

25   give this answer:
```

Denehy-People-Cross







1         Question:  Now, as you were searching that car

2    you were searching, which again was unrelated to what

3    is about to happen, what occurred?

4         Answer:  As I was on the driver's side of the

5    vehicle there was a Jeep we were searching.  I heard

6    gunshots.  At this point we didn't know where it was

7    coming from.  It was really loud.  I ducked because I

8    thought somebody was shooting at us from a building or

9    a car passing by.  I turned around and didn't see

10    anything.  I really couldn't tell where it was coming

11    from because it was echoing off the buildings at that

12    point.

13         MR. ROSENBLATT:  Judge, I think she left out

14    the word maybe.  I thought maybe somebody was shooting

15    at us.

16         MS. GOLOMBEK:  I stand corrected.

17    Q.  I thought maybe somebody was shooting at us from a

18    building or a car passing by.  I couldn't really tell where

19    it was coming from because it was echoing off the buildings

20    at that point.

21         Were you asked that question and did you give that

22    answer?

23    A.  Yes, I did.

24    Q.  And at no time -- and you didn't testify that it

25    was coming from behind you at that point, correct?



1    A.    If it's not in the minutes then I didn't testify to

2    it.    I might have earlier today, but I'm not sure.

3    Q.    Is your memory better today than it was on November

4    20, 2018?

5    A.    My memory is probably better that day because the

6    events had just taken place.

7    Q.    Thank you.

8         Now you indicate that the person you saw running,

9    the first person you saw running you recognize as Duane

10   Costa.    You didn't know Duane Costa before that day, did you?

11   A.    No, I did not.

12   Q.    You didn't know the person's name that you are

13   saying that you saw running was Duane Costa, did you?

14   A.    I found out his name later on in the investigation

15   for the purpose of IDing him.    He was the defendant I saw

16   running now known to me as Duane Costa.

17   Q.    When you say the person was wearing -- well, it was

18   dark out that night, correct?

19   A.    If you can see from the picture, it's pretty well

20   lit at that corner, so I could see pretty well his clothing.

21   Q.    So show me in that picture where the person is

22   running with a gun extended, with his hand extended with a

23   gun in it?

24   A.    If you want me to show you the direction he ran, I

25   can show you.

Kathi A. Fedden, Sr. Court Reporter

1          Q.    Show me the gun and show me the person running.

2          A.    There is nobody running in that picture, ma'am.

3          Q.    Oh, nobody running in that picture?

4          A.    In that picture, no, there is not.

5          Q.    And while we're at the picture, I see there is a

6     taxicab, correct?

7          A.    That is correct.

8          Q.    Was there anybody in that taxicab?

9          A.    There was somebody outside the taxicab at the time.

10         Q.    You interview that person?

11         A.    I didn't interview anybody, ma'am.

12         Q.    Didn't you want to get a statement from that person

13    as to what he saw or she saw?

14         A.    After the whole shooting incident, being shot at,

15    we were a little shooken [sic] up and we had other stuff to

16    do like look for a weapon that could have fallen into the

17    wrong hands.

18              MS. GOLOMBEK:  I object to that, Judge.  It's

19         not responsive.

20              MR. ROSENBLATT:  It is, Judge.

21              THE COURT:  Overruled.

22         Q.    Did you interview that person who was in the taxi,

23    yes or no?

24         A.    As I answered earlier, no, I did not.

25         Q.    So that person who was in the taxi would have been

Kathi A. Fedden, Sr. Court Reporter

```
 1   a witness to what happened, correct?

 2              MR. ROSENBLATT:  Objection.

 3              THE COURT:  Sustained.

 4       Q.   You let a witness go by that could enlighten us on

 5   what happened this evening?

 6              MR. ROSENBLATT:  Objection.

 7       Q.   Is that what you are saying?

 8              MR. ROSENBLATT:  Objection.

 9              THE COURT:  Sustained.

10       Q.   Now, this person that you saw running, you said

11   this person was wearing a black jacket, correct?

12       A.   Black jacket and blue jeans, the defendant, yes,

13   Mr. Costa, running.

14       Q.   I just ask that you answer my question.

15              The person that was running you say was wearing a

16   black jacket.  Was there any specific emblem on the black

17   jacket or anything that said Duane Costa on the jacket or

18   anything other than a black jacket that you say you

19   recognized?

20       A.   Not that I recall, ma'am.

21       Q.   Isn't it true that you couldn't see any black

22   jacket on the person because it was dark out?

23       A.   As I testified, there was a light at the corner.

24       Q.   Did you have your flashlight out?

25       A.   Yes, I did.
```

 1          Q.   Now, isn't it true that your testimony that the
 2     person was wearing a black jacket is because you located a
 3     jacket later on that morning, correct?
 4          A.   No, my testimony is to he was wearing the black
 5     jacket when I observed him at the corner of Midwood and
 6     Clinton wearing a black jacket.
 7          Q.   Let me ask you, you said you found a black jacket?
 8          A.   That is correct.
 9          Q.   On Meriam Street, correct?
10          A.   On the side of a house, 20 Meriam, that is correct.
11          Q.   And 20 Meriam Street is not where you located
12     Mr. Costa, correct?
13          A.   It is in the vicinity.
14          Q.   It's not the place where you located, where you
15     apprehended Mr. Costa, is it?
16          A.   No.  I think I apprehended him at 6 Meriam which is
17     a few houses away from 20 Meriam.
18          Q.   So 6 Meriam --
19               THE COURT:   Wait.  Please, you have to wait
20          until the witness is concluded, all right.  Please.
21          Q.   Six Meriam is not 20 Meriam Street, is it, yes or
22     no?
23          A.   No, it's not 20 Meriam.
24          Q.   And you didn't see anybody place that jacket at 20
25     Meriam Street on the ground, did you?

```
 1        A.    No, I did not.

 2        Q.    And you didn't see anybody take that jacket off at

 3    20 Meriam Street, did you?

 4        A.    No, I did not.

 5        Q.    And there is nothing on that jacket that said Duane

 6    Costa on it, is there?

 7              MR. ROSENBLATT:  Objection; asked and

 8        answered.

 9        A.    Not that I know of.

10        Q.    And you have no way of knowing if that's the exact

11    jacket that another person, in fact, the person you saw

12    running, was wearing, correct?

13        A.    It resembles the master jacket he was wearing.

14        Q.    And you are only saying it resembles it because

15    it's black, correct?

16        A.    No, because it looks and appears to be the same

17    jacket he was wearing when he was running.

18        Q.    The only thing you saw on the jacket or that you

19    say you saw when somebody was running was a jacket that

20    happened to be black, correct?

21        A.    The someone I saw running was the defendant,

22    Mr. Costa, wearing the black jacket.

23        Q.    I ask you answer the question.

24        A.    I don't know what you are trying to ask me.

25              THE COURT:  You both need to stop.  Only one
```

Kathi A. Fedden, Sr. Court Reporter

```
 1          person can talk at a time.  So, ask your question,
 2          Ms. Golombek, and then, Officer Denehy, you will
 3          respond.
 4                    THE WITNESS:  Okay.
 5          Q.   The only thing you recognize about the jacket --
 6     well, the only thing that you can say about the jacket you
 7     found by 20 Meriam Street and the jacket you say the
 8     perpetrator was wearing was that they were both black,
 9     correct, yes or no?
10          A.   They were both black.  As I said earlier --
11          Q.   That's all I'm asking you.
12                    MR. ROSENBLATT:  Objection, your Honor.
13          Q.   That's the only thing about the jacket.  Not about
14     what you saw, but about the jacket.
15                    THE COURT:  The objection is sustained.
16          Q.   Now, when you say you heard shots when you are on
17     Clinton Street, the shots that you don't know where they were
18     coming from, you ducked down, correct?
19          A.   That's correct.
20          Q.   And you ducked down because you don't want to get
21     hit, correct?
22          A.   That is correct.
23          Q.   Because you don't know if they're coming from up on
24     a building or down below, correct?
25          A.   I'm sorry?
```



Kathi A. Fedden, Sr. Court Reporter

Denehy-People-Cross



355



1      Q.   You don't know if they are coming from a building

2  or from a car perhaps passing by, correct?

3      A.   I didn't know where they were coming from at all,

4  that is correct.

5      Q.   And when you say you heard shots, this whole thing

6  happened very quickly, correct?

7      A.   It happened fast.

8      Q.   And the whole thing, even when you say you are on

9  Clinton running towards Midwood, correct?

10     A.   I'm sorry, what's the question?

11     Q.   The whole incident from where you are on Clinton

12  after you search the car and hear shots to the time that you

13  are at the alleyway, that happened very quickly, correct?

14     A.   What do you mean?  Quickly, but I don't know how

15  quick it was.  I don't know time.

16     Q.   It happened in a matter of a few minutes, correct?

17     A.   That is correct.

18     Q.   As a matter of fact, it could have taken less than

19  a minute, correct?

20     A.   That I don't know.

21     Q.   It could have taken less than two minutes, correct?

22     A.   Anything is possible.  I don't know what the time

23  frame actually went by.  I never --

24     Q.   Now, when you say you heard gunshots when you are

25  on Clinton, how many gunshots do you hear when you are on

Kathi A. Fedden, Sr. Court Reporter

```
 1    Clinton searching the other vehicle?
 2         A.    Two or three.  I don't recall at this moment.  It
 3    might have been two.  I don't recall.
 4         Q.    Well, from the time you ducked down, is that after
 5    you heard the two or three shots or is that before you hear
 6    the two or three shots?
 7         A.    I was searching the vehicle.  I heard the shots and
 8    that's when I ducked down.
 9         Q.    And how long did you duck down for?
10         A.    For a moment until the shots are over.
11         Q.    So now when you see somebody running, correct?
12         A.    At that point after the shots and ducking down, I
13    remove my weapon, I turn around and I start observing to see
14    possibly where the shots come from.
15         Q.    Now, when you are still across the street and when
16    you see somebody running, isn't it true that when you yelled,
17    Police, don't move, stop running, that at that point you see
18    somebody else running behind him, correct?
19         A.    It's two questions in one.  Can you --
20         Q.    Well, it was only one question but I'll be happy to
21    rephrase it.
22         A.    Okay.
23         Q.    When you are across the street at Clinton, you
24    indicate that you see somebody running.  You see them running
25    on which street, Midwood or Clinton?
```

Kathi A. Fedden, Sr. Court Reporter

Denehy-People-Cross

1       A.   On Midwood.

2       Q.   So now you are on a completely different street and

3    you are telling us you see somebody running, that would be

4    parallel to where you are or perpendicular to where you are?

5       A.   If I can get up and show you, I can show you where

6    it's coming from if that's all right.

7               THE WITNESS:  Is that okay?

8               THE COURT:  Sure.  If Ms. Golombek would like

9       you to do that, that's fine with me.  Here you go.

10      Q.   Sure.

11           Actually, I'm going to withdraw that question and

12   ask a different question.  Thank you.

13           After you hear these shots and after you duck down,

14   you then have a flashlight in your hand and you have your

15   gun.  Your gun is drawn at that time or it's not drawn at

16   this time?

17      A.   After the shots, as I explained earlier, I ducked

18   down.  At that point as I'm turning towards the street, I

19   withdraw my service weapon and I bring it up to a ready

20   position and I turn around facing the street, facing

21   westbound on Clinton, scanning and observing.

22      Q.   The two people that are running, you don't know who

23   is running after who, correct?

24      A.   No, I don't.  At first I only see one person

25   running.  As I'm crossing the street, that's when I see a

1    second person running also.

2        Q.    And you approach the second person with your gun

3    drawn at the second person, correct?

4        A.    I had my gun drawn at both the first person, the

5    defendant running, Mr. Costa and then I still had my gun

6    drawn and pointed in the direction of both of them and

7    Officer Kraemer, sorry.

8        Q.    Isn't it true that when you see the two people

9    running, you don't really know what's transpiring at that

10    time, that point?

11        A.    That's true.

12        Q.    And isn't it true that you don't know whether the

13    second person is the subject or not?

14        A.    In the initial phase, yes, I didn't know who was

15    shooting, who wasn't shooting or both people were shooting.

16    I didn't know until --

17        Q.    And isn't it true that you draw your gun towards

18    the second person, which is Officer Kraemer, correct?

19        A.    I drew my gun at both people, yes, and Officer

20    Kraemer, that is correct.

21        Q.    Well, isn't it true it's Officer Kraemer that you

22    raised -- that you gave him verbal commands and you yelled,

23    Police, don't move?

24        A.    Yes.  I gave verbal commands to the defendant.

25        Q.    I'm asking you isn't it true that you gave verbal

Delahoy-People-Cross    359

1    commands to Officer Kraemer and said, Police, don't move?

2        A.    Yes, I did.

3        Q.    And that's because you thought he may have been the

4    perpetrator, correct?

5        A.    I did not know.  There could be more than one

6    perpetrator.  Yes, I thought he could possibly be a

7    perpetrator.

8        Q.    That's because you never saw the first person raise

9    and extend his hand with a gun in it, correct, yes or no?

10       A.    That is incorrect.

11       Q.    Well, if you saw the first person run and extend a

12   hand, you are saying you let him run away and you went after

13   the second person, is that what you are saying?

14       A.    At that time the second person was coming directly

15   at me with a weapon in his hand and at that point I thought

16   he was more of a threat than the other person was and I also

17   had another officer who could take possibly -- I can't

18   testify to what he can or can't do, but I had another officer

19   with me.

20       Q.    I'm asking that you answer my questions.

21            So you let the first person get away, correct?  At

22   that point that you go towards Officer Kraemer and extend

23   your gun and say, Police, don't move, you are letting the

24   first person get away, correct?

25            Yes or no, are you letting that first person get

Kathi A. Fedden, Sr. Court Reporter

1    away?

2        A.    Not necessarily, no.

3            MR. ROSENBLATT:  Objection, Judge.  It doesn't

4        call for a yes or no.

5            THE COURT:  Correct.

6            Sustained.

7        Q.    So you don't go after the first person that you are

8    saying extends his hand with a gun, correct?

9        A.    I did go after him.

10       Q.    You don't go after him right away, you go after

11   Officer Kraemer, correct?

12       A.    That is correct.

13       Q.    So you go after Officer Kraemer and say, Police,

14   don't move and when you are going after Officer Kraemer and

15   saying, Police, don't move, the first subject already turns

16   the corner, correct?

17       A.    That is correct.

18       Q.    Now, do you radio for help, somebody should go

19   after -- and use your radio and indicate to other officers

20   that they should go after the first subject at this point

21   since you think he may have a gun?

22       A.    I did not radio, no, I did not.

23       Q.    Do you yell out to Officer Bourke to assist you

24   that a person -- that there is a person running loose with a

25   gun?

1          A.    Officer Bourke knows that there is a person running
2     with a weapon.  I didn't have to yell to him.
3          Q.    But you thought you had the perpetrator who had the
4     gun, correct?  Your gun is pointed at Officer Kraemer,
5     correct?
6                    THE COURT:  Sustained.
7          Q.    Now, when you say you saw this person running up
8     Midwood and fire shots, you see this person with an arm
9     extended?
10         A.    I never said I saw this person fire shots.  I said
11    shots came from his vicinity.
12         Q.    And when you say shots came from his vicinity,
13    isn't it true that you didn't know if the shots were coming
14    from a building or if they were coming from a car passing by,
15    isn't that what you said, yes or no?
16         A.    I said that to the beginning of the events that
17    transpired, yes.
18         Q.    Well, you heard more shots after that, correct?
19         A.    That is correct.
20         Q.    And that's when you were with Officer Kraemer?
21         A.    That is when I was encountering Officer Kraemer.
22         Q.    When you were encountering Officer Kraemer, you had
23    your gun drawn pointed towards Officer Kraemer, correct?
24                    THE COURT:  Yes, asked and answered.  Can we
25        move on?

Kathi A. Fedden, Sr. Court Reporter

```
 1                MS. GOLOMBEK:  May I finish, Judge?

 2                THE COURT:   It's asked and answered a thousand

 3        times.

 4                MS. GOLOMBEK:  I have to lead up to the

 5        question.

 6        Q.    And you were looking at Officer Kraemer, correct?

 7                THE COURT:  Asked and answered a thousand

 8        times.

 9        Q.    And the first subject was ahead of you, correct?

10                THE COURT:  Asked and answered.

11        Q.    And you couldn't see what the first subject was

12    doing at the time you're posting up at Officer Kraemer,

13    correct, yes or no?

14        A.    Too many interruptions.  Can you repeat the

15    question?

16                THE COURT:  Sorry.

17                THE WITNESS:  No, not your fault.  It was too

18        much going on.  I'm sorry, it's my fault.

19                THE COURT:  That's all right.

20                MS. GOLOMBEK:  Judge, I want to ask to have

21        the question read back, otherwise I'll paraphrase it to

22        the best I can.

23                THE COURT:  All right, we'll have it read

24        back.

25                (Whereupon, the last question was read back by
```

1        the reporter.)

2        A.    I guess at the actual point when I am encountering

3   Officer Kraemer, I have peripheral vision but no, I can't see

4   as well what the defendant is doing at that point.

5        Q.    And at that point that you are posting up and

6   looking at Officer Kraemer with your gun out, you don't see

7   where that first subject is at all, correct?

8        A.    I'm focusing on Officer Kraemer, but I'm still

9   aware of where the defendant was running.  But, I mean, I

10  can't have my eyes in two places, no, I cannot.

11       Q.    And you never saw the first person turn onto

12  Clinton, did you?

13       A.    Yes, I did.

14       Q.    When the person turned onto Clinton, you are on

15  Midwood, correct?

16       A.    No, I'm not, I'm on Clinton.  The defendant was on

17  Midwood.  I was on Clinton.

18       Q.    At the time that you post up at Officer Kraemer --

19            THE COURT:  What does that mean, post up?

20       Q.    Well, what does post up mean?

21       A.    I use that term.  I was looking for cover,

22  concealment a little bit because of the gunshots.  I found a

23  telephone pole and I kind of got behind or got up on it so it

24  kind of gave me some concealment from further gunfire but yet

25  I'm able to still observe.



```
 1                    THE COURT:  Okay.

 2                    THE WITNESS:  If you would like me to use

 3          another terminology.

 4                    THE COURT:  No.

 5          Q.   At the time you draw your gun at Officer Kraemer,

 6     you indicate that you hear more shots, correct?

 7          A.   During my exchange with Officer Kraemer, yes, we

 8     hear more shots.

 9          Q.   Well, it's more than an exchange, you have your gun

10     pointed at Officer Kraemer and you are saying, Don't move.

11          A.   What do you want me to call it?

12                    THE COURT:  Ms. Golombek, this is really

13          argumentative now.  Just ask another question....

14          Q.   Do you ever see the first person raise his arm up

15     in your direction?

16          A.   Yes, I saw his arm coming up in my direction.

17          Q.   And that's -- and when you testified to that,

18     that's when you say you have your gun drawn at Officer

19     Kraemer, correct?

20          A.   My gun is drawn.  His arm is starting to come out.

21     I have a second threat that I believed coming at me who was

22     coming a lot faster at me.  This other threat was now moving

23     away from me.  Yes, I turned and trained my eye on Officer

24     Kraemer believing that he was more of a threat.

25          Q.   So what you are saying is you have your gun drawn
```

1    at Officer Kraemer and then you turn your head while you have

2    your gun drawn at Officer Kraemer or do you point your gun

3    towards the first subject?

4        A.    This is a decision I had to make in a split second

5    and perceive which one was more of a threat to me.

6        Q.    So you never saw anybody raise their hand, correct?

7        A.    Yes, I did.

8        Q.    You never did because your attention is focused on

9    Officer Kraemer whom you have your gun drawn at.

10       A.    As I testified earlier, his arm was coming up, but

11   I also had the other person coming at me, so I took it and I

12   had another officer with me so I thought maybe he would be

13   able to handle that situation as I confront the other one

14   coming at me as teamwork.

15       Q.    So you are confronting Officer Kraemer, you didn't

16   turn your head, correct?

17                THE COURT:  Sustained.  Please move on.

18       Q.    When you say you hear shots and you say this person

19   is pointing his arm, is that arm pointed at you or is it

20   pointed at Officer Kraemer?

21                THE COURT:  Could you ask that question again?

22       Q.    In this one second that you say you turn your head

23   and you see this arm extended, is the arm extended at you or

24   is it extended at Officer Kraemer?

25                MR. ROSENBLATT:  Objection.  It calls for the

Kathi A. Fedden, Sr. Court Reporter

```
 1                operation of someone else's mind.

 2                        MS. GOLOMBEK:  I'm asking for the operation of

 3                his mind.

 4                        THE COURT:  You are not asking for the

 5                operation of anybody's mind.  You are asking for what

 6                this officer specifically did and saw.

 7                        MS. GOLOMBEK:  Correct.

 8                        THE COURT:  So you are asking for no operation

 9                of anybody's mind, all right.

10                        So did you ever see Mr. Costa raise his hand

11                in your direction?

12                        THE WITNESS:  I saw his arm coming up in my

13                direction, but it wasn't straight out in my direction.

14                        THE COURT:  All right.  Did you ever observe

15                him discharge a weapon in your direction?

16                        THE WITNESS:  No, I did not.

17                        THE COURT:  Let's move on.

18         BY MS. GOLOMBEK:

19         Q.    The whole time, this was only during a second, the

20         extending of the arm that you are talking about, this is in

21         that one second that you take your attention off of Officer

22         Kraemer that you have your gun extended at, is that what you

23         are telling us?

24                        THE COURT:  Please, stop.  Please move on.

25                        MS. GOLOMBEK:  It's cross-examination, Judge.
```

Kathi A. Fedden, Sr. Court Reporter

```
 1                    THE COURT:  I'm very aware it's
 2       cross-examination, Ms. Golombek.  It doesn't mean you
 3       can keep asking the same question 50,000 times.
 4       Q.    Now, when you say the subject that you say is Duane
 5   Costa immediately right before he turns the corner on
 6   Clinton, you said there was a third set of shots or a fourth
 7   set of shots.  You weren't sure before if there were two or
 8   three shots.
 9                    THE COURT:  Why don't you ask the question
10       specific.
11       Q.    When you hear another shot, right before you say
12   Mr. Costa turns on Clinton Street, was that shot directed at
13   Officer Kraemer or was it directed at Officer Rilling?
14       A.    I can't tell.  His back was turned.  I can't tell.
15   I couldn't tell.
16       Q.    Was that shot directed at you?
17       A.    No, it was not.
18       Q.    Well, at this time your attention is on Officer
19   Kraemer who you have your gun towards, correct?
20       A.    At which point are you talking about now?  I feel
21   like you jumped.
22                    THE COURT:  Wait.  Please, the witness is
23       speaking.
24                    MS. GOLOMBEK:  Judge, I'm going to object.  He
25       doesn't ask questions.
```

Kathi A. Fedden, Sr. Court Reporter

```
 1                    THE COURT:  Well, if he needs to clarify
 2           something so that he can answer your question, I think
 3           that's appropriate.
 4                    What was your question?
 5                    THE WITNESS:  I don't know anymore.
 6                    THE COURT:  Just ask a question.
 7           Q.   Immediately before you see the first person turn
 8      around and point, was that at you or was that in your general
 9      direction?
10           A.   I don't know what part or where when you are
11      asking.  If you would like, I will go through the story again
12      and explain it.
13                    THE COURT:  You don't need to go through the
14           story again, Officer Denehy.
15           Q.   Immediately before you testified you see the first
16      person turn around and point, was that at you or in your
17      general direction?
18                    MR. ROSENBLATT:  Objection as to when?
19                    THE COURT:  Did you see anybody turn around?
20                    First when you first were standing on Clinton
21           and you looked down Midwood, do you see anybody turning
22           around or you just see a person running in your
23           direction?
24                    THE WITNESS:  I saw him running in my
25           direction.  As I'm crossing the street, I saw the
```

Kathi A. Fedden, Sr. Court Reporter

1    defendant turn around.  We heard more shots, but I

2    couldn't see if it was him shooting or Officer Kraemer

3    shooting.  That's what I testified to earlier.  I don't

4    know what else I can say, I'm sorry.

5              THE COURT:  That's fine.

6    Q.    As this first person turns onto Clinton, do you see

7    him extend his arm at all, the first person?

8    A.    When he's turning onto Clinton, no, I do not.

9    That's when I started giving him verbal commands yelling,

10    Police, don't move.  Yelling, Don't run like I said earlier,

11    so.

12    Q.    At what point did you testify that you saw the

13    first person raise his arm?

14              THE COURT:  Asked and answered.  Please move

15    on.

16    Q.    Now, when you have your gun drawn at Officer

17    Kraemer, the first subject is running ahead, correct?

18              THE COURT:  Asked and answered.  Sustained.

19    Q.    You are no longer running at the time your gun is

20    drawn towards Officer Kraemer, correct?

21    A.    I had stopped.  I wasn't running across the street,

22    I was moving across the street.  When I got to Officer

23    Kraemer, yes, I stopped my movements other than to make

24    contact with Officer Kraemer.

25    Q.    And at the point that your gun is drawn and you are

Kathi A. Fedden, Sr. Court Reporter

1    at Officer Kraemer, are you under a street light, yes or no?

2        A.    I can't recall.

3        Q.    And at that point that you say you see in your

4    peripheral vision for a second the first subject turning with

5    his arm extended, that's for a second, correct?

6        A.    I did not say his arm was extended.  I said his arm

7    was coming up.  I answered this already.  I don't know what

8    to say.  I wish I could be of more help.  Sorry.

9                THE COURT:  No.

10       Q.    And that person is still running, correct?

11       A.    As far as I could tell, yes.

12       Q.    You couldn't tell because you couldn't see,

13   correct?  You can't see behind you, can you?

14               MR. ROSENBLATT:  Objection.

15               THE COURT:  Sustained.

16       Q.    Were you able to see behind you?

17               MR. ROSENBLATT:  Objection.

18               THE COURT:  Sustained.  Sustained.

19       Q.    You had your gun pointed at Officer Kraemer.  At

20   the time your gun is faced towards Officer Kraemer, you are

21   in the opposite direction of the first person who is running,

22   correct?

23               MR. ROSENBLATT:  Objection.

24               THE COURT:  Sustained.  Please move on.

25       Q.    How far are you from the person who is running when

Kathi A. Fedden, Sr. Court Reporter

1    you first say you observed the person running, the first

2    subject, how far away are you?

3        A.    This is where we went over with the Court.

4            MS. GOLOMBEK:  Judge, I'm going to move to

5        strike that.  It's very inappropriate for him to comment

6        on questions, Judge.

7            THE COURT:  He's not commenting, he's saying

8        when was this.  This is something we did before.  So

9        probably he did do it before.  What was the question?

10       How far was he from the person -- the defendant?  Well,

11       it's the defendant.  He identified the defendant.

12           So how far were you when you first saw the

13       defendant running, how far from the defendant were you?

14           THE WITNESS:  Like I was saying --

15           THE COURT:  Is this the --

16           THE WITNESS:  Yeah.  Give or take a few feet

17       from here to the back.  I have to figure it out.  There

18       is four lanes, a sidewalk.

19           THE COURT:  We agreed, Ms. Golombek, it was

20       approximately 48 feet.

21   BY MS. GOLOMBEK:

22       Q.    And at the time your gun is drawn at Officer

23   Kraemer, how far away is the first subject?

24       A.    He's running past the gas station at that point.  I

25   can't tell you how far away he was.

1          Q.    And you lost sight of him, correct?

2          A.    I take him out of my vision for a brief moment, but

3     I scan back to him.

4          Q.    And as a matter of fact, your partner, Officer

5     Bourke, runs ahead of you at this point, correct?

6          A.    No, I don't think so.

7          Q.    No?

8          A.    I don't think so.  I don't know.

9          Q.    You are not sure?

10         A.    Yeah, I'm not sure.

11         Q.    And you are not sure because your attention is

12    focused on Officer Kraemer and you engage in a conversation

13    and that takes a few minutes, correct?

14                    MR. ROSENBLATT:  Objection.

15                    THE COURT:  Sustained.

16         Q.    Now, when you find this jacket, do you see any gun

17    powder residue on this jacket that you find this black jacket

18    at 20 Meriam Street?

19         A.    It's not my job to test for that.

20         Q.    I'm asking you do you see any gun residue?  I'm not

21    asking if it's your job.

22         A.    No, I do not see any gun residue.

23         Q.    When you apprehend Mr. Costa, do you see any gun

24    powder residue on his hands?

25         A.    I do not test for gun powder residue, no.

```
 1        Q.   Do you see any?

 2                  THE COURT:  Do you see any?

 3                  THE WITNESS:  No.

 4                  THE COURT:  Obviously, no, you don't see any.

 5                  No, he doesn't see any.

 6        Q.   Does he have a weapon on him?

 7        A.   At that point, no, he does not.

 8        Q.   When you apprehend Mr. Costa, does he have any

 9   bullets on him?

10        A.   I did not recover any when I searched him, no.

11                  MS. GOLOMBEK:  One moment, your Honor.

12                  (Pause in the proceedings.)

13        Q.   And when you duck, you duck by a telephone pole,

14   correct?

15                  MR. ROSENBLATT:  Objection; asked and

16        answered.

17                  THE COURT:  I'm going to sustain the

18        objection.

19                  MS. GOLOMBEK:  That was asked by ADA

20        Rosenblatt.

21                  MR. ROSENBLATT:  No, it wasn't.

22                  (Pause in the proceedings.)

23                  MS. GOLOMBEK:  I have no further questions of

24        this witness.

25                  THE COURT:  Thank you.
```

```
 1                    Any redirect, Mr. Rosenblatt?

 2                    MR. ROSENBLATT:  No, thank you, your Honor.

 3                    MS. GOLOMBEK:  Wait a second, I'm sorry, I do

 4          have further questions.

 5   BY MS. GOLOMBEK:

 6          Q.   Isn't it true that on June 5, 2006 you were accused

 7   of unprofessional conduct in that there were allegations that

 8   two plainclothes police officers came through a person's

 9   front door with their weapons drawn without invitation?

10          A.   I don't recall the incident.

11          Q.   And you responded that you were responding to a

12   break-in at 642 and that this person explained to you that

13   the defendant was not 642 and that there was no break-in at

14   that house and isn't it true that you were rude to this

15   person and told him to shut up, go inside and you refused to

16   give your shield and complaint number?

17          A.   I don't recall the incident, no.

18          Q.   Isn't it true there was another incident on March

19   17, 2009 where there was a complaint that officers were rude

20   in their tone where dealing with a complainant and this was

21   on Fletcher Avenue where her vehicle was cut off and two male

22   whites exit the vehicle and the operator of the Suburban,

23   later identified as Police Officer Kearney, issues a traffic

24   summons to the person and that you were one of the officers

25   there and you were very rude to this woman, you didn't
```

Kathi A. Fedden, Sr. Court Reporter

1    identify yourselves as police officers?

2         A.    I don't recall.  We have written a lot of

3    summonses.

4              MS. GOLOMBEK:  I have no further questions at

5         this point.

6              THE COURT:  Thank you.

7              So Mr. Rosenblatt, you still do not have any

8         redirect?

9              MR. ROSENBLATT:  I still have no redirect.

10   Thank you, your Honor.

11             THE COURT:  Thank you, retired Officer Denehy.

12   Have a good rest of the day.

13             THE WITNESS:  Thank you.

14             (Whereupon, the witness was excused.)

15             THE COURT:  Do you want to call your next

16        witness?

17             MR. ROSENBLATT:  Judge, it's up to you.

18   Tomorrow I have, if we don't put the officer on now,

19   I'll have Lee Krill from Crime Scene will be first and

20   then probably Niall Bourke who is outside now will go

21   next.  I anticipate calling Detective Bourguignon

22   tomorrow as well.  I had Detective Vinberg notified.  He

23   just texted he was rushed to the hospital for a medical

24   issue.  He said he will fill me in later and so I don't

25   know if he's going to be available tomorrow, but I still

Kathi A. Fedden, Sr. Court Reporter

1    have three witnesses for tomorrow notwithstanding his

2    health.

3                THE COURT:  All right.

4                MR. ROSENBLATT:  So I can start now, your

5    Honor, or we can start tomorrow at 10:30, whatever your

6    Honor wishes.

7                THE COURT:  I guess we'll start tomorrow at

8    10:30 as opposed to just beginning with this next

9    witness, all right.  So we'll adjourn until 10:30

10   tomorrow and we'll continue the trial at that time.

11               (Whereupon, the trial was adjourned to

12   November 16, 2021.)

13

14                *                *                *

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU :   PART 38
2    -------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4
                  -against-                    Indictment No. 1934N/18
5
                                               BENCH TRIAL
6    DUANE COSTA,

7                      DEFENDANT.
     -------------------------------------x
8
                         Mineola, New York
9                        November 16, 2021

10
     B E F O R E:   HON. PATRICIA HARRINGTON
11                   Acting Supreme Court Justice

12

13   A P P E A R A N C E S:

14
              (Same as previously noted.)
15

16

17                  Kathi A. Fedden
                    Senior Court Reporter
18

19        *              *              *

20        (Whereupon People's Exhibits 34 through 36

21   were pre-marked for identification.)

22        THE CLERK:  For the record, this is Indictment

23   1934N of 2018, the People versus Duane Costa.  It's a

24   continued trial.

25        Appearances, please.

Kathi A. Fedden, Sr. Court Reporter

```
 1                    MR. ROSENBLATT:  For the People, Assistant

 2          District Attorney Jared Rosenblatt.  Good morning, your

 3          Honor.

 4                    THE COURT:  Good morning.

 5                    MR. NELSON:  Ryan Nelson.  Good morning,

 6          Judge.

 7                    THE COURT:  Good morning.

 8                    THE CLERK:  Sir, you are Duane Costa?

 9                    THE DEFENDANT:  Yes.

10                    MS. GOLOMBEK:  Good morning, your Honor, Lori

11          Golombek, 114 Old Country Road, Mineola, New York.

12                    THE COURT:  Good morning.

13                    Good morning, Mr. Costa.

14                    THE DEFENDANT:  Good morning.

15                    THE COURT:  So are we prepared to continue

16          this trial?

17                    MR. ROSENBLATT:  Yes, Judge.

18                    MS. GOLOMBEK:  Yes, Judge.

19                    THE COURT:  Is there anything for the record

20          before we have Mr. Rosenblatt call his next witness?

21                    MR. ROSENBLATT:  Judge, I just wanted to

22          indicate for the record that yesterday Ms. Golombek and

23          myself went down with the court staff and placed a

24          trigger lock on the gun.  That was a request of the

25          security of the court staff.  We went down there and
```

Kathi A. Fedden, Sr. Court Reporter

378

1       watched that happen.

2               This morning we're calling the Crime Scene

3       detective.  Mr. Nelson will be asking the questions, but

4       should it come up, I just want the record to reflect

5       that that was done in front of all the parties.

6               THE COURT:  All right.  And you acknowledge

7       that right, Ms. Golombek?

8               MS. GOLOMBEK:  I do acknowledge that, your

9       Honor.

10              Your Honor, I want the record to reflect

11      yesterday I made the objection to the late discovery

12      that I received regarding the Cellebrite information and

13      I asked for preclusion, Judge.  I do want to stress that

14      I believe it is a violation, Judge.  They submitted a

15      Certificate of Compliance, Judge.  They were not ready

16      at the time they submitted the Certificate of

17      Compliance, Judge.

18              THE COURT:  Okay.

19              MS. GOLOMBEK:  And it is a violation.

20              MR. ROSENBLATT:  Can I be heard briefly on

21      that, Judge?

22              THE COURT:  Sure.

23              MR. ROSENBLATT:  Judge, as your Honor is

24      intimately familiar because I know you have been dealing

25      with these types of motions, that the only time the

Kathi A. Fedden, Sr. Court Reporter

1      Court is to institute a remedy for a discovery

2      obligation is if there is some sort of prejudice.  I

3      have the ten pages of material that I checked.  Your

4      Honor had asked me to check.  I don't believe it was

5      turned over.  I also don't believe it's discovery, but

6      because of the climate we're in and I have been acting

7      in an abundance of caution as we are going forward in

8      this case, I turned it over anyway.  There is no way

9      there is a prejudice at all impacted by turning this

10     over now or if I didn't turn it over.

11             So I just wanted that to be noted for the

12     record.  I can go into more case law.  I know your Honor

13     is intimately familiar with all of it.

14             The other thing I wanted to put on the record

15     is there has been some discussion about the videos which

16     I know your Honor is familiar with as well.  I am going

17     to be calling Detective Maloney tomorrow.  I will be

18     moving in the videos as we discussed.  I have created

19     this morning, with the assistance of Detective Maloney,

20     the clips on one video so it's easier for everybody and

21     I made Ms. Golombek a copy.  It's an exact duplicate of

22     all the videos that have been turned over, but it's in a

23     smaller format or easier format instead of hours of

24     video.  It's, I think, under three minutes.

25             THE COURT:  Okay.  When is there going to be

Kathi A. Fedden, Sr. Court Reporter

380

1           testimony with regard to the cell phone?

2                   MR. ROSENBLATT:  Tomorrow.

3                   THE COURT:  All right.  So when you get a

4           chance, if I could just have a copy of what you turned

5           over to Ms. Golombek yesterday so I can see what it is.

6                   MR. ROSENBLATT:  Sure.

7                   THE COURT:  And I'll reserve decision,

8           Ms. Golombek, at this moment about the cell phone.

9                   MS. GOLOMBEK:  The preclusion?

10                  THE COURT:  Yes.

11                  MS. GOLOMBEK:  And I also made a motion in

12          limine before that witness testified.  It also may go to

13          Detective Bourguignon.  Judge, my motion in limine, I'm

14          repeating what it was, is I believe photos are going to

15          be introduced from a cell phone with my client allegedly

16          holding up a weapon, Judge.  I submit that that's overly

17          prejudicial to my client, Judge.  I submit that any

18          photograph of a gun, we don't know if it's the same gun,

19          we don't know if it's a toy gun.  We don't know if

20          someone was rehearsing for a video, your Honor.  There

21          could be multiple interpretations and I believe it's

22          being introduced for prejudice to be honest, your Honor,

23          against my client and I'm moving it should not be

24          introduced.

25                  MR. ROSENBLATT:  Judge, just for clarity, I

Kathi A. Fedden, Sr. Court Reporter

381

1      will be doing that tomorrow with Detective Brady.  I

2      won't be introducing any of the photographs that were

3      downloaded today.  Tomorrow Detective Maloney and

4      Detective Brady are my witnesses.  Detective Maloney

5      regarding the video and Detective Brady is regarding the

6      search of the phone, so I anticipate that being

7      tomorrow's evidence.

8                  THE COURT:  Very good.  I will reserve on that

9      issue as well, Ms. Golombek.

10                 MR. ROSENBLATT:  Judge lastly, we pre-marked,

11     I don't remember if Ms. Golombek was here when we put

12     these on or not, but 34, 35 and 36 have been pre-marked.

13     They are just additional photos of the guns that were

14     taken by Detective Krill who is our first witness.

15                 THE COURT:  All right.  So then why don't you

16     call your next witness, Mr. Rosenblatt, or Mr. Nelson.

17                 MR. NELSON:  Thank you, Judge.  The People do

18     call Detective Lee Krill.

19     D E T.   L E E   K R I L L, Shield #1102, assigned to the

20          Crime Scene Search Section of the Nassau County Police

21          Department, having been called as a witness on behalf

22          of the People, having been duly sworn by the Clerk of

23          the Court, was examined and testified as follows:

24                 THE COURT:  Could you please state your name

25     and spell your name and your command.

Kathi A. Fedden, Sr. Court Reporter

Det. KRILL-DIRECT

1              THE WITNESS:  It's Lee Krill, K-R-I-L-L.  I'm

2      in the Crime Scene Search Section of the Nassau County

3      Police Department.  Shield 1102.

4              THE COURT:  All right, Mr. Nelson, you may

5      inquire.

6              MR. NELSON:  Thank you, Judge.

7    DIRECT EXAMINATION

8    BY MR. NELSON:

9      Q.   Detective, what is your current position within the

10   Nassau County Police Department?

11     A.   I'm a detective.

12     Q.   And where are you currently assigned as a

13   detective?

14     A.   The Crime Scene Search Section.

15     Q.   How long have you been a detective with the Crime

16   Scene Search Section?

17     A.   Thirteen years.

18     Q.   What, if any, training have you received in

19   connection with your position as a detective with the Crime

20   Scene Search Section?

21     A.   We do a seven month in-house training and six weeks

22   of field training.

23     Q.   And specifically in combination of in-house and

24   field training, what, if any, techniques did you learn in

25   connection with your role as a detective?

1    A.    We learned to collect documents and preserve

2    evidence at crime scenes.

3    Q.    What type of evidence did you learn to document and

4    preserve?

5    A.    Blood, DNA, ballistics and weapons.

6    Q.    Directing your attention to October 28th of 2018,

7    were you working in your role as a detective on that date?

8    A.    Yes.

9    Q.    And on that date were you working for the Crime

10   Scene Search Section?

11   A.    Yes.

12   Q.    Directing your attention to approximately 2:20 a.m.

13   on October 28, 2018, did you arrive at the location of

14   Midwood and Clinton Street in Hempstead, New York?

15   A.    Yes.

16   Q.    If you can describe for the Court what happened

17   when you initially arrived at that location?

18   A.    Sure.  So after I initially arrive I meet with the

19   investigating detective and I do an initial walk through of

20   the scene to assess the scene for any potential evidence.

21   Q.    And if you can go into a little more detail.  What

22   did you mean by walk through?

23   A.    So I will walk through the blocks, look for any

24   ballistic, guns or any other evidence in order for

25   preparation for photography and how I'm going to document the

384

1    scene.

2         Q.    Now, when doing the walk through, where did you go

3    while, again, conducting that walk through?

4         A.    So I walked on Midwood and Clinton and Meriam

5    Street in Hempstead.

6         Q.    During your walk through of Midwood, Clinton and

7    Meriam, what, if any, evidence did you observe?

8         A.    So I observed two handguns and five casings.

9         Q.    I would like to talk to you about that evidence you

10   observed starting with the handguns.

11               I apologize.   Again, how many handguns did you

12   observe?

13        A.    Two handguns.

14        Q.    Where did you observe those handguns?

15        A.    One was on Midwood and one was on Meriam.

16               THE COURT:    I'm sorry, can you say that again?

17               THE WITNESS:   One was Midwood and one was on

18        Meriam.

19        Q.    Starting with the handgun you observed on Midwood,

20   what type of handgun did you observe?

21        A.    That was a Smith & Wesson.

22        Q.    And with respect to the handgun you observed on

23   Meriam, what type of handgun was that?

24        A.    That was a Georgia Czechoslovakian handgun.

25        Q.    I would like to talk about the Smith & Wesson

Kathi A. Fedden, Sr. Court Reporter

385

1   handgun that you found on Midwood.  When you observed that

2   Smith & Wesson handgun, what, if any, characteristics did you

3   observe with respect to that handgun?

4       A.    It was -- when I recovered it or while I

5   photographed it?

6       Q.    When you photographed it.

7       A.    I put a marker one down to photograph it where it

8   was and I observed it to be laying on the grass.

9               MR. NELSON:  If I may have, Mr. Clerk, the

10          photographs that are already in evidence.

11              Your Honor, if I may hand to the witness

12          what's already in evidence as People's Exhibit 1 and

13          People's Exhibit 9?

14              THE COURT:  Yes.

15              (Handed to witness.)

16      Q.    Detective, could you please look at the photograph

17   in evidence as People's Exhibit 1 and People's Exhibit 9?

18              MS. GOLOMBEK:  Objection, Judge.  People's

19          number 9, I don't believe that's in evidence, your

20          Honor.  I believe that was subject to connection.

21              THE COURT:  Right.  I don't have 9 as

22          evidence, I just have it for identification.

23              MR. ROSENBLATT:  I have it as evidence.

24              THE CLERK:  I have it marked as evidence too.

25              THE REPORTER:  It is in evidence, Judge.

Kathi A. Fedden, Sr. Court Reporter

386

1              THE COURT:  The objection is overruled.

2         Q.   Detective, do you recognize People's Exhibit 1 and

3    People's Exhibit 9?

4         A.   Yes, those are the photographs I took that night.

5         Q.   And what is depicted in those photographs in

6    People's Exhibit 1 and People's Exhibit 9?

7         A.   The Smith & Wesson handgun.

8              MR. NELSON:  Your Honor, I am now publishing

9         what's in evidence as People's Exhibit 1.

10        Q.   Detective, what is being published on the screen,

11   is that the same photograph you are looking at in your hand

12   as People's Exhibit 1?

13        A.   Yes.

14        Q.   If you can please tell the Court what's depicted in

15   People's Exhibit 1?

16        A.   That's Midwood and on the lower right-hand corner

17   there is a gun by the fence line.

18             MS. GOLOMBEK:  I can't really hear.  I heard

19        Midwood on the corner.  I didn't hear.

20             THE COURT:  Just speak loud and clear, all

21        right, Detective, thank you.  Just repeat what you said.

22             THE WITNESS:  That's a picture of the roadway

23        at Midwood.  On the lower right hand corner there is a

24        picture of the Smith & Wesson.

25        Q.   And in the lower right hand corner of People's

                    ' Kathi A. Fedden, Sr. Court Reporter

1   Exhibit 1, is that the Smith & Wesson you observed on your

2   walk through of the scene on Midwood?

3       A.   Yes.

4                MS. GOLOMBEK:   Judge, I have no way of knowing

5           what the witness is referring to.

6                MR. NELSON:   Judge, I think --

7       Q.   Detective, if you can please step down.

8                THE COURT:   Why don't you step down and point

9           out what you are speaking about.

10      A.   Right here (indicating).

11      Q.   Detective, when you are pointing right there.

12               MR. NELSON:   May the record reflect that the

13          detective is pointing to the lower right portion of

14          People's Exhibit 1.

15      Q.   And, Detective, what specifically are you pointing

16  to at that lower right-hand portion of People's Exhibit 1?

17      A.   That's the Smith & Wesson handgun.

18      Q.   Again, so the record is clear, what roadway is

19  depicted in People's Exhibit 1?

20      A.   Midwood.

21      Q.   Thank you.

22               MR. NELSON:   Let the record reflect I'm now

23          going to publish what's in evidence as People's Exhibit

24          9.

25      Q.   Detective, is what's displayed on the screen as

Kathi A. Fedden, Sr. Court Reporter

388

1    People's Exhibit 9 the same picture you are looking at as

2    People's Exhibit 9?

3        A.    Yes.

4        Q.    Please tell the Court what's depicted in People's

5    Exhibit 9.

6        A.    That's a close-up of the handgun on Midwood.

7        Q.    And again, specifically what handgun are you

8    referring to?

9        A.    The Smith & Wesson.

10       Q.    And, Detective, please step down, I apologize.

11            With People's Exhibits 1 and 9, did you take those

12    photographs?

13       A.    Yes.

14       Q.    And you may remain seated.

15            THE COURT:  Oh, I thought you wanted her to

16        step over.

17            MS. GOLOMBEK:  I'm sorry, I didn't hear your

18        question.

19            MR. NELSON:  Sure.  I said with respect to

20        People's Exhibit 1 and People's Exhibit 9, did you take

21        those photographs.

22       A.    Yes, I did.

23            MS. GOLOMBEK:  Then there was a question after

24        that.

25            MR. NELSON:  No.  If the record may reflect

                    Kathi A. Fedden, Sr. Court Reporter

389

1           there was no question after that.  I was telling the

2           witness she may need to step down from the witness box.

3           Q.    Now, after photographing the Smith & Wesson, what

4     did you do next with your investigation?

5           A.    I then collect that, I then send it for further

6     testing.

7           Q.    And just take a step back.  When you say you

8     collect that, are you referring to the Smith & Wesson?

9           A.    Yes.

10          Q.    And how do you collect the Smith & Wesson?

11          A.    I remove it from the scene.  I make it safe,

12    removing any ammunition that is in it and then I put it in a

13    gun box, sign and date it.

14          Q.    And what, if anything, do you do with respect to

15    the Smith & Wesson before signing and dating the gun box?

16          A.    I'll take close-up photographs of it.

17                    MR. NELSON:  One second, Judge, if I may.

18                    (Pause in the proceedings.)

19                    MR. NELSON:  Judge, if I may, I believe the

20          photographs that were earlier pre-marked today were

21          provided to defense counsel.  If I may just grab those

22          photographs from defense counsel's table.

23                    THE COURT:  Oh, yes.

24                    MR. NELSON:  Judge, I am now handing to the

25          witness what has been pre-marked as People's Exhibit 22

1          for identification, 23 for identification and 34 for

2          identification.

3                    (Handed to witness.)

4                    THE COURT:   All right, People's 22, 23 and 24

5          for identification.   I mean 22, 23 and 34.

6                    MR. NELSON:   Correct, Judge.

7                    (Handed to witness.)

8          Q.   Detective, do you recognize People's Exhibit 22, 23

9     and 34 that I just handed to you?

10         A.   Yes.

11         Q.   And what do you recognize those exhibits to be?

12         A.   The photographs of the Smith & Wesson I took at the

13    scene.

14         Q.   And does -- and to be specific, where was the Smith

15    & Wesson located at that time when you took those

16    photographs?

17         A.   Inside the gun box.

18         Q.   And does People's Exhibit 22, 23 and 34 for

19    identification fairly and accurately depict the Smith &

20    Wesson that you placed in the gun box on October 28, 2018?

21         A.   Yes.

22                   MR. NELSON:   Your Honor, I'm asking what has

23         been pre-marked as People's Exhibits 23, 24 and -- I'm

24         sorry, Judge, 22 and 23 and 34 be received into evidence

25         as People's Exhibit 22, People's Exhibit 23 and People's

391

1          Exhibit 34.

2                    THE COURT:  All right.  Let's show them to

3          Ms. Golombek.

4                    (Handed to counsel.)

5                    MS. GOLOMBEK:  May I, your Honor?

6                    THE COURT:  Yes.

7   VOIR DIRE EXAMINATION

8   BY MS. GOLOMBEK:

9          Q.   When you placed, when you placed this, what you

10  indicate is a Smith & Wesson in the gun box, was anybody

11  present with you?

12         A.   No.

13         Q.   Did you take any pictures of you, actually where

14  you can see you placing it in the gun box?

15         A.   No.

16                   MS. GOLOMBEK:  Objection, your Honor.

17                   THE COURT:  Based on what?

18                   MS. GOLOMBEK:  Not a proper foundation, your

19         Honor.

20                   THE COURT:  Overruled.  People's 22, 23 --

21                   MS. GOLOMBEK:  Chain of custody.

22                   THE COURT:  Overruled.  People's 22, 23 and 34

23         are marked in evidence.

24                   (Whereupon, People's Exhibits 22, 23 and 34

25         were received in evidence.)

Kathi A. Fedden, Sr. Court Reporter

392

1              COURT OFFICER:  So marked.

2              MR. NELSON:  Your Honor, I'm now going to be

3         displaying on the screen what is in evidence as People's

4         Exhibit 22.

5    DIRECT EXAMINATION (Cont'd)

6    BY MR. NELSON:

7         Q.    Detective, what is being displayed on the screen as

8    People's Exhibit 22, is that also the photograph that you

9    have in front of you marked as People's Exhibit 22?

10        A.    Yes.

11        Q.    If you can please tell the Court what is depicted

12   in People's Exhibit 22?

13        A.    That's a close-up of the Smith & Wesson handgun.

14        Q.    And where specifically at that time is the Smith &

15   Wesson handgun?

16        A.    In the gun box.

17             MR. NELSON:  Your Honor, I am now publishing

18        what is in evidence as People's Exhibit 23.

19        Q.    Detective, what's being displayed on the screen as

20   People's Exhibit 23, is that the same photograph that you

21   have in front of you also marked as People's Exhibit 23?

22        A.    Yes.

23        Q.    And if you can please tell the Court what's

24   depicted in People's Exhibit 23?

25        A.    That's a close-up of the Smith & Wesson handgun and

Kathi A. Fedden, Sr. Court Reporter

393

1    the magazine that was inside the gun.

2         Q.    Now, Detective, earlier you mentioned that you

3    recovered the Smith & Wesson from Midwood Street.  At that

4    time was the weapon loaded?

5         A.    Yes.

6         Q.    And how could you tell that the Smith & Wesson was

7    loaded?

8         A.    The magazine was in it and when I removed the

9    magazine there were cartridges inside the magazine.

10              MR. NELSON:  Your Honor, I am now publishing

11        on the screen what is in evidence as People's Exhibit

12        34.

13        Q.    Detective, what's being published on the screen as

14   People's Exhibit 34, is that the same photograph that you

15   have in front of you also marked as People's Exhibit 34?

16        A.    Yes, it is.

17        Q.    Can you please tell the Court what's depicted in

18   People's Exhibit 34?

19        A.    That's the serial number of the Smith & Wesson.

20        Q.    And for the record, could you please state the

21   serial number associated with the Smith & Wesson?

22        A.    FWL 6311.

23        Q.    Detective, earlier you mentioned after

24   photographing the Smith & Wesson while it's in the box, what

25   do you do after you photograph it in the box?

1      A.    I then seal the box, date and sign it or initial
2    it.
3                MR. NELSON:   Your Honor, at this time I ask
4       People's Exhibit 29 which is subject to connection be
5       shown to the witness.
6                THE COURT:   All right.
7                (Handed to witness.)
8       Q.    Detective, do you recognize People's Exhibit 29
9    which is subject to connection?
10      A.    Yes.
11      Q.    What is it?
12      A.    This is the box that I put the Smith & Wesson in.
13      Q.    And how do you know that's the box that you put the
14   Smith & Wesson in?
15      A.    There is my handwriting.  On top here it says where
16   it was recovered and the BEAST report.  I also have the bar
17   code from the report I made when I submit it and my initials
18   and the date are on the box.
19      Q.    Detective, what is contained inside People's
20   Exhibit 29?
21      A.    So inside is the handgun that I recovered at the
22   scene.
23      Q.    And what specific handgun are you referring to?
24      A.    The Smith & Wesson.
25      Q.    And is the Smith & Wesson in the same substantial

Kathi A. Fedden, Sr. Court Reporter

395

1    condition as when you recovered it on October 28th of 2018?

2        A.    Yes.

3            MR. NELSON:    I am now moving into evidence

4        what has been marked as People's Exhibit 29 into

5        evidence as People's Exhibit 29.

6            MS. GOLOMBEK:    May I have a short voir dire,

7        your Honor?

8            THE COURT:    Yes.

9    VOIR DIRE EXAMINATION

10   BY MS. GOLOMBEK:

11       Q.    On October 28, 2,000 -- October 28, 2018 you

12   indicated that you did a walk through and located the Smith &

13   Wesson that you indicate is in the box, correct?

14       A.    Yes.

15       Q.    Prior to your arriving there at 2:20 a.m., you

16   didn't see who else touched that Smith & Wesson, did you?

17       A.    No.

18       Q.    You didn't see who placed it there, did you?

19       A.    No.

20       Q.    You didn't see if that was placed there that day or

21   a month ago, correct?

22       A.    Correct.

23       Q.    You didn't see if it was placed that day or a year

24   ago, correct?

25       A.    Correct.

396

1       Q.    You have no idea where that came from, correct?

2       A.    Correct.

3       Q.    You have no idea what was done to that prior to

4    your placing it in the box, correct?

5       A.    Correct.

6       Q.    When you placed it in the box, did you use your

7    hands?

8       A.    Yes.

9       Q.    Did you have anything on your hands?

10      A.    Gloves.

11           MS. GOLOMBEK:  Your Honor, I'm going to

12    object.  There is not a proper chain of custody, your

13    Honor.

14           THE COURT:  Overruled.  People's 29 is

15    admitted into evidence.

16           (Whereupon, People's Exhibit 29 was received

17    in evidence.)

18           THE REPORTER:  Judge, this is already in

19    evidence.

20           THE COURT:  I admitted it into evidence

21    subject to connection.

22           Just so everybody knows, 29 was already marked

23    into evidence.  It was marked into evidence subject to

24    connection.  The connection has obviously been made so

25    there is no reason to take it out of evidence.

Kathi A. Fedden, Sr. Court Reporter

397

1   DIRECT EXAMINATION (Cont'd)

2   BY MR. NELSON:

3       Q.   Detective, you also mentioned in connection with

4   the Smith & Wesson that there was a magazine?

5       A.   Yes.

6       Q.   What, if anything, did you do with the magazine?

7       A.   So the magazine was removed from the Smith & Wesson

8   and then I also send that over to the lab for testing in the

9   same box as the Smith & Wesson.

10      Q.   And at that time that you removed the magazine, was

11  it loaded?

12      A.   Yes, there were cartridges in the magazine.

13      Q.   At any point with respect to the magazine, did you

14  remove the cartridges from the magazine?

15      A.   No, I did not.

16           MR. NELSON:   People's Exhibit 29 can be

17      removed from the witness at this time.

18      Q.   Detective, you also mentioned you recovered a

19  second firearm.   Where did you recover that second firearm

20  from?

21      A.   That was on the rear of 20 Meriam.

22      Q.   And again, is that in Hempstead, New York?

23      A.   Yes.

24      Q.   And what firearm did you recover from the rear of

25  20 Meriam?

Kathi A. Fedden, Sr. Court Reporter

398

```
 1         A.    That was the Georgia Czech gun.

 2         Q.    And when did you first observe the Georgia

 3    Czechoslovakian handgun?

 4         A.    During my initial walk through.

 5         Q.    And when you observed it during your walk through,

 6    what, if any, characteristics did you observe of that gun?

 7         A.    It was in the rear of 20 laying on the grass.

 8              MR. NELSON:  Your Honor, I am handing to the

 9         witness what is in evidence as People's Exhibit 8.

10              THE COURT:  All right.

11              (Handed to witness.)

12         Q.    Detective, do you recognize People's Exhibit 8?

13         A.    Yes, that's a photograph of the scene that I took.

14         Q.    And it's a photograph of what?

15         A.    Of the Czech gun.

16         Q.    And when you say Czech gun, you are referring to

17    the Czechoslovakian gun?

18         A.    Yes.

19              MR. NELSON:  Your Honor, I'm now publishing

20         what's in evidence as People's Exhibit 8.

21         Q.    Detective, just to confirm, the photograph that I

22    handed to you also marked as People's Exhibit 8, is that what

23    is depicted on the screen?

24         A.    Yes.

25         Q.    If you can please tell the Court what is depicted
```

1  in People's Exhibit 8?

2      A.    Sure.    At marker two at the corner of marker two is

3  a picture of the Georgia Czechoslovakian gun.

4      Q.    And to be more specific, is it to the right of

5  marker two --

6      A.    Yes.

7      Q.    -- that you are referring to?

8          And after you photographed this Czechoslovakian

9  handgun, what, if anything, did you do?

10     A.    I then recovered it, put it in a gun box and

11  photograph it.

12     Q.    And when you recovered it, what, if anything, did

13  you observe at that point with the gun?

14     A.    When I went to make it safe to put it in the gun

15  box, I took the magazine out of it.

16     Q.    And did you observe -- what, if anything, did you

17  observe with the magazine?

18     A.    The magazine was empty and so was the chamber.

19     Q.    And at the point then when you put it in the box,

20  what, if anything, did you do?

21     A.    I then remove it, photograph it and I would seal

22  the box and send it for testing.

23          MR. NELSON:    Your Honor, I have in my hand

24      what has been pre-marked for identification the

25      following exhibits:    People's Exhibit 24, People's

Kathi A. Fedden, Sr. Court Reporter

400

1          Exhibit 25, People's Exhibit 26, People's Exhibit 35 and

2          also People's Exhibit 36.  I am now handing those

3          exhibits to the witness.

4                    THE COURT:  All right.

5                    (Handed to witness.)

6          Q.    Detective, have you reviewed those exhibits?

7          A.    Yes.

8          Q.    Do you recognize again the exhibits, People's

9     Exhibits 24, 25, 26, 35 and 36?

10         A.    Yes, those are the photographs that I took of the

11    Georgia Czechoslovakian gun.

12         Q.    And at what point did you take those photographs?

13         A.    After I collected them and put them in the gun box.

14         Q.    And do those photographs fairly and accurately

15    depict the Georgia Czechoslovakian handgun that you placed in

16    the box on October 28th of 2018?

17         A.    Yes.

18                    MR. NELSON:  Your Honor, I'm asking at this

19          time that what has been pre-marked as People's Exhibits

20          24, 25, 26 and 35 and 36 be received into evidence as,

21          again, Judge, People's Exhibits 24, 25, 26, 35 and 36.

22                    THE COURT:  All right.

23                    Is there a fifth photograph there because I

24          only see four?

25                    THE WITNESS:  There is.

                    Kathi A. Fedden, Sr. Court Reporter

```
 1                    THE COURT:  Let's show them to Ms. Golombek.
 2                    (Handed to counsel.)
 3    VOIR DIRE EXAMINATION
 4    BY MS. GOLOMBEK:
 5         Q.   Did you place this item in the box?
 6         A.   Yes.
 7         Q.   Was anybody with you at the time you placed it in
 8    the box?
 9         A.   No.
10         Q.   Do you have any photographs showing you actually
11    placing it in the box?
12         A.   No.
13         Q.   Do you know if anybody touched this prior --
14    touched this item prior to you arriving at the scene on
15    October 18, 2018 [sic]?
16         A.   No.
17         Q.   October 28, 2018 at 2:20?
18         A.   No.
19         Q.   And you don't know when the item was left there,
20    correct?
21         A.   Correct.
22         Q.   And you didn't see anybody place it there, correct?
23         A.   Correct.
24         Q.   And you didn't see what was done to this item prior
25    to your placing it in the box, correct?
```

Kathi A. Fedden, Sr. Court Reporter

402

```
 1        A.    Correct.

 2                   MS. GOLOMBEK:  Objection, your Honor.

 3                   THE COURT:  Overruled.  People's 24, 25, 26,

 4        35 and 36 are admitted into evidence.

 5                   (Whereupon, People's Exhibits 24, 25, 26, 35

 6        and 36 were received in evidence.)

 7                   COURT OFFICER:  So marked.

 8                   THE COURT:  Do you want them shown back to the

 9        witness, Mr. Nelson?

10                   MR. NELSON:  Yes, Judge.

11                   (Handed to witness.)

12                   MR. NELSON:  Your Honor, may I publish

13        People's Exhibit 24?

14                   THE COURT:  Yes.

15                   MR. NELSON:  Thank you, Judge.

16   DIRECT EXAMINATION (Cont'd)

17   BY MR. NELSON:

18        Q.    Detective, what's depicted on the screen as

19   People's Exhibit 24, is that a photograph that you have in

20   your hand also marked as People's Exhibit 24?

21        A.    Yes, it is.

22        Q.    Please tell the Court what is depicted in People's

23   Exhibit 24?

24        A.    It's the Georgia Czechoslovakian gun that I placed

25   in the gun box.
```

Kathi A. Fedden, Sr. Court Reporter

403

1      Q.    Detective, if you can please look at the

2   photograph --

3                  MR. NELSON:   I apologize, Judge.  What's being

4         displayed on the screen now is People's Exhibit 26.

5         Q.    Detective, if you can please look at People's

6   Exhibit 26, what's in your hand, and does it match what's

7   displayed on the screen?

8         A.    Yes, it does.

9         Q.    Can you please tell the Court what's depicted in

10  People's 26?

11        A.    It's the Georgia Czechoslovakian gun with the

12  magazine removed.

13                 MR. NELSON:   Your Honor, I now ask to publish

14        People's Exhibit 35.

15        Q.    Withdraw my last question.  I apologize, Detective.

16               If you can please state again for the record what's

17  depicted in People's Exhibit 26?

18        A.    Twenty six is the Georgia Czechoslovakian gun with

19  the magazine removed.

20        Q.    And at that time with the magazine removed, is

21  there any ammunition contained within the magazine?

22        A.    No, there is not.

23                 MR. NELSON:   I would now like to display

24        what's in evidence as People's Exhibit 35.

25        Q.    Detective, does People's Exhibit 35 on the screen

Kathi A. Fedden, Sr. Court Reporter

404

1  match the photograph in your hand?

2  A.  Yes, it does.

3  Q.  And could you please tell the Court what's depicted

4  specifically in this photograph?

5  A.  Sure.  This is also a picture of the Georgia

6  Czechoslovakian gun.  It also states the name right above the

7  trigger that says it is the Georgia Czechoslovakian gun and

8  the caliber is 7.62 x 25.

9  Q.  Sure.  And, Detective, if you wouldn't mind and if

10  your Honor wouldn't mind handing the detective the pointer so

11  she can point out specifically where she is reading from.

12  THE COURT:  Sure.

13  MR. NELSON:  Thank you, Judge.

14  Q.  Detective, using the pointer, please describe

15  what's depicted with again this exhibit?

16  A.  Right above the trigger here it says Georgia.  To

17  the right of it by the trigger guard it says Czech and then

18  down here underneath the Georgia it says the caliber right

19  there (indicating).

20  Q.  What caliber does it state on this gun?

21  A.  7.62 x 25.

22  Q.  Thank you, Detective, you can have a seat.

23  Again, Detective, after you photographed the Czech

24  handgun that's contained in the box, what did you do next

25  with respect to the handgun?  After you photographed the

Kathi A. Fedden, Sr. Court Reporter

1    Czech handgun, what did you do with respect to your

2    investigation next?

3         A.    I then seal it and I sent it off for testing.

4         Q.    Where do you seal the handgun?

5         A.    On the gun box I put the tape, I initial it and

6    date it.

7                   MR. NELSON:   Your Honor, I'm handing to the

8              witness what's in evidence subject to connection

9              People's Exhibit 30.

10                   THE COURT:   All right, People's 30.

11                   (Handed to witness.)

12        Q.    Detective, have you reviewed People's Exhibit 30?

13        A.    Yes.

14        Q.    Do you recognize it?

15        A.    Yes, it's the box that I submitted with the

16   Czechoslovakian gun for testing.

17        Q.    And how do you know that's the box with the Czech

18   handgun that you submitted for testing?

19        A.    It has my writing on the front, the address and the

20   bar code.

21        Q.    And your handwriting on the front and the bar code

22   evidence label, where is that located?

23        A.    On the left-hand side of the box is the barcode and

24   on the right-hand side is the address with my writing on it.

25        Q.    If you can open People's Exhibit 30 and please tell

406

1    the Court what is inside.

2        A.    The Czechoslovakian gun and the magazines inside

3    the box.

4        Q.    How do you recognize the Czech handgun that is

5    inside the box?

6        A.    It's the gun that I photographed and recovered from

7    the scene.

8        Q.    And is People's Exhibit 30 in the same substantial

9    condition as when you recovered the Czech handgun on October

10   28th of 2018?

11       A.    Yes, it is.

12             MR. NELSON:    Your Honor, I am now asking to

13        move into evidence what has been subject to connection

14        People's Exhibit 30.

15             MS. GOLOMBEK:    May I?

16             THE COURT:    It's already in evidence.    It was

17        just marked in evidence subject to connection,

18        Ms. Golombek.    If you want to ask a couple of questions.

19             MS. GOLOMBEK:    Yes, Judge, I'm going to ask

20        connection questions.

21             THE COURT:    All right.

22   VOIR DIRE EXAMINATION

23   BY MS. GOLOMBEK:

24       Q.    You didn't see who placed what's in that box where

25   you located it, correct?

1      A.   Correct.

2      Q.   And when you sealed it and gave it for testing, who

3 did you give it to for testing?

4      A.   I submit it to our laboratory for testing.

5      Q.   Did you submit it to any particular person?

6      A.   No.

7      Q.   So you don't know where it went to, correct?

8      A.   I do not.

9      Q.   And you didn't see from where it came, correct?

10     A.   Where it came?

11     Q.   Where the item you recovered in the grass came

12 from.

13     A.   Correct.

14          MS. GOLOMBEK:  Objection, your Honor.

15          THE COURT:  All right, overruled.  What was

16     previously marked as People's Exhibit 30 in evidence

17     subject to connection has been connected to the facts in

18     this case and, accordingly, it's fully marked in

19     evidence.

20          MR. NELSON:  Your Honor, if People's Exhibit

21     30 can be removed from the witness.

22          THE COURT:  All right.

23 DIRECT EXAMINATION (Cont'd)

24 BY MR. NELSON:

25     Q.   Detective, what, if anything, or what, if any,

408

1    other evidence did you observe on your walk through that you

2    previously described?

3         A.    There were five casings also recovered.

4              MS. GOLOMBEK:   Excuse me, I didn't hear if you

5         had said fire casings.

6              THE WITNESS:   Five casings.

7              MS. GOLOMBEK:   Number five you said?

8              THE WITNESS:   Number five.

9         Q.    Where did you observe those casings?

10        A.    So three of the casings were on Midwood and two of

11   the casings were around the block.

12        Q.    When you say around the block, where specifically?

13        A.    On Clinton in front of the BP.

14        Q.    And I would like to talk to you about the casings

15   that you recovered on Midwood first.

16             What, if anything, did you do with respect to the

17   casings on Midwood in the course of your investigation?

18        A.    So I put markers down and then I photograph their

19   location and then after I photograph them I collected them

20   and sent them off for further testing.

21        Q.    When you say markers, what do you mean?

22        A.    Yellow cones just as visual aids for the

23   photographs.

24        Q.    After you place the markers down, what, if

25   anything, do you do?

                    Kathi A. Fedden, Sr. Court Reporter

                                                              409

```
 1          A.    I then do close-up photographs of the casings.

 2                MR. NELSON:  Your Honor, I have in my hand

 3     what has been pre-marked as People's Exhibits 11 --

 4     actually, one second, Judge.  Let me put them in

 5     numerical order.

 6                I have in my hand what's been pre-marked as

 7     People's Exhibits 10, 11, 17, 18, and 19 for

 8     identification and I'm handing these exhibits to the

 9     witness.

10                THE COURT:  All right.

11                (Handed to witness.)

12          Q.    Detective, do you recognize -- have you had a

13     chance to review the exhibits that were handed up to you?

14          A.    Yes.

15          Q.    And do you recognize those exhibits?

16          A.    Yes, they are photographs I took of the scene that

17     night.

18          Q.    And specifically where were those photographs taken

19     by you?

20          A.    On Midwood Street.

21          Q.    And what is contained in those photographs?

22          A.    Three casings at markers one, two and three.

23          Q.    And do those exhibits fairly and accurately depict

24     the photographs that you took on Midwood Street of the

25     casings?
```

410

1          A.    Yes.

2                     MR. NELSON:  Your Honor, at this time I would

3          ask that those exhibits for identification be received

4          into evidence.

5                     THE COURT:  All right, let's show them to

6          Ms. Golombek.

7                     (Handed to counsel.)

8                     MS. GOLOMBEK:  Have they been offered for

9          evidence yet, Judge?

10                    THE COURT:  Yes.

11                    MS. GOLOMBEK:  May I?

12                    THE COURT:  Yes.

13    VOIR DIRE EXAMINATION

14    BY MS. GOLOMBEK:

15         Q.    You didn't see who placed those casings there, did

16    you?

17         A.    No.

18         Q.    Did anybody photograph you placing the cones down

19    and taking the photographs?

20         A.    No.

21         Q.    Did anybody photograph you placing the markers down

22    and taking the photograph?

23         A.    No.

24         Q.    You didn't see when those casings were placed

25    there, correct?

Kathi A. Fedden, Sr. Court Reporter

411

1        A.    Correct.

2        Q.    You don't know whether those casings were placed

3    there that day or a month ago, correct?

4        A.    Correct.

5        Q.    You don't even know whether they were placed there

6    a few years ago, correct?

7        A.    Correct.

8             MS. GOLOMBEK:   Objection, your Honor.

9             THE COURT:   Your objection is overruled.

10    People's 10, 11, 17, 18 and 19 are marked in evidence.

11             (Whereupon, People's Exhibits 10, 11, 17, 18

12         and 19 were received in evidence.)

13             COURT OFFICER:   So marked.

14             MR. NELSON:   Judge, I apologize I'm handing

15         what's already in evidence as People's Exhibit 13 to the

16         witness as well with the other photos.

17             THE COURT:   All right.

18    DIRECT EXAMINATION (Cont'd)

19    BY MR. NELSON:

20        Q.    Detective, with respect to just People's Exhibit

21    13, do you recognize it?

22        A.    Yes, it's a photograph I took that night.

23        Q.    And displaying on the screen now what's in evidence

24    as People's Exhibit 13, is that the same photograph that you

25    have in your hand?


                    Kathi A. Fedden, Sr. Court Reporter

1      A.    Yes.

2         Q.    And could you please tell the Court what's depicted

3    in People's Exhibit 13?

4      A.    That's Midway Street [sic] with a yellow cones

5    number one, two and three.

6         Q.    And if you can -- what street was that?

7      A.    Midwood.

8         Q.    And I apologize, how many cones are depicted in

9    this photograph?

10     A.    Three cones.

11        Q.    And what do those cones mean with respect to your

12   investigation?

13     A.    That's where the casings are located.

14            MR. NELSON:    I would ask what has been

15      received into evidence as People's Exhibit 17 be

16      published.

17        Q.    Detective, do you recognize what's on the screen as

18   People's Exhibit 17?

19     A.    Yes.

20        Q.    And does that match the photograph Exhibit 17 in

21   your hand?

22     A.    Yes.

23        Q.    Could you please tell the Court what's depicted in

24   this exhibit?

25     A.    That's a casing at cone number one.

Kathi A. Fedden, Sr. Court Reporter

413

1    Q.    And where was that photograph -- withdrawn.

2          Where was that casing found in the course of your

3    investigation?

4    A.    On Midwood Street.

5          MR. NELSON:   I'm asking what's in evidence as

6    People's Exhibit 18 be displayed.

7    Q.    Detective, what's being displayed as People's

8    Exhibit 18, does that match the Exhibit 18 in your hand?

9    A.    Yes, it does.

10   Q.    If you can please tell the Court what's depicted in

11   this photograph?

12   A.    That's a casing found at yellow cone number two.

13   Q.    Where was that casing found?

14   A.    On Midwood Street.

15         MR. NELSON:   I would ask for People's Exhibit

16   19 to be published on the screen.

17   Q.    Detective, does People's Exhibit 19 on the screen

18   match People's Exhibit 19 in your hand?

19   A.    Yes.

20   Q.    And again, if you can tell the Court what's being

21   displayed in this picture?

22   A.    That's a casing I found on Midwood at cone number

23   three.

24   Q.    Now, Detective, you also mentioned that you

25   recovered two additional casings.  Again, where did you

1    recover those two casings from?

2        A.    From the BP gas station on Clinton.

3        Q.    And with respect to those casings near the BP gas

4    station on Clinton, what, if anything, did you do in the

5    course of your investigation?

6        A.    I put markers four and five down and photographed

7    them.

8        Q.    And what did you photograph?

9        A.    The casing.

10            MR. NELSON:   Judge, I have exhibits that have

11        been pre-marked for identification as People's Exhibit

12        14, 15, 16, 20 and 21.   I'm going to ask these exhibits

13        be shown to the witness.

14            THE COURT:   All right.

15            (Handed to witness.)

16        Q.    Detective, I just ask you review those exhibits and

17    look up when you are done.

18            Detective, have you reviewed People's Exhibits 14,

19    15, 16, 20 and 21 for identification?

20        A.    Yes.

21        Q.    Do you recognize them?

22        A.    Yes, those are the photographs I took at the scene.

23        Q.    And again, specifically, what scene are you

24    referring to that were taken, those photographs?

25        A.    The BP gas station on Clinton Street.

Kathi A. Fedden, Sr. Court Reporter

415



1    Q.    And do those photographs fairly and accurately --

2    withdrawn.

3         What was the purpose of those photographs?

4    A.    To document the scene and show where the evidence

5    was collected.

6    Q.    And again, those photographs, what evidence are you

7    referring to?

8    A.    The two casings I found at yellow cone four and

9    five.

10   Q.    And do People's Exhibits 14, 15, 16, 20 and 21,

11   fairly and accurately depict the casings that you found on

12   Clinton Street near the BP gas station on October 28, 2018?

13   A.    Yes.

14            MR. NELSON:    Your Honor, at this time I would

15         ask that what has been pre-marked as People's Exhibits

16         14, 15, 16, 20 and 21 for identification be received

17         into evidence as same.

18            THE COURT:    All right.    Let's show them to

19         Ms. Golombek.

20                 (Handed to counsel.)

21            MS. GOLOMBEK:    May I, your Honor?

22            THE COURT:    Yes.

23   VOIR DIRE EXAMINATION

24   BY MS. GOLOMBEK:

25   Q.    With regard to what's been marked as People's

416

```
 1   number 20 and 21, did you see who placed those bullet casings
 2   there?
 3        A.   I did not.
 4        Q.   And you have no idea when they were placed there,
 5   correct?
 6        A.   Correct.
 7        Q.   And did anybody photograph you placing the cones
 8   there?
 9        A.   No.
10        Q.   Did anybody photograph you placing the cones by
11   what's been marked as People's number 15 and 16?
12      . A.   No.
13        Q.   Was anybody present when you photographed this?
14        A.   No.
15        Q.   Was anybody present when you photographed what's in
16   item number 14 by the BP gas station?
17        A.   No.
18             MS. GOLOMBEK:  Objection, your Honor.
19             THE COURT:  Overruled.  People's 14, 15, 16
20        and 20 and 21 will be marked in evidence.
21             (Whereupon, People's Exhibits 14, 15, 16, 20
22        and 21 were received in evidence.)
23             COURT OFFICER:  So marked.
24             MR. NELSON:  Your Honor, I am publishing now
25        what's in evidence as People's Exhibit 14.
```

Kathi A. Fedden, Sr. Court Reporter

417

1   DIRECT EXAMINATION (Cont'd)

2   BY MR. NELSON:

3       Q.   Detective, does what's being displayed as People's

4   Exhibit 14 match what's in your hand as marked what's

5   People's Exhibit 14?

6       A.   Yes.

7       Q.   What does People's Exhibit 14 depict?

8       A.   That is the front of the BP gas station on Clinton

9   with yellow cones number four and five.

10      Q.   Could you please point out on the screen where the

11  yellow cones four and five are located within that

12  photograph?

13      A.   Here is four and here is five (indicating).

14           MR. NELSON:   May the record reflect that the

15  witness has identified cone four on the lower right-hand

16  portion of the photograph and then to the left of cone

17  four is cone five, again to the lower portion of the

18  photograph.

19           THE COURT:   All right.

20           MR. NELSON:   Your Honor, I'm now going to

21  publish what's in evidence as People's Exhibit 20.

22      Q.   Detective, what's being published on the screen as

23  People's Exhibit 20, does that match the People's Exhibit 20

24  that you have located in the witness box with you?

25      A.   Yes.

Kathi A. Fedden, Sr. Court Reporter

418

1    Q.    And what is depicted in this photograph?

2    A.    It's a close-up of the casing I found at yellow

3    cone number four.

4    Q.    And again, where was that casing located?

5    A.    On Clinton at the BP gas station.

6    Q.    And publishing now on the screen People's Exhibit

7    21.

8    A.    It's a close-up of the casing I found at yellow

9    cone number five at the BP gas station.

10    Q.    Again for the record, Detective, does what's being

11    published as People's 21 on the screen match People's 21 in

12    your hand?

13    A.    Yes.

14            MR. NELSON:    At this time, Judge, I'm asking

15        what has been marked as People's Exhibit 31 in evidence

16        subject to connection be shown to the witness.

17            THE COURT:    All right.

18            (Handed to witness.)

19    Q.    Detective, please review People's Exhibit 31 and

20    after reviewing it please look up.

21            Detective, have you reviewed People's Exhibit 31?

22    A.    Yes.

23    Q.    Do you recognize People's Exhibit 31?

24    A.    Yes.

25    Q.    What do you recognize it to be?

Kathi A. Fedden, Sr. Court Reporter

419

1        A.    The envelopes that I packed the casings in with my
2    signature and initials and the date.

3        Q.    What casings are you referring to?

4        A.    The casings that I found at yellow cones number one
5    through five.

6        Q.    And I apologize, Detective, but just for clarity
7    purposes, how do you recognize those are the casings that you
8    recovered?

9        A.    My handwriting is on the envelopes and my initials
10   and the date.

11       Q.    And, Detective, are the envelopes contained in the
12   casings in the same or substantial condition as you recovered
13   them and placed them inside on October 28th of 2018?

14       A.    Yes.

15             MR. NELSON:  Your Honor, at this time I ask
16        what has been received into evidence as People's Exhibit
17        31 subject to connection be received.

18             THE COURT:  Ms. Golombek?

19             MS. GOLOMBEK:  May I, your Honor?

20             THE COURT:  Yes.

21             MS. GOLOMBEK:  May I see what's proposed to be
22        marked into evidence, your Honor?

23             THE COURT:  Well, it is marked into evidence.
24        This is whether or not it's subject to connection.

25             MS. GOLOMBEK:  Subject to connection?

```
 1              THE COURT:  Yes.  We'll show it to you.

 2                   (Handed to counsel.)

 3    VOIR DIRE EXAMINATION

 4    BY MS. GOLOMBEK:

 5         Q.   You didn't see who placed the casings that are

 6    contained in this -- that were contained in these envelopes

 7    or that are now contained in these envelopes, you didn't see

 8    who placed those casings on the ground where it was recovered

 9    from, correct?

10         A.   Correct.

11         Q.   And after you sealed this, you sealed this on

12    October 28, 2018?

13         A.   Yes.

14         Q.   You indicated you passed it off to the laboratory?

15         A.   Excuse me?

16         Q.   You then gave it to the laboratory after that?

17         A.   Yes.

18         Q.   Do you have a chain of custody of what happened to

19    this from October 28, 2018 to November 15, 2018?

20                   MR. NELSON:  Objection.

21                   THE COURT:  Sustained.

22                   MS. GOLOMBEK:  Your Honor, objection.  It's

23         not proper connection, your Honor.  They don't know

24         where these casings came from, your Honor.

25                   THE COURT:  Well, they came from the ground at
```

421

1    the scene.

2              MS. GOLOMBEK:   Or who placed them there, your

3        Honor.

4              THE COURT:   The objection is overruled and

5        People's 31 which was already admitted into evidence

6        subject to connection no longer needs a connection.

7              MR. NELSON:   People's Exhibit 31 can be

8        removed from the witness, thank you.

9    DIRECT EXAMINATION (Cont'd)

10   BY MR. NELSON:

11        Q.   Detective, using what's again still published or

12   what can be published as People's Exhibit 20 on the screen.

13   Just for the record, what's being depicted in People's

14   Exhibit 20?

15        A.   That is a casing that is on Clinton at the BP gas

16   station.

17        Q.   And what caliber casing was recovered or is

18   depicted in People's Exhibit 20?

19        A.   7.62 x 25.

20        Q.   And additionally, you recovered an additional four

21   casings between Midwood and Clinton at the BP gas station.

22   What caliber casings were the remaining four casings?

23        A.   The same as that 7.62 x 25.

24              MR. NELSON:   Judge, I am now going to display

25        People's Exhibit 23 which again has already been

 1          received into evidence.

 2          Q.    Detective, People's Exhibit 23, can you please

 3    again tell the Court what's depicted in this photograph?

 4                THE COURT:    It's been asked and answered.

 5          She's already testified what's depicted in 23.

 6                MR. NELSON:    Yes, Judge.

 7          Q.    Specifically with the magazine that is depicted in

 8    Exhibit 23, can you state what is shown with respect to the

 9    magazine?

10          A.    Yes, that's a .40 caliber cartridges in that

11    magazine from the Smith & Wesson.

12          Q.    And can you see a .40 caliber cartridge contained

13    in the magazine?

14          A.    Yes.

15                MR. NELSON:    Judge, lastly, Judge, I would

16          like to just show the witness what has been received

17          into evidence as People's Exhibit 6.

18                (Handed to witness.)

19          Q.    Detective, do you recognize People's Exhibit 6?

20          A.    Yes, that's a photograph I took at 20 Meriam.

21          Q.    And please tell the Court what's depicted in

22    People's Exhibit 6.

23          A.    It's a black jacket that I recovered from the

24    scene.

25                MR. NELSON:    Judge, I have no further

                    Kathi A. Fedden, Sr. Court Reporter

423

1          questions for this witness at this time.

2                    THE COURT:  All right, very good.

3                    Cross-examination, Ms. Golombek?

4                    MS. GOLOMBEK:  Yes, your Honor.

5     CROSS-EXAMINATION

6     BY MS. GOLOMBEK:

7          Q.   Detective Krill, your job on October 28, 2018 was

8     to collect evidence, that was part of your duties, correct?

9          A.   Yes.

10         Q.   And you didn't gather the evidence, correct?  That

11    was evidence that was already found, correct?

12         A.   Correct.

13         Q.   And that is something that somebody else labeled --

14    indicated to you was evidence, correct?

15         A.   Yes.

16         Q.   So you don't know whether the things that you

17    photographed relate to that day or relate to any other day,

18    correct?

19         A.   Correct.

20         Q.   Now as you did this walk through and searched for

21    any so-called evidence, are there any videos of your searches

22    for those guns that were found or bullet casings that were

23    found?

24         A.   No.

25         Q.   So nobody videotaped you, correct?

                    Kathi A. Fedden, Sr. Court Reporter

424



```
 1        A.   Correct.

 2        Q.   And you were walking through with two detectives?

 3        A.   Yes.

 4        Q.   Who were you walking through with?

 5        A.   One detective, Detective Willdig.

 6        Q.   Detective who?

 7        A.   Willdig.

 8        Q.   And he showed you what to collect, correct?

 9        A.   Yes.

10        Q.   He showed you where to go, correct?

11        A.   Yes.

12        Q.   You didn't just search the area and indicate this

13   might be evidence, correct?

14        A.   Well, that's what I do as part of my walk through

15   also.

16        Q.   But this Detective Willdig, he pointed out what he

17   wanted you to put markers by, correct?

18        A.   No.  So he doesn't determine where I put the

19   markers, I determine where I put the markers.

20        Q.   But you put them in relation to what he wants you

21   to place the markers down near.  For example, a bullet

22   casing, if he showed you a bullet casing, you would determine

23   where to place the marker, correct?

24        A.   Correct.

25        Q.   And when you are doing these searches, let me ask
```

Kathi A. Fedden, Sr. Court Reporter

425

1    you, did you find any bullets?

2         A.   No.

3         Q.   So no bullets found from that Georgia

4    Czechoslovakian gun?

5         A.   Not that I recovered, no.

6         Q.   And you searched the whole area, correct?

7         A.   Correct.

8         Q.   And there was nothing at all found, correct?

9         A.   Correct.

10        Q.   So you searched Meriam Street, no bullets, correct?

11        A.   Correct.

12        Q.   And even though there were three casings there,

13   correct, you said?

14        A.   Three casings on Midwood.

15        Q.   So no bullets on Midwood.

16             How about Clinton, any bullets on Clinton?

17        A.   No bullets on Clinton.

18        Q.   But there were two bullet casings right by the BP

19   gas station on the corner of Clinton, correct?

20        A.   Yes.

21        Q.   And no bullets there either, correct?

22        A.   No bullets.

23        Q.   And no bullets in that vicinity, correct?

24        A.   Not that I could locate.

25        Q.   And you searched the area and you did a walk

Kathi A. Fedden, Sr. Court Reporter

426



1    through through the area for quite awhile, correct?

2        A.    Yes.

3        Q.    And no bullets anywhere, correct?

4        A.    Correct.

5        Q.    And you didn't see how -- let's take the bullet

6    casings.  You didn't see how any of the bullet casings got to

7    the BP gas station correct?

8              MR. NELSON:  Objection, Judge; asked and

9        answered.

10             THE COURT:  Overruled.

11       A.    I did not see it.

12       Q.    And these bullet casings that you found in front of

13   BP gas station, did you notice any gunpowder residue on them?

14       A.    No.

15       Q.    How about the bullet casings that you found on

16   Midwood, the three bullet casings, any gunpowder residue on

17   those?

18       A.    Not that I noticed.

19       Q.    So no gunpowder residue at all on any of the bullet

20   casings, correct?

21       A.    Correct.

22       Q.    How about the .40 Smith and caliber Wesson that you

23   recovered on Midwood Street, any gunpowder residue on there?

24       A.    No.

25       Q.    How about the Georgia Czechoslovakian gun that you



1    recovered?  Well, not that you recovered, that you collected

2    on 20 Meriam Street, any gunpowder residue that you observed

3    on there?

4         A.   No.

5         Q.   How about the jacket that you photographed by 20

6    Meriam Street, any gunpowder residue on there?

7         A.   Not that I saw.

8         Q.   And when you placed the cones down by the BP gas

9    station, if there were a video, it would show you placing

10   that down, correct?

11                  MR. NELSON:  Objection, Judge.

12                  THE COURT:  Sustained.

13        Q.   Did you see any video in relation to the BP gas

14   station and you placing cones down there?

15                  MR. NELSON:  Objection, Judge.

16                  THE COURT:  Overruled.

17        A.   I did not see any video.

18        Q.   Are you aware that there is video cameras at the BP

19   gas station on the corner of Clinton and Meriam?

20        A.   Yes.

21        Q.   Did you gather the videos or ascertain whether

22   there were videos there?

23        A.   That's not the part of the evidence that I collect.

24   That would be a separate unit.

25        Q.   But you are aware there are videotapes there,

1    correct?

2                    MR. NELSON:  Objection.

3                    THE COURT:  Overruled.

4        A.    I'm not aware if there is any videotapes or

5    anything there, but there are cameras.

6        Q.    There is video cameras.  As a matter of fact, there

7    are cameras above each of the gas tanks, correct?

8        A.    I wouldn't know that offhand, I would have to look.

9        Q.    And there would also be a camera right by that

10   location, correct?

11                   MR. NELSON:  Objection, Judge.

12                   THE COURT:  Sustained.

13       Q.    Now, when you photographed the Smith & Wesson, the

14   .40 caliber, that was observed on the grass, correct?

15       A.    Yes.

16       Q.    And before you sent this item off for testing, what

17   did you do with this .40 caliber Smith & Wesson?

18       A.    So I put it in the box, I photograph it, I make it

19   safe.  I seal the box, initial it and date it and then I sent

20   it off to our Evidence Management Unit for further testing.

21       Q.    And did you ever see a chain of custody with what

22   happened to the .40 caliber Smith & Wesson?

23                   MR. NELSON:  Objection, Judge.

24                   THE COURT:  Sustained.

25       Q.    Are you aware that somebody tested these items on

1  | November 15, 2018?

2  |           MR. NELSON:  Objection, Judge.

3  |           THE COURT:  Sustained.

4  |     Q.    Did you see what was done with the .40 caliber

5  | Smith & Wesson between October 28, 2018 and November 15,

6  | 2018?

7  |           MR. NELSON:  Objection, Judge.

8  |           THE COURT:  You mean after it left her

9  | possession, Ms. Golombek?

10 |           MS. GOLOMBEK:  Yes.

11 |           MR. NELSON:  Objection to that question.

12 |           THE COURT:  Sustained.

13 |     Q.    And the Czechoslovakian gun, the 7.62 x 25, before

14 | you sent this off for testing, what did you do with this

15 | item?

16 |     A.    I then photograph it in the box after I collect it

17 | and then I make it safe and I sent it in the box after I

18 | taped it, dated it and signed it to our Evidence Management

19 | Unit.

20 |     Q.    And you didn't see what happened to that until it

21 | was tested on November 15, 2018 correct?

22 |           MR. NELSON:  Objection.

23 |           THE COURT:  Overruled.

24 |           Did you ever see that weapon again?

25 |           THE WITNESS:  No.

Kathi A. Fedden, Sr. Court Reporter



1    Q.    So you don't know if proper procedures were taken

2    after it left your possession as to the Georgia Czech 7.62 x

3    25 weapon, correct?

4                MR. NELSON:  Objection, Judge.

5                THE COURT:  Sustained.

6    Q.    Now, on the Smith & Wesson that you placed in the

7    box, People's number 23, it's you who separated the magazine

8    from the Smith & Wesson, correct?

9    A.    Yes.

10   Q.    Did you photograph you taking the magazine out of

11   the Smith & Wesson?

12               MR. NELSON:  Objection, Judge.

13               THE COURT:  Overruled.

14   A.    I photographed the gun before I took the magazine

15   out and after I took the magazine out.

16   Q.    But we don't have a photograph of you taking it

17   apart, do we?

18               MR. NELSON:  Objection, Judge; asked and

19        answered.

20               THE COURT:  Overruled.

21   A.    No.

22   Q.    Let me ask you, you have testified in Court before

23   today?

24   A.    Yes.

25   Q.    How many times have you testified?

1           A.    Hundreds of times.

2           Q.    And every time you testified, that was for the

3    prosecution, correct?

4           A.    Yes.

5           Q.    Are you getting paid for testifying?

6           A.    No.

7           Q.    So you work for the police department, correct?

8           A.    Yes.

9           Q.    And, of course, you're allegiance is to the police

10   department, correct?

11                MR. NELSON:   Objection, Judge.

12                THE COURT:   Overruled.

13          A.    My allegiance is to collect the evidence accurately

14   and depict it properly.

15          Q.    And to also -- you report to the police department,

16   correct?

17          A.    Yes, I work for the police department.

18          Q.    And the police department works with the District

19   Attorney's Office, correct?

20                MR. NELSON:   Objection, Judge.

21                THE COURT:   Sustained.

22          Q.    Now, in item number 29 there are test fires.   Did

23   you place the test fires in what's been marked as People's

24   number 29?

25                THE COURT:   There is 29-A.

Kathi A. Fedden, Sr. Court Reporter

432

1        Q.    In People's number 29-A, did you place the test
2    fires there?
3        A.    No, I did not.
4        Q.    Did you see who placed the test fires there?
5        A.    No.
6        Q.    Did you see what was done to the test fires before
7    they were placed there?
8        A.    No.
9        Q.    Did you see what was done to the bullet casings
10   before you placed them in the envelopes?
11                 MR. NELSON:  Objection, Judge; asked and
12           answered.
13                 THE COURT:  Overruled.
14       A.    No, I did not.
15       Q.    Did you see what, if anything, was done to the
16   weapons before the .40 caliber, before you placed it in the
17   envelope?
18       A.    No.
19       Q.    Did you see what was done to the Czechoslovakian
20   gun before you placed it in the envelope and before you
21   gathered it?
22       A.    No, I did not.
23       Q.    And when you gathered the .40 caliber Smith &
24   Wesson -- well, first of all, you don't handle evidence with
25   your bare hands, do you?

Kathi A. Fedden, Sr. Court Reporter

433

1        A.    No, I do not.

2        Q.    So you indicated that you used gloves, correct?

3        A.    Yes.

4        Q.    Now, you don't know if anybody touched the

5   Czechoslovakian gun prior to -- well, you don't know -- well,

6   you didn't see who touched the Czechoslovakian gun prior to

7   your placing it in the envelope, correct?

8        A.    Correct.

9        Q.    And you didn't see whether anything was done to it

10  prior to your placing it in the envelope, correct?

11       A.    That's correct.

12       Q.    And you don't know whether anybody tampered with it

13  prior to your placing it in the envelope, correct?

14             MR. NELSON:  Objection, Judge.

15             THE COURT:  Overruled.

16       A.    I didn't see anybody handling the weapon before.

17       Q.    And as far as the .40 caliber Smith & Wesson, you

18  didn't see who handled that weapon before you gathered it,

19  correct?

20       A.    Correct.

21       Q.    And you don't know whether that was tampered with,

22  correct?

23       A.    Correct.

24       Q.    And the bullet casings that were -- that you saw on

25  Midwood Street, you didn't see who placed them there,

434

1    correct?

2         A.    That's correct.

3         Q.    And you didn't see if anybody tampered with those

4    bullet casings, did you?

5         A.    I did not.

6         Q.    And the two bullet casings that you found at the BP

7    gas station, you didn't see who placed them there, correct?

8         A.    Correct.

9         Q.    And you didn't see whether anybody tampered with

10   them prior to your receiving them, correct?

11        A.    That's correct.

12        Q.    And, of course, after it left your possession, you

13   didn't see what was done to the bullet casings or if anybody

14   tampered with them, correct?

15                  MR. NELSON:  Objection.

16                  THE COURT:  Overruled.

17        A.    What was the question, I'm sorry?

18        Q.    After they left your possession, the bullet

19   casings --

20        A.    Yeah, I did not.

21        Q.    -- you didn't see whether anybody tampered with it,

22   correct?

23        A.    Correct.

24        Q.    And the Smith & Wesson, you didn't see whether

25   anybody tampered with it after it left your possession,

Kathi A. Fedden, Sr. Court Reporter

435

1      correct?

2                      MR. NELSON:  Objection, Judge.

3                      THE COURT:  Overruled.

4          A.    I did not see.

5          Q.    And the Czechoslovakian gun, you didn't see whether

6      it was -- 7.62 x 25, you didn't see whether anybody tampered

7      with that after it left your possession, correct?

8                      MR. NELSON:  Objection.

9                      THE COURT:  Overruled.

10         A.    I did not see that.

11         Q.    And with respect to the .40 caliber Smith & Wesson,

12     you said you signed it, dated it and sent it off for testing,

13     correct?

14         A.    That's correct.

15         Q.    And you sent it off for testing under case number

16     218CR0055811?

17         A.    Yes.

18         Q.    And you didn't see what happened to that after it

19     left your possession, correct?

20         A.    That's correct.

21         Q.    And the black jacket that you photographed from the

22     rear of 20 Meriam Street, you didn't see who placed it there,

23     correct?

24         A.    That's correct.

25         Q.    And you didn't observe any gunpowder residue on

436



500

1    there, did you?

2         A.    No, I did not.

3              MS. GOLOMBEK:   One moment.

4         Q.    Do you have a chain of custody record with you from

5    October 28, 2018 until November 15, 2018 with regard to the

6    Czechoslovakian handgun?

7              MR. NELSON:   Objection, Judge.

8              THE COURT:   Sustained.

9         Q.    Do you have a chain of custody report from October

10   28th through November 15, 2018 for the .40 caliber Smith &

11   Wesson?

12             MR. NELSON:   Objection.

13             THE COURT:   Sustained.

14             MS. GOLOMBEK:   I have no further questions of

15        this witness at this time.

16             THE COURT:   Thank you.

17             Any redirect, Mr. Nelson?

18             MR. NELSON:   No redirect, Judge.

19             THE COURT:   Thank you very much, Detective.

20        You are excused.  Have a good rest of the day.

21             THE WITNESS:   You too.

22             (Whereupon, the witness was excused.)

23             THE COURT:   We're going to take our lunch

24        break now.  It's 20 after 12 and we will begin again, I

25        do have something at 2:00, so we will be as close to

                   Kathi A. Fedden, Sr. Court Reporter

437

1     2:00 as I can after lunch.  Probably more like 2:15 or

2     2:30 to continue.

3     MR. ROSENBLATT:  Judge, can I bring one thing

4     up at this time?

5     THE COURT:  Yes.

6     MR. ROSENBLATT:  Judge, on October 21st when

7     Maria Rauche testified, ADA Pulaski, that Exhibit 29-A

8     had been received into evidence.  At that time

9     according, to the transcript, it was subject to

10     connection.  I believe that 29-A, based on the

11     transcript, should be received into evidence.  Those

12     were the test fires that Maria Rauche generated, I

13     guess, for lack of a better term, and so I would ask

14     that that item be received in evidence.

15     MS. GOLOMBEK:  Judge, this is highly improper.

16     We don't have a witness on.  He's asking for something

17     to be received in evidence, your Honor.  It has to be

18     done through a witness.  This is not appropriate at all.

19     THE COURT:  Well, the ballistic expert who

20     actually created the test fires which are in 29-A did

21     testify and it was really I guess just subject to

22     connection until somebody could show that those came

23     from a weapon that was in some way relevant to this

24     case.  That was testified to today through Detective

25     Krill.  So that connection was made with regard to that.

438

```
 1        So 29-A, it's in evidence anyway, but it has been
 2    connected to the case.
 3              MR. ROSENBLATT:  Thank you, Judge.
 4              THE COURT:  Have a good lunch, everybody.
 5    I'll see you later.
 6              (A luncheon recess was taken.)
 7              AFTERNOON SESSION
 8              THE CLERK:  For the record, this is a recall
 9    of Indictment number 1934N of 2018, the People versus
10    Duane Costa, continued trial.
11              Appearances, please.
12              MR. ROSENBLATT:  For the People, Assistant
13    District Attorney Jared Rosenblatt.  Good afternoon,
14    Judge.
15              THE COURT:  Good afternoon.
16              MR. NELSON:  And Ryan Nelson.  Good afternoon.
17              THE COURT:  Good afternoon.
18              MS. GOLOMBEK:  Good afternoon, your Honor,
19    Lori Golombek, 114 Old Country Road, Mineola, New York.
20              Your Honor, my client had wanted me to make
21    this application.
22              THE COURT:  I will ask the clerk to make sure
23    Mr. Costa is Mr. Costa for the record.
24              THE CLERK:  Sir, you are Duane Costa?
25              THE DEFENDANT:  Yes.
```

```
 1                 MS. GOLOMBEK:  Yes, Judge, my client feels

 2         he's not getting a fair trial.  He's indicated that he

 3         wanted me to make an application for a mistrial, Judge.

 4         He feels that all the rulings are against him and he

 5         feels that it is not fair to him and he wanted a new

 6         judge.

 7                 THE COURT:  Okay.  Anybody want to be heard on

 8         that?

 9                 MR. ROSENBLATT:  No.

10                 THE COURT:  Your application is denied.

11         Mr. Costa is being given a fair trial.  All the rulings

12         are not against him and that's all I have to say on the

13         issue.  And nothing has occurred in this trial that

14         would engender a mistrial.

15                 So Mr. Rosenblatt, do you want to call your

16         next witness?

17                 MR. ROSENBLATT:  Yes, the People call

18         Detective Niall Bourke.

19   D E T.   N I A L L   B O U R K E, Shield #1396, assigned to

20         the Third Squad of the Nassau County Police

21         Department, having been called as a witness on behalf

22         of the People, having been duly sworn by the Clerk of

23         the Court, was examined and testified as follows:

24                 THE CLERK:  Please state your name with the

25         spelling, your command, shield and your rank, please.
```

Kathi A. Fedden, Sr. Court Reporter

440

1          THE WITNESS:  Niall, N-I-A-L-L, Bourke,

2     B-O-U-R-K-E.  Detective, Nassau County Police

3     Department.  Command is Third Squad.  Shield is 1396.

4               THE COURT:  Mr. Rosenblatt, you may inquire.

5               MR. ROSENBLATT:  Thank you, your Honor.

6     DIRECT EXAMINATION

7     BY MR. ROSENBLATT:

8          Q.   Good afternoon, Detective.

9          A.   Good afternoon.

10         Q.   For how long have you been employed by the Nassau

11    County Police Department?

12         A.   Sixteen years.

13         Q.   And where are you currently assigned?

14         A.   The Third Squad.

15         Q.   For how long have you been assigned to the Third

16    Squad?

17         A.   A little over a year.

18         Q.   Prior to your assignment in the Third Squad, where

19    were you assigned?

20         A.   The Bureau of Special Operations.

21         Q.   For how long were you assigned to the Bureau of

22    Special Operations?

23         A.   Just about five years.

24         Q.   I want to call your attention to October 27th into

25    the early morning hours of October 28, 2018.  Were you

1    working on those days?

2        A.    Yes.

3        Q.    And at approximately 12:45 in the morning on

4    October 28, 2018 what part of Nassau County were you located?

5        A.    I was patrolling in the Village of Hempstead.

6        Q.    Now, did there come a point in time where you were

7    in the vicinity of Clinton Street and Midwood Street in

8    Hempstead?

9        A.    Yes.

10       Q.    And that corner, is that here in the County of

11   Nassau?

12       A.    Yes.

13       Q.    On that date at around that time, were you wearing

14   a uniform or in plainclothes?

15       A.    I was working in plainclothes.

16       Q.    Were you in a marked or unmarked vehicle?

17       A.    Unmarked vehicle.

18       Q.    At approximately 12:45 in the morning, tell the

19   Court what happened.

20       A.    I was involved in an uninvolved car stop

21   investigation on Clinton Street.  I was outside my RMP when I

22   heard gunshots.

23       Q.    And that car stop was unrelated to this case?

24       A.    Correct.

25       Q.    And when you say you were near your said RMP, but

Kathi A. Fedden, Sr. Court Reporter

442

 1   that was an unmarked vehicle, right?

 2       A.   Yes.

 3       Q.   At the time that you heard the gunshots, describe

 4   where you were and where you heard the shots?

 5       A.   I was standing outside of the unmarked police car

 6   on Clinton Street just north of the intersection of Midwood.

 7       Q.   When you heard the gunshots, could you tell where

 8   they were coming from?

 9       A.   No, initially no.

10       Q.   Did there come a point that you believed you could

11   identify the location?

12       A.   Yes.  Shortly thereafter there was an additional

13   gunshot.  At that point I believed they were coming from the

14   south of us.

15       Q.   And when you say south, what street was south of

16   you?

17       A.   The intersection of Midwood and Clinton.

18       Q.   So was Midwood south of you?

19       A.   Correct.

20       Q.   Now you said at the beginning that when you heard

21   gunshots, how many gunshots did you hear first?

22       A.   Two.

23       Q.   And at the time you heard that third gunshot, is

24   that when you realized they were coming from the southbound

25   direction?

443

```
 1          A.    Correct.

 2                MS. GOLOMBEK:   Objection, repeating the

 3          testimony.  We just went through this.

 4                THE COURT:   Overruled.

 5          Q.    What was your answer?

 6          A.    Correct.

 7          Q.    Now, when you realized where these gunshots were

 8     coming from, what did you do?

 9          A.    At that point I started moving southbound.  I

10     observed the defendant who I now know to be Duane Costa.  He

11     was running eastbound on Midwood Street and I began moving

12     southbound.

13          Q.    Let's back up.  When you say at some point you

14     observed the defendant, describe what he was wearing.

15          A.    He was wearing a dark colored jacket, jeans, that's

16     it.

17          Q.    And when you say you observed him, was he

18     running -- in what direction was he running, towards you or

19     away from you?

20          A.    He was on the sidewalk of Midwood Street running

21     eastbound towards Clinton Street.

22          Q.    Meaning running towards you?

23          A.    Correct.

24                MS. GOLOMBEK:   Objection; leading the witness.

25                THE COURT:   Sustained.
```

Kathi A. Fedden, Sr. Court Reporter

1    Q.    When you say that you observed the defendant, prior
2    to October 28th, did you know who he was?

3    A.    No.

4    Q.    As you observed the defendant running towards you,
5    what did you do?

6    A.    Initially I started moving southbound.  My partner
7    that I was working with, Dale Denehy observed him to the
8    right of me.  I began to cross the street towards his
9    direction when I heard him engaging another person on Midwood
10    Street.  He was yelling police commands.

11              MS. GOLOMBEK:  Objection; hearsay.

12              THE COURT:  Overruled.

13              Detective, can you just be specific?  You said
14         moving towards him.  You know, if you can use the names
15         of what you are talking about, it would make it clearer
16         for me and for Ms. Golombek and Mr. Rosenblatt and
17         Mr. Nelson.

18              THE WITNESS:  Sorry.

19    Q.    So let's just back up.  You said that at the time
20    that you are on Clinton Street, correct?

21    A.    Correct.

22    Q.    Where on Clinton Street were you?

23    A.    Our vehicle is on the northbound lanes, so the east
24    side of Clinton Street.

25    Q.    I'm going to hand you -- actually I'm going to hand

1   you what's in evidence as Exhibit 27.

2              (Handed to witness.)

3        Q.   Utilizing that map, can you put an N.B. for your

4   initials as to where you were when you heard the gunshots?

5        A.   Yep.

6              (Indicating.)

7        Q.   By La Hacienda, is that the N.B. that you just

8   made?

9        A.   Yes.

10       Q.   Okay.

11             Now at the time of -- you said you heard the

12  gunshots and you observed the defendant running towards you?

13       A.   Correct.

14       Q.   Where did you go at the time that you heard the

15  gunshots?

16       A.   I initially went towards what would be the

17  northeast corner of Clinton, Midwood.

18       Q.   When you say the northeast corner, is this the

19  northeast corner or is this the northeast corner

20  (indicating)?

21       A.   That, that.

22             MS. GOLOMBEK:  Objection; leading the witness.

23             THE COURT:  Sustained.

24             MR. ROSENBLATT:  I'm not suggesting anything,

25  I'm just asking which is the northeast corner.

Kathi A. Fedden, Sr. Court Reporter

1          Q.    Which is the northeast corner?

2          A.    The corner closest to where I wrote N.B.  Initially

3    I moved.

4                MS. GOLOMBEK:  Judge, instead of him pointing

5          to it.

6                THE COURT:  He is describing it and I can see

7          where he is describing.

8          Q.    As you moved to the northeast corner, what

9    happened?

10         A.    I observed the defendant running towards eastbound

11   on Midwood Street towards Clinton.  I was proceeding towards

12   crossing Midwood Street at which time I heard Officer Dale

13   Denehy verbally engaging with another subject or somebody off

14   view that I could not observe at which point I started to

15   then cross the street towards Officer Dale Denehy who was on

16   the opposite corner of Clinton Street.

17         Q.    And as you observed the defendant running up

18   Midwood towards Clinton, what did you observe the defendant

19   do?

20         A.    He turned the corner at the corner of Clinton.  He

21   then proceeded southbound running on Clinton Street at which

22   time I observed that he was carrying what appeared to be a

23   firearm.  And as he made it into the area of the actual gas

24   station, I saw him point back with a firearm and I heard

25   additional gunshots.



Kathi A. Fedden, Sr. Court Reporter

447





1      Q.    Now, when you say that you observed him fire rounds

2   near the gas station, show us what you observed?

3      A.    He's running southbound away.  He has the firearm,

4   what appeared to be a firearm in his right hand and then his

5   right hand came up over his shoulder back (indicating).

6      Q.    And you are indicating with your arm, right arm

7   extended over your right shoulder?

8      A.    Correct.

9              MS. GOLOMBEK:  Objection to the

10          characterization.

11             THE COURT:  He's creating a record so the

12          record is clear as to what the witness just did.  Do you

13          disagree with what Mr. Rosenblatt has just said the

14          witness just did?

15             MS. GOLOMBEK:  Well, he just said what he did.

16             THE COURT:  Well, he also gestured and, as you

17          know, we have to have a record, so the record was what

18          Mr. Rosenblatt was putting on the record.  If you

19          disagree with the record, then say so, Ms. Golombek.

20             MS. GOLOMBEK:  Yes, Judge.

21      Q.    At the time you saw the defendant extend his arm,

22   what did you hear?

23      A.    I heard additional gunshots.

24      Q.    At that time do you know how many shots you heard?

25      A.    I heard two.

Kathi A. Fedden, Sr. Court Reporter



1    Q.    When you heard the gunshots and the defendant's arm
2    extended, what did you observe him do next?

3    A.    He then continued running southbound on Clinton
4    Avenue.

5    Q.    Now, at the time that you observed the defendant
6    running down Clinton, what did you do?

7    A.    I briefly made a move to go southbound.  Officer
8    Kraemer and Officer Denehy were ahead of me.  They continued
9    the foot pursuit at which time I then turned around, I had an
10   uninvolved individual in my police car.  I responded back to
11   my car and took my car southbound on Clinton.

12   Q.    Now, when you tell the Court that you observed the
13   defendant running towards you back on October 28, 2018, what
14   is the defendant wearing today?

15   A.    He's wearing a blue suit with a red tie and a blue
16   face mask.

17             THE COURT:    All right, the record will reflect
18        that the witness has identified the defendant.

19   Q.    Now, as you got back into your car, where did you
20   go?

21   A.    I traveled southbound on Clinton.

22   Q.    Go ahead, Detective, I apologize.

23   A.    I traveled southbound on Clinton to just south of
24   Meriam Street towards the alleyway.

25   Q.    When you say towards the alleyway, could you tell

Kathi A. Fedden, Sr. Court Reporter

449

```
 1   on that map that's on the television where that alleyway is
 2   located?
 3       A.   It's where the black circle, the end of the black
 4   line, the black circle is.
 5       Q.   When you got to the alleyway on Clinton, what
 6   happened?
 7       A.   I lost sight of the subject when he had turned into
 8   the alley.  I had a brief discussion with Officer Denehy and
 9   Officer Kraemer about entering the alley.
10           MS. GOLOMBEK:  Objection; hearsay.
11           THE COURT:  So far all he said was they had a
12       brief conversation.  He hasn't said anything about what
13       anybody said.
14           MS. GOLOMBEK:  Well, he was just about to say.
15           THE COURT:  Well, let him say it and make your
16       objection and I can strike it.
17           MS. GOLOMBEK:  Then you have heard it, Judge,
18       but okay.
19           THE COURT:  You know --
20           Well, finish your answer and please don't tell
21       us what anybody said to you, okay, Detective.
22       A.   The decision was made to attempt to secure a
23   perimeter on the block and I took my police car and I headed
24   towards Meriam Street.
25       Q.   As you headed to Meriam Street, what happened?
```

450

1    A.    I was traveling westbound on Meriam Street
2    attempting to the secure the north side of the perimeter when
3    I heard yelling outside of my vehicle and I headed towards
4    the west end of Meriam Street and I observed the defendant
5    being taken out of the rear yard into custody.

6    Q.    When you say that you observed the defendant being
7    removed from a rear yard, where was he being removed?

8    A.    It's the property that's on the corner of Meriam
9    and Lafayette.

10    Q.    I'm going to give you back the map and I'm going to
11    hand you what's Exhibit 27 in evidence.  If you can just put
12    a triangle in the area of where you saw the defendant being
13    apprehended.

14    A.    (Indicating.)

15    Q.    You can keep that in front of you for a moment.

16          After you saw the defendant being apprehended by
17    Meriam, did you ultimately conduct a further search?

18    A.    Yes.

19    Q.    Tell the Court what happened.

20    A.    At that point there was firearms outstanding.  We
21    began to search the areas of the route that we observed the
22    subject and at a later time during the search I did observe a
23    firearm in the rear property of 206.  I'm sorry, excuse me.

24          MS. GOLOMBEK:  I'm sorry, what was that
25    answer?

Kathi A. Fedden, Sr. Court Reporter

451

```
 1                    THE WITNESS:  I saw a firearm in the rear of

 2          20 Meriam.

 3                    MS. GOLOMBEK:  Is the witness referring to any

 4          notes?  I see he's looking down.

 5                    THE WITNESS:  I looked at the map and I

 6          recalled I had the house numbers confused.

 7                    MR. ROSENBLATT:  And just for the record,

 8          Judge, the only thing in front of him is Exhibit 27.

 9                    THE COURT:  I know.

10          Q.   Now, you indicated that you observed a firearm at

11     20, in the rear of 20 Meriam.  Describe that firearm that you

12     observed.

13          A.   It is a black handle handgun.

14          Q.   I'm going to hand you what's in evidence as

15     People's Exhibit 5.

16                    (Handed to witness.)

17          Q.   Do you recognize that?

18          A.   Yes.

19          Q.   And I'm also going to hand you now Exhibit 8.

20                    (Handed to witness.)

21          Q.   Do you recognize those two photographs?

22          A.   Yes.

23          Q.   The first one I handed you, Exhibit 5, what is

24     that?

25          A.   That is a photo of the rear yard of 20 Meriam.
```

Kathi A. Fedden, Sr. Court Reporter

1      Q.   And how about the other exhibit, 5 [sic]?

2      A.   That is a zoomed in photo of the firearm that I

3   observed in the rear of 20 Meriam.

4      Q.   Can you just write the number 20 on the map?

5      A.   Where?  That area?

6      Q.   Yeah.

7      A.   (Indicating.)

·8          It's underneath this area foliage.

9      ·Q.   I'm going to put it on the projector.

10          I have in my hands Exhibit 27.  Can you see that?

11      A.   Yeah.

12 .    Q.   And does that -- those markings indicate where you

13   observed the defendant being apprehended and where you

14   observed the firearm as indicated in those photographs?

15      A.   Yes.

16      Q.·   Now, Detective Bourke, at the time that you

17   observed the defendant with his arm extended, could you see a

18   muzzle flash from where you were?

19      A.   I didn't.

20          MS. GOLOMBEK:  Objection; leading the witness.

21      There has been no testimony about muzzle flashes.

22          THE COURT:  Correct.  That's not the reason

23      for a leading question.  I'm going to overrule the

24      objection.

25      A.   I didn't observe a muzzle flash, I just heard the

1 | shots.

2 |     Q.   And at the time that the defendant had his arm

3 | extended, can you describe in what direction was his arm

4 | pointed?

5 |     A.   His arm was pointed northbound up Clinton Street.

6 |     Q.   And who was northbound on Clinton Street?

7 |     A.   Officer Dale Denehy, Officer Kraemer and myself.

8 |          MR. ROSENBLATT:  I have no further questions

9 | of the witness, your Honor.

10 |          THE COURT:  All right, thank you.

11 |          Cross-examination Ms. Golombek?

12 |          MS. GOLOMBEK:  Thank you, Judge, yes.

13 | CROSS-EXAMINATION

14 | BY MS. GOLOMBEK:

15 |     Q.   Detective Bourke, on October 27th into the early

16 | morning hours of October 28th at approximately 12:45 p.m.,

17 | you were working for the Bureau of Special Operations,

18 | correct?

19 |     A.   Yes.

20 |     Q.   Highly specialized unit, correct?

21 |     A.   Highly trained, yes.

22 |     Q.   Yes.

23 |     You had special training for that, correct?

24 |     A.   Yes.

25 |     Q.   So you handled tactical situations like hostage

454

1   situations, correct?

2       A.   Yes.

3       Q.   And you no longer work for BSO, correct?

4       A.   No.

5       Q.   So prior to coming here today did you have an

6   opportunity to review prior testimony of yours?

7       A.   I have seen my grand jury notes -- grand jury

8   minutes.

9       Q.   And you read those grand jury notes, correct?

10      A.   Yes.

11      Q.   And your testimony is based solely on your grand

12  jury notes, correct?

13      A.   No.

14      Q.   Did you have a conversation with ADA Rosenblatt,

15  correct?

16      A.   Yes.

17      Q.   Did he tell you what to say?

18      A.   No.

19      Q.   Now, you testified that you saw a person running on

20  October 28, 2018.  You said it was Duane Costa.  Did you know

21  Duane Costa prior to this day?

22      A.   No.

23      Q.   And at the time you say that Duane Costa was

24  running at 12:45 a.m. or 12:46 a.m., you indicate he was

25  wearing a dark jacket, correct?

Kathi A. Fedden, Sr. Court Reporter

455

1        A.    Correct.

2        Q.    You couldn't see the color of the jacket, correct?

3        A.    It was a black dark colored jacket.

4        Q.    Well, you are saying it's black because you know

5    that a black jacket was recovered, correct?

6        A.    No, it was a black dark colored jacket.

7        Q.    You just know it was dark, correct?

8        A.    No, it was a black dark colored jacket.

9        Q.    You are basing it on what you know was recovered,

10   correct?

11       A.    No, it's based on what I observed.

12       Q.    And was there any specific emblem on that jacket?

13       A.    I don't know.

14       Q.    Let me ask you, when you saw this person running

15   you had a subject that you were with, correct, in your

16   vehicle?

17       A.    I'm sorry?

18       Q.    You were stopping another vehicle, correct, when

19   you observed this person running, correct?

20       A.    Yes, I was in the middle of a stop.

21       Q.    So you were in the middle of something else,

22   correct?

23       A.    Yes.

24       Q.    And your attention is focused on the stop of

25   another car, correct?

456

1          A.   No.

2          Q.   You weren't looking at the stop of the car you were

3     involved in?

4          A.   The gunshots are what diverted my attention away

5     from my car stop.

6          Q.   Well, you said you heard gunshots, but you are on

7     Clinton and you said you are north of Clinton, correct?

8          A.   Correct.

9          Q.   How many yards north of Clinton are you?

10              THE COURT:   You mean Midwood?

11         Q.   Midwood are you?

12              You are on Clinton?

13         A.   You want it in feet or yards?

14         Q.   How many yards?

15         A.   At the time of the initial gunshots my car stop is

16    I would say approximately 100 or so -- we're doing yards,

17    we're going to do 30 yards.

18         Q.   And you didn't know where the shots were coming

19    from, correct?

20         A.   The initial two, no.

21         Q.   And as a matter of fact, you saw two people -- you

22    saw two people running, correct?

23         A.   No.

24         Q.   When you heard the two gunshots you didn't see

25    anybody running, correct?



1    A.    No.

2        Q.    And you have no idea where the shots came from,

3    correct?

4        A.    You are referring to the initial gunshots?

5        Q.    The initial two gunshots that you said you heard,

6    was it two or was it more?

7        A.    I heard two gunshots initially.

8        Q.    You didn't know where they were coming from,

9    correct?

10       A.    Not initially, no.

11       Q.    So you took your attention off of the subject that

12   was the subject that you were with?

13       A.    Yes.

14       Q.    Was that subject under arrest?

15       A.    Yes.

16       Q.    Was that subject in your police car?

17       A.    Yes.

18       Q.    Was that subject cuffed?

19       A.    Yes.

20       Q.    When you turned your attention away from the

21   subject, who is watching the person in the police car?

22       A.    At that time I was trying to find out if we were

23   being shot at.

24       Q.    Well, you hear shots.  You don't see any shots at

25   that point, the first two shots, correct?

Kathi A. Fedden, Sr. Court Reporter

458

```
1          A.    No, I heard shots.

2          Q.    And you had a subject in your car that you just

3    arrested, correct?

4          A.    Correct.

5          Q.    And you want to take that subject to the precinct,

6    correct?

7          A.    Yes.

8          Q.    And you want to make sure that subject is secure,

9    correct?

10         A.    Correct.

11         Q.    And you are not going to leave that subject alone,

12   are you?

13         A.    Well, when I believe we're being shot at, I have to

14   make sure we're not going to be shot.

15         Q.    So you are going to leave?

16               THE COURT:  Ms. Golombek, let the witness

17         finish answering the question.

18         A.    When I hear gunshots, I'm making sure that we're

19   not being shot at.

20         Q.    Well, then, of course, while you are making sure

21   you are not being shot at, you then leave Officer Denehy with

22   the subject who is under arrest, correct?

23         A.    No, we both --

24         Q.    You don't?

25               THE COURT:  Wait, Ms. Golombek.
```

Kathi A. Fedden, Sr. Court Reporter

459

1              Let me just say this, Mr. Costa.  If you think

2    I am making rulings against you, you are incorrect.  I

3    am making rulings against the way your attorney is

4    asking the questions because there is a court reporter

5    here that takes down everything that is said because

6    there is an accurate record.  If two people are speaking

7    at once, there is no accurate record.  That's why there

8    have been several times I have had to admonish and I

9    have done it also for Mr. Rosenblatt and all the other

10   witnesses that we cannot speak over each other.

11             Ms. Golombek, you have to allow the witness to

12   answer the question before you ask the next question.

13             MS. GOLOMBEK:  Yes, Judge.

14             THE COURT:  So, ask your question.

15   Q.   So, of course, you let Officer Denehy stay with the

16   subject who is under arrest in the car while you investigate,

17   correct?

18   A.   No.

19   Q.   You are telling us you don't do that?

20   A.   I'm sorry?

21   Q.   You don't have anybody watch the subject in your

22   car who is under arrest, is that what you are saying?

23   A.   I don't understand the question.

24   Q.   I'll rephrase it.

25             You leave the subject alone who was under arrest in

460

1    your car?

2        A.   Yes, for the moment.

3        Q.   Well, so it was only for a moment that you see two

4    people running?

5        A.   No.

6        Q.   Well this whole incident that you talk about from

7    the time that you heard the two initial gunshots until the

8    time you go over to the alleyway, that happened really

9    quickly, correct?

10       A.   It was over a period of time.

11       Q.   It was over a very short period of time, correct?

12       A.   I didn't have a watch.  I wasn't -- it was over --

13       Q.   It was a few minutes, correct?

14       A.   Correct.

15       Q.   It was actually less than five minutes, correct?

16       A.   I don't know the exact time from start to finish.

17       Q.   But it was very quick, correct?

18       A.   Right.

19       Q.   And it was dark out, correct?

20       A.   Yes.

21       Q.   Because it's nighttime, correct?

22       A.   Yes.

23       Q.   And when those shots, those two shots, you don't

24    see any shots, those initial two shots, correct?

25       A.   No.

461

1          Q.    And you don't see any bullets at that point going

2     anywhere, do you?

3          A.    No.

4          Q.    Did you ever see any bullets fly by anybody's head?

5          A.    No.

6          Q.    So let me get this straight, you hear shots and you

7     don't see any bullets at all, correct, flying by anybody's

8     head, correct?

9          A.    Nope.

10         Q.    How about do you see any bullets on the ground?

11         A.    No.

12               Are you referring to the first two shots?

13         Q.    The first two shots, yeah, you see any bullets on

14    the ground at all?

15         A.    No.

16         Q.    And those first two shots, you don't see any

17    muzzles, correct, muzzle flashes, correct?

18         A.    No.

19         Q.    So you don't even know whether it's in your area or

20    several miles away, correct?

21         A.    I could tell from the sound that they were in our

22    immediate vicinity.

23         Q.    Well, your immediate vicinity could be a vicinity

24    of about 20, 30 blocks, correct?

25         A.    I would say no.

Kathi A. Fedden, Sr. Court Reporter

1        Q.    But you are not sure, are you?

2        A.    I believed it to be in our immediate vicinity.

3        Q.    So both you and Officer Denehy leave the subject

4    who is in the car, who is in the police car, correct?

5        A.    Correct.

6        Q.    And you don't know how long you are going to be

7    gone for, correct?  When you are looking to where the shots

8    came from, you don't know how long you are going to go for,

9    do you?

10       A.    At that point I'm in the immediate vicinity of that

11   intersection with my police car.

12       Q.    But you don't -- you radio for any assistance at

13   that point?

14       A.    At some point.  I don't recall --

15       Q.    Well, not some point.

16             MR. ROSENBLATT:  Objection, Judge, the witness

17        is in the middle of an answer.

18             MS. GOLOMBEK:  Well, it's not responsive,

19        Judge.

20             THE COURT:  All right.  I'm going to sustain

21        the objection but allow the witness to complete the

22        answer.

23       A.    At some point I radioed that there were shots fired

24   on Clinton.  I don't recall when in the transpiring of

25   events.

1            MS. GOLOMBEK:  I move to strike as

2       unresponsive.  The question dealt with when you heard

3       the two shots, did you radio for police.  My question

4       was very specific, Judge.

5            THE COURT:  I agree, Ms. Golombek, and

6       accordingly your objection is sustained and that answer

7       to that question will be stricken from the record.

8       Q.   Now, at the point you heard the first two shots, do

9  you radio for any assistance?

10      A.   I don't recall when I radioed for assistance.

11      Q.   So you are afraid somebody could be shooting at

12 you, you don't know where it's coming from, you don't -- on

13 those first two shots -- and you are telling us you don't

14 radio for any assistance at that point, correct?

15           MR. ROSENBLATT:  Objection.

16      A.   Nope.

17           THE COURT:  Overruled.

18      Q.   Now, after you hear the first two shots and you

19 look around, you still don't know where those first two shots

20 came from, correct?

21      A.   Correct.

22      Q.   And then you indicate there is an additional

23 gunshot, correct?

24      A.   Correct.

25      Q.   Well, is your flashlight out at this point?

Kathi A. Fedden, Sr. Court Reporter

464

1      A.    I don't recall.

2      Q.    Do you have a flashlight on you?

3      A.    In my normal course of business, I don't recall if

4   I had it on me at that moment.

5      Q.    How about your partner, Officer Denehy, does he

6   have his flashlight out at this point?

7      A.    I don't recall.

8      Q.    So aren't both of you looking to see where the

9   shots came from?

10      A.    Yes.

11      Q.    And you don't recall if either one of you has your

12   flashlight out?

13      A.    I don't recall.

14      Q.    You have your gun out?

15      A.    Yes.

16      Q.    Do you shoot your gun at all at this point after

17   you hear the first two shots?

18      A.    No.

19      Q.    How about you hear a second shot, do you shoot your

20   gun at that point?

21      A.    No.

22      Q.    Well, when you hear the additional gunshots, you

23   indicate the additional gunshot you believed was south of

24   you, correct?

25      A.    Correct.



Kathi A. Fedden, Sr. Court Reporter

465



1     Q.   Now this additional gunshot, you didn't see where

2   that gunshot came from, correct?

3     A.   No.

4     Q.   You didn't see any flash at that point, did you?

5     A.   No.

6     Q.   You indicate you moved southbound.  How far from

7   your initial location do you move when you indicate you saw

8   two people running?

9     A.   I don't think I ever indicated I saw two people

10  running.

11    Q.   Well, do you see two people while you are on

12  Clinton Street?

13            MR. ROSENBLATT:  Objection.  As to when?

14            MS. GOLOMBEK:  I'll rephrase that.  That's

15        perfectly fine.

16            THE COURT:  All right.

17    Q.   When you are on Clinton Street and hear this third

18  shot, do you see two people running at that point?

19    A.   No.

20    Q.   So at the time you hear the third shot, do you

21  radio for assistance at that point?

22    A.   I don't recall when in the event I radioed for

23  assistance.

24    Q.   Well, do you hear your partner radio for assistance

25  when you hear this third shot?

Kathi A. Fedden, Sr. Court Reporter

4 66

1        A.    I don't recall.  I radioed for assistance.  I don't

2    recall when exactly in the event.

3        Q.    You hear this third shot, you see any bullets fly

4    by anybody's head?

5        A.    No.

6        Q.    Any other persons around when you hear this third

7    shot?  The area that you are in, any other persons around

8    other than the person you have secured in your police car?

9        A.    There was a passenger in the investigation we were

10   involved in.

11       Q.    Any other persons on the street?

12       A.    There was I believe somebody at a gas station

13   working on a car.

14       Q.    Do you go over to that person who was in the gas

15   station?

16       A.    I never had an opportunity to.

17       Q.    Do you interview that person?

18       A.    Nope.

19       Q.    Well, that person could be a witness, correct?

20               MR. ROSENBLATT:  Objection.

21               THE COURT:  Sustained.

22       Q.    Does your partner or Officer Denehy go over to that

23   witness?

24       A.    I don't know.

25       Q.    So you hear the additional gunshot.  Where are you

Kathi A. Fedden, Sr. Court Reporter

467

1    located when you indicate that you saw two people running?

2         A.    I don't think I indicated I saw two people running.

3         Q.    Excuse me?

4         A.    I don't think I indicated I saw two people running.

5         Q.    There came a point you saw two people running,

6    correct?

7         A.    No.

8         Q.    You testified in Court on direct that you saw the

9    person that you believed to be Mr. Costa running with

10   somebody behind him, correct?

11        A.    No.  I stated I saw Mr. Costa running and I heard

12   Officer Denehy engaging somebody on Clinton Street.

13        Q.    Did you see the other person running that Officer

14   Denehy was engaged with?

15        A.    No.

16        Q.    How far were you from Officer Denehy when Officer

17   Denehy was engaged with another subject?

18        A.    As he was making those verbal commands, I started

19   to move towards him.

20        Q.    And the verbal commands were, Police, stop,

21   correct?

22        A.    Police, stop.  Police, don't move.

23        Q.    And the verbal commands were towards the subject he

24   was with, correct?

25        A.    I'm sorry?

Kathi A. Fedden, Sr. Court Reporter

468



1    Q.    The verbal commands were towards the subject that

2    he had stopped, correct?

3    A.    Yeah, towards Clinton Street.  He was engaging

4    someone down Clinton Street.

5    Q.    And your attention was focused on that, correct?

6    A.    No.  I was attempting to observe the defendant

7    Costa who was running southbound and I heard Officer Denehy

8    engaging this person on Clinton.

9    Q.    Well, how far, how far was Mr. Costa from where

10   Police Officer Denehy was and Police Officer Denehy -- Police

11   Officer Denehy and the other subject?

12                  MR. ROSENBLATT:  Objection.

13                  THE COURT:  Overruled.

14   A.    I'm sorry, repeat the question one more time.

15   Q.    You said you saw Officer Denehy engaging somebody,

16   correct?

17   A.    I heard him giving verbal commands.

18   Q.    And you saw that Officer Denehy had his gun out,

19   correct?

20   A.    Correct.

21   Q.    And you went over to assist Officer Denehy,

22   correct?

23   A.    Yes, I made my way towards Officer Denehy.

24   Q.    And you were trying to make sure that Officer

25   Denehy was safe, correct?

Kathi A. Fedden, Sr. Court Reporter

469

1      A.    Yes.

2          Q.    And all this time the subject who was in front

3      going southbound was going ahead, was running ahead, correct?

4          A.    Correct.

5          Q.    So you were in between the person you say is

6      Mr. Costa and Officer Denehy and the person he was engaging,

7      correct?

8          A.    I'm sorry, one more time.

9          Q.    Officer Denehy was engaging a person, correct?

10         A.    Yes.

11         Q.    And you were going over and Officer Denehy had his

12     gun drawn at this person, correct?

13         A.    Yes.

14         Q.    And Officer Denehy thought the shots came from this

15     person, correct?

16                   MR. ROSENBLATT:   Objection.

17                   THE COURT:   Sustained.

18         Q.    You believed that the shots came from the person

19     that Officer Denehy was engaging, correct?

20                   MR. ROSENBLATT:   Objection.

21         A.    No.

22                   THE COURT:   Overruled.

23         Q.    You were going over to make sure that Officer

24     Denehy was safe, correct?

25         A.    I was moving towards his side of the street.

Kathi A. Fedden, Sr. Court Reporter





1      Q.    And how far were you from Officer Denehy and the

2    subject?

3                  THE COURT:    When?

4      Q.    At the time Officer Denehy has his gun towards this

5    subject.

6      A.    How far am I from Officer Denehy?

7      Q.    Yeah.

8      A.    Approximately 15 feet behind him.

9      Q.    And you are running towards Officer Denehy,

10   correct?

11     A.    Yeah.

12     Q.    Correct?

13     A.    Yes.

14     Q.    And you are not running after Mr. Costa, are you?

15     A.    No.

16     Q.    Mr. Costa is in front of you, correct?

17     A.    Yes.

18     Q.    Now, as you are running towards Officer Denehy,

19   Officer Denehy is now on Midwood or Clinton?

20     A.    He's on the corner of.

21     Q.    He's on the corner of Clinton, correct?  Corner of

22   Clinton and Midwood, correct?

23     A.    Corner of Clinton and Midwood.

24     Q.    And you indicate Duane Costa is on Clinton,

25   correct?  He's at this point now southbound Clinton and he's



1   turned the corner, correct?

2       A.   He's turned the corner onto southbound Clinton, but

3   ahead of, yeah.

4       Q.   But ahead of you, correct?  Now your back is

5   towards Duane Costa; isn't that correct?

6       A.   No.

7       Q.   When you are running towards Officer Denehy, your

8   back would have to be towards Duane Costa, correct?

9       A.   No.

10      Q.   Well, you indicate Duane Costa is running, correct?

11      A.   Yes.

12      Q.   At the point that you are running towards Officer

13  Denehy and trying to make sure Officer Denehy is safe, you

14  indicate that Duane Costa takes his hand over his head and

15  extends it back, correct?

16      A.   I don't think that's what I indicated, but over his

17  head.

18      Q.   He puts his hand over his head and extends his arm

19  back, correct?

20      A.   He extended his hand back, correct.

21      Q.   And at the same time he was running, correct?

22      A.   Correct.

23      Q.   And you indicate you see him turn back, correct?

24           Do you see Duane Costa turn back?

25      A.   Yes.  I saw him raise his hand and point back.

472

```
 1          Q.   I would like you to show us.

 2               MS. GOLOMBEK:  If I could ask the Court.

 3          Q.   Can you stand up?

 4               THE COURT:  What do you want him to show you?

 5               MS. GOLOMBEK:  I would like him to show us.

 6          Q.   Actually, I will demonstrate.

 7               You indicate that Mr. Costa had his hand back,

 8     correct?

 9          A.   Correct.

10          Q.   And you indicate over his shoulder, correct?

11          A.   Correct.

12          Q.   And you indicate that he is running forward?

13          A.   Correct.

14          Q.   And you indicate he's turning back, correct?

15          A.   Correct.

16          Q.   Are you aware that that's impossible?

17               MR. ROSENBLATT:  Objection.

18               THE COURT:  Sustained.

19          Q.   Have you tried running forward?  I'm going to ask

20     you --

21               MS. GOLOMBEK:  I'm going to ask the Court if

22          he can run forward with his head facing back.

23          Q.   I would like you to demonstrate how you can run,

24     have your arm back and turn your head and run forward?  Can

25     you demonstrate that for us?
```

Kathi A. Fedden, Sr. Court Reporter

473

```
 1                   THE COURT:  No.  Sustained.

 2                   MR. ROSENBLATT:  Objection.

 3      Q.   Now, at the point that you say he is running with

 4   his arm back facing you and Officer -- was he facing you and

 5   Officer Denehy?

 6      A.   Yes.

 7      Q.   And this happened how long, a matter of seconds?

 8      A.   The length of time it took him to get -- run down

 9   to the BP.

10      Q.   Well, at this time you take your attention off the

11   subject that Officer Denehy is engaging?

12      A.   I never had a visual of who Officer Denehy was

13   making the verbal commands.

14      Q.   Well, you said you went over to assist Officer

15   Denehy?

16      A.   I moved from the eastbound side of Clinton towards

17   the westbound side of Clinton.

18      Q.   In order to help him, correct?

19      A.   Towards Officer Denehy when he started engaging,

20   announcing commands at which time --

21      Q.   And you think that the person that Officer Denehy

22   is engaging is the person who is shooting, correct?

23      A.   No, because I heard immediately the response, the

24   challenge back, Blue.

25      Q.   So let me get this straight.  You said you are not
```

474

```
 1    near them.  You are not near Officer Denehy, but you can hear
 2    the conversation?
 3                  MR. ROSENBLATT:  Objection.  That's not what
 4        he said.
 5                  THE COURT:  Sustained.
 6        Q.   You said you heard the response, Blue?
 7        A.   Yes.
 8        Q.   From how far do you hear this response, Blue?
 9        A.   I was approximately 15 feet behind Officer Denehy
10    at that time.
11        Q.   So you are saying it was as Costa was running, he's
12    not running forward, correct?  He's running forward, but not
13    looking forward, correct?
14        A.   He momentarily looks back, correct.
15        Q.   Well, how many shots -- you said there were more
16    shots, correct?
17        A.   Yes.
18        Q.   You never see any muzzle flashes, correct?
19        A.   No.
20        Q.   How about any bullets?  Any bullets go towards your
21    direction?
22        A.   I didn't hear any bullets.
23        Q.   Any fly over your head?
24        A.   No.
25        Q.   Did you see any fly over anybody's head at this
```

475

1    point?

2         A.    I didn't see any bullets.

3         Q.    Do you go looking on the ground for bullets?

4         A.    I did not.

5         Q.    You have your flashlight on at the time you are

6    running to make sure that Officer Denehy is safe?

7         A.    I don't recall.

8         Q.    Now, you said these shots, do you see where these

9    shots go?  You said you heard shots.  Do you see where the

10   shots go?

11        A.    I didn't see where they struck.

12        Q.    Well, how close are you to Mr. Costa when you say

13   you heard shots?

14        A.    I think it was approximately 150 feet.

15        Q.    Did you shoot back?

16        A.    No.

17        Q.    So you are telling us that you hear shots, you

18   think it's coming from Duane Costa, correct?

19        A.    Correct.

20        Q.    You think you are being shot at, correct?

21        A.    Correct.

22        Q.    And you are going to let him shoot at you, is that

23   what you are saying?  Is that what you want us to believe?

24        A.    I did not fire back.

25        Q.    You don't fire back?

Kathi A. Fedden, Sr. Court Reporter

476

1    A.    No, I did not.

2    Q.    Well, does Officer Denehy then fire at the person

3    who is extending his arm supposedly?

4    A.    No.

5    Q.    Does Officer Denehy fire any shots at that point?

6    A.    No.

7    Q.    Well, of course, you then radio for assistance to

8    help you, correct?

9    A.    I stated I radioed at some point.  I don't recall

10   exactly when.

11   Q.    So you think you might be -- let me get this

12   straight.  You think you might be shot at, correct, and you

13   think that it might be Duane Costa, correct, and you don't

14   shoot at him at this point, right?

15   A.    No.

16   Q.    And you don't call -- you don't recall if you

17   called for more officers at this point, correct?  Is that

18   correct?

19   A.    I called for officers.  I don't know when.

20   Q.    You don't know when.  You don't know if it's at the

21   time that you think somebody is raising their hand and

22   extending it backwards towards you, correct?

23   A.    I don't recall.

24   Q.    Did you watch any videos of the incident?

25   A.    The only video I have seen is partial video of the

477

1    BP.

2         Q.    At the BP.

3              So when you watched this partial video at the BP,

4    you don't see Duane Costa extending his arm in it, do you?

5         A.    I didn't go through the entire video.

6         Q.    Well, I'm just asking, the part of the video that

7    you saw, is Duane Costa raising his arm in that part of the

8    video?

9         A.    No.

10        Q.    Do you see any part of the video where Duane Costa

11   is raising his arm and extending it backwards?

12        A.    I didn't see the video in its entirety.

13        Q.    Of what you saw.  I'm not asking you what you -- in

14   its entirety.  Of what you saw, did you ever see Duane Costa

15   extending his hand back in the video?

16        A.    No.

17        Q.    Do you ever see in the video Duane Costa extending

18   his hand back with a gun in it?

19              MR. ROSENBLATT:  Objection, Judge.  The video

20         is not in evidence.

21              THE COURT:  Sustained.

22        Q.    And on the part of the video that you watched, you

23   never saw yourself approaching Officer Denehy confronting

24   another subject, did you?

25        A.    You can see figures moving.

Kathi A. Fedden, Sr. Court Reporter

478

```
 1          Q.   But you can't see who those figures are, correct?

 2          A.   I recognize them to be myself.

 3          Q.   Excuse me?

 4          A.   I recognize them from what I observed.

 5          Q.   And by the gas station, Duane Costa was never on

 6    the sidewalk; isn't that correct?

 7          A.   He was running southbound on the area of the

 8    sidewalk in the pump area.

 9          Q.   Isn't it true he never ran by the street?

10          A.   I'm sorry?

11          Q.   Isn't it true he never ran by the street?

12          A.   He was running alongside the street.

13          Q.   Now, you initially heard two gunshots and then you

14    heard another -- and then how many shots did you hear after

15    the initial two gunshots?

16          A.   I heard another shot.

17          Q.   Another shot and where was that shot?  Where did

18    that shot come from?

19          A.   I heard it to the south of us.

20          Q.   And that was the total number of shots that you

21    heard, correct?

22          A.   No.

23          Q.   You heard other shots?

24          A.   After I observed Duane Costa running to the gas

25    station I heard two more shots.
```

Kathi A. Fedden, Sr. Court Reporter

479

```
 1         Q.    Now, when you say Duane Costa ran towards the
 2    alleyway, you didn't go into that alleyway, correct?
 3         A.    No.
 4         Q.    And Officer Rilling and Kraemer, did they go into
 5    the alleyway?
 6         A.    I didn't observe them enter.
 7         Q.    Did they make their way into the alleyway, yes or
 8    no?
 9         A.    I don't know where they went.  I moved in my police
10    car to northbound Meriam.  When I left them, they were at the
11    entrance to the alleyway.  Officer Denehy was running on foot
12    southbound.
13         Q.    Do you recall testifying in the grand jury?
14         A.    Yep.
15         Q.    And you testified on November 20, 2018?
16         A.    Yep.
17         Q.    And you were under oath just like you are today?
18         A.    Yep.
19         Q.    Do you recall being asked this question and giving
20    this answer:
21              MS. GOLOMBEK:  I draw the Court's attention to
22         page 63, lines 12 through 23.
23         Q.    Question:  You then go back for the car.  You drive
24         it towards the alleyway at Clinton and Miranda --
25         between Meriam and Van Cott?
```

Kathi A. Fedden, Sr. Court Reporter



1            Answer:  Yes.

2            Question:  Then what happens?

3            Officers Rilling and Kraemer start making their

4        way into the alleyway.  I moved to the north side

5        trying to set up a perimeter on that street.  I went

6        to the north block, Meriam and Officer Denehy went

7        south until we got additional resources there to do a

8        full perimeter on that block.

9            Were you asked those questions and did you give

10   that answer?

11        A.   Yes.

12        Q.   So now, is your testimony -- is your memory better

13   today than it was on November 20, 2018?

14            MR. ROSENBLATT:  Objection.

15            THE COURT:  Overruled.

16        A.   It's the same answer.  They move right to the

17   entrance of the alleyway where the alley splits and when I

18   left them they're right at that entrance where the two yards

19   split.

20        Q.   Thank you, Officer -- Detective.

21            MS. GOLOMBEK:  One moment, please.

22            THE COURT:  Yes.

23            (Pause in the proceedings.)

24        Q.   And you have been accused of unprofessional conduct

25   before, correct?

Kathi A. Fedden, Sr. Court Reporter

481

1                    MR. ROSENBLATT:  Objection.

2                    THE COURT:  Overruled.

3        Q.    On April 23, 2008 you were accused of

4   unprofessional conduct where it was alleged on either

5   November 11, 2007 or November 14, 2007 at 1855 hours a

6   complainant was stopped behind a Uniondale library by you.  A

7   complainant stated there was no basis for the stop and he and

8   his vehicle were searched.  Complainant states there was --

9   no contraband was found and he was sent on his way.

10                   You were accused of unprofessional conduct in that

11   case, correct?

12                   MR. ROSENBLATT:  Objection.

13.                  THE COURT:  Yeah, I thought we had a ruling on

14        this, Ms. Golombek.

15                   MS. GOLOMBEK:  It's undetermined, Judge.

16                   MR. ROSENBLATT:  If I can just be heard.  I

17        thought your Honor permitted as to whether the act

18        occurred, not whether there was an accusation.

19                   THE COURT:  Right.

20                   So did that act occur?

21                   THE WITNESS:  No.

22                   MS. GOLOMBEK:  No.

23                   I have no further questions at this point.

24                   THE COURT:  Thank you.

25                   Redirect?

1        MR. ROSENBLATT:  Brief redirect, your Honor.

2   REDIRECT EXAMINATION

3   BY MR. ROSENBLATT:

4        Q.    Detective, you were asked questions on

5   cross-examination regarding the sound of the bullets or the

6   sound of the shots that you heard coming from Midwood Street?

7        A.    Yes.

8        Q.    And you testified on direct examination that you

9   could tell that they were close?

10       A.    Yes.

11       Q.    How did you make that or how did you reach that

12  conclusion?

13       A.    Just from my experience being around gunfire and

14  how loud they were.

15       Q.    And based on how loud it was to you on October 28,

16  2018 at approximately 12:45 a.m., how close would you believe

17  those shots to be?

18       A.    I believed initially we were possibly being fired

19  at.

20       Q.    Now, you told us that you made your way to Officer

21  Denehy.  Still on the screen is Exhibit 27.

22            From the initials N.B. that you indicated where you

23  were at that unrelated car stop, how far did you actually

24  run?

25       A.    Not that far because I had initially moved towards

Kathi A. Fedden, Sr. Court Reporter

483



1   the corner and then when I heard Officer Denehy engage the

2   other person with commands, I then moved across the street

3   towards him.

4        Q.   And did you ever fully cross Clinton?

5        A.   Not on foot.

6        Q.   I'm going to show you what's in evidence as

7   People's Exhibit 33.  Did you ever reach the orange circle or

8   the pink circle in Exhibit 33?

9                  MS. GOLOMBEK:  Objection.  That's not the

10            proper scope of redirect.

11                 THE COURT:  Well, I'm going to overrule the

12            objection, but can you be a little more specific?

13                 MR. ROSENBLATT:  Sure.

14       Q.   You indicated on cross that you were running?

15       A.   Correct.

16       Q.   From where your car was to the sounds of where the

17  shots were?

18       A.   Correct.

19       Q.   Did you ever pass that pink circle in Exhibit 33?

20                 MS. GOLOMBEK:  Objection, Judge.  As I have

21            indicated, this was never gone into on

22            cross-examination.  It's not the proper scope.

23                 THE COURT:  Well just because a vehicle that

24            was parked there, you didn't ask specifically with

25            regard to this picture, doesn't mean it wasn't asked.

484

1          You asked many questions about where he ran, where he

2      went to, where he was.  How far he was from Officer

3      Denehy, from Mr. Costa, from many things, so this

4      absolutely would be proper cross-examination [sic].

5          Q.   Did you ever run on foot, Detective, past that pink

6    circle?

7          A.   No.

8          Q.   You were asked questions on cross-examination

9    regarding whether or not you observed Mr. Costa running on

10   the sidewalk.  Do you remember being asked those questions?

11         A.   Yes.

12         Q.   Where did you observe Mr. Costa run on Clinton?

13         A.   On Clinton he was on the area of the sidewalk and

14   then right where the pump area would be.

15              MR. ROSENBLATT:  I'm going to ask that this

16      photograph be marked as People's Exhibit 37.

17              THE COURT:  All right, People's 37 for

18      identification.

19              (Whereupon, People's Exhibit 37 was marked for

20      identification, only.)

21              COURT OFFICER:  People's 37 marked for ID.

22              MR. ROSENBLATT:  May it be shown to the

23      witness, please?

24              THE COURT:  Yes.

25              (Handed to witness.)

485

1      Q.    Detective, do you recognize Exhibit 37?

2      A.    Yes.

3      Q.    What do you recognize it to be?

4      A.    It's a picture of the BP parking lot.  Gas station

5    parking lot.

6      Q.    And does that photograph fairly and accurately

7    depict your observations as you observed Mr. Costa running on

8    October 28, 2018 at approximately 12:45 a.m. as he ran down

9    Clinton?

10     A.    Yes.

11             MR. ROSENBLATT:  Judge, I would ask that that

12         item be received as a fair and accurate depiction of

13         what he observed Mr. Costa doing at that time.

14             THE COURT:  All right, let's show it to

15         Ms. Golombek.

16             (Handed to counsel.)

17             MS. GOLOMBEK:  May I voir dire?

18             THE COURT:  Yes.

19   VOIR DIRE EXAMINATION

20   BY MS. GOLOMBEK:

21     Q.    Did you take this photo?

22     A.    No.

23     Q.    Do you know when this photo was taken?

24     A.    I believe it's from the security cameras.

25     Q.    Did you see who took this photo?



1        A.    No.

2        Q.    Excuse me?

3        A.    No.

4        Q.    Do you know if this photo -- well, so you can't

5    tell us for a fact whether this photo was taken on October

6    28, 2018 or whether it was taken on October 27, 2018,

7    correct?

8        A.    That's an accurate depiction of that during the

9    incident.

10       Q.    Well, let me ask you something, the incident took

11   place, from what you testified to, at about 12:45 a.m.,

12   correct?

13       A.    Yes.

14       Q.    And it wasn't 1:40 p.m., was it?

15       A.    No.

16       Q.    And there could have been a person running on

17   October 28, 2018 at 1:40 p.m. as well, correct?

18             MR. ROSENBLATT:    Objection.

19       Q.    Yes or no?

20             THE COURT:    No, sustained.

21       Q.    And in this photo you don't see anyone turning

22   around with his arm extended over his shoulder, do you?

23       A.    No.

24             MS. GOLOMBEK:    Your Honor, I'm going to object

25        and the reason why I'm objecting is this was time

487

1    stamped.  It's time stamped October 28, 2018 at 1:39:05,

2    Judge.  It's certainly not the time that everything was

3    testified to, Judge.  He certainly can't say who took

4    the picture.  We certainly have no way of knowing if

5    this was not a picture taken of an incident at 1:39,

6    your Honor, a.m.  So based on everything that has been

7    elicited, I submit this photograph should not come into

8    evidence and any testimony regarding it should be

9    stricken.

10            THE COURT:  All right.

11            You want to be heard, Mr. Rosenblatt?

12            MR. ROSENBLATT:  Judge, I'm not offering it

13   for the date and time stamp in the top left corner.

14   What I asked was does it depict what he observed as

15   Mr. Costa was running down the street.  Quite frankly, I

16   believe we will get the time and the offset, but for

17   this witness my question was limited as to does it

18   depict Mr. Costa running down Clinton.

19            MS. GOLOMBEK:  Judge, we have no connection as

20   it stands at this moment, Judge.

21            MR. ROSENBLATT:  He said it.

22            THE COURT:  We have the testimony of the

23   Officer who was allegedly present at that time.

24            MS. GOLOMBEK:  We have a time stamp of 1:39

25   a.m.

Kathi A. Fedden, Sr. Court Reporter

1              MR. ROSENBLATT:  Well, Judge, if it makes

2      everyone's job easier, we can put a sticker over the

3      time stamp until I can connect it tomorrow.

4              THE COURT:  Can I see the picture?

5              MR. ROSENBLATT:  I'm not offering it for that

6      time, I'm offering it for his observations.

7              Just so we're clear, Exhibit 33 that is in

8      evidence that depicted Officer Denehy has a time stamp

9      as well.  It's not meant to show the time, it's meant to

10     show that scene at the moment that he says it captures.

11             MS. GOLOMBEK:  Why doesn't Mr. Rosenblatt play

12     the video for this witness so we can see whether

13     Mr. Costa is raising his arm looking back, your Honor?

14             MR. ROSENBLATT:  I have already indicated the

15     video is coming in tomorrow, Judge.  There is a proper

16     way to do these things and I'm trying to do it properly

17     by calling that witness tomorrow.

18             THE COURT:  All right.

19             Well, if there is no testimony tomorrow with

20     regard to the time, then I am going to strike this from

21     evidence, this document.  If there is testimony that

22     talks about the difference in the time, then I will

23     consider it as evidence, but I'm not going to consider

24     it as evidence until that has been established.

25             MR. ROSENBLATT:  Very well, Judge.

Kathi A. Fedden, Sr. Court Reporter

489

```
 1              THE COURT:  So I understand that Detective
 2    Bourke has testified that this fairly and accurately
 3    represents what he saw on that night and we'll see what
 4    the time difference is.
 5              MR. ROSENBLATT:  Depicting Mr. Costa running
 6    down Clinton, which is what he testified to on cross.
 7              MS. GOLOMBEK:  Objection.  That's what you
 8    said.
 9              THE COURT:  That's what the witness said.  So
10    I'm going to mark it in evidence, again, though,
11    provisionally and only unless and until the time
12    difference is explained or proved, will I actually
13    consider it.
14              MR. ROSENBLATT:  Very well, your Honor.
15              (Whereupon, People's Exhibit 37 was received
16    in evidence.)
17              COURT OFFICER:  So marked.
18              MR. ROSENBLATT:  May I publish it on the
19    screen, your Honor?
20              THE COURT:  Well, I already saw it.
21              MR. ROSENBLATT:  For the purpose of asking a
22    couple of additional questions.
23              THE COURT:  All right.
24              MS. GOLOMBEK:  Note my objection, Judge,
25    because we don't know whether it's going to be stricken
```



1    and I will want the prior testimony stricken, your

2    Honor.

3              THE COURT:  Well, I will say this, if whatever

4    testimony was elicited based upon this photograph and if

5    I don't find that the time difference has been proved to

6    be inaccurate that's on the photo, then I will strike

7    all the testimony related to this photo, okay.

8              MR. ROSENBLATT:  Judge, just as a

9    clarification, when you say the time being accurate,

10   what I anticipate tomorrow is an explanation regarding

11   the time and what it was as to real-time on the day in

12   question.

13             THE COURT:  Correct.

14             MR. ROSENBLATT:  Okay.

15   REDIRECT EXAMINATION (Cont'd)

16   BY MR. ROSENBLATT:

17        Q.   Detective, on the screen is Exhibit 37.  Can you

18   see it?

19        A.   Yes.

20        Q.   And tell us what we see?

21        A.   That's the BP gas station at the corner of Clinton

22   and Midwood.  Up at the far right of the screen looking to

23   the top, the lights, that's my police car.

24        Q.   Just above the taxi?

25        A.   Correct.

Kathi A. Fedden, Sr. Court Reporter

491

1      Q.   And how about in the middle of the screen on
2    Clinton?

3      A.   That's the defendant, Duane Costa who is running
4    southbound on Clinton.

5            MR. ROSENBLATT:   I have nothing further, your
6        Honor, thank you.

7            THE COURT:   Recross?

8            MS. GOLOMBEK:   Yes.

9    RECROSS EXAMINATION

10   BY MS. GOLOMBEK:

11     Q.   And the person that is running, his arm is not back
12   or over his shoulder, is it, in that picture?  The person
13   have his arm back over his shoulder?

14     A.   No.

15     Q.   The person looking back at you facing you and
16   looking back at you?

17     A.   I don't know where he's looking.

18     Q.   Well, he's certainly not looking back with his arm
19   extended, is he?

20     A.   No, he appears to be running there, holding what
21   appears to be a firearm in his hand.

22     Q.   Well, he appears to be running, correct?  You can't
23   see what's in his arm, correct?

24     A.   There appears to be an object in his hand.

25     Q.   You just see somebody running, correct?

Kathi A. Fedden, Sr. Court Reporter



1      A.   Correct.

2      Q.   And the person that is running, what race is the

3   person?

4      A.   Sorry?

5      Q.   What race?

6      A.   The defendant?

7      Q.   Yeah, what race?

8      A.   A male black.

9      Q.   All you see is somebody black, correct, in that

10   picture?  That's all you see is black?

11             MR. ROSENBLATT:  Objection, Judge.

12             THE COURT:  Sustained.

13      Q.   Now, at the point that you say where you testified

14   on redirect that you thought you were being shot at.  When

15   you say Duane Costa is extending back, which, of course, we

16   can't say in that photo?

17             MR. ROSENBLATT:  Objection.

18      Q.   When you say he's extending his hand back looking

19   at you and you think you are being shot at, you don't shoot

20   back?

21             MR. ROSENBLATT:  Objection.

22             THE COURT:  Sustained.

23      Q.   Is that what you are saying?

24             THE COURT:  Sustained.

25             MS. GOLOMBEK:  I have no further questions.

1          THE COURT:  Thank you very much, Detective.

2     You are excused and have a good rest of the day.

3          THE WITNESS:  You too, your Honor, thank you.

4          (Whereupon, the witness was excused.)

5          MS. GOLOMBEK:  Your Honor, I'm going to ask

6     that picture be taken down.

7          THE COURT:  That's fine.  Let's move it from

8     the screen.

9          Who else do you have to testify?

10         MR. ROSENBLATT:  I have Detective Bourguignon.

11         MS. GOLOMBEK:  Can we have time for a

12    one-minute recess to use the facilities or you want me

13    to wait until after direct?

14         THE COURT:  If everybody needs a break.

15         MS. GOLOMBEK:  I do.

16         THE COURT:  Okay.  We'll be in recess for five

17    minutes or so.

18         MS. GOLOMBEK:  That's all I need, Judge, thank

19    you.

20         (A recess was taken.)

21         MR. ROSENBLATT:  Can I mark some exhibits,

22    Judge?

23         THE COURT:  Yes, go ahead.

24         (Whereupon, People's Exhibits 38 and 39 were

25    marked for identification, only.)

Kathi A. Fedden, Sr. Court Reporter



1    THE COURT:  Back on the record for the

2    continuing trial of People versus Duane Costa.  All the

3    appearances are the same.

4            Mr. Rosenblatt, did you want to call your next

5    witness?

6            MR. ROSENBLATT:  Yes, your Honor, the People

7    call Detective William Bourguignon.

8    D E T.   W I L L I A M   B O U R G U I G N O N, Shield #1307,

9        assigned to the Gang Investigation Squad of the Nassau

10       County Police Department, having been called as a

11       witness on behalf of the People, having been duly

12       sworn by the Clerk of the Court, was examined and

13       testified as follows:

14           THE CLERK:  Please state your name with the

15   spelling, your command, shield number and rank, please.

16           THE WITNESS:  Detective Bourguignon.  Shield

17   1307.  B-O-U-R-G-U-I-G-N-O-N.  Gang Investigation Squad,

18   Nassau County Police Department.  William.

19           MS. GOLOMBEK:  Objection.

20           THE COURT:  Yes?

21           MS. GOLOMBEK:  The use of the word gang, your

22   Honor.

23           THE COURT:  That's where he is assigned right

24   now, so overruled.

25           MR. ROSENBLATT:  May I inquire, your Honor?

Kathi A. Fedden, Sr. Court Reporter

495

```
 1              THE COURT:  Yes.

 2   DIRECT EXAMINATION

 3   BY MR. ROSENBLATT:

 4        Q.   Good afternoon, Detective.

 5        A.   Good afternoon.

 6        Q.   Where do you work?

 7        A.   Gang Investigation Squad.

 8        Q.   And how long have you been working for the Nassau

 9   County Police Department?

10        A.   Approximately 13 years.

11        Q.   Prior to working for the Nassau County Police

12   Department, did you work in other law enforcement?

13        A.   Yes, I was with the N.Y.P.D. for approximately nine

14   years.

15        Q.   For how many years have you been at the rank of

16   detective?

17        A.   Almost six.

18        Q.   On October 28, 2018 were you working?

19        A.   Yes.

20        Q.   And were you working for the Nassau County Police

21   Department?

22        A.   Yes.

23        Q.   In the early morning hours of October 28, 2018 were

24   you asked to assist in an investigation involving an incident

25   involving someone named Duane Costa?
```



1      A.    Yes.

2      Q.    Do you see Mr. Costa in the courtroom today?

3      A.    Yes, I do.

4      Q.    Can you identify him by an article of clothing that

5    he's wearing and tell us where he is seated?

6      A.    He's seated to the right here at the table wearing

7    the blue blazer jacket.

8                  THE COURT:  The record will reflect that the

9          witness has identified the defendant.

10      Q.    Detective, on October 28, 2018, did there come a

11    point in time that you observed Mr. Costa in a police

12    precinct?

13      A.    Yes.

14      Q.    Where did you see him?

15      A.    He was in the Third Squad.

16      Q.    And when you entered the Third Squad, did you enter

17    there for the purpose of speaking to Mr. Costa?

18      A.    Yes.

19      Q.    On October 28, 2018 when you came to speak to

20    Mr. Costa, did you read him Miranda warnings?

21      A.    Yes.

22      Q.    And did you do that from memory or from a

23    preprinted form?

24      A.    A preprinted form.

25      Q.    I'm going to show you what's been pre-marked as

Kathi A. Fedden, Sr. Court Reporter

497

1    Exhibit 38 for identification and let us know if you

2    recognize this item?

3                    (Handed to witness.)

4        A.    Yes, this is the rights card that I read Mr. Costa.

5        Q.    And is that an original or a photocopy of the

6    rights card that you read to him on October 28, 2018?

7        A.    This is the original.

8        Q.    How do you know?

9        A.    There is a yellow marking I put in the right-hand

10   corner and I see my shield and signature.

11       Q.    Is that the exact Miranda card that you read to him

12   on October 28, 2018?

13       A.    Yes.

14                   MR. ROSENBLATT:  I ask that it be received

15            into evidence.

16                   THE COURT:  Let's show it to Ms. Golombek.

17                   (Handed to counsel.)

18                   MS. GOLOMBEK:  May I have a short voir dire,

19            your Honor?

20                   THE COURT:  All right.

21   VOIR DIRE EXAMINATION

22   BY MS. GOLOMBEK:

23       Q.    You indicate that this is the original card that

24   you had with you when you spoke to Duane Costa on October 28,

25   2018?

                 Kathi A. Fedden, Sr. Court Reporter

                                                        498

1      A.    Yes.

2      Q.    Well I notice there is a yellow marking on top,
3   correct?

4      A.    Yes.

5      Q.    Was that yellow marking placed there at the same
6   time the signatures were placed there?

7      A.    I believe I marked it after the signatures, but I
8   don't recall.

9      Q.    So the yellow marking wasn't at the time of the
10   signatures, correct?

11     A.    I don't know if it was before or after the
12   signature, Miss.

13     Q.    So this card doesn't reflect the card that was read
14   to -- it doesn't reflect -- well, was this card shown to
15   Mr. Costa?

16              MR. ROSENBLATT:  Objection.

17              THE COURT:  It's improper voir dire.

18     Q.    So when you spoke to Mr. Costa and had him sign
19   this rights card, was this yellow marking on the card, yes or
20   no?

21     A.    Again, I can't remember if I marked it prior or
22   after.

23              MS. GOLOMBEK:  Judge, I'm going to object to
24        this.  This document is not what it purports to be.
25        It's not what was shown or read from where Mr. Costa was

                    Kathi A. Fedden, Sr. Court Reporter

499

```
 1          present.  We have no testimony.  We have an extra yellow
 2          marking on here, Judge.
 3                    THE COURT:  The detective mentioned the yellow
 4          marking when he was testifying about this document just
 5          a few minutes ago.  That's how he knows if it's an
 6          original document; is that correct?
 7                    THE WITNESS:  Correct, Judge.
 8                    THE COURT:  So that's his own personal
 9          marking.
10                    MS. GOLOMBEK:  Well, it shows us that there
11          are markings that were not made at the time of the
12          signing of the rights card, your Honor.
13                    THE COURT:  Well, we don't know and it's a
14          yellow dot.  So I'm -- you have your exception.  I'm
15          going to overrule your objection and admit People's 38
16          into evidence.
17                    (Whereupon, People's Exhibit 38 was received
18          in evidence.)
19                    COURT OFFICER:  So marked.
20                    (Handed to witness.)
21     DIRECT EXAMINATION (Cont'd)
22     BY MR. ROSENBLATT:
23          Q.   Detective, tell us how it is that you used that
24     card before speaking to Mr. Costa.
25          A.   I went in and introduced myself to Mr. Costa and I
```

500

1    explained to him if he wanted to speak to me without an

2    attorney, that he would -- I would need to read this to him

3    and he would need to agree after I read it to him.

4                    MS. GOLOMBEK:  Can I have the witness speak up

5         a little bit?

6                    THE COURT:  Yes, just speak up.

7                    MS. GOLOMBEK:  If we can start from the

8         beginning.  How did you introduce yourself?

9                    THE COURT:  Start from the beginning when you

10        went into the room.

11        A.    I went into the room.  I introduced myself and I

12   explained that in order for him to speak to me without an

13   attorney, I would need to read him this rights card.

14        Q.    Did you on October 28th read him that card?

15        A.    Yes.

16        Q.    What time did you read him that Miranda card?

17        A.    0750 hours is when I read it to him.

18        Q.    7:50 in the morning on October 28th?

19        A.    Yes.

20        Q.    And can you read us what you read to Mr. Costa on

21   October 28, 2018?

22        A.    Sure.

23                    MS. GOLOMBEK:  Objection; reading from a

24        document.

25                    THE COURT:  That's in evidence, so that's all

1          right.   Overruled.

2          A.    Notification of rights prior to custodial

3    interrogation.

4                Before asking you any questions, you should

5    understand you have the right to remain silent and that any

6    statements you make may be used against you in court.  Also,

7    you have the right to talk to a lawyer before answering any

8    questions or to have a lawyer present at any time.

9                If you cannot afford to hire a lawyer one will be

10   furnished to you, if you wish, and you have the right to keep

11   silent until you have had a chance to talk with a lawyer.

12               Do you understand?  Mr. Costa wrote yes and signed

13   his name next to the yes.

14               Now that I have advised you of your rights, are you

15   willing to answer questions?

16               Again, Mr. Costa wrote yes and signed his name next

17   to the yes.

18               Notification of rights.  Acknowledgment and waiver.

19   Custodial interrogation.  Written statements.

20               I have been told by the detective-police officer

21   that I have the right to remain silent and that any

22   statements I make may be used against me in court.  I have

23   been told that I have the right to talk with a lawyer before

24   answering any questions or to have a lawyer present at any

25   time.  Further, I have been advised that if I cannot afford

502

1   to hire a lawyer, one will be furnished me and I have the

2   right to keep silent until I have had the chance to talk with

3   a lawyer.

4       I understand my rights and make the following

5   statement freely and voluntarily.  I am willing to give this

6   statement without talking with a lawyer or having one

7   present.

8       Mr. Costa wrote yes and signed his name next to the

9   yes.

10      Q.   Can I have that item back?

11          MR. ROSENBLATT:  With the Court's permission,

12      may I publish it on the screen and ask a couple of

13      questions?

14          THE COURT:  All right.

15      Q.   Detective, on the screen is what's in evidence as

16   Exhibit 38.  After you read that item, who wrote the word yes

17   and signed Duane Costa?

18      A.   Mr. Costa.

19      Q.   And is your signature on that document?

20      A.   Yes, it is.

21      Q.   Where is it?

22      A.   It's in the top left corner.

23      Q.   And is there another person's signature on that

24   document that was in the room with you?

25      A.   Yes, Detective Pichardo.

Kathi A. Fedden, Sr. Court Reporter

503

```
 1          Q.    And where is that detective's signature?

 2          A.    On the top right.

 3          Q.    Now after you read the Miranda card to Mr. Costa

 4    and he signed it in the places with his signature, did you

 5    speak to him?

 6          A.    Yes.

 7          Q.    Did you have a conversation with him?

 8          A.    Yes.

 9          Q.    And did you take notes?

10          A.    Yes.

11          Q.    What did you do after you took notes of your

12    conversation with Mr. Costa?

13          A.    I exited the interview room and I went and typed up

14    a statement based off the notes and the questions and answers

15    that we had.

16          Q.    I'm going to hand you what's been pre-marked as

17    Exhibit 39 for identification.  Take a look at that.

18                (Handed to witness.)

19          Q.    Do you recognize what's in front of you as Exhibit

20    39?

21          A.    Yes.

22          Q.    What is it?

23          A.    This is a statement of admission from Duane Costa.

24          Q.    And is that the original or a copy of the statement

25    that you presented to him after you typed up what he told you
```

504

1  | on October 28, 2018?

2  |      A.    This is an original.

3  |      Q.    How do you know?

4  |      A.    Once again I have a yellow marking up at the top

5  | corner, my name and shield number and Detective Pichardo and

6  | Mr. Costa.

7  |                  MR. ROSENBLATT:   Your Honor, I would ask that

8  |        Exhibit 39 be received.

9  |                  THE COURT:   Let's show it to Ms. Golombek.

10 |                  MS. GOLOMBEK:   May I have a short voir dire?

11 |                  THE COURT:   Yes.

12 | VOIR DIRE EXAMINATION

13 | BY MS. GOLOMBEK:

14 |      Q.    I notice that there is a yellow marking on this.

15 | Was that yellow marking made at the time that you indicate

16 | you wrote this statement?

17 |      A.    I'm sorry?

18 |      Q.    Was the yellow marking on top, did you make that

19 | yellow marking?

20 |      A.    Yes.

21 |      Q.    Was that made at the time that you wrote this

22 | statement -- you inputted this statement on the computer?

23 |      A.    I'm sorry, I don't understand what you are asking.

24 |      Q.    The yellow marking that is on top of the page.

25 |      A.    Okay.

Kathi A. Fedden, Sr. Court Reporter

505

1    Q.    Was that yellow marking there at the time you typed

2    this statement into the computer and this page was generated?

3    A.    I don't remember if I put the yellow marking before

4    I typed it or after.

5    Q.    Well, after the statement was typed, it was

6    photocopied, correct?

7    A.    Yes.

8    Q.    And it was photocopied for discovery purposes

9    correct?

10    MR. ROSENBLATT:  Objection.

11    THE COURT:  Sustained.

12    MS. GOLOMBEK:  I'm going to ask that this be

13    marked as Defendant's A.

14    THE COURT:  What is it?

15    MR. ROSENBLATT:  We're up to d.

16    THE COURT:  What is it?

17    MS. GOLOMBEK:  It's a statement.  The

18    photocopy of the statement.

19    THE COURT:  I'm sorry, this is a copy of the

20    statement?

21    MS. GOLOMBEK:  Uh-huh.

22    THE COURT:  It's not what the DA has offered

23    in as People's 39?

24    MS. GOLOMBEK:  No, it's not.

25    THE COURT:  All right.  I think we're up to D

Kathi A. Fedden, Sr. Court Reporter

5bb

1    though for defendant's.

2                    MS. GOLOMBEK:  Defendant's D.

3                    THE COURT:  All right, Defendant's D for

4    identification.

5                    (Whereupon, Defendant's Exhibit D was marked

6    for identification, only.)

7                    MS. GOLOMBEK:  I'm going to ask that that be

8    shown to the witness?

9                    THE COURT:  All right.

10                   (Handed to witness.)

11   Q.    Do you recognize that?

12                   MR. ROSENBLATT:  Objection.  How does this

13   impact the foundation, Judge?

14                   THE COURT:  Well, I don't know.  Let me see.

15   Q.    Do you recognize that?

16   A.    Yes.  There are four pieces of paper here though,

17   two being a copy of the original statement and then another

18   statement from April Grant and some other -- something else.

19   I have no idea what this is.

20   Q.    I'm going to refer you to the copy of the

21   statement.  That differs from what the original is, correct?

22   The first two pages, that differs from what's been marked as

23   People's number 39, correct?

24   A.    May I see the original, please?

25   Q.    Sure.

1                    (Handed to witness.)

2          A.    The only thing I see different is the yellow

3     marking on the original versus the copy.

4          Q.    So it shows that the original has been tampered

5     with, correct?

6                    MR. ROSENBLATT:  Objection.

7                    THE COURT:  Sustained.

8          Q.    So that yellow marking that was made, that would

9     have had to have been made after the statement was typed by

10    you, correct?

11                   MR. ROSENBLATT:  Objection.

12                   THE COURT:  Sustained.

13         Q.    May I have those documents back, please?

14                   (Handed to counsel.)

15         Q.    And where you say there is a signature of Duane

16    Costa, did you tell Duane Costa he didn't have to sign the

17    statement?

18                   MR. ROSENBLATT:  Objection.

19                   THE COURT:  Sustained.  It's improper voir

20         dire.

21                   MS. GOLOMBEK:  Judge, I'm objecting to it.  My

22         position is this is not what it purports to be.  It has

23         been tampered with.  There is a yellow marking on it

24         that did not exist when the statement was generated, nor

25         at the time that it was signed by the detectives and

                 Kathi A. Fedden, Sr. Court Reporter

                                                        508

1    allegedly by Mr. Costa, your Honor.

2              THE COURT:  You have your exception.  I'm

3    going to admit People's 39 into evidence.

4              (Whereupon, People's Exhibit 39 was received

5    in evidence.)

6              COURT OFFICER:  People's 39 marked into

7    evidence.

8    DIRECT EXAMINATION (Cont'd)

9    BY MR. ROSENBLATT:

10        Q.    Detective, can you read into the record what you

11   typed out and ultimately what the statement was?

12        A.    At the top of the form says, Police Department

13   County of Nassau, New York.  Statement of Admission.  Date of

14   10/28/2018.

15        Q.    Slow down.

16        A.    Page one of two.  Arrest number is 2180016494.

17   Case report 218CR0055811.  It says my name is Duane Costa.  I

18   am 37 years old, having been born on 10/21/1981.  I reside at

19   751 Union Drive, Uniondale, New York 11553 on the first

20   floor.  My telephone number is 516-817-2417 and I am employed

21   as a construction worker.

22              I have been told by the detective that I have the

23   right to remain silent and that any statements I make may be

24   used against me in court.  I have been told that I have the

25   right to talk with a lawyer before answering any questions or

1    to have a lawyer present at any time.  Further, I have been

2    advised that if I cannot afford to hire a lawyer, one will be

3    furnished me, if I wish, and I have the right to keep silent

4    until I have had the chance to talk with a lawyer.

5            I understand my rights and make the following

6    statement freely and voluntarily.  I am willing to give this

7    statement without talking with a lawyer or having one

8    present.

9            Last night I called my friend April around midnight

10   for a ride from Terrace Avenue.  I saw the police riding up

11   and down Terrace so I walked to Fulton and April picked me

12   up.  I told her to take me to the BP gas station on Clinton.

13   I wanted to go to my mom's after and put the guns away.  I

14   had a .40 caliber black handgun in my jacket pocket and a

15   silver handgun in the front of my pants.  I'm carrying the

16   guns because shit is crazy out here and I need protection.

17           The cops pulled us over and said they smelled

18   alcohol coming from the car asked us for ID.  April and I

19   gave them our IDs.  I had been drinking a few Heineken beers

20   before April picked me up.  The police asked us to step out

21   of the car.  I knew they were going to find the guns on me

22   and arrest me, so I stepped out of the car and I pushed past

23   the cop and started running.  The .40 caliber dropped from my

24   coat pocket to the ground as I started running.  I didn't

25   want to get arrested, so I took the other gun from my waist

1 and started firing at the ground hoping it would keep the

2 cops from chasing me.  I think I shot it about five or six

3 times but I'm not really sure.  I was not shooting at the

4 police and all I wanted to do was get away.  I would never

5 shoot a cop or hurt a cop.  I was just scared and didn't want

6 to get arrested because I'm on federal probation.  I want to

7 apologize to the police officers who were chasing me.

8          At the bottom it says I'm at the Third Squad where

9 I'm giving the statement to a detective who is typing it for

10 me and I have read it and it is the truth.  I signed it,

11 Detective Pichardo signed it and Duane Costa signed it.

12          It moves on, continuation.  Again, the same second

13 page, two of two, October 28, 2018.  Same thing, my name is

14 Duane Costa.  I'm 37 years old having been born on October

15 21, 1981.  I reside at 751 Union Drive, Uniondale, New York

16 11553.  Telephone number is 516-817-2417 and I'm employed as

17 a construction worker.  I have been told by the detective

18 that I have a right to remain silent and any statements I

19 make may be used against me in court.  I have been told that

20 I have the right to talk with a lawyer before answering any

21 questions or to have a lawyer present at any time.

22          Further, I have been advised if I cannot afford a

23 lawyer, one will be furnished me, if I wish, and I have the

24 right to keep silent until I have had the chance to talk with

25 a lawyer.

1          I understand my rights and make the following
2     statement freely and voluntarily.  I'm willing to give the
3     statement without talking with a lawyer or having one
4     present.

5          The statement continues.  I wish this never
6     happened.  I have been doing well and working since I have
7     been home and I don't want to get killed in the streets.
8     That's the only reason I was carrying the guns.  I'm thankful
9     the police didn't shoot me and that none of the cops got
10    hurt.

11         I'm at the Third Squad where I'm giving the
12    statement to a detective who is typing it for me and I have
13    read it and it's the truth.  It's my signature, Detective
14    Pichardo's and again, Duane Costa's signature.

15    Q.    I'll take that back from you.

16         Now, you indicated that Mr. Costa signed both
17    pages, correct?

18    A.    Yes.

19    Q.    And on this document, who provided the phone number
20    516-817-2417 to you?

21    A.    Mr. Costa.

22    Q.    And who provided the date of birth 10/21/1981 to
23    you?

24    A.    Mr. Costa.

25    Q.    Prior to taking this statement, Detective, did you

512

1    make any threats to Mr. Costa?

2         A.    No.

3         Q.    Did you make any promises to him?

4         A.    No.

5         Q.    Did you use any force to induce him to give you

6    that statement?

7         A.    No.

8         Q.    Now I want to fast forward to October 30th of 2018.

9    On that date did you execute a search warrant looking for an

10   iPhone?

11        A.    Yes.

12        Q.    And did you locate an iPhone during the search of

13   that search warrant?

14        A.    No.

15        Q.    On November 20, 2018 were you working?

16        A.    Yes.

17        Q.    And were you still investigating the case involving

18   Mr. Costa?

19        A.    Yes.

20        Q.    On that day, without telling us what was said, who

21   did you speak with regarding this case?

22        A.    April Grant.

23        Q.    And where did you speak to Ms. Grant?

24        A.    At her residence.

25        Q.    On November 20th did you obtain a black iPhone 8

1    Plus?

2                    MS. GOLOMBEK:  Objection; leading the witness.

3          Maybe what, if anything, did you obtain?

4                    THE COURT:  All right, I'm going to overrule

5          it.

6                    You can answer the question.

7          A.    Yes.

8          Q.    From whom did you obtain it?

9          A.    April Grant.

10         Q.    What did you do with that phone?

11         A.    The phone was brought to Electronics Squad to be

12    downloaded.

13         Q.    And was there a GIS number associated with this

14    case?

15         A.    Yes.

16         Q.    Was that 306 of 18?

17         A.    Yes.

18         Q.    And was that phone that you indicated that you gave

19    to Electronics, was it given to them under that GIS number?

20         A.    Yes.

21                   MS. GOLOMBEK:  Objection; leading the witness.

22         He's given you the file number, the phone number.

23                   THE COURT:  Sustained.

24         Q.    Under what GIS number did you give the phone to the

25    Electronics Squad?

514

```
 1          A.    306 of 18.

 2          Q.    And do you know who from the Electronics Squad was

 3    working to download the information contained in that black

 4    iPhone 8 Plus?

 5          A.    I don't recall.

 6                    MR. ROSENBLATT:   Your Honor, I have no further

 7          questions for the detective.

 8                    THE COURT:   All right.

 9                  ⌐  Ms. Golombek, cross-examination?

10                    MS. GOLOMBEK:   Yes, Judge.

11    CROSS-EXAMINATION

12    BY MS. GOLOMBEK:

13          Q.    Detective Bourguignon, on October 28, 2018 you were

14    the carrying detective here on this case, correct?

15          A.    Yes.

16          Q.    Tell us what a carrying detective is.

17          A.    I would be the detective that is essentially in

18    charge of the case.

19          Q.    So the outcome of the case is important to you,

20    correct?

21          A.    Yes.

22          Q.    And it's important to you that you secure a

23    conviction here, correct, yes or no?

24          A.    Yes.

25          Q.    And you would do anything that you could to secure
```

1    a conviction here, correct, yes or no?

2                 MR. ROSENBLATT:  Objection.

3                 THE COURT:  Overruled.

4                 You can answer, Detective.

5         A.    Within legal limits, correct.

6         Q.    Now, on October 28, 2018 you went there

7    specifically to the precinct to obtain a statement from Duane

8    Costa, correct?

9         A.    Yes.

10        Q.    And you were going to do anything you could to

11   obtain this statement, correct?

12        A.    Within legal limits, yes.

13        Q.    Now, you got to the precinct that night at about

14   7:30 a.m., correct?

15        A.    Yes.

16        Q.    But that's not when Duane Costa got to the

17   precinct, correct?

18        A.    Correct.

19        Q.    It's fair to say Duane Costa got to the precinct at

20   about 1:57 a.m., correct?

21        A.    I believe so, yes.

22        Q.    And you don't know what was done to Duane Costa

23   between one -- well, you didn't see if anything was done to

24   Duane Costa between 1:57 a.m. and the time you spoke to him

25   at 7:50 a.m., correct?

1        A.    Correct.

2        Q.    You don't know whether he was beaten up or you

3    didn't see if he was beaten up prior to your seeing him at

4    7:50 a.m., correct, on October 28, 2018?

5        A.    He had no injuries and complained of no pain or

6    anybody beating him up when I spoke to him.

7        Q.    Well, you don't know whether he had any pain,

8    correct?

9        A.    I'm sorry?

10       Q.    You can't testify as to whether he had any pain,

11   correct?

12       A.    He did not say he was beat up and he did not look

13   injured and he did not tell me he was beat up.

14       Q.    You didn't see what any officers did to him or

15   didn't do to him correct, yes or no?

16       A.    No.

17       Q.    And you didn't see if anybody offered him anything

18   to eat from 1:57 a.m. until 7:50 a.m. on October 28, 2018,

19   correct?

20       A.    Correct.

21       Q.    And you didn't see whether anybody offered him

22   anything to drink between 1:57 a.m. and 7:50 a.m., correct,

23   yes or no?

24       A.    I don't know if anybody gave him anything to eat or

25   drink, no.

Kathi A. Fedden, Sr. Court Reporter

517

```
 1        Q.   And prior to you speaking to him, you don't know
 2   when the last time he ate was, correct, yes or no?
 3        A.   I have no idea when the last time he ate was.
 4        Q.   And prior to you speaking to him at 7:50 a.m., you
 5   don't know when the last time he had anything to drink,
 6   correct, yes or no?
 7        A.   Correct, I don't know.
 8        Q.   But you do know that he smelled of alcohol,
 9   correct?
10        A.   No.
11        Q.   Prior to you speaking to him, you had spoken to
12   other detectives, correct?
13        A.   I talked to Detective Pichardo when I got to the
14   precinct, yes.
15        Q.   And you also spoke to other police officers,
16   correct?
17        A.   Yes.
18        Q.   And you learned that when Duane Costa -- and you
19   learned when there was a car stop, the car that Duane Costa
20   was in smelled of alcohol, correct?
21        A.   Yes.
22        Q.   And when you saw Duane Costa, he was intoxicated,
23   correct?
24        A.   No.
25        Q.   Did you ask him if he needed any treatment at the
```

Kathi A. Fedden, Sr. Court Reporter

518

1    time before you started speaking to him, yes or no?

2         A.   No.

3         Q.   Did you ask him if he needed any medication, yes or

4    no?

5         A.   No.

6         Q.   Did you perform any tests on him to see if he was

7    intoxicated, yes or no, prior to your speaking to him at 7:50

8    p.m. [sic]?

9         A.   No.   We observed no signs of intoxication.

10        Q.   Well, it was reported to you that the car smelled

11   of alcohol, correct?

12                    MR. ROSENBLATT:   Objection.

13                    THE COURT:   Overruled.

14        Q.   Correct?

15        A.   Yes.

16        Q.   And it was reported also to you that Duane Costa

17   was intoxicated, correct?

18        A.   No, nobody told me he was intoxicated.

19        Q.   It was reported to you that he was under the

20   influence of alcohol, correct?

21        A.   Yes.

22        Q.   Didn't you want to see if he understood what was

23   happening in this room with you, yes or no?

24        A.   I don't understand the question, I'm sorry.

25        Q.   Didn't you want to wait until he sobered up until

1    you took a statement from him?

2         A.   Again, I saw no signs of intoxication from

3    Mr. Costa.  We had a very lucid conversation.  There was no

4    slurring of words.

5              MS. GOLOMBEK:  I'm moving to strike as

6         unresponsive.  The question called for a yes or no

7         answer, your Honor.

8              THE COURT:  Overruled.

9         A.   Can you ask the question again?

10        Q.   Sure.

11             MS. GOLOMBEK:  Can I have the question read

12        back, please?

13             THE COURT:  Yes.

14             (Whereupon, the penultimate question was read

15        back by the reporter.)

16        A.   He was sober.

17        Q.   Well, you didn't test him to see if he was sober,

18   did you?

19             MR. ROSENBLATT:  Objection; asked and

20        answered.

21             THE COURT:  Sustained.

22        Q.   Did you perform the finger to nose test on him to

23   see if he was sober?

24             MR. ROSENBLATT:  Objection.  He indicated he

25        gave no tests.

Kathi A. Fedden, Sr. Court Reporter

```
 1            Q.   Did you ask him to walk a straight line to see if
 2    he was sober?
 3                 MR. ROSENBLATT:  Objection.
 4                 THE COURT:  Okay.  Ms. Golombek, he said he
 5            didn't perform any tests with regard to determining
 6            intoxication.
 7            Q.   Didn't you want him to sleep it off prior?
 8                 MR. ROSENBLATT:  Objection.
 9            Q.   Prior to your taking a statement from him?
10                 MR. ROSENBLATT:  Objection.
11                 THE COURT:  Overruled.
12                 MR. ROSENBLATT:  It assumes a fact not in
13            evidence, Judge.
14                 THE COURT:  Correct, but I'm going to overrule
15            the objection and allow the detective to answer.
16            A.   I'm sorry, you are going to have to repeat the
17    question.
18            Q.   Didn't you want him to sleep off the alcohol prior
19    to taking a statement so it would be a fair statement,
20    Detective?
21            A.   No.  Again, I saw no signs of intoxication or
22    impairment.
23            Q.   That's because you didn't want it to be a fair
24    statement, did you?
25                 MR. ROSENBLATT:  Objection.
```

Kathi A. Fedden, Sr. Court Reporter

521

1                    THE COURT:  Overruled.

2        A.    I did want it to be a fair statement.

3        Q.    You wanted to put down in your statement what you

4   wanted to put down and not what Duane Costa wanted to put

5   down, correct?

6        A.    No.

7        Q.    Well, did you have Duane Costa write the statement,

8   yes or no?

9        A.    Did I have him what?

10       Q.    Did you have him write the statement?  I notice

11  it's typed.  Did you have him write it?

12       A.    No.

13       Q.    Well, didn't you want his version of what happened?

14       A.    Yes, which is why I asked him questions and he gave

15  me answers which I used to write the statement.

16       Q.    Well, let me ask you something, you have pen and

17  paper in the precinct, right?

18       A.    Yes.

19       Q.    And when you said Duane Costa signed the rights

20  card, correct?

21       A.    Yes.

22       Q.    So you know Duane Costa can write, correct?

23       A.    Yes.

24       Q.    So you are telling us you have pen and paper in the

25  precinct and you know he can write and you don't ask him to

522

1   put down his version of what happened, is that what you are

2   telling us?

3       A.   No.  I have never allowed a defendant to write

4   their own statement while I have been here in Nassau County.

5       Q.   Well, you never allow a defendant to write their

6   own statement because you don't want their story of what

7   happened, do you?

8                MR. ROSENBLATT:  Objection.

9                THE COURT:  Overruled.

10      Q.   Do you?

11      A.   I do want their version, yes.

12      Q.   You want to write down your version so that you can

13  obtain a conviction, which was your job as the carrying

14  detective correct, yes or no?

15               THE COURT:  I think that's a compound question

16       there, Ms. Golombek.

17      Q.   You wanted the statement to be written in your

18  words and your ideas so you could obtain a conviction,

19  correct?

20      A.   No, I wanted the statement to be true and accurate.

21      Q.   You wanted it to be your version of what you wanted

22  to be true and accurate, correct, yes or no?

23      A.   No.

24      Q.   Well, let me ask you, in this taking of this

25  statement, since there was -- first you took notes, correct?

523

1      A.   Yes.

2      Q.   When you take notes, didn't you ask Duane Costa to

3    take the notes and write down his own notes?

4      A.   No.

5      Q.   This question and answer, this period where you are

6    taking notes?

7      A.   Yes.

8      Q.   That's, of course, recorded, correct?

9      A.   I'm sorry, I couldn't hear that middle part of your

10   question.

11     Q.   That, of course, is recorded, correct?

12     A.   Recorded how?  I don't understand.

13     Q.   You video recorded it, correct?

14     A.   No.

15     Q.   You didn't video record it?

16     A.   No.

17     Q.   Didn't you want to memorialize it so we could

18   actually see the conditions at the time that Duane Costa was

19   signing a statement?

20     A.   There is no recording devices or equipment in the

21   Third Squad interview room.

22     Q.   Well, how about body camera, did you have a body

23   camera on so we could see what was going on?

24     A.   No.

25     Q.   Did you have a body camera so we could see the

Kathi A. Fedden, Sr. Court Reporter

1    condition of Duane Costa on October 28, 2018 when the

2    statement was given?

3              MR. ROSENBLATT:  Objection.

4         Q.   Allegedly.

5              THE COURT:  The detective said he didn't have

6         a body camera.

7         Q.   How about there is video recording done at the

8    District Attorney's Office, correct?

9         A.   Yes.

10        Q.   Of course, you took him to the District Attorney's

11   Office to have his statement that you say he made video

12   recorded, correct?

13        A.   No.

14        Q.   Oh, you didn't do that here?

15        A.   No.

16        Q.   Well, didn't you want to memorialize it so that we

17   could see Duane Costa's condition on October 28, 2018?

18             MR. ROSENBLATT:  Objection; asked and

19        answered.

20             THE COURT:  Overruled.

21             MS. GOLOMBEK:  Well, this was as to --

22             THE COURT:  Overruled.

23        A.   No, it would not be what we would normally do.  I

24   would not be taking him to record a statement he gave.

25        Q.   It's not what you wanted to do here, but you do

1    take persons, defendants to the District Attorney's Office
2    for video recordings, correct?
3                    MR. ROSENBLATT:  Objection to the comment at
4        the beginning, Judge.
5                    THE COURT:  What was the comment in the
6        beginning?
7                    MR. ROSENBLATT:  That that's not what he
8        wanted to do.
9                    THE COURT:  Sustained.
10                   Rephrase your question.
11       Q.   Defendants are taken to the District Attorney's
12   Office for video recordings in certain cases, correct?
13                   MR. ROSENBLATT:  Objection; asked and
14       answered.
15                   THE COURT:  Overruled.
16       A.   Yes.
17       Q.   It wasn't done here, was it?
18                   THE COURT:  Okay that's asked and answered.
19   We know that that didn't happen.
20       Q.   How about tape recorder, you, of course, tape
21   recorded the conversation that you say happened, correct,
22   between you and Duane Costa?  You tape recorded it, no?
23       A.   No.
24       Q.   Oh, you didn't tape record it either?
25       A.   No.

Kathi A. Fedden, Sr. Court Reporter

1    Q.    So we only have your testimony as to what happened,
2    correct?
3    A.    You have the statement that I took from Mr. Costa
4    that he read over and signed.
5    Q.    Well, you have the statement that you typed,
6    correct?  That's what we have.  Your statement that you
7    inputted into the computer, correct?
8    A.    Yes.
9    Q.    That's what we have, correct?
10   A.    Correct, based off the answers that Mr. Costa
11   provided, yes.
12   Q.    That's based on what you say the answers are that
13   Mr. Costa provided, correct, yes or no?
14              MR. ROSENBLATT:  Objection.
15              THE COURT:  Yeah, sustained.
16   Q.    Now, this room that Duane Costa was in, this room
17   is approximately four by six, correct?
18   A.    Give or take.  It's probably a little bit bigger
19   than that.
20   Q.    Five by seven?
21   A.    Yeah, five by seven, five by eight.
22   Q.    Mr. Costa wasn't free to leave, was he?
23   A.    No.
24   Q.    And it was just yourself in the room and Detective
25   Pichardo was in the room when it was signed, correct?

527

1      A.   Yes.

2      Q.   But he wasn't in the room the whole time, was he,

3    Detective Pichardo?

4      A.   Detective Pichardo was with me the whole time.

5    · Q.   And at the time that you are reading from the

6    rights card, Duane Costa is seated in a chair, correct?

7      A.   Yes.

8      Q.   And the room, this four by seven or five by seven

9    room is closed.  The door is closed, correct?

10     A.   Yes.

11     Q.   And it's in a precinct, correct?

12     A.   Yes.

13     Q.   And there is many police officers in the precinct,

14   correct?

15     A.   Yes.

16     Q.   And there is detectives outside the door, correct?

17     A.   Yes.

18     Q.   And there is police officers outside the door,

19   correct?

20     A.   Yes.

21     Q.   And Mr. Costa can't go home, can he?

22     A.   Nope.

23     Q.   And Mr. Costa not only is in a chair, but he's

24   cuffed correct?  One hand is cuffed, correct?

25     A.   Yes, one hand was cuffed to the desk.

Kathi A. Fedden, Sr. Court Reporter

1      Q.    So one hand is cuffed to the desk and the other

2   hand is not cuffed, correct?

3      A.    Correct.   There is only one handcuff in that

4   interview room.

5      Q.    And the reason only one hand is cuffed is so that

6   Duane Costa can sign, correct?

7      A.    I don't know that that's the purpose of only one

8   hand is cuffed.   It's just that's what was set up in the

9   room.

10     Q.    That's one of your purposes in leaving Duane

11  Costa's hand loose was that he could sign the statement that

12  you wrote, correct?

13     A.    Yes, definitely a free hand.

14              THE COURT:   Wait.

15              Finish your answer.

16     A.    Yes, so he could sign the statement.

17              THE COURT:   It's actually 4:30 and we have to

18       break.   I'm not authorized for any overtime, so I will

19       see everybody back here at 10:30 tomorrow.   We will

20       continue with your cross-examination, Detective.

21       Detective, I'm admonishing you not to speak to anybody

22       about your testimony as you are in the middle of

23       cross-examination.

24              THE WITNESS:   Yes, Judge.

25              THE COURT:   Thank you.

Kathi A. Fedden, Sr. Court Reporter

529

1           MR. ROSENBLATT:  Judge, if I can get one

2      clarification before we leave for the day.  I envision

3      resting tomorrow as I indicated yesterday and I

4      indicated today.  Your Honor indicated that if we finish

5      tomorrow we need to be prepared for the defense case or

6      summations.  I'm asking Ms. Golombek what she

7      anticipates for tomorrow.

8           MS. GOLOMBEK:  Honestly, I have no idea,

9      Judge.  My client has -- we are discussing the

10     possibility of putting on a case, Judge.  I don't have a

11     definitive answer.  If I had a definitive answer, I

12     could let you know.  Part of it depends on what happens

13     tomorrow on the direct case, your Honor.  So part of it

14     is contingent on that.

15          My client still doesn't know whether he wants

16     to testify, Judge, and that also depends on the

17     testimony tomorrow.  So, I don't have the answer.  If I

18     knew one way or the other, I could tell the Court, but I

19     honestly don't know one way or the other.

20          THE COURT:  I don't anticipate that you are

21     going to be done in the morning with your case,

22     Mr. Rosenblatt.  We still have cross-examination of this

23     witness and you have two additional witnesses to put on,

24     in which case I think it will be too late in the day

25     even if you rest, if there is no case to be put on by

1    the defense, for you to have time to do summations.  So

2    in any event, we will not do summations tomorrow.  We

3    will figure out another date if there is no further

4    testimony for tomorrow.

5            MS. GOLOMBEK:  And there is also the requests

6    to charge and charge conference.

7            THE COURT:  You are right.

8            MS. GOLOMBEK:  I realize you are the trier of

9    fact.

10           THE COURT:  I understand.  You can have

11   requests to charges, absolutely.

12           See everybody tomorrow at 10:30.

13           MR. ROSENBLATT:  Thank you, Judge.

14           MS. GOLOMBEK:  Thank you, Judge.

15           THE COURT:  Have a good night.

16           (Whereupon the trial was adjourned to November

17   17, 2021.)

18

19            *                *                *

20

21

22

23

24

25

Kathi A. Fedden, Sr. Court Reporter

531

1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU :   PART 38
2   --------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4
                   -against-                    Indictment No. 1934N/18
5
                                                BENCH TRIAL
6   DUANE COSTA,

7                       .        DEFENDANT.
     --------------------------------------x
8
                            Mineola, New York
9                           November 17, 2021

10
     B E F O R E:    HON. PATRICIA HARRINGTON
11                   Acting Supreme Court Justice

12

13  A P P E A R A N C E S:

14
                   (Same as previously noted.)
15

16
                        Kathi A. Fedden
17                      Senior Court Reporter

18
             *                *                *
19

20                 THE CLERK:   For the record, this is Indictment

21      1934N of 2018, the People versus Duane Costa.

22                 Counsel, your appearance, People.

23                 MR. ROSENBLATT:   For the People, Assistant

24      District Attorney Jared Rosenblatt.   Good morning, your

25      Honor.

1              THE COURT:  Good morning.

2              MR. NELSON:  Ryan Nelson.  Good morning.

3              THE COURT:  Good morning.

4              MS. GOLOMBEK:  Good morning, your Honor, for

5  Duane Costa, Lori Golombek, 114 Old Country Road,

6  Mineola, New York.

7              THE COURT:  Good morning.

8              THE CLERK:  Sir, you are Duane T. Costa?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Good morning, Mr. Costa.

11             THE DEFENDANT:  Good morning.

12             THE COURT:  So we're going to be continuing

13  today with the trial and we were in the middle of

14  cross-examination of Detective Bourguignon by

15  Ms. Golombek.

16             Before we bring in the detective, is there

17  anything for the record?

18             MR. ROSENBLATT:  I'll do it later, Judge, it's

19  fine.

20             THE COURT:  So let's bring in Detective

21  Bourguignon.

22

23

24

25

1    D E T.   W I L L I A M   B O U R G U I G N O N, Shield #1307,

2         assigned to the Gang Investigation Unit of the Nassau

3         County Police Department, having been previously

4         called as a witness on behalf of the People, having

5         been previously duly sworn by the Clerk of the

6         Court, was examined and testified as follows:

7              THE CLERK:  Please remember that you are still

8         under oath.

9              THE WITNESS:  Yes.

10             THE COURT:  Good morning, Detective.

11             THE WITNESS:  Good morning.

12             THE COURT:  So, Ms. Golombek, whenever you are

13        ready.

14             MS. GOLOMBEK:  Thank you, Judge.

15             May I see what's been marked into evidence as

16        People's 38, please?  And also while you are at it, may

17        I see People's 39?  Thirty eight is the rights card.

18        Thirty nine is the statement.

19             (Handed to counsel.)

20   CROSS-EXAMINATION (Cont'd)

21   BY MS. GOLOMBEK:

22        Q.   Detective Bourguignon, on the rights card that you

23   testified about which is in evidence as People's 38, I see

24   that the name Duane Costa is signed there.  Did you tell

25   Duane Costa to sign his name?

1      A.   Yes.

2      Q.   Did you tell him to put down the word yes next to

3   the question, Do you understand, yes or no?

4      A.   Yes.

5      Q.   Did you tell him, Now that I have advised you of

6   your rights, are you willing to answer questions, did you

7   tell him to write down the word yes?

8      A.   After he verbalized yes, yes.

9      Q.   And you told him to put his signature down,

10  correct?

11     A.   Yes.

12     Q.   Did you tell him he could write the word no down?

13     A.   I did not.

14     Q.   So you never told him next to the question, Do you

15  understand you can write no?

16     A.   I did not.  I asked -- I read him the rights.  He

17  verbalized yes.  I said write down yes and sign your name

18  next to it.

19     Q.   Thank you.

20          MS. GOLOMBEK:  I move to strike that as

21     unresponsive.

22          THE COURT:  Overruled.

23     Q.   Now, you asked, Now that I have advised you of your

24  rights, are you willing to answer questions?  Did you tell

25  him he could write the word no down?

1       A.    No.

2       Q.    Did you tell him he could write nothing down?

3       A.    No.

4       Q.    Did you tell him next to the question, Do you

5   understand you could write nothing down?

6       A.    I'm sorry, repeat?

7       Q.    Next to the question, Do you understand, did you

8   tell him that he could write nothing down?

9       A.    No.

10      Q.    And the time that's written on that card, was that

11   written by you?

12      A.    Yes.

13      Q.    So you didn't tell Duane Costa write down the time,

14   correct?

15      A.    I wrote the time.

16      Q.    And immediately upon entering that interrogation

17   room, because that five by room -- the room you testified is

18   approximately five by seven, the interrogation room, did you

19   read the rights right away?

20      A.    No.  As I stated previously, I went in, introduced

21   myself and said I would be back and I came back in shortly

22   thereafter.

23      Q.    Was Detective Pichardo left in the room at that

24   time with Duane Costa?

25      A.    No.

1          Q.    When you went back in the room was Duane Costa

2    sleeping?

3          A.    No.

4          Q.    He was slumped over, correct?

5          A.    No, he was sitting in a chair.

6          Q.    Now, the statement, what's been marked into

7    evidence as People's 39, I notice there is a signature at the

8    bottom of the page that says Duane Costa.  Did you show Duane

9    Costa where to put his signature down?

10                    THE COURT:  Ms. Golombek, to be clear, there

11          are two pages there, so you are talking about the first

12          page?

13                    MS. GOLOMBEK:  I am talking about the first

14          page.

15         Q.    Did you show him where to put his signature down?

16         A.    Yes.

17         Q.    And you pointed to it, correct?

18         A.    Yes, I showed him which line to write on.

19         Q.    And on the rights card you also showed him which

20   line to write the word yes, correct?

21         A.    Yes.

22         Q.    And you showed him which line to write his

23   signature, correct?

24         A.    Yes.

25         Q.    And on page one you showed him where to put his

1    signature, correct?

2        A.    Yes.

3        Q.    You never told him on page one of the statement

4    that he didn't have to put his signature down, correct?

5        A.    No, I did not.

6        Q.    And you never told him that he didn't have to write

7    anything down at all on the first page, correct?

8        A.    No, I did not.

9        Q.    And on the second page of the statement which was

10   marked into evidence as People's 39, you told Duane Costa

11   where he had to put his name down at the bottom of the page,

12   correct?

13       A.    Are you referring to page two?

14       Q.    Page two.

15       A.    Yes.

16       Q.    And you pointed to the place, correct?

17       A.    Yes.

18       Q.    And the printed portion of the rights that are

19   contained on item 49 [sic], that's already preprinted,

20   correct, prior to you typing into the computer, correct?

21              THE COURT:   I'm sorry, that's item 39.

22              MS. GOLOMBEK:   Thirty nine, which is the

23       statement of Detective Bourguignon.

24       Q.    The statement that you typed, the rights card, on

25   the beginning of the card, that's already preprinted on the

 1   form, correct?

 2       A.    I'm sorry, you are saying card.  Are you referring

 3   to the rights card or the statement?

 4       Q.    I'm referring to the statement, item 39.  That's

 5   already preprinted, correct?

 6       A.    The jargon in there, yes, correct.

 7       Q.    I'll read it to you so you can tell me what it is.

 8   I have been told by the detective-police officer.  Detective

 9   is circled.  There is a little circle in a box.  That I have

10   a right to remain silent.  It goes on.

11            Is that already preprinted?

12       A.    Yes.

13       Q.    Or did you write that?

14       A.    It's preprinted.

15       Q.    So that's not anything that Duane Costa said to

16   you, correct?

17       A.    No.

18       Q.    So you already had it in the form so that if

19   anybody looked at this, they would say he was read his

20   rights, correct?

21       A.    No.  I read him his rights already off the rights

22   card.

23       Q.    So this was just there, correct?

24       A.    Correct.  It's a standardized form, yes.

25       Q.    Let me ask you this:  On this standardized form,

1   the top of the statement says Statement of Admission.  That's

2   already preprinted, correct?

3       A.   Yes.

4       Q.   Duane Costa never said to you I'm going to make an

5   admission, did he?

6       A.   Did he use those exact words, is that what you are

7   asking me?

8       Q.   Did he --

9               THE COURT:  Please, again.  We have to go

10      through this every day.  Please wait, Ms. Golombek,

11      please wait until the detective has finished his answer

12      and, Detective, wait until Ms. Golombek has finished her

13      question, okay.

14      Q.   Did he say to you I'm going to make an admission?

15      A.   No.

16      Q.   So that's already in the form that you have which

17  you are going to generate from the machine, from the

18  computer, correct?

19      A.   Ask the question, again, sorry.

20      Q.   That's the form that you intend on generating from

21  the computer that says Statement of Admission, correct?

22      A.   That's correct, that's a form that is generated

23  from the computer, correct.

24      Q.   So your purpose here is to get an admission from

25  Duane Costa, correct?

1    A.    Yes.

2    Q.    And that's to do whatever it takes to get an

3    admission from Duane Costa, correct?

4    A.    I don't understand the question.

5    Q.    Well, you are going to do whatever it takes to get

6    his signature on the bottom of these two pages, correct?

7    A.    Within legal forms, yes.

8    Q.    Well, this statement that you wrote, your

9    statement, you, of course, had Duane Costa read this aloud,

10   didn't you?

11   A.    No, I read it to him and then I allowed him to read

12   it to himself and then he signed it.

13   Q.    Well, let me stop you there.  You say that he read

14   it to himself.  On this morning did you have Duane Costa read

15   the first line -- while he's in the room with you from

16   approximately 7:50 a.m. until 9:10 p.m., do you have him read

17   the first few lines out loud so you know that he understands

18   what he's reading?

19   A.    No.

20   Q.    Well, you know that he's had a few drinks, correct?

21   A.    Yes.

22   Q.    And when someone has a few drinks, in your

23   experience, their judgment may be impaired, correct?

24   A.    Potentially, depending on when they consumed the

25   drinks and the time that we're interacting.

```
1        Q.    Correct.

2              So now you knew that Duane Costa was under the

3     influence of alcohol, correct?

4                    MR. ROSENBLATT:  Objection.

5                    THE COURT:  Overruled.  We did cover this

6         yesterday, Ms. Golombek, so move on, okay.

7                    I overruled the objection, so you can answer

8         the question, Detective.

9        A.    As I stated yesterday, I saw no signs of impairment

10    and we had a very lucid conversation.

11       Q.    Well, when you had this question and answer period

12    which you said lasted for about ten, 15 minutes before you

13    wrote your statement, Duane Costa indicated to you he had a

14    few beers, correct?

15       A.    Earlier in the evening prior to Ms. Grant picking

16    him up, he stated to me yes, he had two Heineken beers.

17       Q.    And you had a conversation with Detective -- one of

18    the detectives that informed you that the car that was

19    stopped, there was a smell of alcohol, correct?

20       A.    Yes.

21       Q.    So you know that Duane Costa was under the

22    influence of alcohol that morning, correct?

23       A.    No.

24       Q.    Well, you didn't know that even though he told you

25    he had a few beers that night?
```

1       A.    He had two Heineken beers is what he articulated to

2    me.

3       Q.    So when he said that to you, didn't that alert you

4    to the fact that he may not understand the document that is

5    given to him, yes or no?

6       A.    No.

7       Q.    So you are saying in your experience dealing with

8    people that are under the influence, you take it for granted

9    they are going to understand every document they see?

10              MR. ROSENBLATT:  Objection.

11              THE COURT:  Sustained.

12       Q.    Well, when you say you read it to him -- I read it

13    to himself, you never heard him read it, did you?

14       A.    No.

15       Q.    So you have no way of knowing whether he read it or

16    not; isn't that correct, yes or no?

17       A.    I handed it to him and he took about a minute to

18    look it over, so yes, I assumed he was reading it and this

19    was again after I read it to him.

20              MS. GOLOMBEK:  I move to strike.  First of all

21        it's speculation.  He said I assumed.

22              THE COURT:  Overruled.

23       Q.    Now, you indicated that you gave Duane Costa an

24    opportunity to make changes to this statement, correct?

25       A.    Yes.

Kathi A. Fedden, Sr. Court Reporter

1        Q.    And I didn't see any cross-outs, correct?

2        A.    Correct.

3        Q.    Well, you never gave Duane Costa a pen, did you,

4    yes or no?

5              While you were in that room with him, did you give

6    him a pen?

7        A.    He had a pen to sign the statement.

8        Q.    But you took the pen back; isn't that correct?

9        A.    The pen sat on the desk.

10        Q.    Isn't it true when you said to him do you want to

11    make any changes or corrections, he didn't have a pen

12    available, correct?

13        A.    No, he had a pen available.

14        Q.    He didn't have a pen in his possession; isn't that

15    correct, yes or no?

16              MR. ROSENBLATT:  Objection; asked and

17        answered.

18              MS. GOLOMBEK:  There is a difference, Judge,

19        between available and in possession.

20              THE COURT:  Where was the pen?

21              THE WITNESS:  On the desk within his reach.

22        Q.    Well, he's cuffed to the desk with one hand,

23    correct?

24        A.    Yes.

25        Q.    And you took the pen back after you had him sign

1    his name, correct?

2        A.    Yes.

3        Q.    Now, these -- of course, when Duane Costa was

4    speaking, you then were typing into the computer to generate

5    your statement, correct?

6        A.    I'm sorry, repeat the question.

7        Q.    Well, as you are talking to Duane Costa, you said

8    you walked into the room, you read the rights card and then

9    you have a conversation with Duane Costa, correct?

10       A.    Yes.

11       Q.    Well, that conversation was an interrogation,

12   correct?

13       A.    Yes.

14       Q.    And as you are doing this interrogation, you are

15   not typing words into the computer at the same time, are you?

16       A.    No, I was taking notes.

17       Q.    So first you take your notes, right?

18       A.    Yes.

19       Q.    And you write down in your notes what you want to

20   say, correct?

21       A.    I'm writing down what Mr. Costa is saying.

22       Q.    And we, of course, don't have that memorialized in

23   any video recordings, correct?

24       A.    No, I do not.

25       Q.    Or any tape recordings, correct?

```
 1                    MR. ROSENBLATT:  Objection; asked and answered
 2          yesterday.
 3                    THE COURT:  Overruled.
 4          Q.   And we don't have any independent witnesses; isn't
 5     that correct?
 6                    Other than yourself and Detective Pichardo in the
 7     room, there is no impartial person in the room, is there?
 8          A.   Correct, it was just us three.
 9          Q.   And he, of course, Detective Pichardo is the lead
10     detective, correct?
11          A.   On the precinct level, yes, he was the lead
12     detective.
13          Q.   And he handed the case to you, correct?
14          A.   Correct.
15          Q.   And you're responsible for a conviction, correct?
16          A.   Yes.
17          Q.   And while you are in this interrogation room with
18     Duane Costa, you are sitting right next to him, correct?
19          A.   Mr. Costa is to the left of the desk handcuffed and
20     I'm sitting at the chair where you would be able to put a
21     chair under the desk.
22          Q.   That's a few feet away, correct?
23          A.   Correct, a few feet away.
24          Q.   It's a few feet away, even maybe less than a foot,
25     correct?
```

1          A.    A few feet, yes.

2          Q.    About two feet?

3          A.    If this was the desk, he's cuffed here, I would be

4     sitting there.  So approximately where myself and the

5     stenographer is.

6                 MS. GOLOMBEK:  Can we stipulate to about two,

7          three feet, your Honor?

8                 THE COURT:  That's not three feet.

9                 You want to measure that, Detective?

10                (Whereupon, the witness took a measurement.)

11                THE COURT:  About two feet?

12                THE WITNESS:  No, it's definitely three feet.

13                THE COURT:  Oh, I'm sorry.  I'm sorry.

14                MS. GOLOMBEK:  What was the measurement?

15                THE COURT:  It was three feet.  I'm sorry, I'm

16         the one that said I don't think it was three feet.  I

17         was incorrect.

18                MS. GOLOMBEK:  Well, Judge, I haven't seen it,

19         so I'm asking you.  I mean, I don't know.

20                THE COURT:  Well, the detective said three

21         feet.

22                MS. GOLOMBEK:  So why don't I approach and

23         take a look and so there is no question for this.  May I

24         do that, Judge?

25                THE COURT:  Sure.

Kathi A. Fedden, Sr. Court Reporter

1              (Whereupon, the witness took a measurement.)

2                   THE WITNESS:  Approximately three feet.

3                   THE COURT:  Just so the record is clear, I

4          provided a 12 inch ruler to the detective so that he

5          could measure the distance that he testified to.

6    BY MS. GOLOMBEK:

7         Q.    And Detective Pichardo is standing over you --

8    Detective Pichardo is standing, correct?

9         A.    Yes.

10        Q.    And he's standing over Duane Costa, correct?

11        A.    No.

12        Q.    He's a few feet from Duane Costa closer to you,

13   correct?

14        A.    He's behind me, you know, to my right and left

15   because --

16        Q.    So if Duane Costa made any sudden movement,

17   Detective Pichardo could grab him, correct?

18        A.    I'm sorry, I don't understand what you are asking.

19        Q.    I said if Duane Costa made any movement whatsoever,

20   Detective Pichardo could grab him, correct?

21        A.    He was standing because there was only two seats in

22   the room and Mr. Costa was handcuffed to the desk, so he

23   wouldn't be able to move very far.

24        Q.    So the purpose for Detective Pichardo standing was

25   to intimidate Duane Costa; isn't that correct?

Det. 1 Bourguignon-People-Cross

1      .    A.    No.

2           Q.    As you are taking down the words, they are not

3      simultaneous.  As you are taking down the words on page one

4      of People's 39, which is your statement of admission, you are

5      not typing into the computer while Duane Costa is speaking,

6      correct?

7           A.    Correct.

8           Q.    So you put down in the computer your version of

9      what you wanted to put down, correct?

10                     MR. ROSENBLATT:  Objection.

11                     THE COURT:  We did go over this yesterday,

12          Ms. Golombek.

13                     MS. GOLOMBEK:  I don't know that we did.

14                     THE COURT:  Yes, we did.  I will overrule the

15          objection at this point in time, but we did go over this

16          yesterday.  You can answer, Detective.

17                     THE WITNESS:  Thank you, Judge.

18                     THE COURT:  What was the question?

19          Q.    You put down your version of what you wanted to put

20     down in your statement; isn't that correct?

21          A.    No.

22          Q.    Well, didn't you want to write down -- didn't you

23     want to type into the computer as Duane Costa was speaking so

24     that you can get every word down?

25          A.    No, there was no computer in the room, so as I

 1   stated, we did the question and answer.  I took notes.  Those

 2   notes were used to create the statement which I read to

 3   Mr. Costa and allowed him to make any changes.

 4        Q.   Didn't you create the statement in front of Duane

 5   Costa?

 6             MR. ROSENBLATT:  Objection; asked and

 7        answered.

 8             MS. GOLOMBEK:  Oh, no, it wasn't, Judge.  He

 9        said the computer wasn't there.

10             THE COURT:  So it wasn't created in front of

11        Mr. Costa then, right.

12             MS. GOLOMBEK:  I want that answer.

13        A.   No, it was not.

14        Q.   So you went out of the room to have that statement

15   generated, correct?

16        A.   Yes.

17        Q.   And you had Duane Costa sign before his -- before a

18   statement was generated, correct?

19        A.   No.

20        Q.   You had him sign a blank statement of admission;

21   isn't that correct?

22        A.   No.

23        Q.   Now, the words in the statement, they're your

24   words, not Duane Costa's words, correct?

25        A.   They were Mr. Costa's answer to my questions based

Kathi A. Fedden, Sr. Court Reporter

1    on my notes.

2        Q.   You --

3            THE COURT:  Again, please, please wait until

4        he's finished before you ask your next question.

5            MS. GOLOMBEK:  I thought he was finished,

6        Judge.

7            THE COURT:  He wasn't.  Please just wait.

8        Q.   You formulated the words; isn't that correct?

9        A.   Based off Mr. Costa's answers, yes.

10       Q.   Now, the words, I was just scared and didn't want

11   to get arrested, you are saying that's Duane Costa's words?

12       A.   He said that to me.

13       Q.   But, of course, we don't have that recorded,

14   correct?

15           MR. ROSENBLATT:  Objection.

16           THE COURT:  Okay, I'm going to sustain the

17       objection.

18       Q.   And, of course, while you are in the room with

19   Duane Costa, you looked at his hands to see if there was any

20   gunpowder residue, correct?

21       A.   No.

22       Q.   You never saw any gunpowder residue on his hands,

23   did you, yes or no?

24       A.   No.

25       Q.   You never saw any gunpowder residue on his

Kathi A. Fedden, Sr. Court Reporter

1    clothing, did you?

2        A.    No.

3        Q.    Now, prior to having Duane Costa in this

4    interrogation room, you never heard that Duane Costa was

5    running with a phone, did you?

6        A.    I'm sorry?

7        Q.    Did you ever learn that Duane Costa was running

8    with a cell phone?

9        A.    No.

10       Q.    Did you ever have any -- did you ever learn that

11   Duane Costa was hiding with a cell phone?

12       A.    No.

13       Q.    Now, you indicated that you went to get -- you

14   executed a search warrant for the cell phone, correct?

15       A.    Yes.

16       Q.    And you had no reason to believe that Duane Costa

17   was using a cell phone during this incident, correct?

18                    MR. ROSENBLATT:  Objection.

19                    THE COURT:  Sustained.

20       Q.    And you had learned that Duane Costa -- well, you

21   learned that there was a phone in the vehicle, correct?

22       A.    Yes.

23       Q.    And that was April Grant's vehicle, correct?

24       A.    I don't remember if it was registered to her, but

25   yes, it was the vehicle she was operating.

```
 1        Q.   And this phone that you executed a search warrant
 2   for, you have no way of knowing whether Duane Costa used that
 3   phone prior to your obtaining the search warrant, correct?
 4        A.   I don't know the use of the phone, no.
 5        Q.   And upon your execution of the search warrant, you
 6   had no reason to believe he was using that cell phone,
 7   correct, yes or no?
 8        A.   I don't know if he was using the cell phone, no.
 9        Q.   So you were merely going on an expedition to try to
10   find any information you could against Duane Costa; isn't
11   that correct, yes or no?
12                  MR. ROSENBLATT:  Objection.
13                  THE COURT:  Sustained.
14        Q.   Now, this phone that you executed a search warrant
15   for, you don't know if there were any messages that were
16   altered in the cell phone, correct?
17                  MR. ROSENBLATT:  Objection, outside the scope.
18                  THE COURT:  Well, let me ask a question, the
19        search warrant that you executed, Detective, was that to
20        search the vehicle for the phone?
21                  THE WITNESS:  Correct.
22                  THE COURT:  Did you -- were you involved at
23        all with the search warrant to actually search the
24        phone?
25                  THE WITNESS:  We wrote the search warrant and
```

```
 1              then the phone was brought to Electronics to go be
 2              processed.
 3                        THE COURT:  But was there a search warrant to
 4              actually go into the phone?
 5                        THE WITNESS:  Yes.
 6                        THE COURT:  That's not the same as the search
 7              warrant to search the car?
 8                        THE WITNESS:  Correct, a different warrant.
 9                        THE COURT:  Please, Ms. Golombek, be specific
10              as to what you are talking about.
11    BY MS. GOLOMBEK:
12         Q.    You were involved with the search warrant for the
13    vehicle or the search warrant for the phone?
14         A.    Both.
15         Q.    And on the search warrant for the phone, you have
16    no way of knowing if any messages in that phone or anything
17    in that phone was altered or deleted, do you?
18                        MR. ROSENBLATT:  Objection.  If I can be
19              heard, your Honor.
20                        THE COURT:  Yes.
21                        MR. ROSENBLATT:  Judge, this witness was only
22              asked questions as to whether he obtained the warrant.
23              A later witness will discuss the results of it.  I think
24              it's outside the scope of my direct to go into the
25              results of that warrant through this witness.
```

Kathi A. Fedden, Sr. Court Reporter

1          MS. GOLOMBEK:  It's cross-examination, Judge.

2    I should have latitude.

3          THE COURT:  I'm aware of cross-examination.

4          Detective, did you review the results of the

5    search warrant of the phone?

6          THE WITNESS:  No, I did not.

7          THE COURT:  Okay.  So the objection is

8    sustained and ask your next question.

9    Q.    On February 26, 2014 you recall a report of a

10   violation of your violation of departmental rules for

11   engaging in conduct unbecoming an officer or a member of the

12   department which is prejudicial to the good order and

13   efficiency of the police department which, based on

14   interviews of yourself and other police officers, there were

15   emails using a departmental computer terminal of Police

16   Officer Landsman and it was without Police Officer Landsman's

17   permission or knowledge and there were seven unauthorized

18   emails reaching 29 other department members.  Do you recall

19   being reprimanded for that?

20   A.    Yes.

21   Q.    Do you recall being -- and that was for violation

22   of Department Rule 1(2) where you were founded of misconduct

23   for improper -- you were founded for misconduct for violation

24   of departmental rules and you were also found to be in

25   violation of Article 5, Rule 17(3) for disseminating

1    photographs, literature or other material that can create a
2    hostile work environment regarding the same emails, correct?
3        A.    Yes.
4        Q.    And there were derogatory terms used as faggot and
5    also the slur of your stupid Spanish accent.  Do you recall
6    those violations?
7        A.    Yes.
8        Q.    And the misconduct for which you were founded,
9    correct?
10       A.    Yes.
11       Q.    And for that the disciplinary action was 40 hours
12   of administrative discipline; isn't that correct?
13       A.    Yes.
14              MS. GOLOMBEK:  One moment.
15              (Pause in the proceedings.)
16       Q.    Now, on the statement which is marked into evidence
17   as People's 39, there is a time written on the bottom by
18   Duane Costa's name which says 9:10 a.m.  Did you write that?
19       A.    No.
20       Q.    Did Duane Costa write that?
21       A.    I believe so.
22              MS. GOLOMBEK:  One moment.
23       Q.    Isn't it true you don't know who wrote that?
24       A.    It looks like Mr. Costa's handwriting.
25       Q.    And you're an expert on Mr. Costa's handwriting?

1          A.    No.

2          Q.    Did you ever see any other work with Mr. Costa's

3    handwriting?

4          A.    No.

5                MS. GOLOMBEK:    I have no further questions of

6          this witness at this time.

7                THE COURT:    Thank you very much.

8                MR. ROSENBLATT:    No redirect, your Honor.

9                THE COURT:    Thank you very much, Detective.

10         You are excused.    Have a good rest of the day.

11               THE WITNESS:    You too.

12               (Whereupon, the witness was excused.)

13               THE COURT:    Do you have another witness,

14         Mr. Rosenblatt?

15               MR. ROSENBLATT:    Yes.    The People call

16         Detective Michael Maloney.

17               Judge if I can make a brief record before

18         Detective Maloney comes in.

19               THE COURT:    All right.

20               MR. ROSENBLATT:    Prior to the start we had a

21         conversation where I advised Ms. Golombek that the

22         timeline video that I had given her yesterday which was

23         all of the video in a combined form, I edited or I asked

24         Detective Maloney to edit it and add about a minute's

25         worth of time for the video I'm going to use today.    All

 1          of the video in its entirety was turned over previously,

 2          but for the purposes of this witness I'm going to use

 3          this disc today.

 4                    THE COURT:  All right.

 5                    MR. ROSENBLATT:  I would ask -- well, I can

 6          mark it now or later.  It's up to you.

 7                    THE COURT:  You can mark it now.

 8                    MR. ROSENBLATT:  I'm going to ask it be marked

 9          as Exhibit 40.

10                    THE COURT:  Forty for identification.

11                    MS. GOLOMBEK:  Judge.

12                    (Whereupon, People's Exhibit 40 was received

13          in evidence.)

14                    COURT OFFICER:  People's 40 marked for ID.

15                    THE COURT:  What do you want to say?

16                    MS. GOLOMBEK:  Judge, I made a motion in

17          limine.  I renewed it yesterday.  I was told that

18          witness wasn't testifying until today.  I believe I was

19          told it was this witness.  I'm going to renew it once

20          again.  I understand there are pictures, your Honor.

21          The purpose of the pictures, I submit, are prejudicial

22          to my client with him with a weapon.

23                    Judge --

24                    MR. ROSENBLATT:  It's the next witness, not

25          this one.

```
 1                    THE COURT:  It's the next witness,
 2        Ms. Golombek.
 3                    MS. GOLOMBEK:  Then I'll renew it again at
 4        that point, Judge.
 5                    THE COURT:  That's fine.
 6                    So we're going to call Detective Michael
 7        Maloney.
 8    D E T.   M I C H A E L   M A L O N E Y, Shield #1338,
 9            assigned to the Electronics Squad Major Case Bureau of
10            the Nassau County Police Department, having been
11            called as a witness on behalf of the People, having
12            been duly sworn by the Clerk of the Court, was
13            examined and testified as follows:
14                    THE CLERK:  Please state your name.
15                    THE WITNESS:  Detective Michael Maloney,
16        M-A-L-O-N-E-Y.  Shield 1338, Nassau County Police
17        Department Electronics Squad Major Case Bureau.
18                    THE COURT:  Good morning and, Mr. Rosenblatt,
19        you may inquire.
20                    MR. ROSENBLATT:  Thank you, your Honor.
21    DIRECT EXAMINATION
22    BY MR. ROSENBLATT:
23        Q.   Good morning, Detective.
24        A.   Good morning.
25        Q.   Tell the Court where do you work?
```

1    A.    I work in the Nassau County Police Department

2    Electronics Squad.

3    Q.    For how long have you been employed by the Nassau

4    County Police Department?

5    A.    Almost 18 years.

6    Q.    Other than working for the Nassau County Police

7    Department, do you have other law enforcement experience?

8    A.    No.

9    Q.    Other than working in the Nassau County Police

10   Department, do you have clearance with other law enforcement

11   departments?

12   A.    Yes.

13   Q.    And who is that?

14   A.    The FBI, Secret Service and I have worked with the

15   State Police in the past.

16   Q.    Detective, what are your duties and

17   responsibilities as a member of the Electronics Squad?

18   A.    We help members of the department or other agencies

19   in gathering digital forensic evidence and analyzing that

20   evidence.

21   Q.    Now, on October 28, 2018 were you working with the

22   Electronics Squad?

23   A.    Yes.

24   Q.    And was it in your capacity as a detective?

25   A.    Yes.

1      Q.   On October 28, 2018 in the early morning hours were

2    you called into work?

3      A.   Yes.

4      Q.   And were you called in to assist in an

5    investigation that occurred in the vicinity of Clinton Avenue

6    and Midwood Street in the Village of Hempstead, County of

7    Nassau?

8      A.   Yes.

9      Q.   What was your role regarding that investigation?

10     A.   I was assisting in gathering video evidence of an

11   incident that occurred there.

12     Q.   Now, Detective, did you respond to a location at

13   375 Clinton Avenue, a BP gas station?

14     A.   I did.

15     Q.   And when you went there, what did you do?

16     A.   I reviewed the system to ensure it was in proper

17   working order.  I viewed the camera system itself to see what

18   angles showed the street and then I retrieved video of an

19   incident that occurred.

20     Q.   Did you also respond to a location at 21 Midwood

21   Street?

22     A.   Yes.

23     Q.   And what was your role at that location?

24     A.   It was a similar role.  I viewed the system to make

25   sure it was in proper working order and what cameras they had

1    that would assist us in gathering information and enhancing

2    our investigation.

3        Q.   Now, can you tell the Court where is 21 Midwood

4    Street in relation to 375 Clinton Avenue, the BP gas station?

5        A.   It's located on a side street just off of Clinton.

6        Q.   If I showed you a photograph of Midwood Street,

7    would you be able to show the Court which house it was that

8    you went to?

9        A.   Yes.

10               MR. ROSENBLATT:  For the record, I'm going to

11       publish --

12               MS. GOLOMBEK:  Objection.  He never said he

13       went to a house.

14               THE COURT:  Yes, he did.  He said he went to

15       21 Midwood Street.

16               MS. GOLOMBEK:  Right.  He said a location.

17               THE COURT:  Maybe he didn't specifically say a

18       residence or a house.

19               What was the location at 21 Midwood Street?

20               THE WITNESS:  It was a home.

21               THE COURT:  All right.

22       Q.   From where you are seated can you see what's on the

23    screen as Exhibit 1?

24       A.   Yes.

25       Q.   And is 21 Midwood depicted on Exhibit 1?

Det. Maloney-People-Direct                563

1        A.    It is.

2        Q.    Tell the Court where.

3        A.    Down the street on the left you will see a yellow

4    fence.  It's just past that.

5        Q.    I'm going to publish Exhibit 11.  Do you see

6    Exhibit 11?

7        A.    Yes.

8        Q.    And can you see the location of 21 Midwood in that

9    photograph?

10       A.    Yes.  If you look towards the middle of the screen

11   you will see the same yellow fence and it's directly next to

12   that yellow fence.

13       Q.    And what color is 21 Midwood?

14       A.    It's a white colored house.

15       Q.    And can you tell us -- you said which side of the

16   street?

17       A.    The right side.

18       Q.    And on which side of the yellow fence?

19       A.    The side closest to us.

20       Q.    I'm pointing to a tree on the right side of the

21   photo.  Is 21 Midwood right behind that tree?

22       A.    It is.

23            MS. GOLOMBEK:  Objection, Judge, that's

24       leading a witness.

25            THE COURT:  Well, it is leading.  It's

1          leading.  That's the bottom line, so I'll sustain the

2          objection.

3          Q.   Where is 21 Midwood on the right-hand side of the

4     street on that photo?

5          A.   It's towards the middle of the screen directly to

6     the right if you were facing that yellow fence.

7          Q.   Now, I want to talk to you about the download of 21

8     Midwood Street.  Were you able to download video?

9          A.   I was.

10         Q.   And where -- tell the Court what you did.

11         A.   During a video canvass as I walked the street we

12    noticed there were video cameras on that home, so we

13    approached the home and inquired about viewing their video.

14    At that time we were given access to the DVR and we previewed

15    the system and were able to catch a couple of video clips

16    which showed the incident.

17         Q.   And how many cameras were you able to download from

18    21 Midwood?

19         A.   Two cameras.

20         Q.   And where were the cameras located on 21 Midwood?

21         A.   One was on the front soffit and one was on the side

22    of the home.

23         Q.   When you say the soffit, what do you mean?

24         A.   The area of the home where like a rain gutter would

25    be.

1          Q.    Now, when you download the video from 21 Midwood

2    Street, were you able to determine whether the time and date

3    on the surveillance system was accurate to real-time?

4          A.    Yes.

5          Q.    Was it?

6          A.    It was not.

7          Q.    And --

8                MS. GOLOMBEK:  Objection.  He just said yes.

9          Now you just wanted a no answer, so you are questioning

10         his answer.

11               MR. ROSENBLATT:  I said were you able to

12         determine whether it was real-time and he said yes and I

13         said what was it, meaning he was able to determine it.

14               THE COURT:  Right.  I don't understand your

15         objection, Ms. Golombek.  I mean, you are free to make

16         it, I just don't understand it.

17               MS. GOLOMBEK:  Yes, he's saying in real-time.

18         Then he had to ask again was it and he said no.

19               MR. ROSENBLATT:  I'll reask the question.

20               MS. GOLOMBEK:  It's unfair.  He's giving an

21         answer and suggesting to change it.

22               THE COURT:  Honestly, that's not what I heard.

23         And you know what, I'm going to have the court reporter

24         read it back so there is no issue.

25               (Whereupon, the requested testimony was read

1          back by the reporter.)

2                    THE COURT:  Thank you.

3                    So Ms. Golombek, do you have any --

4                    MS. GOLOMBEK:  Yeah.  He is saying he

5          determined it was real-time.

6                    THE COURT:  No, he didn't.

7                    MS. GOLOMBEK:  That's my interpretation of it.

8                    THE COURT:  Well, he asked if he examined it

9          to see if it was real-time and after he examined it to

10         see if it was real-time, he said it was not.  That's

11         what the court reporter just read back.

12                   MS. GOLOMBEK:  I interpret it differently, if

13         you examine it and it's not real-time.

14                   THE COURT:  I don't think there is any

15         question or any interpretation of the words that were

16         just stated and the testimony that was just stated by

17         the court reporter and the detective, so I'm going to

18         overrule your objection.

19    BY MR. ROSENBLATT:

20         Q.   Detective Maloney, regarding the surveillance that

21    you viewed and downloaded at 21 Midwood Street, did you

22    determine the time offset?

23         A.   I did.

24         Q.   What is time offset?

25         A.   On computer systems or computer base systems

Det. Maloney-People-Direct

 1    similar to a DVR, the system time needs to be either in sync
 2    with something called network time protocol which would
 3    automatically adjust the time to the local time.
 4              · We determined that this system was not following
 5    that network time protocol and the time was manually set.  So
 6    in the event of a power outage or Daylight Savings time, the
 7    time will not automatically adjust on its own, it will be off
 8    by whatever set period of time the system is down or not
 9    functioning or Daylight Savings time.  It could be off by up
10    to an hour.  In this case the system was off by three hours
11    and 59 minutes.
12         Q.   And when you say it was off by three hours and 59
13    minutes, regarding the time that 21 Midwood displays on the
14    surveillance, was it three hours and 59 minutes fast or slow?
15         A.   Fast.
16         Q.   Meaning that we would have to subtract three hours
17    and 59 minutes to determine real-time?
18         A.   Yes.
19              MS. GOLOMBEK:  Judge, objection.  He doesn't
20         have to interpret what three hours and 59 minutes means.
21         That interpretation came from the ADA.  Again, he's
22         testifying.
23              THE COURT:  Can you rephrase the question,
24         Mr. Rosenblatt, please?
25         Q.   How·do we determine what the actual time was from

1    the surveillance on the 21 Midwood?

2         A.    Upon arriving at a location, when we do a video

3    download, we verify the screen on time matches that of our

4    Verizon issued department cell phone.  During that time

5    period at this location I noticed that the time was not

6    accurate and it was actually three hours and 59 minutes in

7    the future.

8         Q.    Did you review the surveillance at 21 Midwood and

9    ultimately download it?

10        A.    I did.

11        Q.    Did you also go to the location of 375 Clinton

12   Avenue -- excuse me, Clinton Avenue to the BP gas station?

13        A.    I did.

14        Q.    Tell the Court what you did at the BP gas station.

15        A.    I reviewed the camera system at the BP gas station

16   to see what exterior views there were.  Upon reviewing the

17   system, we downloaded some cameras which covered the outside

18   of the location and we verified the system time there also,

19   which was not accurate.

20        Q.    What did you determine regarding the time at the BP

21   gas station at 375 Clinton Avenue on October 28, 2018?

22        A.    It was fast by 49 minutes.

23        Q.    Did you download the video from 375 Clinton Avenue?

24        A.    I did.

25        Q.    What camera angles did you download from 375

1    Clinton Avenue?

2         A.    We downloaded all the exterior camera angles and

3    the particular cameras of interest were a camera which showed

4    Midwood and Clinton and another one which showed the top of

5    the pumps or the middle of the pump area facing Clinton.

6         Q.    Ultimately did you take the videos that you

7    downloaded from 21 Midwood Street on October 28, 2018 and 375

8    Clinton Avenue, the BP gas station and put it into a timeline

9    for myself?

10                   MS. GOLOMBEK:  Objection, leading, Judge.

11                   THE COURT:  Overruled.

12        A.    I did.

13        Q.    And did you confirm that the actual video that you

14   had download was an exact duplicate of the timeline video you

15   created for my office?

16                   MS. GOLOMBEK:  Objection, Judge, he's

17              suggesting and he's leading.  He's saying exactly what

18              the witness should be saying he was doing.

19                   THE COURT:  No, I'm going to overrule the

20              objection.

21        A.    Can you repeat the question?

22                   MR. ROSENBLATT:  Can I have it read back, your

23              Honor?

24                   THE COURT:  Yes.

25                   (Whereupon, the last question was read back by

Kathi A. Fedden, Sr. Court Reporter

```
 1            the reporter.)

 2       A.   Yes, I did.

 3                 MR. ROSENBLATT:  Your Honor, at this time I

 4       would ask the witness to be shown what's been pre-marked

 5       as People's Exhibit 40 for identification purposes.

 6                 THE COURT:  All right.

 7                 (Handed to witness.)

 8       Q.   Do you recognize, Detective, what's in front of you

 9  as Exhibit 40 for identification?

10       A.   I do.

11       Q.   What is it?

12       A.   It's a copy of a timeline video I created.

13       Q.   And what's contained in that timeline video?

14       A.   It's a combination of video clips taken from

15  Midwood and from the BP gas station sequenced in order so we

16  could follow the incident as it -- post-incident as it

17  occurred.

18       Q.   When you say in sequence, what do you mean from a

19  timing perspective?

20       A.   We go from a video clip closest to the crime scene

21  and then follow it towards the BP gas station and then

22  through the BP gas station parking lot in video.

23       Q.   Does that timeline video include the exact

24  duplicate of the videos you downloaded from 375 Clinton

25  Avenue and 21 Midwood Street from October 28, 2018 shortly
```

1    after 12:45 in the morning?

2         A.    It does.

3              MR. ROSENBLATT:  Your Honor, I would ask that

4    Exhibit 40 be received.

5              THE COURT:  Let's show it to Ms. Golombek.

6              (Handed to counsel.)

7              MS. GOLOMBEK:  I have no objection, your

8    Honor.

9              THE COURT:  All right, so People's 40 will be

10    marked in evidence.

11              (Whereupon, People's Exhibit 40 was received

12    in evidence.)

13              COURT OFFICER:  So marked.

14         Q.    I'm also now going to hand you, Detective, what's

15    been received into evidence as Exhibits 33 and 37 and just

16    take a look at those.

17              (Handed to witness.)

18         Q.    Let's start with Exhibit 37 is what's on the screen

19    in front of you.

20         A.    Yes.

21         Q.    And do you recognize this?

22         A.    Yes.

23         Q.    What do you recognize it to be?

24         A.    It's a still image taken from the video at the BP

25    gas station.

1          Q.    And on the top left is a date and a time.  Can you
2     see that?
3          A.    Yes.
4          Q.    What is the actual time that that depicted?
5          A.    So the time on the screen reads October 20, 2018
6     [sic] at 1:39 a.m. and five seconds.  And this system
7     happened to be 49 minutes fast.
8          Q.    So how do we determine the real-time?
9          A.    So we would subtract 49 minutes from 1:39 a.m.
10         Q.    What was the date that you said, I didn't hear you?
11         A.    10/28/2018.
12         Q.    So this image is October 28, 2018 at 12:50 and five
13    seconds, is that the actual time?
14         A.    Yes.
15         Q.    And I'm going to show you now what's in evidence as
16    Exhibit 33.  Do you recognize this?
17         A.    Yes.
18         Q.    And what do you recognize Exhibit 33 to be?
19         A.    It's another still image taken from the video five
20    seconds later.
21         Q.    And are both of these contained in video form on
22    this timeline video, Exhibit 40?
23         A.    Yes.
24              MR. ROSENBLATT:  Your Honor, at this time may
25         I play what's in evidence as Exhibit 40?

1              THE COURT:  Yes.

2              (Whereupon, People's Exhibit 40 in evidence

3        was played in open court.)

4        Q.    Now, the video is playing.  It's at ten seconds and

5   the bottom right says camera four.  What location is this?

6        A.    This is the Midwood Street location.

7        Q.    21 Midwood?

8        A.    Yes.

9        Q.    And where should we focus our attention?

10       A.    The top right corner in between the Christmas

11  lights, the first Christmas light and the second Christmas

12  light you will see persons move through the screen.

13       Q.    Okay, we'll watch.

14             And this is the offset that you indicated was three

15  hours and 59 minutes?

16       A.    Yes.

17       Q.    So we -- withdrawn.

18             And did you just see something, Detective?

19       A.    Yes.

20       Q.    What did you see on the video?

21       A.    A person run from the right most corner diagonally

22  across on that sidewalk and you will see another person now

23  entering.

24       Q.    It now went to camera three and what are we looking

25  at here?

1          A.    The top right corner once again you will see a

2     person, the first person which we believe to be the subject

3     followed by the --

4                     MS. GOLOMBEK:  Objection as to we believe.

5                     MR. ROSENBLATT:  I'll withdraw the question,

6          your Honor.

7          Q.    What location is this?

8          A.    Midwood.

9          Q.    21 Midwood Street?

10         A.    Yes.

11         Q.    And what location is on the top right portion of

12    that video?

13         A.    The BP gas station.

14         Q.    This is now it says camera ten.  We're at two

15    minutes and 23 seconds in.  What location is this?

16         A.    The BP gas station.

17         Q.    This is the 49 minute offset?

18         A.    Yes.

19         Q.    This is now camera 11.  We're at three minutes and

20    15 seconds into this video.  What location is this?

21         A.    BP gas station.

22         Q.    And this says camera 13.  We're now at three

23    minutes and 40 seconds.  What location is this?

24         A.    This is also the BP gas station facing south.

25                     MS. GOLOMBEK:  Objection.  The ADA just said

1    we're now at three minutes and 40 seconds.  It doesn't

2    say that, Judge.

3              MR. ROSENBLATT:  Sure it does, at the bottom

4    of the screen.  Now it says 3:57 into the timeline

5    video.

6              MS. GOLOMBEK:  Judge, the document speaks for

7    itself.  The ADA should not be reading off the screen.

8              THE COURT:  It's in evidence.

9              MR. ROSENBLATT:  I'm just documenting from the

10   evidence, your Honor.

11             THE COURT:  I appreciate that.  The objection

12   is overruled.

13        Q.   I just want to pause the video at two minutes and

14   45 seconds into the timeline video.  What direction are we

15   looking at from BP gas station in this video?

16        A.   This is north by northeast.

17        Q.   And at the end of the video was which direction?

18        A.   That's south looking southbound on Clinton, but

19   it's actually south by southeast.

20        Q.   Detective, I have published now Exhibit 14.  Do you

21   recognize this?

22        A.   Yes.

23        Q.   What do you recognize it to be?

24        A.   The BP gas station.

25        Q.   Now, on the top of the BP overhang, what do you

1    observe?

2         A.    There is cameras and fire suppression equipment.

3         Q.    Did you go into the BP gas station on October 28,

4    2018 to determine whether all of those cameras recorded?

5         A.    Yes.

6         Q.    Did they?

7         A.    I did observe everything and they did not record.

8         Q.    What do you mean by that?

9         A.    There are cameras systems at all gas stations that

10   view the pumps that are near the fire suppression equipment.

11   They are not always recording.  It's my finding and my

12   practice that most of them don't record.

13        Q.    And did you down --

14                    MS. GOLOMBEK:  Objection as to his practice.

15                    THE COURT:  Sustained.

16        Q.    Did you download all of the video surveillance that

17   was recording on October 28, 2018 at approximately 12:45 in

18   the morning that you could?

19        A.    I did.

20                    MR. ROSENBLATT:  Your Honor, I have no further

21             questions of the detective.

22                    THE COURT:  All right, thank you.  I have a

23             matter that I have that we were supposed to do at 12:15.

24             It's a bail situation, so I guess it's better if we

25             break now and we'll come back this afternoon at 2:15

1    because I have a sentence at 2:00.

2              MR. ROSENBLATT:  Judge, if I may, I don't know

3    how long Ms. Golombek is going to be, but both Detective

4    Maloney and Detective Brady are testifying for another a

5    DA's jury trial downstairs, so I don't know if it's at

6    all possible to start the cross for five to ten minutes

7    because at some point we're going to need the same

8    witnesses and, quite frankly, I don't know how long you

9    can cross-examine somebody regarding the downloading of

10   videos.

11             THE COURT:  Well, we can certainly get started

12   and do ten minutes.  That's not a problem.

13             MR. ROSENBLATT:  Thank you, Judge.

14             THE COURT:  I just didn't want --

15             MS. GOLOMBEK:  Well, then we run into the

16   problem of me possibly repeating things today which I

17   was told today on Bourguignon I asked something from

18   yesterday when he has to be excused and that happens.

19   I'm happy to start.

20             THE COURT:  It's only going to be a few hours,

21   it's not a whole day, right?

22             I appreciate what you are saying,

23   Mr. Rosenblatt, but the officers have to bring Mr. Costa

24   down and bring up the other individual and it's just not

25   going to work.  So we'll work with your witnesses and, I

1    mean, they both can't testify at the same time

2    presumably, so, you know, hopefully we will be able to

3    start cross-examination of you, Detective Maloney, at

4    2:15.  If he's called at that moment to testify in the

5    other trial, then we can postpone cross and we'll start

6    with the direct of Detective Brady.

7              MR. ROSENBLATT:  I appreciate that, Judge.

8    Thank you very much.

9              THE COURT:  Detective Maloney, you will be

10   beginning cross-examination, so please do not discuss

11   your testimony with anybody.

12             THE WITNESS:  All right, thank you.

13             THE COURT:  Have a good lunch, everybody.

14             (A luncheon recess was taken.)

15             AFTERNOON SESSION

16             THE CLERK:  This is continued trial of

17   Indictment 1934N of 2018, the People versus Duane Costa.

18   All parties are present.  The prosecution is here, the

19   defense is here and the defendant is here.

20             THE COURT:  All right, so we were going to be

21   starting the cross-examination of Detective Maloney now

22   but he is required to testify in a jury trial

23   downstairs.  Certainly it's not my intent to hold up the

24   jurors.  So, while he's doing that, we're going to go

25   ahead with the next witness which would be Detective

 1    Brady and I know that you have an application with

 2    regard to that, Ms. Golombek.

 3              MS. GOLOMBEK:  I do.  One moment.

 4              (Pause in the proceedings.)

 5              MS. GOLOMBEK:  Yes, Judge.  Judge, I brought

 6    up this issue prior to the trial, during the trial and

 7    I'm going to bring it up again.  I understand this is

 8    the relevant witness.  This witness is intending on

 9    introducing a certain phone number and messages from

10    that phone number, whether it be text messages,

11    photographs, Judge.

12              Judge, first of all, there is -- first of all,

13    I submit to the Court there was no probable cause to

14    search the phone.  There is no showing that it was my

15    client's phone whatsoever.  It's attached to a number.

16    There is no showing my client used the phone, that it

17    belonged to my client or anything like that, Judge.  I

18    submit, Judge, that if you find that there was probable

19    cause and the search warrant should have been issued,

20    Judge, which I have litigated before and I believe it

21    was litigated before your Honor, Judge.  If I'm

22    incorrect, it might have been Judge Sturim.  In any

23    event, the photographs that the People intend to

24    introduce which have been shown to me or disclosed in

25    discovery are photographs of a weapon, Judge.

Proceedings                                                     580

1          Judge, there is no showing that the weapon --

2     first of all, there is no showing that the weapon is, in

3     fact, the same weapon.  There is no showing that it's

4     not a toy weapon.  There is no showing that it was

5     possessed by my client, that it was used by my client.

6     It could have been used for a Rap video.  I have had

7     cases where guns have been used for Rap videos and

8     videotaped, so there is no showing.

9          I submit that any intent to introduce that

10    phone is merely for prejudice on my client, Judge.  It

11    is not evidence of my client's use during this case.

12    During the case there is absolutely no testimony that my

13    client during which there was this run or this hiding in

14    a yard, Judge, or this running into a yard where he's

15    apprehended, there is allegedly -- there is no showing

16    that he used the phone during that time, that he made

17    any calls during that time.

18          Judge, there is one further thing.  Also, the

19    search warrant had expired at the time it was gone into,

20    Judge, so, I believe this is an illegal search of

21    somebody's phone and there was no reason to search this

22    person's phone, especially on an expired search warrant,

23    your Honor.  It was searched 60 days after the

24    expiration of the search warrant, Judge.  It just can't

25    be a system where the police department and the DA's

1     office run loose and do whatever they want, Judge, to

2     prejudice my client. It certainly would deprive my

3     client of a fair trial. And when you weigh any

4     probative value against the prejudicial value, it's

5     clearly prejudicial to my client and there is no showing

6     that it's relevant or that it's related to my client at

7     all.

8           So, I am moving that the People should not

9     introduce this witness, to strike any testimony from

10    Detective Bourguignon regarding a cell phone, regarding

11    the execution of the cell phone and not allow this

12    witness to testify and not allow the People to introduce

13    into evidence any photographs of a weapon.

14          THE COURT: Thank you.

15          Mr. Rosenblatt.

16          MR. ROSENBLATT: So, Judge, I think there is

17    two issues that are before your Honor at the moment.

18    One of them was brought up the other day, which is the

19    ten pages of material that I submit were not

20    discoverable that I submitted, as well as the issue

21    regarding or, I guess, three issues, the second being

22    the prejudice and the next being the timeliness of the

23    warrant. I think I have outlined regarding those ten

24    pages how I don't believe A, that they are discoverable

25    and even if they were, we're --

Kathi A. Fedden, Sr. Court Reporter

1              THE COURT:  We're not talking about the ten

2       pages.

3              MR. ROSENBLATT:  But they all apply to Brady.

4       She had made the application.

5              THE COURT:  Can you first address the warrant

6       and the phone issue?

7              MR. ROSENBLATT:  Sure.  So the warrant was

8       signed on November 21, 2018 by Judge Corrigan.  And the

9       phone began to be searched on November 26th of 2018,

10      which is five days later.  Now there are a slew of cases

11      that talk about the execution of a warrant of a phone

12      that begins within the ten days and continues afterwards

13      and that's what we're talking about here.

14              And so I can cite those cases for your Honor

15      and I will in a moment.  The first one is People v.

16      Deprospero.  It's a Court of Appeals case from 2013.

17      People v. Ruffin is a First Department case from 2019.

18      I have a federal case which is interpreting state law,

19      but I'll stick with these for the moment.

20              Basically, Judge, what the Courts hold is when

21      you are talking about executing a warrant, the intrusion

22      of the individual's privacy begins upon the recovery of

23      the phone and the execution of that warrant and it

24      continues forward.  The warrant signed by Judge Corrigan

25      specifically authorizes the police to gain assistance

Proceedings

1    from outside agencies to assist them in getting into the

2    phone.  In particular, the bottom of page two and the

3    top of page three of the order says, You are further

4    authorized in carrying out the above commands to utilize

5    the assistance of others with expertise in decoding

6    and/or obviating password protections and/or encryptions

7    and in transferring, downloading, converting, dumping or

8    draining of data from the memory of the subject cell

9    phone in order to minimize possible loss or alteration.

10           And it continues, Such experts may be members

11   of law enforcement organizations or from companies which

12   manufacture or service such electronic devices or from

13   the computer or telecommunications industries.  And

14   that's what happened in this case.

15           On November 26th the police attempted to

16   execute the warrant signed by Justice Corrigan.  They

17   were unsuccessful in getting into it.  They continued

18   that search with the assistance of an outside agency and

19   were successful in getting into it in January, I

20   believe, of 2019.  That's what was done in this case and

21   that's what I believe the Court of Appeals and the

22   Appellate Division has held is acceptable.

23           There has been no violation of the defendant's

24   rights by continuing the execution or attempted

25   execution of this item.  It's been seized.  That's what

Proceedings                                            584

1    the purpose of this is.

2            When we talk about ten days, the Court and the

3    statute are looking to prevent 15 days later going back

4    into somebody's house where it's a clear violation of

5    their expectation of privacy after ten days.  There the

6    search has ended.  When we're talking about electronics,

7    in particular in phones, that's what was permitted and

8    that was done in this case.

9            MS. GOLOMBEK:  Judge, if I may be heard.

10           THE COURT:  Wait.  Is Mr. Rosenblatt done yet?

11           MS. GOLOMBEK:  I thought he was.  He said that

12   was done in this case.  I thought he was done.

13           THE COURT:  I think he was still going on.

14           MR. ROSENBLATT:  That's in regards to the

15   timeliness of it.

16           In regards to the prejudice, I think the

17   standard cited by Ms. Golombek, quite frankly, is wrong.

18   The question is is there a danger of unfair prejudice

19   when compared to the probative value of the item that is

20   being offered.  The item that is being offered is a cell

21   phone that was testified to by Police Officer Rilling, I

22   believe, that he observed in the defendant's hand a

23   large iPhone which at the time was an iPhone 8 Plus.

24   That was the larger phone at the time.  They executed a

25   warrant.  It wasn't in there.  They then obtained that

1   black iPhone and it was executed pursuant to the GIS

2   number 306 of 2018.

3          When Detective Brady testifies, what I

4   anticipate him saying is that he ultimately got the

5   phone when executing the warrant, was able to observe

6   the home page or the screen, the home screen which

7   appears to be, and at least I'll be arguing, Mr. Costa

8   with two children.  When going through the phone, there

9   is a .40 caliber Smith & Wesson which is the exact same

10  gun which I will argue was the gun Mr. Costa dropped and

11  a unique Czech weapon as described that was found in the

12  backyard near where Mr. Costa and his jacket were found

13  which ballistically matches the casings that were fired

14  at Officer Rilling and Officer Kraemer.

15         Finally, there will be a photo of what I

16  submit will be Mr. Costa with two guns on his chest

17  which I will argue is the .40 caliber Smith & Wesson and

18  the unique Czechoslovakian gun with a Heineken over his

19  face that I believe mirrors the defendant, Mr. Costa.

20         So when we talk about does the prejudice

21  substantially outweigh the probative value, I think this

22  is extremely probative, combined with the fact, Judge,

23  that these messages were sent by Mr. Costa on I believe

24  October 27th, the day before this incident for which we

25  are before your Honor took place.

1                     So, I don't think that there is any piece of

2         evidence, other than the videos and the testimony, it's

3         all overwhelming, Judge, but this is -- the undue

4         prejudice does not substantially outweigh the probative

5         value.  So, I believe that answers Ms. Golombek's issues

6         today.

7                     MS. GOLOMBEK:  First of all -- is

8         Mr. Rosenblatt finished, ADA Rosenblatt finished?

9                     THE COURT:  Since he sat down, I'll assume he

10        was.

11                    MS. GOLOMBEK:  I have to ask for a mistrial

12        once again.  He has showed you photographs that are not

13        in evidence.  He's explained to you the photographs,

14        Judge.  They are not in evidence.  You are the trier of

15        fact.  He has already prejudiced my client.  If you are

16        not going to grant the mistrial, then obviously I would

17        ask for an adverse inference against the People.  I

18        would also ask that you instruct yourself to disregard

19        that, Judge, if you determine that it should be

20        disregarded.

21                    But I would like to go into what the CPL

22        690.30 provides regarding search warrants, Judge, and

23        the search warrant order signed by Judge Corrigan which

24        was signed on November 21, 2021 indicates that the

25        search warrant has to be executed within ten days of the

1    issuance of the warrant.  So it would have had to have

2    been done by December 9th, Judge.  It was not done by

3    December 9th.  It I'm sorry, it's supposed to be done by

4    November 30, 2018 and I have the cell phone

5    investigation form from the Electronics Squad.  I'm

6    going to mark this as People's E [sic].

7                  THE COURT:  Defendant's E.

8                  MS. GOLOMBEK:  Defendant's E.

9                  I also want to mark the search warrant order

10   as Defendant's F.

11                  I also want to mark another document and that

12   will be the Cellebrite certification and business record

13   and that will be Defendant's G.

14                  THE COURT:  So E is what?

15                  MS. GOLOMBEK:  That was the search warrant

16   order signed by Judge Corrigan.

17                  And F is the certification and business record

18   of Cellebrite.

19                  THE COURT:  There was something else in there.

20                  MS. GOLOMBEK:  Oh, there was a Nassau County

21   Police Department Electronics Squad cell investigation

22   form.

23                  THE COURT:  I think that's F and G you had

24   asked for.

25                  THE CLERK:  That's E.

Kathi A. Fedden, Sr. Court Reporter

```
 1                    THE COURT:  That's E and the search warrant
 2        order is F and the certification from Cellebrite is G.
 3                    MS. GOLOMBEK:  D was the search warrant order,
 4        correct?
 5                    THE COURT:  No, F is the search warrant order.
 6        E is the Electronic Squad's investigation form and G is
 7        the certification of the business record of Cellebrite.
 8        You are asking these be marked in evidence?
 9                    MS. GOLOMBEK:  Yes, I am asking.  They were
10        provided to me by the District Attorney's Office as part
11        of discovery.
12                    THE COURT:  Any objection?
13                    MR. ROSENBLATT:  To be received into evidence?
14                    MS. GOLOMBEK:  Yes.
15                    THE COURT:  She wants them to be marked into
16        evidence.
17                    MS. GOLOMBEK:  I want it to be on the record.
18                    MR. ROSENBLATT:  I have no objection to them
19        being Court exhibits, but to come into evidence during
20        the trial I would object.
21                    THE COURT:  She is marking them as defendant's
22        exhibits.
23                    MR. ROSENBLATT:  She said she wants them in
24        evidence.
25                    MS. GOLOMBEK:  As exhibits because they are
```

1      part of the argument and if in the event this case goes

2      to the Appellate Division, I want the Appellate Division

3      to see these documents.  I'm not saying they will.

4                 MR. ROSENBLATT:  I have no objection for them

5      being marked for identification.

6                 THE COURT:  She wants them marked in evidence.

7                 MR. ROSENBLATT:  I object.  I think they

8      should come in as a Court exhibit.

9                 THE COURT:  Fine, I'll put them in as Court

10     exhibits.  Does that make a difference to you?

11                MS. GOLOMBEK:  No, it doesn't make a

12     difference.  I just want to make my argument.

13                THE COURT:  We'll accept them as Court Exhibit

14     I.

15                MR. ROSENBLATT:  Judge, for a point of

16     clarity, we can keep the letters as long as they are not

17     being used for the purposes of summation or the trial.

18     If they are just being used to memorialize this

19     argument, I don't care what they are marked as.  My

20     issue is whether they are being used as substantive

21     evidence for the purposes of this trial and summation

22     and cross-examination.

23                MS. GOLOMBEK:  I want them used for both,

24     Judge.

25                MR. ROSENBLATT:  That's my objection.

```
 1              MS. GOLOMBEK:  If not, then I ask they at
 2    least be exhibits, but I'm asking for both, Judge.  I
 3    believe it's relevant to the whole issue.
 4              THE COURT:  The search warrant order is a
 5    court record anyway.  You know that was signed by Judge
 6    Corrigan, so I have no problem with that being admitted
 7    into evidence.
 8              MR. ROSENBLATT:  That's F?
 9              THE COURT:  That's F.
10              With regard to this other one, the document
11    that you are looking to put in as E, I don't know what
12    that is.
13              MR. ROSENBLATT:  Can I see it, please?
14              (Handed to counsel.)
15              MS. GOLOMBEK:  Judge, that indicates the
16    expiration of the search warrant, which was November
17    30th.
18              THE COURT:  You have the search warrant order.
19    I said you can have the search warrant order.  I said
20    that's fine and that's marked as F in evidence.  I don't
21    know what this Electronic --
22              MR. ROSENBLATT:  You know what, Judge, I'll
23    consent to them all coming in.  We'll make it a lot
24    easier.
25              THE COURT:  All right, then you have
```

1    Defendant's E F and G.

2           MS. GOLOMBEK:  I'll wait until they are marked

3    until I finish the rest of my argument.

4           (Whereupon, Defendant's Exhibits E, F and G

5    were received in evidence.)

6           COURT OFFICER:  Defendant's E, F and G marked

7    into evidence.

8           THE COURT:  All right, you can continue,

9    Ms. Golombek.

10           MS. GOLOMBEK:  Yes.  Does the prosecution want

11    to see?

12           MR. ROSENBLATT:  I just want to see one thing,

13    sorry.

14           MS. GOLOMBEK:  Judge, according to Exhibit E

15    in evidence, it indicates that the expiration of the

16    cell phone investigation report, that the expiration of

17    the warrant was November 30, 2018.

18           According to the certification and that would

19    be Exhibit G, Cellebrite wasn't engaged by the District

20    Attorney's Office to determine the pass code for this

21    phone until January 9, 2019.  And it further provides,

22    the Cellebrite order, that on January 23rd, using the

23    Cellebrite's trade secret, they determined the pass

24    code.  Judge, that is approximately two months after the

25    expiration of the search warrant.  I don't see any

1    application for a continuance of the search warrant.  I

2    don't see that it should be extended.  This is not the

3    wild west where the People can do whatever they want,

4    Judge.

5         So clearly, clearly, the action of the

6    District Attorney's Office in working with the police

7    department and Cellebrite, Judge, in opening up the

8    phone that they had no permission to do after that time,

9    clearly was not allowed, clearly is not supported by the

10   warrant.

11        Second of all, I would like to have this

12   marked as Exhibit H in evidence.  It's a voucher process

13   to redeem and unlock from Cellebrite.  I would like it

14   marked in evidence and then I would like to admit it

15   into evidence.  It was disclosed to me by the District

16   Attorney's Office.  I would like to show it to the DA.

17        MR. ROSENBLATT:  I'm going to object to this

18   coming into evidence.

19        THE COURT:  Let me see it.  I don't even know

20   what you are talking about.

21        (Handed to the Court.)

22        THE COURT:  What's the relevance of this?

23        MS. GOLOMBEK:  The relevance is it indicates

24   that nothing shall go to Cellebrite without a valid

25   search warrant without an IME number.  There is no

1     indication there was an IME number here and a search

2     warrant was clearly not valid.  There was no asking for

3     an extension, so the People went, like I said, like the

4     people did in the wild west, and they did whatever they

5     wanted here, Judge.

6              Regarding prejudice to my client, I'm going to

7     point out that the search warrant is not my client's

8     phone.  You will see on the search warrant order which

9     is in Exhibit F, it shows the name James

10    S-C-H-M-E-T-T-A-M.  That is not the name of Duane Costa.

11    That's the application of the detective.  But there is

12    no showing in there that it was my client's phone, your

13    Honor.  There was no showing that anything should be

14    used against my client and, once again, the prejudicial

15    value outweighs anything here, Judge.

16              I also had brought up an issue, I also brought

17    up another issue which slips my mind at this moment, but

18    I will bring it back up.

19              Next there has been no showing of chain of

20    custody.  We have gotten no documents at all regarding

21    any chain of custody on the cell phone.

22              And lastly, I had a case in 2019, I could

23    provide the Court with that name, with Judge Peter

24    Vallone, Jr.  The case was before a Queens Supreme

25    Court.  It was a five co-defendant case, four or five

1      co-defendant case, I believe, Judge, and the Judge did

2      not let in photographs.  The photographs were from a Rap

3      video, as I have indicated in the case before, and there

4      is no showing that it was used by the person charged

5      with possession of the gun.  I believe all clients were

6      charged with possession of a gun and those photographs

7      did not come in.  If the Court wants, I can provide it

8      with that case later on, Judge.

9              One further issue when you are done with what

10     you are doing, Judge.

11              (Pause in the proceedings.)

12              THE COURT:  All right, you have something

13     else, Ms. Golombek?

14              MS. GOLOMBEK:  Yes, Judge.  I had brought this

15     up.  I don't know whether I brought it up yesterday or

16     the day before, there should be preclusion because of

17     late disclosure of some of the Cellebrite records.

18              THE COURT:  You are just using those

19     Cellebrite records, so how are you asking me to preclude

20     them?

21              MS. GOLOMBEK:  No, I want to preclude the

22     testimony, not the record.  I want to preclude the

23     testimony of the witness.

24              THE COURT:  With regard to what?

25              MS. GOLOMBEK:  With regard to his entire

1    testimony and with regard to introduction of the

2    pictures.

3              THE COURT:  I looked at those pages provided

4    by Mr. Rosenblatt to you with regard to Cellebrite and I

5    don't see anything in here at all that would be relevant

6    to viewing the phone, what methods were used.  This is a

7    bill for how much it cost the DA and a letter about, you

8    know, saying that we need this being reviewed with the

9    name of the user for the device and the IMEI serial

10   number.  I don't see how any of this is relevant

11   necessarily or has to be provided to you.  This is, to

12   me, just communication dealing with information with

13   regard to getting the cell phone operational.  So, as

14   far as that argument goes, Ms. Golombek, I'm denying

15   your argument for preclusion on that issue.

16              With regard to the search warrant for the

17   phone issue -- oh, also, this document that you are

18   looking to have marked in evidence as H, Defendant's H,

19   I am not going to mark that in evidence as H.  Again, I

20   ·don't see that it has any relevance.  I mean, I have the

21   information about when these things went to Cellebrite.

22   Mr. Rosenblatt is going to -- I don't think

23   Mr. Rosenblatt is going to dispute that date.

24              But with regard to the search warrant, this is

25   kind of a whole interesting situation in this case

Kathi A. Fedden, Sr. Court Reporter

1        because originally, Ms. Golombek, you did a whole big

2        omnibus motion way back when, including the motion to

3        controvert the search warrant.  In open court your

4        client said he wanted to withdraw the motion with regard

5        to the search warrant and that happened.  Then there was

6        another motion was filed to controvert the search

7        warrant and that motion was denied.  And it was denied

8        by me.  So I reviewed all the papers, I have reviewed

9        the search warrants and I denied that motion.

10                 I'm not going -- it's not open for

11       re-litigation today.  So the search warrant is valid at

12       the time.  The only issue as I see it is when you talk

13       about not being executed until more than the expiration

14       date of the warrant.  I now have been able to look at

15       the cases provided by Mr. Rosenblatt and specifically

16       with regard to People v. Ruffin, which is 178 A.D.3d 455

17       First Department 2019.  It specifically says in here

18       that the warrant for the cell phone is deemed executed

19       at the date and time of the issuance of the warrant and

20       they find that to be appropriate in the specific context

21       of phones already in police custody, which this was.

22                 It says the duration of a warrant's authority

23       is more appropriately measured by the persistence of the

24       cause for its issue.

25                 So, here the phones were in police custody at

1    the time that the warrants were issued and nothing had

2    happened since the warrants were signed to diminish the

3    reason for their issuance.  So, accordingly, with regard

4    to your argument that there should be nothing introduced

5    with regard to the cell phone because the warrant --

6    because the information was not fully retrieved from the

7    phone until several months later, I'm denying that.

8            MS. GOLOMBEK:  Judge, I'm just going to note

9    my exception and the reason I'm going to note my

10   exception is because the search warrant order that was

11   submitted to Judge Corrigan clearly stated it was to

12   expire within ten days of issuance.

13           THE COURT:  And you know what --

14           MS. GOLOMBEK:  In the Court of Appeals case

15   that you are referring to, Judge --

16           THE COURT:  I was referring to the Appellate

17   Division First Department.

18           MS. GOLOMBEK:  In the Appellate Division First

19   Department case you were referring to, it did not, I

20   don't believe that case said within ten days of the

21   issuance of the warrant which is why the Court

22   determined the duration.  This case specifically the

23   warrant gives that specific ten days.  It wasn't done

24   here, Judge, so that's why I'm noting my exception.

25           THE COURT:  And you have your exception and I

1    also query as to why wouldn't you have made this motion

2    on papers well before the trial started?  I mean, this

3    is not something that has just come to light since we

4    started the trial.

5              MS. GOLOMBEK:  And I was told by Judge Sturim

6    no more motions, that many motions were done and no more

7    motions.

8              MR. ROSENBLATT:  That's not true.  Judge

9    Sturim had said that because of the frivolous amount of

10   motions that were being filed by both Mr. Costa and

11   Mr. Golombek, that the defendant should do it by Order

12   to Show Cause.

13             MS. GOLOMBEK:  And I should get permission.

14             MR. ROSENBLATT:  And the other issue is that

15   Ruffin does indicate the ten days.  It specifically

16   cites 690.30 which references the ten days.

17             THE COURT:  Based upon Ruffin I am denying

18   your motion to preclude the evidence from the phone

19   because the evidence was not obtained fully until more

20   than a few months after the warrant was signed.

21   However, now with regard to what is discovered on the

22   phone, I haven't seen those pictures.  You indicate,

23   Ms. Golombek, you wanted a mistrial because

24   Mr. Rosenblatt was displaying them to me when they might

25   not be admitted into evidence.  I couldn't see what they

Kathi A. Fedden, Sr. Court Reporter

1    were from here.  And my concern is that this was before

2    this event.  I don't know if you are able to see on the

3    photos the serial numbers or any other identifying

4    characteristics that we did see on the weapons that were

5    recovered on October 28th.  We saw that in the

6    photographs.

7         So, as far as those pictures being admitted

8    into evidence, I'm going to deny that as far as the

9    People's direct case.  However, if the defendant

10   testifies and says he never was in possession of those

11   weapons, then I will allow Mr. Rosenblatt then to bring

12   them in as part of recent fabrication.

13        MR. ROSENBLATT:  So, Judge, as an offer of

14   proof, I believe that on the Czech gun you can compare

15   serial numbers and the gun in the phone you can see the

16   serial number.

17        THE COURT:  Okay, if you can actually see the

18   serial number and it matches, that is one thing.  So I

19   haven't seen them.  I don't want Ms. Golombek to say it

20   should be a mistrial if I look at them to see.

21        Have you shown them to Ms. Golombek and have

22   you compared those pictures with the pictures that are

23   in evidence of the phones that were recovered on October

24   28th and if you can see the numbers, great, then it's

25   the same weapon and that's great.  But if you can't and

1    it's not, then I would only allow it to be introduced

2    into evidence if Mr. Costa testifies and he says that he

3    never was in possession of the weapons that were

4    recovered and then those can be used for

5    cross-examination and even a rebuttal case.

6            MR. ROSENBLATT:  Okay.  Judge, I think the

7    issue as to whether the serial numbers can be viewed is

8    going to be an issue of fact for your Honor.  You know,

9    I can show Ms. Golombek, but I know how it's going to

10   end.  She's going to say she can't see it and I'm going

11   tell you that you can and we are both going to throw up

12   our hands and look to your Honor who is the finder of

13   facts.

14           THE COURT:  Can we just try it?  Let's just

15   try it.  Let's get a couple of pictures that were

16   already in evidence.

17           MS. GOLOMBEK:  Judge, I looked at it.  I can't

18   make it out.  I just make out there is writing, but I

19   can't make out what the writing is.  I used my reading

20   glasses.  I only wear reading glasses.  I use reading

21   glasses.

22           MR. ROSENBLATT:  I could zoom in, Judge.

23           THE COURT:  All right.  I'm not going to look

24   at these pictures because they are not in evidence yet

25   and I don't want another application for a mistrial.  I

Kathi A. Fedden, Sr. Court Reporter

1    will turn my chair around. You can display them on the

2    screen for the defendant and Ms. Golombek and see if you

3    can agree that you can see the numbers on the pictures

4    in the phone.

5            MR. ROSENBLATT:  I understand, Judge.

6            THE COURT:  If you can zoom in and zoom in and

7    if you can see them, then you can see them.  So go

8    ahead, you do that.

9            (Whereupon the Court turned her chair around

10    in the courtroom and away from the projector.)

11            MR. ROSENBLATT:  That's the photo from the

12    phone.

13            Judge, do you want this on the record?

14            THE COURT:  This is off the record because I'm

15    not participating.

16            (Whereupon, a discussion was held off the

17    record between counsel.)

18            THE COURT:  Back on the record.

19            So there is no agreement?

20            MS. GOLOMBEK:  No agreement, Judge.

21            THE COURT:  Then my ruling remains the same

22    that I'm not going to put those pictures in as part of

23    your direct case.  They will only be permitted in if the

24    defendant testifies and denies being in possession of

25    the guns that have been admitted into evidence in this

```
 1          case.   Then you would be able to cross-examine him on
 2          those, as well as put in a rebuttal person.
 3                      MR. ROSENBLATT:   Okay.   So then we're waiting
 4          on Maloney.
 5                      THE COURT:   He has nothing else to say,
 6          Detective Brady?   I don't know, I'm asking.
 7                      MR. ROSENBLATT:   There are photos and videos
 8          that I think are relevant that your Honor is not
 9          permitting me to use, so then I'll rest with Maloney.
10          Can I step outside and see if he's back?
11                      THE COURT:   Yes.
12                      (Pause in the proceedings.)
13                      THE COURT:   So we're back on the record on the
14          trial of People versus Duane Costa.   I realize there was
15          one issue that you had raised, Ms. Golombek, that I did
16          not address that was the chain of custody issue and, as
17          you know, if there are any breaks in the chain of
18          custody, it goes to the weight, not the admissibility of
19          the evidence, so accordingly, with regard to your
20          application to strike that evidence or preclude that
21          evidence, that application is denied.
22                      So we're going to now continue with the
23          cross-examination of Detective Maloney.
24                      (Whereupon, the witness entered the
25          courtroom.)
```

Kathi A. Fedden, Sr. Court Reporter

Det. Maloney/People/Cross
666

1              THE CLERK:  Detective, you are advised you are

2      still under oath.

3              THE WITNESS:  Yes, thank you.

4              THE COURT:  All right, Ms. Golombek, whenever

5      you are ready, you may inquire.

6              MS. GOLOMBEK:  Thank you.

7   CROSS-EXAMINATION

8   BY MS. GOLOMBEK:

9      Q.    Detective Maloney, good afternoon.

10     A.    Good afternoon.

11     Q.    You weren't at this incident on October 28, 2018,

12  were you?

13     A.    After it occurred I responded.

14     Q.    So you weren't present when whatever occurred

15  happened, correct?

16     A.    No.

17     Q.    And at the time on October 28, 2018 you were

18  working for the Nassau County Police Department, correct?

19     A.    Yes.

20     Q.    For the Electronics Squad, correct?

21     A.    Yes.

22     Q.    And you are still working with the Electronics

23  Squad today in the Nassau County Police Department, correct?

24     A.    Yes.

25     Q.    So it's important to you and the police

         1    department -- withdraw that.

         2              And the police department works with the District

         3    Attorney's Office, correct?

         4        A.    Yes.

         5        Q.    And it's important to you the outcome of a trial,

         6    correct?

         7        A.    The truth is more important than the outcome.

         8        Q.    Well, you do want to see a conviction because you

         9    are testifying for the police department, correct?

        10        A.    I am testifying for the police department, yes.

        11        Q.    And if you didn't do a good job testifying, you

        12    would be reprimanded by the police department, correct, yes

        13    or no?

        14        A.    I don't believe so.

        15        Q.    But you might be, correct?

        16        A.    A lot of things might happen.  I can only testify

        17    as to what I know for certain.

        18        Q.    You have testified in court before, correct?

        19        A.    Yes.

        20        Q.    As a matter of fact, you testified in court today,

        21    correct?

        22        A.    Yes.

        23        Q.    And when you testified, you testified for the

        24    prosecution, correct?

        25        A.    Yes.

```
 1        Q.    And you have never testified as a defense witness,

 2   have you?

 3        A.    No.

 4        Q.    Now, prior to today you went over the videotapes,

 5   correct?

 6        A.    Yes.

 7        Q.    And did you go over them this morning?

 8        A.    Yes.

 9        Q.    And did you go over them at other times?

10        A.    Yes.

11        Q.    When else did you go through them?

12        A.    The day of, night of, subsequent days afterwards

13   looking for evidence.

14              MS. GOLOMBEK:  I would ask for the assistance

15         of the prosecution to play the video that was played

16         this morning beginning with camera number three that was

17         played.  I believe it was one point 39 and somewhat

18         hours.

19              THE COURT:  That would be the beginning,

20         correct, Ms. Golombek?

21              MS. GOLOMBEK:  That would be the beginning,

22         yes.

23              (Whereupon, People's Exhibit 40 in evidence

24         was played in open court.)

25              MS. GOLOMBEK:  And I'm going to ask you to
```

1          stop there.

2               Q.  Any point in this video you see somebody running

3      with their arm extended with a gun in it?

4               A.   Not in this particular clip, no.

5               Q.   Okay.

6                    MS. GOLOMBEK:  I ask we go to the next frame.

7          Are we at the next frame?

8                    MR. ROSENBLATT:  I hit play.

9                    THE COURT:  I think it's moving along here.

10                   MR. ROSENBLATT:  You want me to stop it every

11         second for five minutes?

12                   MS. GOLOMBEK:  No, no.

13              Q.   And you are watching what's been marked into

14     evidence as the video, correct?

15              A.   Yes.

16              Q.   And that's People's number 40?

17                   THE COURT:  40.

18                   MS. GOLOMBEK:  Thank you, Judge.

19              Q.   Anyplace here you see a person with an arm extended

20     behind his shoulder with a gun?

21              A.   Not at that particular frame, no.

22                   MS. GOLOMBEK:  If he can continue playing.

23                   MR. ROSENBLATT:  It's playing.

24              Q.   And there is somebody running.

25                   MS. GOLOMBEK:  Stop.

1        Q.   You don't see an arm extended behind somebody's

2   shoulder here, do you?

3        A.   No.

4        Q.   Thank you.

5             MS. GOLOMBEK:   If you can continue playing, I

6        appreciate your assistance.

7        Q.   You can see somebody running, but you can't see an

8   arm extended over somebody's shoulder, correct?

9        A.   Correct.

10       Q.   And you see somebody else running and you don't see

11  that person's arm extended back with a gun in it, do you?

12       A.   No.

13       Q.   And what street is this?

14       A.   Midwood and Clinton.

15       Q.   You see somebody running, but you don't see his arm

16  extended back with a gun in it, do you?

17       A.    If you slow down the frames, when he crosses the

18  driveway apron you can see the silhouette of what appears to

19  be a handgun.

20       Q.   You see a silhouette.  You are talking about the

21  black spot in the ground?

22       A.   No, in the person running's hand.

23       Q.   Well, you see somebody running and you don't see an

24  arm extended back with the person turning their arm back, do

25  you?

```
 1         A.    No.

 2         Q.    No, okay.

 3               And I don't see anywhere in that frame -- what

 4    street is that, is that Midwood?

 5         A.    That's Clinton.

 6         Q.    That's Clinton?

 7         A.    Yes.

 8         Q.    So before we were looking at Midwood and when you

 9    looked at Midwood before you didn't see anyone with their arm

10    extended back with a gun in it, correct?

11         A.    No.

12         Q.    And as you are looking at Clinton.

13               Now we're back at Clinton by the BP gas station,

14    375 Clinton.  You see somebody running, but you don't see his

15    arm extended back with a gun in it, do you?

16         A.    You can see the silhouette of a handgun if you slow

17    that down.

18         Q.    Okay, let's go back.  You see somebody running?

19         A.    Yes the first person running.  Now you will see a

20    puff of smoke right in the center of where the shots were

21    claimed to have been fired right over the top of the gas

22    pump.

23         Q.    You see a puff of smoke?

24         A.    Yeah.  If you go back, you can see it pretty clear.

25         Q.    Do you have any expertise in puffs of smoke?
```

Det. Maloney-People-Cross

```
 1          A.    I'm familiar with gunfire.
 2          Q.    And you --
 3                MS. GOLOMBEK:  Can we go back to that frame?
 4                MR. ROSENBLATT:  What frame?  It's five
 5     minutes of video.
 6                MS. GOLOMBEK:  Can we go back a few minutes
 7     ago?
 8                MR. ROSENBLATT:  To what?
 9                MS. GOLOMBEK:  By the BP gas station on
10     Clinton.  Right there.
11          Q.    There is no puff of smoke there.  You see lights.
12     You see the reflections on the lights, correct?
13          A.    Yes.
14          Q.    But there is bullet casings there, correct?
15          A.    I don't believe they were recovered from there.
16     They were recovered from where the next camera angle was.
17                MS. GOLOMBEK:  If we can just stop the video
18     for a moment, please.
19                I would like to have this marked into evidence
20     as Defense --
21                THE COURT:  H.
22                MS. GOLOMBEK:  Thank you, Judge, as Defense H.
23                THE COURT:  We will mark it for
24     identification.
25                MS. GOLOMBEK:  I'm going to mark all of them,
```

Kathi A. Fedden, Sr. Court Reporter

```
 1                 Defendant's H, I and J.
 2                         THE COURT:  Defendant's Exhibits H, I and J
 3            will be marked for identification.
 4                         (Whereupon, Defendant's Exhibits H, I and J
 5            were marked for identification, only.)
 6                         COURT OFFICER:  H, I and J marked for
 7            identification.
 8                         THE COURT:  You want them shown to the
 9            witness, Ms. Golombek?
10                         MS. GOLOMBEK:  Yes.
11                         THE COURT:  All right.
12                         (Handed to witness.)
13       BY MS. GOLOMBEK:
14            Q.    I ask that you look at Defendant's H and tell us if
15       you recognize it.  That's the first one.
16            A.    It's the BP gas station.
17            Q.    And is that the way the BP gas station looked on
18       October 28, 2018?
19            A.    Yes.
20            Q.    And is that what you viewed when you viewed the
21       videotape?
22            A.    Yes.
23            Q.    And is it in substantially the same condition as it
24       was when you viewed it?
25            A.    Yes.
```

```
1                  MS. GOLOMBEK:  At this time I would ask

2       that -- you want me to do them one at a time, introduce

3       them into evidence or all of them, Judge?

4                  THE COURT:  Why don't you go through all three

5       and then we'll have Mr. Jared -- Rosenblatt take a look.

6       Q.   As to what's been marked as Defense I, I ask you

7  look at it.

8       A.   Okay.

9       Q.   What do you -- do you recognize it?

10      A.   It appears to be the side of the BP gas station on

11 Midwood Street.

12      Q.   And is that the side of the gas station that you

13 viewed?

14      A.   Yes.

15      Q.   Or you viewed the videotape?

16      A.   Yes.

17      Q.   Is it in substantially the same condition as when

18 you viewed it?

19      A.   Yes.

20      Q.   Is it what it looked like on October 28, 2018?

21      A.   Yes.

22      Q.   I would like you to look at Defense marked for --

23 Defense marked as J and I ask you if you recognize it?

24      A.   Yes.

25      Q.   What do you recognize that to be?
```

Kathi A. Fedden, Sr. Court Reporter

1          A.    The front of the BP gas station.

2          Q.    And is that -- does that look like what you viewed

3     when you viewed the videotape on October 28, 2018?

4          A.    Yes.

5          Q.    And is it in substantially the same condition as

6     when you viewed it?

7          A.    Yes.

8                MS. GOLOMBEK:  At this time I would ask that

9          Defense H, I and J be marked into evidence.

10               THE COURT:  All right, let's show them to

11         Mr. Rosenblatt.

12               MR. ROSENBLATT:  I have no objection, Judge.

13               THE COURT:  All right, so Defendant's H, I and

14         J are in evidence.

15               (Whereupon, Defendant's Exhibits H, I and J

16         were received in evidence.)

17               COURT OFFICER:  So marked.

18               MS. GOLOMBEK:  May I have them, please?

19               (Handed to counsel.)

20         Q.    Now, in what's been marked as Defendant's H, I

21    notice that there are cones where there were bullet casings.

22    I would ask that you look at this.

23               (Handed to witness.)

24         Q.    You recall seeing bullet casings by those cones or

25    around the area of where the cones were?

1      A.    I recall seeing the cones, yes.

2      Q.    And you said you walked through the BP gas station,

3   so you did see them, correct?

4      A.    I remember seeing the cones, yes.

5      Q.    Now, where in those pictures do you see somebody

6   running with his arm extended behind his shoulder with a gun?

7   Do you see that in the picture?

8              MR. ROSENBLATT:    Judge, objection.   In the

9         crime scene photos?

10             MS. GOLOMBEK:   Yeah, in the photos.

11             THE COURT:   In Defendant's H in evidence you

12        are asking?

13             MS. GOLOMBEK:   In Defendant's H in evidence,

14        yeah.

15     Q.    Do you see that?

16     A.    No.  These are after the fact.

17     Q.    And what you saw -- you didn't see it in the video

18   either, correct?

19     A.    No.

20     Q.    And I'm going to ask that you look at Exhibit J in

21   evidence.

22             (Handed to witness.)

23     Q.    There is a bullet casing right under one of the

24   video cameras at that gas station, correct?

25     A.    Yes, under the overpass.

1       Q.    And there is no video of somebody with their arm
2    extended behind their shoulder with a gun, is there, in that
3    picture what's marked into evidence?
4       A.    No, this is a picture post-incident of the crime
5    scene.
6       Q.    And we don't have that on the video that you looked
7    at, do we?
8       A.    No, the view is obstructed by the pumps.
9       Q.    Excuse me?
10      A.    The view of the person gets obstructed by the pumps
11   at times.
12      Q.    Well, did you check -- did you download the video
13   from all the pumps?
14      A.    The pump cameras were view only at the time of
15   incident.  We were able to get cameras from the actual
16   building, not the actual overhang cameras.
17      Q.    Well, did you attempt to get the videos from the
18   overhang cameras?
19      A.    Yes.
20      Q.    And did you retrieve them?
21      A.    No, there was no video recorded.
22      Q.    Are you basing that on what the store owner said or
23   did you actually try to download that yourself?
24      A.    No, we investigated and conducted an analysis of
25   the system and determined that there was no recording media.

1    Q.    Well, you are saying you investigated.  Did you

2    actually look inside the camera and see if there was a video

3    by that gas station pump?

4    A.    The particular cameras which are attached to the

5    overhang where the fire suppression equipment is are analogue

6    cameras which contain no recording media to store information

7    or video and they come back to, at the time, I couldn't say

8    what they are now, but at the time of incident they came back

9    to a system which just displayed them on the screen and there

10   was no recording medium in between, so no hard drive, no

11   removable media.

12   Q.    So we can't see today that there is no video of

13   anyone with their hand extended over their shoulder and a

14   gun, correct?  We can't see that, correct?  Because you

15   couldn't get that videotape, correct?

16   A.    Well, there is no videotape to get, so we could not

17   go back in time and watch something that does not exist.

18   Q.    So these videos which would prove that my client is

19   not guilty, we don't have those videos, do we?

20              MR. ROSENBLATT:   Objection.

21              THE COURT:   Sustained.

22   Q.    Now, there's 24 cameras at this BP gas station,

23   correct?

24   A.    I believe including the pump cameras, yes.

25   Q.    Did you download or check all 24 pumps to get those



1  videos?

2      A.    There weren't 24 pumps.

3      Q.    Did you download the videos from 24 pumps?

4      A.    There weren't 24 gas pumps at the gas station.

5      Q.    But there is 24 cameras altogether?

6      A.    Altogether there were, yes.

7      Q.    And did you make an attempt to download each and

8  every one?

9      A.    As I previously stated, yes, I did.

10     Q.    And we're missing at least six, correct?

11             MR. ROSENBLATT:  Objection.

12             THE COURT:  Sustained.

13     Q.    How many were you unable to download?

14             MR. ROSENBLATT:  Objection.

15             THE COURT:  Overruled.

16             You can answer, Detective.

17     A.    I would have to refer to my notes.  I believe it

18  was four cameras that we were able to get video from that

19  actually we're able to see the outside.  Some were the

20  interior of the store area which were not relevant to our

21  particular case.

22     Q.    So we couldn't see 20 of them, correct?

23             MR. ROSENBLATT:  Objection.

24             THE COURT:  Sustained.

25             MS. GOLOMBEK:  I would ask that the rest of

1        the video be played.  ADA Rosenblatt, I would ask that

2        the rest of the video be played for Detective Maloney,

3        please.

4                MR. ROSENBLATT:  The video has been played

5        from beginning to end.  If you want me to go back to a

6        specific portion, I can.

7                THE COURT:  Why don't you play from beginning

8        to end again.

9                (Whereupon People's Exhibit 40 in evidence was

10       played in open court.)

11   Q.   Just stop me when you see somebody reaching with

12   their hand over their shoulder shooting a gun or their hand

13   behind their shoulder with a gun.  Stop me any time,

14   Detective.

15               MS. GOLOMBEK:  Okay, can you back up a little

16       bit?

17               MR. ROSENBLATT:  To where?

18               MS. GOLOMBEK:  Back it up to 32.

19               MR. ROSENBLATT:  Thirty two what.

20               MS. GOLOMBEK:  Four point five one point 32.

21       You can stop right here, actually.

22               If you can back up.

23               MR. ROSENBLATT:  To where?

24               MS. GOLOMBEK:  Thank you, I'll do it from the

25       picture.

Det. Maloney-People-Cross

```
 1   BY MS. GOLOMBEK:

 2       Q.   I'm going to show you what's been marked as Defense

 3   I.  I notice there is a cone in that photo.  Do you see that?

 4       A.   Yes.

 5       Q.   And that's after a person would have run and turned

 6   the corner, correct?

 7                   MR. ROSENBLATT:  Objection, Judge.

 8                   THE COURT:  Sustained.

 9       Q.   Anyplace in that photo you see somebody running

10   with their arm extended over their shoulder and behind with a

11   gun, extended with a gun?

12                   THE COURT:  You have asked that question.

13                   MS. GOLOMBEK:  Not on that.

14                   THE COURT:  You asked it on the three

15       pictures.  You asked that question.

16                   MS. GOLOMBEK:  I was on the third, Judge.  I

17       had the third one with me.

18                   THE COURT:  Okay, ask the question.

19                   MS. GOLOMBEK:  Certainly, Judge.

20       Q.   Now, you indicated that the camera was not -- the

21   machine was not working properly, correct, when you were

22   downloading the videos, correct?

23       A.   No.

24                   MR. ROSENBLATT:  Objection.

25                   MS. GOLOMBEK:  I'm sorry, is there an
```

Kathi A. Fedden, Sr. Court Reporter

1          objection?

2                    MR. ROSENBLATT:  Objection.

3                    THE COURT:  He said no.

4                    There was an objection?  I didn't hear the

5          objection.

6                    MR. ROSENBLATT:  I'll withdraw it and take the

7          answer, Judge.

8                    THE COURT:  So the witness said no.

9          Q.    Now, you indicate that the time is incorrect, is

10    that what you are saying?

11         A.    Yes.

12         Q.    Now, that meant to you that the whole system was

13    not working properly, correct?

14         A.   The time was off on the system which we frequently

15    see with homeowners or small businesses.  The system itself

16    was recording.

17         Q.    But you don't know that everything was recording

18    properly because there was already one malfunction and that

19    malfunction being the time, correct?

20         A.    It's not a time, it's an improper setting.

21         Q.    Well, you know one setting is off.  There could

22    have been other settings off, correct?

23                    MR. ROSENBLATT:  Objection.

24                    THE COURT:  Overruled.

25         A.    The system was in proper functioning order minus

1    the clock being off.

2         Q.   You can't say if it was functioning improperly

3    because you can't compare it to the incident since you were

4    not at the incident, correct, yes or no?

5         A.   I could compare it to the time upon my arrival and

6    view the events that had taken place on video and using the

7    offset of the time, I'm able to see relevant video of that

8    incident, so the system itself is recording but the time is

9    off.

10        Q.   And you can't assure us that no one tampered with

11   the video prior to your seeing it, correct?

12        A.   If you tamper with a DVR system, the system would

13   not -- you would either damage the system to the point of it

14   being unable to retrieve video or you would damage the

15   system.  There is no way to alter video on a DVR system.

16        Q.   Now, when you walked through this station, when you

17   walked through the BP gas station at 375 Clinton, you saw

18   bullet casings, correct?

19        A.   I saw, I remember, the cones of the bullet casings.

20   I don't remember seeing the exact casings.

21        Q.   You never saw any bullets, did you?

22        A.   No, I did not see any bullets.

23        Q.   Now, you did a video canvass, correct?

24        A.   Yes.

25        Q.   And the video canvass you did was Lafayette Street





 1  also, correct?

 2      A.   We walked the surrounding areas, yes.

 3      Q.   Well, you did a canvass of 46 Lafayette, correct?

 4      A.   I don't recall.

 5      Q.   And you did a canvass of 50 Lafayette Street,

 6  correct?

 7      A.   I don't recall.

 8           MS. GOLOMBEK:  I'm going to ask that this be

 9  marked as Defense K and ask that you look at it, please.

10           THE COURT:  Defendant's K for identification.

11           (Whereupon, Defendant's Exhibit K was marked

12  for identification, only.)

13           COURT OFFICER:  Defense K marked for

14  identification.

15           (Handed to witness.)

16      Q.   I'm going to ask that you look at it.

17      A.   Okay.

18      Q.   Do you recognize that?

19      A.   No.

20      Q.   Are those your notes?

21      A.   No.

22           MS. GOLOMBEK:  May I have that back, please?

23           (Handed to counsel.)

24      Q.   If I gave you a DD3 number, DD3-5445-18 of places

25  that were video canvassed, would that refresh your

1    recollection as to where you video canvassed?

2        A.    No, not particularly, no.

3        Q.    Well, you said you walked around Lafayette Street.

4    Do you have those videos?

5        A.    Any video we were able to obtain lawfully or with

6    the cooperation of the homeowner was downloaded in this case.

7        Q.    Well, did you download the videos at 46 and 50

8    Lafayette Street?

9        A.    I personally don't believe I canvassed those

10    locations or had a response from people at those locations.

11        Q.    Well, is there anything that -- you don't believe.

12    Would your notes refresh your recollection?

13        A.    I don't have any notes of being there, so I would

14    believe that we were unable to retrieve video from there.

15        Q.    But you don't know?

16        A.    No.

17        Q.    And that could contain exculpatory information

18    towards my client, correct?

19                MR. ROSENBLATT:  Objection.

20                THE COURT:  Sustained.

21        Q.    And what about 21 Midwood Street, did you download

22    a video from there?

23        A.    Yes.

24        Q.    And that's the video we saw, correct?

25        A.    Yes.

Kathi A. Fedden, Sr. Court Reporter

```
 1        Q.   And nowhere in that video is a person extending
 2   their arm, we see a body turn and extend an arm and fire
 3   backwards, is there?
 4        A.   No.
 5        Q.   And nowhere in the video of 375 Clinton Street by
 6   the gas station did you see anybody turn and extend an arm
 7   and fire backwards, did you?
 8        A.   If you watch the video between the pumps, you see
 9   the silhouette of a weapon.
10        Q.   You see a silhouette?
11        A.   Yeah.
12        Q.   And you are saying a weapon, but you can't make out
13   what that silhouette is, correct?
14        A.   It appears in the video to be a handgun.
15        Q.   Well, that's what you want it to appear because you
16   work for the police department, correct?
17                  MR. ROSENBLATT:   Objection.
18                  THE COURT:   Overruled.
19                  You can answer, Detective.
20        A.   I do work for the police department, yes.
21        Q.   And the police department works with the
22   prosecutor?
23                  THE COURT:   All right, objection sustained.
24        Q.   You also did a video canvass of Clinton Street, the
25   bodega Hispanic deli at 30 -- 303 Clinton Street?
```

1      A.   Yes.

2      Q.   Now, you testified on direct that you did a video

3   canvass of Clinton Avenue, correct?

4      A.   Clinton Street.

5      Q.   Well, is it Clinton Avenue or Clinton Street?

6      A.   Clinton Street.

7      Q.   So you were wrong before, correct?

8           MR. ROSENBLATT:   Objection.

9           THE COURT:   Sustained.

10      Q.   So what you testified to on direct about your video

11   canvass of Clinton Avenue, that was incorrect; is that right?

12           MR. ROSENBLATT:   Objection.

13           THE COURT:   Sustained.

14      Q.   You also did a video canvass of St. Stephen's

15   Church at 384 Clinton Street, correct?

16      A.   I was never able to obtain video from there.

17      Q.   So you don't have the video that could contain

18   exculpatory information for my client, correct?

19           MR. ROSENBLATT:   Objection.

20           THE COURT:   Sustained.

21      Q.   And you also did a video canvass of 393 Clinton

22   Street, the deli, correct?

23      A.   Yes.

24      Q.   And you don't have a video canvass from there, do

25   you?



1          A.    We checked video from there.  We don't have any
2     video from there, no.
3          Q.    Now, as you turn into the gas station there is a
4     bullet casing in the street at the cone on the turn into the
5     gas station, correct?
6                    MR. ROSENBLATT:  Objection.
7                    THE COURT:  Sustained.
8                    MS. GOLOMBEK:  I have no further questions at
9          this time, Judge.
10                    THE COURT:  Thank you.
11                    Any redirect, Mr. Rosenblatt?
12                    MR. ROSENBLATT:  Yes, Judge.
13     REDIRECT EXAMINATION
14     BY MR. ROSENBLATT:
15          Q.    Detective, you were asked questions on
16     cross-examination as to whether or not you saw a gun in the
17     defendant's hand.  Does the video depict the defendant firing
18     a gun?
19          A.    There is no direct depiction of a handgun being
20     fired, no.
21          Q.    I want to call your attention to 1:35 in the video.
22     Did you see what just occurred?
23          A.    Yes, you do see a flash on the screen.
24          Q.    Where does the flash come from?
25          A.    It came from the vicinity of the defendant's hand.





 1              MS. GOLOMBEK:  I'm sorry, I didn't hear that

 2      answer.

 3              THE WITNESS:  It came from the vicinity of

 4      where the defendant's hand would be while running.

 5      Q.   I want to call your attention to --

 6              MS. GOLOMBEK:  Objection.  We have no way of

 7      knowing that's the defendant running, Judge.

 8              THE COURT:  Well, that's true.

 9              MS. GOLOMBEK:  This is all speculation.

10              THE COURT:  That's true, this witness wouldn't

11      know that is the defendant.  I will sustain that

12      objection.

13      Q.   Back at that time the individual that's captured on

14      the surveillance video between 1:37 to 1:42, did you see

15      something being discharged out of that individual's hand?

16      A.   Yes.

17      Q.   What did you see?

18      A.   It appeared to be the shot of a firearm.

19      Q.   Calling your attention on the video to 3:41, what

20      do you see right above the gas pump?

21      A.   You see a puff of smoke.

22      Q.   Who do you see running just past that puff of

23      smoke?

24      A.   The individual that we tracked on video just passed

25      that pump.

                Kathi A. Fedden, Sr. Court Reporter



1    Q.    What happens if a firearm is discharged?

2    A.    There is a puff of smoke.

3              MR. ROSENBLATT:  I have nothing further.

4              THE COURT:  Any recross?

5    RECROSS EXAMINATION

6    BY MS. GOLOMBEK:

7    Q.    In frame, I believe, it was 3:41, there is a car

8    pulling away.

9              MR. ROSENBLATT:  Is that a question?

10             THE COURT:  No.  She wants you to go to that

11   location on the video.

12   Q.    You see the car pulling away?

13             MS. GOLOMBEK:  Back it up a little bit,

14   please.

15   Q.    You see the smoke?

16   A.    No.

17   Q.    And smoke comes from cars also; isn't that correct?

18   A.    In reference to?

19   Q.    Smoke can come from cars as well, correct?

20   A.    It can come from a lot of things, yes.

21   Q.    So if a car pulse away, there is smoke coming out

22   of the car, correct?

23   A.    You will see the puff of smoke rise when the car is

24   substantially further away.

25   Q.    So there is the car leaving.  The car is pulling



1   away and there is a puff and then there is smoke?

2       A.   Yes.

3       Q.   It's related to the car.

4            Do you see that?  The car pulls away and then there

5   is smoke.  It's from the car, Detective; isn't that correct?

6       A.   No.

7       Q.   Well, what's depicted in Defense Exhibit H, the

8   bullet casings, may I show it to you?

9                MR. ROSENBLATT:  Objection, it's outside the

10       scope.

11               THE COURT:  Ms. Golombek, this witness has

12       said repeatedly he's never seen a bullet casing, he's

13       only seen the markers.

14               MS. GOLOMBEK:  I'll show him the markers.

15               MR. ROSENBLATT:  I'm going to object.  It's

16       outside the scope of my --

17               THE COURT:  She didn't ask the question yet,

18       so I'm not going to address that.

19               (Handed to witness.)

20       Q.   Where the markers are, that's at the other end of

21   the gas station from where you say -- from where the car

22   pulled away and the person was running, correct?

23               MR. ROSENBLATT:  Objection.

24               THE COURT:  Wait.  You need to ask that

25       question again.  I'm confused as to what you are asking.



1    Q.   The markers, you see where the markers are?

2    A.   Yes.

3    Q.   That's at the other end of the gas station than

4    what we just viewed in the video, correct?

5              THE COURT:  Where the puff of smoke was?

6              MS. GOLOMBEK:  Where the puff of smoke was.

7    Q.   Correct?

8              MR. ROSENBLATT:  Objection.

9              THE COURT:  Overruled.

10   A.   This cement apron in the picture with this yellow

11   cone is in front of the first pump we saw on the video.  That

12   is what you are asking?

13   Q.   Yes, I'm asking you if that's on the other end of

14   the gas station from where we saw the car and where we saw

15   the puff of smoke?

16   A.   It's on the pump before.

17   Q.   So it's not in the same location, correct?

18   A.   It's one pump before, north of the pump where the

19   puff of smoke was.

20   Q.   Which is not the same location?

21             MR. ROSENBLATT:  Objection.

22             THE COURT:  Sustained.

23   Q.   When you say there was a flash to the ground, that

24   could be somebody with a cell phone in his hand, correct, yes

25   or no?

Kathi A. Fedden, Sr. Court Reporter

1          A.    It's a rapid flash, so it would be contrary to a

2     cell phone flashlight.

3          Q.    What?  Do you see anybody turn around and extend an

4     arm when you say there was a flash?

5          A.    No.

6          Q.    Thank you.

7                     MS. GOLOMBEK:  No further questions.

8                     THE COURT:  Okay.  Thank you so much,

9          Detective Maloney, you are excused.  Have a good rest of

10         the day.

11                    THE WITNESS:  You too.

12                    (Whereupon, the witness was excused.)

13                    MS. GOLOMBEK:  Judge, I have an application.

14                    THE COURT:  What's your application?

15                    MS. GOLOMBEK:  At this time I'm going to ask

16         for an adverse inference charge, Judge.  The adverse

17         inference against the prosecution.  We have not seen all

18         the videos.  We have seen videos from four scenarios,

19         Judge.  There are 24 cameras.  This witness testified

20         that he tried to download, but he couldn't download the

21         videos when he played it.  The screen was blank.  I

22         submitted that contained exculpatory information.

23                    I submit there was information and it's not

24         being turned over.  I have made several motions, my

25         client has during this case that we don't have

1      information that would exculpate my client and show that

2      he's not guilty.  I'm asking for an adverse inference

3      against the prosecution and to weigh everything in the

4      light most -- and to weigh his testimony against the

5      prosecution in favor of the defense.

6                  THE COURT:  Mr. Rosenblatt, do you wish to

7      address that?

8                  MR. ROSENBLATT:  None of that was testified

9      to.  The witness testified he downloaded all the video

10     that was outside, so that just never happened during

11     this proceeding.

12                 THE COURT:  Thank you.

13                 Yes, the testimony of this witness was that

14     the cameras that were overhead which were quite a number

15     of cameras that were not cameras that recorded.  They

16     were cameras you could look at at the same time and see

17     what was going on, but they did not record anything.

18     And he did not download the cameras that face inside the

19     gas station, but he downloaded all the other cameras

20     that faced, he testified that he downloaded the

21     information for the cameras that faced outside of the BP

22     gas station.  So there has been no testimony that there

23     has been any videos withheld in this matter, so your

24     application is denied.

25                 MS. GOLOMBEK:  Respectfully, I'll note my

Proceedings

1          exception, your Honor.

2                    THE COURT:  Of course.

3                    Mr. Rosenblatt, anything further?

4                    MR. ROSENBLATT:  Yes, Judge.  Exhibit 29-B,

5          based on my review of Maria Rauche's testimony contained

6          on pages 240 four through 254 of the transcript, Exhibit

7          29-B was admitted subject to connection.  I had asked

8          that the other items be received without any connection

9          missing.  29-B was the cartridges and I believe that

10         that should be received into evidence without any

11         missing connection at this time.

12                   THE COURT:  All right.

13                   Ms. Golombek?

14                   MS. GOLOMBEK:  I'm objecting, your Honor.

15                   THE COURT:  Of course.

16                   Yes, 29-B was already marked in evidence

17         subject to connection.  There was the testimony of the

18         Crime Scene person that they recovered the guns with the

19         cartridges that were contained in the magazine,

20         specifically of a Smith & Wesson, so accordingly, there

21         is a connection made and it will remain 29-B in

22         evidence.

23                   MR. ROSENBLATT:  Judge, next I would move to

24         call Detective Brady based on the cross-examination by

25         Ms. Golombek.  I believe she opened the door to the

1    testimony regarding the phone.  Ms. Golombek tried to

2    elicit that Mr. Costa was running with a phone.  The

3    evidence elicited at this trial is when he was arrested

4    there was were no weapons or cell phones on him.  I

5    believe it's appropriate to call Detective Brady at this

6    time to show the phone that was recovered of the

7    defendant was recovered at a later time.

8    MS. GOLOMBEK:  Judge, I used a hypothetical.

9    I didn't say he was running with a phone.  I said a

10    flash could come from a lot of things.  It was a

11    hypothetical.  I did not open the door to anything about

12    a phone.  As a matter of fact, the testimony is that

13    there was a cell phone left behind in the car.

14    THE COURT:  Right.

15    MS. GOLOMBEK:  So that was the testimony.

16    There is not testimony that he had a gun.  I'm just

17    giving a scenario of where flashes can come from.  I

18    said it could come from a car, from a phone.  It could

19    come from anything.

20    THE COURT:  I'm going to say at this point,

21    Mr. Rosenblatt, there is no need to do that.  That was

22    just Ms. Golombek just asking a hypothetical.

23    MR. ROSENBLATT:  Next I received communication

24    from Detective Sergeant Vinberg.  He was still

25    undergoing medical treatment, so he is unavailable to

1          me.  I won't be seeking an adjournment to call him.  I

2          wanted the Court to know that I did receive that

3          communication he was still getting medical care.

4                    Based on that, at this point the People will

5          rest their case.

6                    THE COURT:  All right, thank you.

7                    Ms. Golombek.

8                    MS. GOLOMBEK:  At this time I move to dismiss

9          and the People have not made out a prima facie case.

10         Even though the standard is in the light most favorable

11         to the People, I submit based on the incredibility of

12         the testimony, that there has been no showing that my

13         client attempted to commit the crime of murder in the

14         first degree, Judge, nor any showing that he attempted

15         to commit the crime of murder in the second degree, your

16.        Honor, nor that he attempted to commit the crime of

17         possession of a weapon in the second degree.

18                   THE COURT:  Well, that's not attempt, that's

19         an actual completed crime charged.

20                   MS. GOLOMBEK:  Or that he had possession of a

21         weapon, criminal use of a firearm in the first degree,

22         your Honor.  I submit based on the incredibility and all

23         the inconsistencies of the testimony of the witnesses, I

24         submit that there is no showing, Judge, that the People

25         made out a prima facie case.  There is no showing that

1    my client had any weapon in his hand.  There is no

2    weapon recovered on him.  There is no bullets found at

3    the scene.  Judge, there is only bullet casings.  We

4    don't know from the experts that testified, we don't

5    know whether those bullet casings were left there that

6    day when the cones were put there, a month ago, years

7    ago.  We don't know where they came from and when they

8    came, Judge.

9              I submit the People have not proven a prima

10   facie case that he had a firearm, that he had a weapon,

11   that he intended to use it, Judge.  They have not shown

12   that and, once again, I base it on the incredibility of

13   all the testimony.  There is no DNA, there is no prints,

14   there is no ShotSpotter, there is no hearing of any

15   sounds.  There is no gunpowder residue and I'll rely on

16   all the other arguments and the incredible testimony and

17   I'll rely on everything that has been put on the record.

18   Thank you, your Honor.

19              THE COURT:  Thank you.

20              Mr. Rosenblatt.

21              MR. ROSENBLATT:  Judge, viewing the evidence

22   in the light most favorable to the non-moving party in

23   this case, the government, I believe a prima facie case

24   has been shown for the 14 counts before your Honor

25   contained in the indictment.  I don't need to go through

```
 1              the counts one by one unless your Honor specifically
 2              requests it, so I'll rely on the record.
 3                        THE COURT:  I'm going to reserve decision.
 4                        So, Ms. Golombek, are you prepared to go
 5              forward with the defendant's case?
 6                        MS. GOLOMBEK:  At this moment, Judge, no.  The
 7              defendant is still deciding if he is putting on a case.
 8                        THE COURT:  Well, I think time is up.  You
 9              have to tell me because I have to know what I'm
10              scheduling for.
11                        MS. GOLOMBEK:  Judge, the defense rests.
12                        THE COURT:  All right, very good.  So,
13              anything further then, Ms. Golombek?
14                        MS. GOLOMBEK:  I have a motion, Judge.  Do you
15              want me to make that now?
16                        THE COURT:  Well, it's up to you if you want
17              to make it now.
18                        MS. GOLOMBEK:  Judge, I would rather wait for
19              the adjourned date when we do the pre-charge conference.
20                        THE COURT:  All right, that's fine.  I
21              actually can do this coming Monday if that works for
22              everybody.
23                        MR. ROSENBLATT:  The 22nd I'm available.
24                        THE COURT:  Great.
25                        MS. GOLOMBEK:  Judge, if you want us to appear
```

1    on the 22nd I will.  That will be for summations.  I

2    mean, I will have to submit -- I would like to start at

3    11:00 if that's possible.

4              THE COURT:  That's fine.

5              MS. GOLOMBEK:  So that way I can go to Central

6    Islip first and then come here.

7              THE COURT:  We can start at 11:00, that's not

8    a problem.

9              MS. GOLOMBEK:  We'll do motion to defense,

10   defense motion charge and then summations?

11             THE COURT:  Correct.

12             MR. ROSENBLATT:  Judge, I'm going to

13   respectfully ask your Honor make an inquiry of the

14   defendant that he --

15             THE COURT:  Yes, I will.

16             So, Mr. Costa, your attorney has indicated

17   that the defense has rested their case.  The decision

18   whether or not you wish to testify is yours alone.  So

19   at this point in time, Mr. Costa, do you wish to testify

20   or not?

21             THE DEFENDANT:  No.

22             THE COURT:  No.  All right.  And no one is

23   forcing you to not testify, correct?

24             THE DEFENDANT:  No.

25             THE COURT:  All right.  So I'll see everybody

Proceedings

1     Monday, November 22nd at 11:00 a.m.

2              MR. ROSENBLATT:   Thank you, Judge.

3              (Whereupon, the trial was adjourned to

4     November 22, 2021.)

5

6              *                *               *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF NASSAU :   PART 38
2    ----------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4
                    -against-                    Indictment No. 1934N/18
5
                                                    JURY TRIAL
6    DUANE T. COSTA,

7                       DEFENDANT.
     ----------------------------------------x
8
                         Mineola, New York
9                        November 22, 2021

10

     B E F O R E:   HON. PATRICIA HARRINGTON
11                    Acting Supreme Court Justice

12

13   A P P E A R A N C E S:

14
                   HON. JOYCE SMITH
15                 Acting District Attorney of Nassau County
                   BY:   JARED ROSENBLATT, ESQ.
16                       RYAN NELSON, ESQ.
                   Assistant District Attorneys
17                 For the People

18
                   LORI GOLOMBEK, ESQ.
19                 114 Old Country Road
                   Mineola, New York   11501
20                 Attorney for Defendant

21

22

23

24                    Kathi A. Fedden
                      Senior Court Reporter
25

                    Kathi A. Fedden, Sr. Court Reporter

1          THE CLERK:  This is Indictment 1934N of 2018,

2     the People versus Duane T. Costa.

3          Counsels, your appearance, People.

4          MR. ROSENBLATT:  For the People, Assistant

5     District Attorney Jared Rosenblatt.  Good morning, your

6     Honor.

7          THE COURT:  Good morning.

8          MR. NELSON:  Ryan Nelson.  Good morning,

9     Judge.

10         THE COURT:  Good morning.

11         MS. GOLOMBEK:  Good morning, your Honor, Lori

12    Golombek, 114 Old Country Road, Mineola, New York.

13         THE COURT:  Good morning.

14         THE CLERK:  Sir, you are Duane T. Costa?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Good morning.  So on November

17    17th, which was the last date that we were here in

18    Court, the People rested and the defense rested.  So,

19    Ms. Golombek.

20         MS. GOLOMBEK:  Yes, Judge, at this time I have

21    a motion to dismiss in that the People have not made out

22    or proven the case beyond a reasonable doubt against my

23    client, your Honor.  I am going to rely on the record,

24    your Honor, the incredibility of the testimony, your

25    Honor, and everything that you have heard and haven't

1    heard here, your Honor.  I'm going to stress here if you

2    see the video, Judge, there is no showing of my client

3    leaning his arm back.  There is no showing of him with a

4    weapon.  There is no showing of him shooting a gun, your

5    Honor.

6         So as to the counts of the indictment, your

7    Honor, I submit that based on everything that you have

8    heard and haven't heard, you are going to have no choice

9    but to return a verdict of not guilty.  There is no

10   showing that he intended on counts of intending to cause

11   the death of police officers, your Honor, the attempted

12   murder in the first and second degree charges.  There is

13   no showing that he intended in any way to cause the

14   death of another when a police officer was in the course

15   of performing his duties.  There were police officers

16   here, your Honor, but there is no showing whatsoever,

17   and that the videotape supports it, that my client did

18   anything to cause their death.  There is no showing of

19   him in that video.

20        There is no showing of him in the video

21   pointing a weapon, your Honor, extending it over his

22   back, no shooting of it, your Honor.  There are no

23   bullets recovered here, your Honor.  There is no DNA.

24   There is no fingerprints, your Honor.  So, there is no

25   showing.

```
 1              I submit it was all tailored testimony.  There
 2      is no showing that he shot at, no bullets, no DNA, no
 3      possession of a weapon on his person, your Honor.  No
 4      gunshot powder residue, no fingerprints, no ShotSpotter
 5      testimony and no video showing the shooting.  As to the
 6      same with the crime of -- the attempted crimes that
 7      appear on the indictment, your Honor, so I submit those
 8      have to be dismissed, your Honor.
 9              Regarding the crime of criminal possession of
10      a weapon, the 11th and 12th counts of the indictment,
11      there is no weapon found on my client.  There is no
12      fingerprints, there is no DNA.  Your Honor, the weapon
13      is found in different locations than my client was, your
14      Honor.  A Smith & Wesson was found on the grass, not the
15      sidewalk.  The only testimony there was was my client
16      was on a sidewalk or going through the gas station, your
17      Honor.
18              Your Honor, as far as criminal use of a
19      firearm in the first degree and second degree, there is
20      no showing that my client used a weapon, your Honor.
21      There is no showing that that weapon wasn't tampered
22      with prior to Marie Rauche examining it or afterwards.
23      There is an improper chain of custody as to any of the
24      weapons, your Honor.  Once again, he was not in
25      possession.  There is no DNA.  There is no prints, your
```

```
 1          Honor.  Based on everything that I have indicated, I am
 2          asking that each and every count of the indictment be
 3          dismissed and that the People have failed to prove the
 4          case beyond a reasonable doubt.
 5                    THE COURT:  Thank you.
 6                    Mr. Rosenblatt.
 7                    MR. ROSENBLATT:  Your Honor, viewing the
 8          evidence in the light most favorable to the non-moving
 9          party, in this case the People, I believe there is
10          sufficient evidence to go before your Honor to make a
11          finding of fact after summations.  I rely on the record.
12                    THE COURT:  Thank you.  I'm going to reserve
13          decision and so now before we get to summations, did you
14          want to have a request to charge, Ms. Golombek?
15                    MS. GOLOMBEK:  Yes, your Honor.
16                    THE COURT:  All right.
17                    MS. GOLOMBEK:  My first request to charge is
18          an adverse inference.  One of the experts here, your
19          Honor, Detective Maloney, testified when he went to the
20          gas station, he was only able to download four videos,
21          your Honor.  There was testimony of there being 24
22          cameras.  Testimony of there being at least tanks with
23          cameras above each one, your Honor.  We only have four
24          here today, your Honor.  I submit that would contain
25          exculpatory information, exculpatory evidence,
```

1    exonerating my client.  It's suspect that we don't have

2    it.  This motion has been made in the courts.  My client

3    has brought it up.  I have brought it up numerous times.

4    I am asking for an adverse inference, your Honor, that

5    if we had those tapes they would provide exculpatory

6    evidence, your Honor, that would exculpate my client.

7              THE COURT:  Thank you.

8              MS. GOLOMBEK:  That's my first request to

9    charge.  Do you want me to go on or do you want the

10    ADA's response to each?

11              THE COURT:  Why don't you go on.

12              MS. GOLOMBEK:  Yes, your Honor, I would ask

13    for prior inconsistent statements.  I have submitted --

14    I have cross-examined on grand jury evidence.  I believe

15    that it impeaches the officers, Judge, so I would like

16    you to charge yourself on that.

17              I would like you to charge yourself on no

18    negative inference from my client not testifying, your

19    Honor.

20              I would ask for -- and the other standard

21    charges, your Honor.  Do you want me to go through them?

22              THE COURT:  No, I'm very aware of what the

23    standard charges are.

24              MS. GOLOMBEK:  And I know that, Judge.

25              THE COURT:  Is there anything specific you

1    want to draw my attention to, I'm happy to hear that.

2              MS. GOLOMBEK:  Correct.  And those are the

3    specific ones, your Honor.

4              THE COURT:  Okay, thank you.

5              Mr. Rosenblatt, do you have any requests to

6    charge?

7              MR. ROSENBLATT:  Judge, nothing other than the

8    standard charge.

9              In regards to the counts, I believe counts

10   five, six seven and eight, the attempted murder in the

11   second degree should only be considered if and only if

12   your Honor acquits of one of the counts of one through

13   four as they relate to the Officer.

14             As it relates to the adverse inference that

15   Ms. Golombek requested, first of all, I believe it's

16   untimely.  I don't believe that it was done at the

17   appropriate time.

18             Second, I don't think that it's applicable in

19   this case.  The adverse inference charge should only be

20   given if the evidence was recovered and destroyed.  To

21   the contrary, the evidence before your Honor was that

22   the detective went to the BP gas station and recovered

23   all cameras that recorded in the exterior.  So, I don't

24   believe it's appropriate.

25             I have no objection to your Honor considering

Kathi A. Fedden, Sr. Court Reporter

1       prior inconsistent statements obviously.

2               THE COURT:  Thank you.

3               MS. GOLOMBEK:  Judge, I'm sorry, I do have a

4       further request, your Honor.  I am going to ask for a

5       missing witness charge.  There was testimony of a

6       taxicab being at the Clinton gas station and there was

7       testimony of somebody being inside the taxicab.  I

8       questioned on that, your Honor, whether there was any

9       interview of that witness, whether that witness said

10      anything, your Honor.  I believe that he would have

11      exculpatory information, your Honor, as to my client not

12      shooting any weapon, your Honor, so I'm going to ask for

13      a missing witness charge as to that.

14              I'm also going to ask for a charge as to

15      somebody's motive.  Motive here.  The motive of the

16      officers, the fact that the officers had an interested

17      witness, your Honor, that the police officer was an

18      interested witness, particularly Detective Bourguignon,

19      your Honor.  He testified that he was the carrying

20      detective, that he became, in essence, the lead

21      detective.  That he did have an interest in this case

22      and he would do anything he could in order to get a

23      conviction.

24              THE COURT:  Thank you.

25              Mr. Rosenblatt.

1              MR. ROSENBLATT:  Judge, as to motive, I mean,

2       I have no objection to your Honor charging yourself that

3       motive is not an element, if you are going to, you know,

4       as part of the general charge.

5              I certainly also have no objection to the

6       expanded intent charge when we talk about just general

7       charges.

8              As to interested witness, I don't believe the

9       interested witness charge is appropriate in this case.

10      And as it relates to the missing witness for the taxi, I

11      also believe that it's untimely first.

12             Second, there has been no showing that that

13      witness is under my control or any showing that is

14      necessary under the law as to how the taxi driver is

15      entitled to a missing -- the taxi person, we don't even

16      know if it's a driver, passenger, there is nothing

17      before your Honor as to any of that; the person's name,

18      none of it, so I would object to that missing witness

19      charge as it relates to the individual by the taxi.

20             MS. GOLOMBEK:  Judge, as to the adverse

21      inference, I did bring that up during the trial, your

22      Honor.  I was told it wasn't the time, so I made it at a

23      later time, your Honor.

24             THE COURT:  That's fine.

25             MS. GOLOMBEK:  And I am making it again.

1            THE COURT:  That's fine.

2            With regard to the adverse inference charge,

3      the testimony of Detective Maloney was that he

4      downloaded the only four videos that were operational

5      that were outside the BP gas station.  The other videos

6      that recorded were inside the BP gas station and all of

7      the other cameras that were above the pumps were not

8      cameras that recorded, they were cameras that a person

9      sitting in there could see what was going on at any

10     given time, but they didn't record.  So accordingly,

11     there is no evidence that was not collected by Detective

12     Maloney from which I could make an adverse inference

13     from, so I'm going to deny your request there.

14            With regard to the missing witness charge,

15     that had to be made at the end of the People's case or

16     prior to the end of the People's case.  That didn't

17     happen and, in addition, the person would have to have

18     been -- you would have to show that they were under the

19     custody and control of the People and that was not

20     shown.  So accordingly, I'm denying your request

21     regarding the missing witness charge.

22            So are we ready to go with summations?  You

23     have your exception, of course, Ms. Golombek.

24            MS. GOLOMBEK:  Certainly, your Honor.

25            THE COURT:  Are we ready to proceed with

1    summations?

2                    MS. GOLOMBEK:  Yes, your Honor.

3                    THE COURT:  So, Ms. Golombek.

4                    MS. GOLOMBEK:  Thank you, your Honor.  May it

5    please the Court.

6                    THE COURT:  Do you want -- is it easier to

7    stand at the podium?

8                    MS. GOLOMBEK:  May it please the Court,

9    Mr. Costa, prosecutors, ladies and gentlemen, your

10   Honor, this is the time that I wanted to thank you

11   particularly for your attention to the case and for your

12   listening to the case, your Honor.

13                    As you know, what I say is not evidence.

14   Evidence is what you heard.  Evidence are the exhibits,

15   your Honor, and evidence I'm going to point you to is

16   what we haven't heard here, your Honor, and, your Honor,

17   what I'm going to do is just point out some of the

18   doubts for which you can attach a reason.

19                    As you know here, your Honor, the standard is

20   has there been proof beyond a reasonable doubt against

21   my client on the counts of attempted murder in the first

22   and second degree, on the counts of criminal possession

23   of a weapon and on the counts of criminal use of a

24   firearm, your Honor.  And I submit the People have not

25   proven the case beyond a reasonable doubt.  They have

                    Kathi A. Fedden, Sr. Court Reporter

1   not proven each and every element.  And why do I say

2   that, your Honor?  Number one reason I say that, your

3   Honor, that's the videotape.  That's what we have here.

4        Your Honor, I'm going to ask you to play that

5   videotape from beginning to end, your Honor, and in that

6   videotape nowhere, nowhere in that videotape do you see

7   the actions that were described by police officers on

8   the stand.  Nowhere do you see my client extending his

9   hand over his shoulder, leaning back, turning back and

10  running at the same time.

11       Let me stress, your Honor, if you are

12  attempting to run, if you are running and walking

13  forward and leaning back and turning your head, you are

14  going to fall.  The movement that is described here is

15  absolutely unbelievable.  And where is it?  Where is it

16  in?  There is videos all over the place.  There is

17  videos on Clinton Street.  I don't care what the

18  prosecutor tried to say.  There is videos on Clinton

19  Street and Midwood Street.  There is videos by the gas

20  station.  You don't see that.  You don't see that at

21  all.

22       We heard totally incredible testimony from I

23  believe it was Detective Maloney or one of the

24  detectives and I'll go on to that, how he was able to

25  tell from the silhouette.  You have the silhouette, look

1    at it.  What can you see there?  Nothing, your Honor.

2    It's like one of those Rorschach tests, your Honor,

3    where you can't make out figures, you can't make out

4    anything.  Somehow, somehow, these witnesses that took

5    the stand, these police officer witnesses, these

6    witnesses who have an interest, these witnesses who work

7    with the District Attorney's Office, somehow they are

8    saying there is a gun in my client's hand.

9         Well, you see a photograph.  You see a black

10   figure.  Black.  You see the hand is black.  My client's

11   color of his skin is dark.  He's black, your Honor.

12   That doesn't mean it's a gun.  That is stretching it.

13   That's saying what they want to believe it is.

14        Now the prosecutor may say why would we want

15   to believe that's a gun?  Well, it goes back to the very

16   beginning, your Honor.  It goes back to the beginning of

17   this case.  You have two black persons.  You have one

18   black person driving a vehicle and that's April Grant,

19   and you have my client, a passenger.  And they're in a

20   vehicle and when they are in the vehicle it's at 12:45

21   at night.  I submit here what's going on and they may

22   not want to admit it, the police officers, but this is

23   totally, totally a racial situation where they are

24   stopping two black people at night.  And then Officer

25   Rilling and Officer Kraemer get angry and they get angry

1    because my client runs.  And, your Honor, I submit

2    running is not a crime, your Honor.  And they decide

3    they're going to make the facts, turn them around, your

4    Honor, and make them fit a scenario and plant weapons,

5    your Honor.

6         Now the prosecutor may say oh, that's

7    unbelievable, planting weapons and why would we say

8    that.  Well, your Honor, I'm going to point out the

9.   doubt in the testimony.  Number one doubt, the video.

10   You don't see a shooting in the video.  They're having

11   you believe it's light out.  It's 12:45 at night and you

12   have officers on the stand telling you oh, it's bright.

13.  It's bright?  It's dark.

14        The incident happened very quickly.  The

15   incident itself from the stop until the time my client's

16   in that alleyway is a few minutes.  The incident when

17   they are saying there was a shooting I submit was

18   seconds, your Honor, and I submit their attention was

19   not focused on my client.

20        And let's first think of more doubts yourself,

21   your Honor, when you are deliberating.  Go through them.

22   I'm just pointing out some of them, your Honor, and I'm

23   going to go through them, but let me point out what we

24   don't have here.  They are saying there are shots.

25   Well, where is the bullets?  There is no bullets.  If

Summations-Defense

1    there was shots on Midwood Street, there are no bullets

2    on Midwood Street.  There were supposedly two shots and

3    then another shot on Midwood Street.  No bullets there.

4         We have Detective Maloney who is telling you

5    he goes through the area and he combed it really well

6    and he went to Clinton Street and he went to the gas

7    station and he went through it really well.  Where is

8    the bullets?  We don't have the bullets.

9         Well, the prosecutor may argue well, we have

10   weapons.  Where is the fingerprints on the weapons?

11   Where is the DNA?  We don't have any of that, your

12   Honor, so that's what we don't have.

13        Where is the ShotSpotter testimony here?  We

14   don't have that either.  Where is the testimony that

15   would line up how many shots were on each block?  Why

16   don't we have that here?  Just more reasons, more

17   reason, more doubts for which you can attach a reason.

18        Let's go to Officer Rilling's testimony, your

19   Honor.  He works for the Bureau of Special Operations.

20   He receives special training, highly special; hostage

21   situations, tactical situations and he's having you

22   believe that he was doing a minor traffic stop for

23   failure to turn or failure to signal and not wearing a

24   seatbelt.  I submit it's unbelievable to start with from

25   the very stop and I pointed that out earlier, your

1    Honor.

2         What's more incredible is how his testimony

3    went on, that when Duane Costa reached for his ID when

4    he was asked for identification, his right arm pushes on

5    a bulge.  Unbelievable.  Unbelievable that Officer

6    Rilling saw that happen, your Honor.  Officer Rilling

7    is -- Officer Rilling is saying that happened, which

8    doesn't make any sense.  There was no testimony that my

9    client had a cell phone in one hand, not using it, but

10    had a cell phone and in the other hand is reaching over

11    to get his ID and then touching the bulge.  So why

12    didn't this officer realize it when this officer came

13    over to the car if there was a bulge?  I submit to you

14    there was no bulge.  I submit this is all incredible

15    testimony, your Honor.

16         And if there was a bulge, why doesn't he have

17    my client put his hands on the dashboard?  Why doesn't

18    he take out his gun?  Why doesn't he order him out right

19    away?  That doesn't happen.  He left his hands loose.

20    Detective Rilling doesn't take out his weapon.

21    Detective Kraemer doesn't take out his weapon.  They are

22    going to let what they think is a weapon and just sit

23    there la de da?  Does that make any sense?

24         He doesn't call for backup.  He doesn't alert

25    his partner at that time.  And I asked him if it's dark

Kathi A. Fedden, Sr. Court Reporter

1    out.  He can't recall if there is lights in the area

2    where it's stopped and it happened quickly.

3        Let's go on to more incredible testimony of

4    Officer Rilling.  He indicates he could see Duane Costa

5    and Duane Costa is running in front of him and he hears

6    a metallic object drop.  And to him it's a sound of a

7    gun.  Does Officer Rilling take out his gun at that

8    point?  He doesn't take out his gun.  He decides to run

9    after Duane Costa and not only does he decide to run

10   after Duane Costa at that point, he doesn't stop, he

11   doesn't retrieve an object.  He's just going to let

12   anybody walk by the area, leave it on the ground and let

13   them pick it up.  He doesn't radio for help for somebody

14   to get this object that he thinks might be a gun.  Your

15   Honor, I submit this is planted testimony.

16       The prosecutor would say well, a .40 caliber

17   Smith & Wesson was found in the grassy area.  There was

18   no testimony at all that my client was running in a

19   grassy area.  So we have a weapon found that's not in

20   the same area where my client is running.  There is no

21   fingerprints on that weapon.  There is no showing that

22   that weapon had anything to do with my client.  There is

23   no gunpowder residue on that weapon.  There is nothing.

24   There is nothing in the video showing my client dropping

25   a weapon.  It's all incredible testimony.  It all

1    supports what I indicated, that this is evidence that

2    was planted and it's not good, credible, reliable

3    evidence to use against my client, just more reasons for

4    which you can attach a doubt, your Honor.

5            The fact that he indicates, Officer Rilling,

6    that he can hear this racking sound is further

7    unbelievable.  He testified Duane Costa was six to eight

8    feet ahead of him, your Honor.  Once again, he doesn't

9    radio for help.  He doesn't do anything like that.  He

10   testified that he could see a weapon in one second, your

11   Honor, in the dark.  How much sense does that make?  In

12   the dark when somebody else's six to eight feet ahead,

13   if Duane Costa is ahead of Officer Rilling, we have that

14   six to eight feet, not only do we have six to eight

15   feet, but if Duane Costa had his arms out, which I

16   submit he did not, Officer Rilling wouldn't even be able

17   to see this because Duane Costa's hands would have been

18   in front of him.  So the whole thing that he is saying

19   he observed, nonsensical, your Honor.  It just doesn't

20   make sense.  Just more showing that it's all tailored

21   testimony, your Honor.

22           He can't remember, Officer Rilling can't

23   remember that he didn't have his gun out, your Honor.

24   And once again, that movement of running at the same

25   time that Duane Costa is extending his arms outward,

1    nonsensical, your Honor.  Impossible, your Honor.  If

2    Duane Costa was doing that, which the video shows he

3    wasn't, he would have fallen on his face, your Honor.

4    He wouldn't have made it two steps, your Honor.  He

5    would have had to have stopped.  And it's nowhere in

6    that video.  Nowhere.

7          Further incredible testimony of Officer

8    Rilling that a shot passes over his head and he hears

9    the zipping sound for two to three feet from his ears.

10   He hears this.  At the same time he indicates he's

11   jumping from left to right and he's being covered by a

12   telephone pole.  Well, if this takes place in a second,

13   you have time to jump from left to right behind a

14   telephone pole, be covering and hiding from this shot

15   and he's indicating he's able to make this observation.

16   Once again, nonsense.

17         And if that bullet was flying two to three

18   feet from his head, where is the bullet?  We don't have

19   it.  Where is the evidence?  Where's the crux of this?

20   Nowhere.  Where is the bullet on Clinton Street when the

21   officers hear two or three more shots?  Nowhere.

22         And he indicates to you when I asked him

23   didn't you take your gun out, somebody is shooting at

24   you, bullets are buzzing by your head, don't you take

25   your gun out?  And he indicates he doesn't take his gun

1    out.  He didn't think it was safe, your Honor, and his

2    partner is blocking him.  Why don't you?  For God sake,

3    his partner is being shot at, if that happened, your

4    Honor.  I submit it didn't happen.  It's not in the

5    video.  You don't see it.  It's tailored testimony.

6         Why doesn't Kraemer fire?  No testimony.  They

7    are not afraid for their lives?  They have guns.

8    Rilling tells you, Officer Rilling just stops and he

9    goes back to his car.  Incredible.  He doesn't radio for

10   help.  He does nothing.  One of the officers says he

11   left his radio behind.  They are just merely going to

12   let somebody shoot at them?  It didn't happen, your

13   Honor.  I submit it didn't happen.  I submit Duane Costa

14   didn't shoot.

15        And Officer Kraemer's testimony is just as

16   incredible as Officer Rilling's testimony.  He is at the

17   driver's side.  He's at the side April Grant is on

18   during the stop, your Honor, and it's dark out and it's

19   12:45 at night and it's not a well lit area, your Honor.

20   He doesn't know whether he has his flashlight on and

21   he's making a conversation with April Grant.  Let me see

22   your ID.  He's smelling alcohol in the car.  He's having

23   you believe that his attention is focused on Duane

24   Costa.  Incredible.  He's talking to April Grant.  He's

25   having you believe he can see an adjustment, an

 1    adjustment, but he doesn't see any bulge when he first

 2    walks over to the car and then he's trying to tell you

 3    his attention is on the driver who is separated by a

 4    car.

 5           He could see Duane Costa push Officer Rilling,

 6    your Honor, and he could see Duane Costa and observe

 7    everything.  Nonsense.  Total nonsense.  Kraemer is on

 8    the other side of the car.  The car is in between them.

 9    He claims he's no more than 20 feet and then he makes

10    this other ridiculous statement that from 30 feet he

11    hears a metallic sound.

12           So Officer Rilling is running ahead of him.

13    Duane Costa is running.  We know Duane Costa is running,

14    your Honor.  Duane Costa is running and he tells you

15    once again he can also see through Officer Rilling.  He

16    can see through the back of Duane Costa and he could see

17    Duane Costa reaching towards his waistband.  Incredible.

18    He's not Superman.  He doesn't have x-ray powers, your

19    Honor.  I submit it never happened.  I submit it's all

20    tailored testimony, your Honor.

21           He tells you Officer Vinberg recovers a second

22    weapon.  He tells you Duane Costa is caught and Officer

23    Vinberg recovers a second weapon and a jacket, a black

24    jacket.  Your Honor, we never heard from Detective

25    Vinberg, your Honor.  We never heard anything about the

```
 1        recovery of that jacket, your Honor, from Detective

 2        Vinberg, your Honor.  I submit there was an improper

 3        chain of custody as to many things here, your Honor; the

 4        weapons, the bullet, the black jacket that was

 5        recovered.

 6                As to the black jacket that was recovered,

 7        there is no showing that, first of all, there is no

 8        showing that Duane Costa was wearing a black jacket.

 9        There is no showing it's the same black jacket.  There

10        is nothing specific about that jacket.  There is no

11        fingerprints found.  There is no gunpowder residue found

12        on that jacket.  I submit Duane Costa wasn't shooting

13        anybody, your Honor.  There is no emblem.  There is

14        nothing of his property, your Honor.  There is nothing

15        at all.  There is no fingerprints, there is no DNA.  We

16        heard nothing of that in this case.

17                And as far as the weapon that was recovered,

18        the Czech, the Georgia Czech weapon, there is no showing

19        that my client had that weapon at all.  There is no

20        showing whatsoever that the bullets came from that

21        weapon.

22                As to the testing that was done of the bullets

23        by Maria Rauche, first of all, as to the bullets, she

24        said she examined the cartridges.  She said that the

25        markings on the cartridges matched, so all of the five
```

1      expended bullets would have come from the same weapon.

2      And she said that weapon was likely a Georgia Czech, but

3      nowhere did she say it was the Georgia Czech that was

4      recovered, your Honor.  So, your Honor, that's not the

5      only weapon around.  There is no showing that anything

6      is connecting to anything else, your Honor, and I submit

7      once again there was an improper chain of custody

8      because if you go into her testimony, your Honor, when I

9      asked if anybody else test fired the two weapons that

10     were recovered, your Honor, what was her statement?  I

11     don't know if anybody test fired it before me, your

12     Honor.  She had no clue.

13            She had no clue as to when she even tested it

14     for operability.  She had no clue as to that at all,

15     your Honor.  She said I don't recall what date, but I

16     test fired it, your Honor.  So once again, I submit that

17     goes to the chain of custody issue as to the expended

18     bullets, as to the weapons that were recovered, as to

19     the operability of the weapons, your Honor.

20            More further incredible -- okay.  About Maria

21     Rauche's testimony, your Honor, the expended cartridges,

22     I asked her were you able to tell if those expended

23     cartridges were there from that morning?

24            No.

25            From a year ago?

1            No.

2            From a month ago?

3            No.

4            She never saw how the expended cartridges got

5       there, your Honor.  So once again, no connection to my

6       client, your Honor.  I submit those expended cartridges

7       were planted there and I submit the weapons were planted

8       where they were, your Honor, as well as the jacket, your

9       Honor.

10           And as far as the jacket, your Honor, the

11      jacket is recovered from a different location than my

12      client was arrested in.  My client was arrested at 6

13      Meriam Street.  That jacket was recovered at 20 Meriam

14      Street.

15           When Maria Rauche was asked about gunpowder

16      residue, she tried to get around that issue and she

17      tried to say well, even though she does gunpowder

18      residue analysis, she uses it to measure distance, to

19      make conclusions in measuring distance.  Well, when she

20      wouldn't answer my question as to whether there was any

21      gunpowder residue found on my client or on his clothing,

22      your Honor, and the answer is no, because we never heard

23      it introduced.  If it were here, we would have heard

24      about it.  We didn't hear about it.

25           When I asked her if she could make any

1     conclusions about there being gunpowder residue from any

2     distance?  No.  So we have no conclusions about that

3     here, your Honor.  Why?  Because I submit my client did

4     not shoot any weapon, your Honor.  He did not have any

5     weapon.  He did not intend to cause the death of any

6     police officers.  There was no backward movement of his

7     arm or any movement or any shooting of any police

8     officer, your Honor.

9            This is a witness who is paid for her

10    testimony.  She said she was reimbursed for travel, your

11    Honor.  Of course, she said to you she doesn't remember

12    the amount that she's paid.  She only has testified as a

13    prosecution witness for the New York State Police

14    Forensic Unit, your Honor.

15           More tailored testimony would be from

16    Detective Dale Denehy.  He also, as well as all the

17    police officers, would have you believe 12:45, 12:46,

18    you have a minute or two this whole incident happened,

19    it was light and you could see from the lights in the

20    streets how bright it is.  Well, if it were that bright,

21    why, why would Detective Denehy go over to Officer

22    Kraemer and take his gun out at Officer Kraemer and aim

23    at Officer Kraemer if he was seeing what was going on,

24    your Honor?  I submit nothing was going on here, your

25    Honor.  Why would he go over to a police officer?  And I

1    realize that police officer was in plainclothes, but in

2    his testimony he testified once he realized it was

3    Detective Kraemer, he then pursued the other subject.

4         What Dale -- so Dale Denehy's actions shows

5    that there was no turning of an arm.  There was no

6    reaching back.  There was no shooting.  There was Duane

7    Costa running with Officer Kraemer running after him.

8    That's what was going on here.  No shooting of a weapon.

9    No intending to cause the death of an officer or

10   attempting to cause the death of a police officer, your

11   Honor.  No using of a firearm, your Honor.  Incredible

12   testimony.

13        So you have the first two officers that I

14   talked about, Detective Rilling and Detective Kraemer

15   telling you about movements he could see.  Officer

16   Denehy who was on a different street, he's on Clinton

17   Street.  He tells you he can hear shots but doesn't see

18   where the shots came from and goes over on this dark

19   evening to Police Officer Kraemer and takes his gun out.

20   And he tried to say that he saw a movement of Duane

21   Costa's arm.

22        Well, if Duane Costa moved his arms, then why

23   did he go after Detective Kraemer?  That's because I

24   submit Duane Costa never moved his arms back.  He was

25   running.  And I submit it's tailored and I submit when

Kathi A. Fedden, Sr. Court Reporter

1    you do run, you don't run with your arms perfectly still
2    either, your Honor.  Nobody walks with their arms --
3    well, people can, but most people don't walk with their
4    arms perfectly still anyway.  But there is no backward
5    motion.  And where is it?  Where is it on the video,
6    that backward motion, that shooting of the weapon?  It's
7    not there.  Just more doubts for which you can attach a
8    reason, your Honor.

9            And I have already mentioned these shots that
10   everybody is saying they heard.  First of all, we don't
11   know where they were heard from.

12           Second of all, we don't hear from a
13   ShotSpotter expert.  We don't know how many shots there
14   were.  We do know the inconsistent testimony of somebody
15   saying, I believe it was Dale Denehy in the grand jury,
16   that first he hears three shots and at trial he tells us
17   there were two shots.  Then when I asked him if his
18   memory got better today than on the day he testified, he
19   said yes.  Incredible.  Something is further from an
20   incident and his memory is better.  It just shows this
21   is all tailored, made up testimony.  Made up to get
22   Duane Costa.  Made up to support there was no reason for
23   this stop.  There was no reason to have it out for my
24   client.

25           You heard from Detective Lee Krill and he

1    gathers evidence and I went through that he gathered

2    what he could find, but there is no bullets.  There is

3    no bullets.  He went through the area.  That's what his

4    expertise is in, gathering evidence.  If there were

5    shots that night, if there were five shots by Duane

6    Costa, your Honor, there would have been bullets found

7    in that area.  They are not found in that area.

8            So there is no bullets on Meriam.  We don't

9    know -- there is just no bullets at all.  What we have

10   are expended cartridges and we have expended cartridges

11   that we don't know when they were left there from, your

12   Honor.

13           And Detective Krill, he doesn't know who

14   placed any of the items where he located it.  He doesn't

15   know who placed the guns there.  He wasn't there at the

16   time, your Honor.  He doesn't know when they were placed

17   there, your Honor.  I submit another police officer

18   placed it or a detective placed it.  He wouldn't know

19   the difference and I submit that's what happened here,

20   your Honor.  More incredible testimony.

21           We hear from Detective Bourke.  Detective

22   Bourke and Detective Denehy, your Honor, don't forget,

23   they are involved in the apprehension of another

24   suspect, your Honor.  That other suspect is handcuffed.

25   That other suspect is placed in a vehicle.  And what

1    they do is they leave this other suspect alone in a

2    vehicle?  All of this is mind-boggling.  All of this is

3    totally incredible and they are going to leave this

4    other suspect and when they leave this other suspect,

5    they hear shots.  They are not radioing in for help at

6    that point, they are leaving their person in a car that

7    they have just arrested and Detective Bourke is watching

8    his partner and he's watching his partner and he wants

9    to make sure his partner is safe and I asked him, you

10   are looking to see that your partner is safe, right?

11        He doesn't see the confrontation between

12   Detective Denehy and Officer Kraemer.  He doesn't see

13   it, but he wants to go over to the officer and he's

14   going to have you believe that he can see Duane Costa

15   with what he believes is a gun.  Incredible, your Honor.

16        How many places can you look?  He can't look

17   behind his head.  Duane Costa is on another Street.  I

18   submit Duane Costa never had a gun, never moved his arm,

19   that it would be totally incredible for Detective Bourke

20   to make that observation, your Honor.

21        He never saw bullets fly over anyone's head.

22   He never saw muzzle flashes.  He doesn't recall when he

23   radios for assistance.  He doesn't recall if flashlights

24   are out.  He sees Costa running, that's what he sees and

25   that's totally incredible that his testimony is focused

1    on Duane Costa running when he doesn't see an incident.

2    And for all we know, your Honor, if he sees his partner

3    detaining or having his gun out towards Detective

4    Kraemer, wouldn't he rush over to there and not rush

5    over to somebody else?  I submit his intention wouldn't

6    even be on Duane Costa.

7            And he also, none of these officers, nobody,

8    Detective Denehy, Detective Bourke, Police Officer

9    Kraemer, Police Officer Rilling, none of them save fact.

10   They make observations and they are willing to let

11   somebody shoot.  Does that make any sense?  If Duane

12   Costa was shooting a weapon, they would have shot back.

13   They are not just going to just say well, let's see what

14   happens.  Let me just see, I'm not going to do anything.

15   It boggles the mind, your Honor.  Common sense-wise,

16   your Honor, it doesn't make any sense.

17           And Detective Bourguignon's testimony,

18   incredible, your Honor.  I submit he is the carrying

19   detective.  The case was passed on to him by Detective

20   Pichardo, your Honor.  He's responsible for the case.

21   He told you I would do anything to get a conviction.  He

22   works with the DA's office.  I submit that that

23   statement, that statement that's in evidence, your

24   Honor, I submit that's not Duane Costa's statement.  I

25   submit that's Detective Bourguignon's statement.  That

1     statement is not video recorded, your Honor.  Duane

2     Costa's not brought up to the DA's office.  There is no

3     video cameras.  We can't see what happened.  We can't

4     see the circumstances that happened.  We do know that

5     Duane Costa was under the influence of alcohol that

6     night.  That's what we know.  We know alcohol was

7     smelled in the car and if Detective Bourguignon wants

8     you to believe he didn't know that, he knew that.  He

9     knew when he was arrested.

10    And Detective Bourguignon and the prosecutors

11    may argue well, it's several hours later, but Detective

12    Denehy -- Detective Bourguignon puts in the statement

13    that Duane Costa had beers in his statement and what the

14    beer was.  Your Honor, if he thought Duane Costa was

15    intoxicated at all, he should have questioned him do you

16    need assistance?  What can I do?  Do you understand what

17    you are signing?  Do you need medical help?  None of

18    that is done here.

19    What do we know?  Duane Costa is brought to

20    that precinct about 1:57 a.m. and we know his rights are

21    supposedly read at about 7:50 p.m. and we know the

22    statement was signed with a time written down of 9:10.

23    What happened from 1:57 a.m. until 7:50 p.m.?  We don't

24    know.  We don't know what happened to Duane Costa.  We

25    don't know if he's beat up, your Honor.  He's under the

1    influence of alcohol, your Honor.  We don't know whether

2    he's had anything to eat, whether he's had anything to

3    drink and we can't see any of that because there is no

4    recording.  We can't see his condition because not only

5    isn't there videotape, not only isn't there body

6    cameras, there is no tape recording of what he said.

7    Conveniently we can't see his condition.

8            We do know that Duane Costa is in an

9    interrogation room, a room that is four by six or five

10   by seven, your Honor.  We know one hand is cuffed to the

11   desk.  Well, the prosecutor may say there is another

12   hand free.  Well, you know why the other hand is free,

13   your Honor?  The other hand is free so Duane Costa would

14   sign his name on a statement, a statement that he knew

15   nothing about, your Honor.  A statement that he didn't

16   comprehend because he was under the influence of

17   alcohol.  He was made to sign Detective Bourguignon's

18   statement, not Duane Costa's statement.

19           Duane Costa could have been given a pen, he

20   could have been given a paper, your Honor.  They knew he

21   knew how to write, right?  They told him where to sign,

22   Detective Bourguignon, where to put his name, where to

23   write yes.  He was never given the choice you can write

24   no.  He was never told you don't have to sign.  So what

25   I submit what you have in evidence is not Duane Costa's

1    signature.  I submit there was no knowing, voluntary

2    waiver of his Miranda rights, your Honor.  That

3    statement was never read aloud by Duane Costa.  They

4    never, Detective Bourguignon never said to Duane Costa,

5    read the first few lines so that I know you are okay.

6    Read the first few lines so that I know you are reading

7    it.  He never read it out loud.

8         I submit this is an interrogation situation

9    where we have an intimidating situation of Detective

10   Pichardo standing, leaning.  We have Duane Costa not

11   free to leave.  We have the door to the interrogation

12   room closed, your Honor.  I submit once again, your

13   Honor, this is not a voluntary statement and you should

14   not consider this statement and that you should

15   disregard it, your Honor.

16        And I asked him if he saw any gunpowder

17   residue on my client's clothing.  He said no.  Did he

18   see any on my client's hands?  He did not, your Honor.

19   Your Honor, is this somebody who we can believe?  This

20   is somebody who there is a founded allegation of police

21   officer misconduct from February 26, 2014 when he sent

22   emails from Police Officer Landman's email without the

23   police officer's knowledge, referring to another as a

24   fagot and referring to another you stupid Spanish

25   accent.  For that he got 40 hours administrative

1    discipline, your Honor.

2             Your Honor, I'm inviting you -- oh, and we

3    heard from Detective Maloney and I already commented on

4    the fact that we didn't have the cameras.  We have no

5    knowledge of that whatsoever and I submit that would

6    exculpate him, your Honor.  I'm inviting you to watch

7    the video from beginning to end and I'm inviting you to

8    carefully look at it, as I'm sure you have and will

9    again, your Honor, and see my client never shoots a

10   weapon, your Honor, and I would submit that you would

11   have no choice whatsoever when going through the counts

12   of the indictment, you will have no choice, there is no

13   showing that he had any intent to cause anybody's death

14   of a police officer, your Honor, or that he had any

15   showing of intent to attempt to cause the death of any

16   police officers.

17             There is no showing that he had any weapon in

18   his hands, your Honor.  There is no showing that he shot

19   that weapon, your Honor.  Based on everything that I

20   have said, there is no showing that he had a weapon at

21   all, your Honor.  So as to the counts of criminal

22   possession of a weapon, as to the counts of criminal use

23   of a firearm, there is no showing whatsoever, your

24   Honor.

25             So, once again, think of your own doubts for

Summations-People                                                        730

1      which you can attach a reason.   More reasonable doubt.

2      I ask you to return a verdict of not guilty on all

3      counts.   Thank you.

4                    THE COURT:   Thank you, Ms. Golombek.

5                    Mr. Rosenblatt.

6                    MR. ROSENBLATT:   Thank you.

7                    May I proceed, your Honor?

8                    THE COURT:   Yes.

9                    MR. ROSENBLATT:   In the early morning hours of

10     October 28, 2018 officers from the Bureau of Special

11     Operations or BSO for short were doing routine patrol in

12     the Village of Hempstead.   Two of those officers,

13     Officer Tom Rilling and Officer Kenneth Kraemer were

14     inside their unmarked Chevy Tahoe.   Little did they know

15     that moments later this defendant, Duane Costa would

16     forever alter their lives and the lives of two other BSO

17     officers because on October 28tnh this defendant tried

18     to kill four members of the Nassau County Police

19     Department.

20                    After a routine car stop, this defendant

21     pushed Officer Tom Rilling and fled.   And as the

22     defendant ran, he dropped a loaded .40 caliber Smith &

23     Wesson.   This defendant then pulled out a second weapon,

24     a Czech gun and fired multiple rounds at Officer Tom

25     Rilling and Officer Ken Kraemer.   The defendant

1     continued running.  And as he ran, he fired more.  He

2     fired at least two more shots at Officers Dale Denehy

3     and Niall Bourke.  In total, the defendant fired at

4     least five rounds at four different police officers.  He

5     fired at least five rounds at the police trying to kill

6     them and ultimately they found the defendant hiding in a

7     backyard in close proximity to the gun that he had just

8     used to fire at them.  In total, two guns were

9     recovered, five shell casings and the defendant here in

10    the County of Nassau tried to end the lives of those

11    four men.

12            So during my summation I'll talk to you about

13    how we had proved the defendant guilty of all of the

14    counts before you and I want to start by talking about

15    count one, the attempted murder of a police officer, in

16    particular, Tom Rilling.

17            You know that we proved the defendant guilty

18    beyond a reasonable doubt of this count and I want to

19    talk to you about the first two elements that when the

20    defendant fired the Czech gun, captured here in Exhibits

21    8 and 24, the CZ 52 gun, the defendant attempted to

22    cause the death of Officer Rilling and he did so with

23    the intent to cause his death.

24            On October 28th at the time of the car stop

25    the defendant had two guns in his possession.  After the

Kathi A. Fedden, Sr. Court Reporter

1    defendant pushed Officer Rilling and ran, the defendant

2    was ahead of him.  The defendant was approximately five

3    to eight feet in front of Officer Rilling and at that

4    time Officer Rilling ordered the defendant to stop.  But

5    this defendant didn't stop.  As this defendant ran, the

6    defendant knew that he couldn't be caught.  And as he

7    ran, he went to his waistband.  The defendant went to

8    the .40 caliber Smith & Wesson captured here on Exhibit

9    23.  This Smith & Wesson, the first gun the defendant

10   went to that night, was loaded as you can see from the

11   photo.  On October 28th that gun was loaded and

12   operable.  And as he ran, the defendant went for this

13   gun because he wanted to use that gun against the

14   police.  And as the defendant went for that first gun,

15   this .40 caliber Smith & Wesson, he dropped it seen here

16   on the bottom right of Exhibit 1.  But the defendant

17   didn't stop when he dropped gun one.

18              At the moment after his first gun fell to the

19   cement and bounced to the grass, as seen here in Exhibit

20   9, the defendant went for his second gun and you know

21   that the defendant wanted to fire that gun at the police

22   because after gun one dropped, he didn't stop for the

23   police, he continued running.  You know the defendant

24   wanted to fire at the police because after gun one

25   dropped, he went for gun two.  And you know he intended

Kathi A. Fedden, Sr. Court Reporter

1    to kill the police because of what he did with that

2    second gun.  Then in his hand was this gun, pictured in

3    Exhibit 24 and recovered there at Exhibit 8, this CZ

4    gun.  The defendant had it in his hand and he racked

5    that gun while running.  And as he racked that gun,

6    Officer Rilling eventually got into a position to fire

7    his weapon.

8              He continued giving more police commands.  He

9    yelled, Police, stop running, don't move, drop the gun.

10    But the defendant didn't listen to any of the police

11    commands given to him.  After the defendant racked the

12    CZ gun, it was loaded and ready to be fired.  And the

13    defendant, with that loaded Czech gun in his hand, a

14    bullet in the chamber ready to be discharged with the

15    pull of a trigger and with the defendant's intentional

16    pull of that trigger, it would fire and he would fire

17    that gun.  The defendant didn't listen to the police

18    commands because he wanted to get away.

19              When the police continued to chase him, he

20    needed them to stop.  He wanted them to stop.  And the

21    only way that he would avoid being caught with two guns

22    was to eliminate the cops who were trying to catch him.

23    And the defendant wanted to eliminate them by trying to

24    kill them.  And as he ran and as he racked the second

25    gun because he wanted to fire it at the police, this

Summations-People

677

1    defendant would fire at the police.  And as Officer

2    Rilling began chasing the defendant again, the defendant

3    began firing.  And as Officer Rilling was chasing and

4    Officer Kraemer was chasing while running, this

5    defendant turned and with his right arm extended,

6    pointed that CZ gun at the direction of Officers Rilling

7    and Kraemer.  And at that moment Officer Rilling told

8    you that this defendant fired two rounds.

9         The firing of that weapon while running is

10   significant because it's at that time the defendant

11   realized the police haven't stopped chasing after him.

12   The police haven't given up.  The police were chasing

13   him and he didn't want to be caught.  He couldn't be

14   caught.  And his intent, his intent to kill Officer

15   Rilling can be inferred from his actions as he continued

16   to run.  And when you evaluate whether the defendant

17   attempted to cause the death of Officer Rilling, you

18   know he intended to kill.

19        As your Honor is intimately aware, intent

20   doesn't require premeditation.  Intent doesn't require

21   advanced planning.  It's not necessary that the intent

22   be in a person's mind for any particular period of time.

23   Intent can be formed and need only exist at the very

24   moment and not at any earlier time.  And the moment that

25   this defendant pulled out that second gun and pointed at

1     Officer Rilling, he had the intent to cause death.  And
2     you know the defendant had the intent to cause death
3     because of the location of where this defendant aimed
4     and fired that gun.
5          Common sense tells us, your Honor, that the
6     two most fatal locations to shoot are the head and the
7     heart.  And when the defendant fired the gun, when
8     Officer Rilling was the closest to him, he chose to fire
9     it at the direction of Officer Rilling's head.  He chose
10    to fire at the most vulnerable part of the human body.
11    And at the time the defendant racked the gun while
12    running, the defendant was only six to eight feet ahead
13    of Officer Rilling.  You know that contained here on
14    page 127 of the transcript.  At the moment when this
15    defendant pointed the gun at Officer Rilling --
16         MS. GOLOMBEK:  Objection.  I don't believe
17    this is proper, your Honor.
18         THE COURT:  This is the trial transcript?
19         MR. ROSENBLATT:  Yeah.
20         THE COURT:  Overruled.
21         MR. ROSENBLATT:  It was at this moment when
22    the defendant pointed the gun at Officer Rilling.  He
23    aimed it directly at him.
24         On page 30, Question:  Where was the gun
25    aimed?

Kathi A. Fedden, Sr. Court Reporter

1    Answer:  It was aimed up.  It was aimed, you

2    know, directly for me.

3    When the defendant fired shot one, he was at a

4    range close enough to cause the death of another person.

5    It was from that close distance that this defendant

6    chose to aim his gun directly at the head of the police.

7    He aimed it directly for him.  And after he fired his

8    gun at the police from that close distance, he had

9    another choice.  He chose to fire that weapon again at

10   Officers Rilling and Kraemer.  He chose to fire it

11   again.  He chose to fire it two times.

12   How do you know that the defendant intended to

13   cause Officer Rilling's death?  Because after he dropped

14   that .40 caliber Smith & Wesson and after he fired round

15   one from that CZ gun, the defendant didn't give up.  He

16   didn't stop shooting.  He didn't stop running.  Instead,

17   he fired again.  And you know his intent was to kill

18   because of where he fired that gun the second time, a

19   second time at the direction of the head of a police

20   officer.  And after missing his target from six to eight

21   feet away, the defendant made the decision to fire his

22   gun again.  And that's how you know on October 28th this

23   defendant wanted to kill Officer Rilling and Officer

24   Kraemer.

25   You also know that how the defendant intended

Kathi A. Fedden, Sr. Court Reporter

1      to cause the death of Officer Rilling and Kraemer

2      because of where he aimed the gun before he fired those

3      first two times.  Calling the Court's attention to page

4      129 to 130 of the transcript.

5                Can you describe the sound?

6                Yeah.  It's kind of a zipping sound or a crack

7      and the only -- I could describe it sounded like an

8      angry bee kind of zipping.

9                Continue on page 130.  Describe how far the

10     bullet was from you?

11               Answer:  Yeah, I felt it pass and I heard it

12     pass.  I think it was within two to three feet.

13               Question:  What part of your body?

14               Answer:  My head, my ear.

15               For those first two shots, this defendant

16     aimed his gun directly at those members of the Nassau

17     County police and but for the Grace of God the defendant

18     missed.  When he fired his gun at Officer Rilling and

19     Officer Kraemer, the defendant wanted those two members

20     of the police to die.  He didn't want to be arrested.

21     He didn't want to be caught.  He didn't want to be

22     stopped and so he fired again.  He wanted no witnesses,

23     that is why he fired multiple shots.

24               The defendant fired shot two immediately after

25     shot one at Officers Rilling and Kraemer because when he

1    missed with shot one, he wanted to kill him, so he shot

2    again.  And you can infer his intent from not just the

3    first two shots, but because of the amount of times he

4    fired at the police.  He shot at least five rounds

5    because he wanted to kill the people chasing him.

6         So how you know that elements three and four

7    were met is that at the time of the attempted killing of

8    Officer Rilling he was the police officer engaged in the

9    course of performing his official duties and the

10   defendant knew or should have known he was a police

11   officer.  You can infer that.  You don't need to infer

12   it, Judge, Officers Rilling and Kraemer said he admitted

13   it in his own statement.

14        You know Officers Rilling and Kraemer were

15   officers engaged in official duties because at the time

16   of the car stop they were members of the BSO in the

17   Village of Hempstead here in the County of Nassau.  And

18   you knew the defendant knew or should have known they

19   were police officers because they pulled over the

20   defendant and his friend with lights and sirens.  Any

21   reasonable person knows or should know the act of

22   police.  As they approached they each had their police

23   shield displayed on a necklace and you know the

24   defendant knew they were police because you heard he

25   provided his license to Officer Rilling.  The defendant

Kathi A. Fedden, Sr. Court Reporter

1    knew Officers Rilling and Kraemer were members of the

2    police because both him and Ms. Grant gave their license

3    over.  Both of them answered their questions and so you

4    don't even need to rely on the testimony that the

5    defendant knew.  In the defendant's own statement he

6    tells you that he knew.  I'll get to the signed

7    statement in a moment.

8         But that statement also proves the final

9    element of attempted murder of a police officer because

10   the defendant admitted his age in that statement, that

11   the defendant was more than 18-years-old at the time of

12   the commission of the crime.  You know from the

13   statement that the defendant was 37-years-old at the

14   time of the crime based on the statement to the police.

15        So what's the defense?  The defense claims

16   it's a racial situation.  There was a planting of

17   weapons, that he never fired this gun.  Well, your

18   Honor, you had the opportunity to watch and listen to

19   the testimony of officers in this case.  Officer Rilling

20   was a member or has been a member of the Nassau County

21   Police Department since 2005.  He was a member of the

22   U.S. Marine Corp. for four years from 1999 to 2003.  He

23   fought for the country during 9/11 and has dedicated

24   over 20 years of his life to serve the public.  Officer

25   Rilling has absolutely no reason to distort the truth

Kathi A. Fedden, Sr. Court Reporter

1      and make up how close he came to dying in October of

2      2018.

3                    MS. GOLOMBEK:  Objection; vouching.

4                    THE COURT:  Overruled.

5                    MR. ROSENBLATT:  There is absolutely no

6      evidence of any prior actions with this defendant.  No

7      history between them.  No reason to hate this defendant

8      prior to the defendant trying to end his life.  There is

9      no evidence in the record to suggest Officer Rilling

10     would come before the Court and intentionally and

11     blatantly lie about a car stop and the defendant's

12     reaction after it.  Officer Rilling's testimony alone

13     proves the defendant guilty of count one.

14                    In fact, your Honor, based on the testimony of

15     Officer Rilling and his testimony alone that the

16     defendant fired the gun and that bullet buzzed by his

17     ear, I submit in order to acquit this defendant of count

18     one, you would have to completely discredit his

19     testimony in its entirety.  You would have to find him

20     incredible.  And there is not one iota of evidence to

21     suggest he was not worthy of your Honor's belief.

22                    The testimony of Officers Denehy, Bourke and

23     Kraemer further prove he intended to kill Officers

24     Rilling and Kraemer.  And you know that because when the

25     next two officers in this defendant's sight told him to

Kathi A. Fedden, Sr. Court Reporter

1    stop, he fired at them too.

2           Officer Ken Kraemer has been a member of the

3    police department for 16 years, eight years working for

4    BSO.  Over half his career has been dealing with hostage

5    situations, high risk search warrants and anti crime.

6    He spends his work days doing the work that keeps the

7    citizens of this county safe.

8           MS. GOLOMBEK:  Objection, Judge.

9           THE COURT:  Overruled.

10          MR. ROSENBLATT:  There is nothing to suggest

11   that he is the type of person to come before you and

12   distort the truth to you.

13          Now Detective Niall Bourke has been working

14   for 16 years, five years in BSO.  Dale Denehy worked in

15   law enforcement for over 27 years before retiring.  None

16   of these men have given any indication to you or any

17   reason to not credit their testimony.  In fact, I submit

18   to you that the testimony that they gave is consistent

19   with the other physical evidence that is before you.

20          Count two is the attempted murder of Police

21   Officer Kraemer.  Officer Kraemer told you how the

22   defendant was running and how he observed this defendant

23   point the gun at him.  This can be found on page 111 of

24   the transcript, lines 17 through 25.  As Officer Rilling

25   gave chase, Officer Kraemer chased after the defendant

1     as well.  The defendant was further away from Officer

2     Kraemer at first.  Remember, that's because Officer

3     Rilling was immediately pushed by the defendant and then

4     immediately gave chase.  Officer Kraemer was with

5     Ms. Grant before he gave chase.  Officer Kraemer told

6     you in the transcript, page 15, lines six to nine, that

7     the defendant got halfway or three quarters of the way

8     down the block and he heard a loud bang and saw a muzzle

9     flash.  Quote, "I heard two pops go off.  As Officer

10     Kraemer ran, he ran on the sidewalk just as Officer

11     Rilling was running on the sidewalk.  That's found on

12     page 13 of the transcript, line 22.

13           Both of them, Officers Kraemer and Rilling

14     were running on the same sidewalk after the defendant.

15     Both of them gave chase after the defendant.  Both of

16     them were in close proximity to each other as they

17     chased the defendant and as Officer Rilling posted up to

18     see if he could get a clean shot at the defendant, a

19     shot that would have been safe on a residential block in

20     Hempstead in the night, Officer Kraemer kept running.

21     And at that time Officer Kraemer ran past Officer

22     Rilling and continued running on the same sidewalk, the

23     same sidewalk that the defendant was running.

24           Officer Kraemer told you that as the defendant

25     fired those first two shots, the defendant turned back

1    with his right arm and pointed and fired the gun.  And

2    as the defendant was running down Midwood and fired, it

3    was aimed at both Officers Rilling and Kraemer.  That's

4    found in page 111 of the transcript.

5        It was aimed towards both Kraemer and Rilling

6    because they were both running on the same sidewalk

7    after the defendant.  The defendant not only intended to

8    kill Officer Rilling, he intended to kill Officer

9    Kraemer.  And just as I argued the location and

10   placement of the weapon and the shots earlier, it

11   applies to count two for Officer Kraemer.

12       Not one police officer fired their weapon at

13   this defendant.  Not one.  Ms. Golombek has this claim

14   of innocence.  In our society where the police are

15   consistently and often inaccurately portrayed as using

16   their service weapons inappropriately or unnecessarily,

17   these four men didn't do it.  These four men didn't fire

18   one time at this defendant.  None of them discharged

19   their weapon at the defendant.  And instead of

20   Ms. Golombek praising them or thanking them for their

21   care and civility of Mr. Costa, the defense attempts to

22   make these officers out to be some sort of plants

23   because of it.

24       The attempt by the defense to make this

25   cautious and intelligent decision not to fire their

1   service weapon at the defendant is an absurd defense.

2   The decisions by these four officers not to return fire

3   at this defendant was safe and prudent.

4              MS. GOLOMBEK:  Objection; vouching.

5              THE COURT:  Overruled.

6              MR. ROSENBLATT:  Their decision not to fire is

7   an example and evidence that your Honor should consider

8   that these four men are cautious and responsible members

9   of law enforcement.

10             MS. GOLOMBEK:  Objection; vouching.

11             THE COURT:  Overruled.

12             MR. ROSENBLATT:  While during this trial their

13  decisions not to fire were attempts to be used to impugn

14  their credibility, the facts in evidence before your

15  Honor are to the contrary.  The decision by these four

16  men not to fire is evidence that your Honor should

17  consider that they are reasonable.  The decision is

18  evidence that your Honor should consider for their

19  trustworthiness.  It's evidence of their care and

20  caution.  It's evidence why they should be believed when

21  they testified to what they did and what they saw.

22             Their claims about the police pulling over the

23  defendant because he was black or because they were out

24  to get him or because they wanted to pin something on

25  him are absurd.  They are illogical, they are

1    unreasonable and they are not supported by one iota of

2    evidence that was heard in this courtroom.  Instead, the

3    evidence in this trial was consistent with members of

4    the police department on October 27th into the early

5    morning hours of October 28th trying to provide some

6    sense of safety for the citizens of the Village of

7    Hempstead.

8         So now that I have proven and explained to

9    your Honor as to why the defendant is guilty of counts

10   one and two, I want to move to the other counts.

11        As now retired Officer Dale Denehy approached

12   Midwood and Clinton he also observed the defendant

13   running.  This time the defendant was observed running

14   directly towards Officer Denehy.  He observed what

15   appeared to be a gun in his hand and you now know it

16   was, in fact, the CZ gun in his hand.  Officer Denehy

17   screamed out commands for the defendant to stop running.  As

18   more police commands, but the defendant didn't stop.  As

19   Officer Denehy was at the corner of Clinton and Midwood

20   and the defendant turned down Clinton, he began firing

21   again.  This time he was firing at Officers Denehy and

22   Bourke who were both on Clinton.  Officer Denehy told

23   you the defendant's arm was up.  And you know that the

24   defendant was trying to kill both him and Officer Bourke

25   from the evidence adduced at this trial.

1           Now Detective Niall Bourke told you that he

2    saw the defendant turn the corner of Clinton and Midwood

3    and run on Clinton.  Detective Bourke observed the

4    defendant with what appeared to be a gun.  Now you know

5    that gun was the CZ gun.  And as Detective Bourke

6    observed the defendant run, he saw this defendant point

7    back with a firearm in his right hand.  He saw the

8    defendant raise his hand over his shoulder and Detective

9    Bourke heard the gunshots.  And at that time Detective

10   Bourke heard two more gunshots.

11           You know from the evidence elicited at this

12   trial that the defendant was shooting again at the

13   police, trying to kill those two officers.  The video

14   evidence and the ballistics evidence corroborates all of

15   this testimony.  The evidence and testimony proved the

16   defendant's intent was to kill.  This is slide two.

17   Excuse me, this is Exhibit 2.  You can see on the far

18   side of the photo the police car.  That was the location

19   of the car stop, of the initial car stop by Officers

20   Rilling and Kraemer.  Right below it is the yellow

21   marker which is the location of the .40 caliber Smith &

22   Wesson located on the bottom of Exhibit 1.  This is the

23   photo from that other direction.

24           Exhibit 23 shows that Smith & Wesson that the

25   defendant dropped.  This is Exhibit 40 between 52 and 57

1    seconds and you can see on the top right portion you can

2    see the defendant running.  There on the top right

3    portion you see the defendant running.  Then between

4    1:06 and 1:11 in Exhibit 40 you can see in the top right

5    corner, Officer Kraemer giving chase.

6              Here in Exhibit 40 between 1:37 and 1:46 in

7    the top right portion you can see the defendant

8    discharge his firearm.  That is the last shot that he

9    fired on Midwood, that third shot.

10             This is Exhibit 11.  That white House in the

11   middle of Exhibit 11 is Midwood Street where that

12   camera, where that surveillance camera was recovered.

13             Here's Exhibit 1, that same white House next

14   to the yellow fence, that's the camera angle we just saw

15   that showed the defendant running just as he hit the

16   corner of Midwood.

17             This is Exhibit 13 that depicts the three

18   casings on Midwood Street.  I submit to you that on the

19   bottom was the first shot the defendant fired.  The

20   middle one was the second shot the defendant fired on

21   Midwood and that final one in the distance is the third

22   shot that the defendant fired.  That third shot was the

23   one that was captured on video.

24             I submit to you, your Honor, that one of those

25   first two casings was the one that buzzed by Officer

Kathi A. Fedden, Sr. Court Reporter

1    Rilling's ear.

2              This is Exhibits 11, 12 and 2.  You can see in

3    Exhibit 12 the car stop location of where Officers

4    Rilling and Kraemer first gave chase.  You can see a

5    close-up -- excuse me, you can see the cone for one

6    which is where the Smith & Wesson was recovered.  You

7    could see where the defendant ran, that first pole, that

8    second pole and you can see in Exhibit 11 that Midwood

9    camera.  The cones in Exhibit 11 depict the location of

10   the casings that were recovered.

11             This is Exhibit 11 again, so you can see with

12   that Midwood house where the camera was recovered, that

13   surveillance camera was recording, shots one, two and

14   three by the cones of where the casings were recovered.

15             Right where that red circle is, your Honor, on

16   this slide between 1:31 and 1:41 you could see the

17   muzzle flash of the defendant firing that weapon just by

18   the bush on the right-hand side.  That location captured

19   on that video in Exhibit 40 between 1:39 and 1:41 is

20   exactly the location of that third shot captured here in

21   Exhibit 10 by that casing.  That's the third shot that

22   Officer Kraemer depicts in his testimony -- excuse me,

23   Officers Kraemer and Bourke both say there are two shots

24   fired and a later time there is a third shot.  It shows

25   first two shots were fired at Officers Rilling and

Kathi A. Fedden, Sr. Court Reporter

1    Kraemer.  Both of them told you that they hear first two
2    shots and then a third.

3                On page 210 of the transcript Officer Rilling
4    testified there was a first shot, there was a second
5    shot and a third shot was a couple of seconds later.
6    Consistent with the physical evidence that was recovered
7    at the scene and depicted on the camera.

8                Officer Kraemer told you on page 39 of the
9    transcript that he heard three shots on Midwood.
10   Officer Kraemer told you on page 16 of the transcript
11   he's running eastbound, he turns back, two quick rounds
12   and then another.  He came down a little bit and then
13   another round after that, three muzzle flashes.

14               On cross-examination on page 95 of the
15   transcript, line 19, Officer Kraemer told you that he
16   heard on Midwood three shots.  He heard two and then he
17   heard another one.  The video evidence corroborates the
18   fact that one of those first shots was fired at Officer
19   Rilling's head, the second one fired at both Officers
20   Rilling and Kraemer and the third captured on the
21   surveillance video.

22               This slide which captures the image from the
23   timeline, Exhibit 10 with the Midwood camera, shows you
24   that the same bush that you see on the timeline video
25   where the defendant fired his weapon is the same bush by

 1          the fence captured on Exhibit 10, which is where the

 2          third casing was recovered.

 3                   After the defendant fired that third round on

 4          Midwood, he came up and made the right on Clinton as

 5          depicted on this video.  You could see on this video the

 6          police siren and the car in the top left portion of

 7          where Officers Denehy and Bourke were located.

 8                   Here on Exhibit 33 you could see Officer

 9          Denehy with his gun extended towards Officer Kraemer.

10          You could see now Detective Bourke right near that car

11          on Clinton.  Here on the timeline video captured between

12          3:12 and 3:23, you could see this defendant running.

13          You could even see his head turning, running past the BP

14          gas station.

15                   And here in Exhibit 40 between 3:37 and 3:50

16          you will see the smoke emanating from the defendant's

17          gun as he fired on the BP gas station.  There it is.

18          And just as you see the smoke, the defendant is running

19          away from the BP gas station.  How do you know that this

20          is where the defendant fired one of his other shots by

21          the BP gas station?  Because Maria Rauche told you on

22          page 231 of the transcript that when the trigger of a

23          gun is pulled it causes the combustion and explosion

24          effect just as depicted here on the timeline video

25          between 3:37 and 3:50.

1    And where is that smoke?  Here's the smoke

2    photo on Exhibit 40 and Exhibit 14 which is the still

3    photograph from the BP gas station.  Just where the

4    defendant would have fired that gun is one of the

5    casings that was recovered by the BP gas station.

6    Detective Bourke told you that the defendant's

7    arm was extended and pointing at him.  It wasn't

8    pointing down.  And you know that it was the defendant

9    who was running because not only did he give his ID to

10    Officer Rilling, he was arrested and found with the same

11    jacket a short while later.

12    Here in Exhibit 37 is the defendant running

13    with the gun in his hand and a black jacket.  Here on

14    the bottom is Exhibit 6, the black jacket was recovered.

15    Your Honor, this is the map that is in

16    evidence.  And the blue line in this map indicates where

17    the defendant ran and it's captured on the video.

18    Exhibit 6 is the jacket, Exhibit 8 is the gun.  Where

19    was the jacket and the gun recovered?  Right by the

20    alley where the defendant was seen entering.  Right in

21    the backyard where that house leads to.

22    It's not only the testimony of the officers,

23    but it's also the defendant's statement that proves him

24    guilty.  And when your Honor looks at the defendant's

25    statement, I ask you not to -- I ask you to examine it

Kathi A. Fedden, Sr. Court Reporter

1    and look at it not because of everything that was said

2    in it is completely truthful, completely believable or

3    completely accurate.  I'm not asking you to believe that

4    everything the defendant said in that statement was

5    true, but many of the things he said in it were.  Other

6    things that he said in it were an attempt to minimize

7    his responsibility.  Look at it and analyze it because

8    it is what the defendant wrote when confronted

9    immediately after the incident by the police.

10                 He didn't know at that time what evidence they

11    had.  He didn't know what surveillance video they had.

12    Look at it for how he minimizes his own responsibility

13    and minimizes his own culpability and how he attempts to

14    deceive the police in that statement about what his

15    intent was.

16                 The police had his identification card.  His

17    identity was known to them.  He didn't want to get

18    caught and so his only way was to try to kill them, but

19    when he was caught, when they did apprehend him, when

20    they did find him, he needed to minimize his own

21    responsibility.  And so when Miranda was read at 7:00

22    a.m. and his statement was given at 9:10 a.m., he signed

23    both of those pages.  His penmanship and signature on

24    the bottom is nearly perfect, not, not that of somebody

25    who is intoxicated.  And certainly not seven to nine

1    hours after he was apprehended.

2                His statement admits that he possessed the

3    gun.  His statement admits that he gave his ID, that he

4    was drinking a few beers which corroborates the

5    officers' smell of intoxication or, excuse me, smell of

6    alcohol in the car.  He admits that he knew they were

7    going to find the guns and the .40 caliber and the other

8    gun were his.  And he admits he fired between five and

9    six times.

10               Both statements are signed.  Both statements

11   have Miranda warnings on the top of them.  After he ran

12   and he was caught, he was caught in close proximity to

13   the gun in Exhibit 8 and the jacket in Exhibit 6.

14               Detective Krill told you that she recovered

15   the different weapons and the guns and the casings from

16   the street.  They showed you the serial number of the

17   Czech handgun and it matches the evidence that your

18   Honor has.  The Czech gun had a magazine and that

19   magazine was empty.  That magazine was empty because the

20   defendant had fired all of the rounds that were in that

21   Czech gun at the police that day.

22               Detective Krill recovered five casings that

23   were observed along Midwood and Clinton.  She recovered

24   the black jacket the defendant was no longer wearing and

25   the CZ gun.

1    Maria Rauche's testimony proved counts nine

2    through 11.  She told you both guns were working, they

3    were operable, that the .40 caliber Smith & Wesson as

4    indicated in the photo was loaded at the time.  And the

5    only reason that the Czech gun wasn't loaded is because

6    the defendant had fired all the rounds inside of it.

7    The five casings were recovered, and notwithstanding

8    Ms. Golombek's memory, she told you that the five

9    casings from that gun matched the test fires from the

10   Czech gun, meaning that that Czech gun recovered in

11   Exhibit 8 that's in evidence for your Honor matched the

12   five casings.  And once your Honor finds the defendant

13   guilty of count one, the attempted murder of Officer

14   Rilling, and counts nine and ten, then he's guilty of

15   counts 13 and 14 of criminal use.

16   And so, your Honor, I'm asking you to find the

17   defendant guilty of all of the counts before you because

18   of the mountain of evidence before you.  I'm asking you

19   to find the defendant guilty because we have proven the

20   defendant guilty beyond a reasonable doubt.  I'm asking

21   you to hold the defendant accountable because he tried

22   to kill members of the Nassau County Police Department.

23   So for what this defendant did in October of 2018 in the

24   Village of Hempstead here in the County of Nassau for

25   firing at least five shots at four officers, I ask you

Kathi A. Fedden, Sr. Court Reporter

Summations-People

1      to find the defendant guilty of all of the counts that

2      your Honor is asked to consider.  Thank you very much

3      for your time.

4                    THE COURT:  Thank you very much,

5      Mr. Rosenblatt.

6                    I need to review the evidence obviously and I

7      have the transcripts, so I'm going to adjourn the case

8      now for a verdict.  How is December 10th or the 13th,

9      14th, 15th?

10                   MS. GOLOMBEK:  One moment, your Honor.

11                   MR. ROSENBLATT:  The 13th is better.

12                   MS. GOLOMBEK:  The 13th is better, your Honor.

13                   THE COURT:  That's fine.

14                   MS. GOLOMBEK:  I have a lot of cases on.  What

15     time?

16                   THE COURT:  Well, is there a better day that

17     week?

18                   MS. GOLOMBEK:  Yeah, the 16th is a better day

19     for me.  I have less cases on that day.

20                   THE COURT:  How is the 16th for you?

21                   MR. ROSENBLATT:  Could we do the morning,

22     Judge?

23                   MS. GOLOMBEK:  That's fine.

24                   THE COURT:  Sure.  You want to say 11:00 on

25     December 16th?

Kathi A. Fedden, Sr. Court Reporter

1              MS. GOLOMBEK:  Yes, Judge.

2              THE COURT:  So we're adjourned now to December

3    16th at 11 o'clock at which time I will issue my

4    verdict.

5              Have a good rest of the day everybody.

6              MR. ROSENBLATT:  Thank you, Judge.

7              (Whereupon, the trial was adjourned to

8    December 16, 2021.)

9

10        *              *                    *

11

12

13              C E R T I F I C A T I O N

14

15    I hereby certify the within to be a

16    true and accurate transcription of my

17    stenographic notes in the above proceeding.

18

19

20

21              Kathi A. Fedden

22

23

24

25

Kathi A. Fedden, Sr. Court Reporter